IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF NEW YORK

_____

TONYA POWELL,

                         Plaintiff,

                                           Civil Action No.:
      v.                                 3:11-CV-1432  (GTS/DEP)
                                           (Lead Case)

ARTHUR R. JOHNSON, Commissioner
of Department of Social Services, in his official
capacity, and DONNA MURCO, in her official
and individual capacity,

                        Defendants.

_____

TONYA POWELL,

                         Plaintiff,

                                           Civil Action No.:
      v.                                   3:11-CV-1471 (GTS/DEP)
                                           (Member Case)

TONY NICELY, GEICO INSURANCE
in its official capacity, GEOFFREY MILLS,
in his official and individual capacity, BRUCE
JAQUAY, in his official and individual capacity,
ELWIN HOYT, SR ., in his official and
individual capacity, GITHESH RAMAMURTHY,
CCC INFORMATION SERVICES, in its
official capacity ,

                        Defendants.

_____

APPEARANCES:                              OF COUNSEL:

FOR PLAINTIFF:

TONYA POWELL
Plaintiff, *pro se*
26 Meadow Street
Binghamton, New York 13905


DAVID E. PEEBLES
U. S. MAGISTRATE JUDGE


REPORT AND RECOMMENDATION

In this first of these two actions, *pro se* plaintiff, Tonya Powell, has

filed a civil rights complaint alleging that her civil rights were violated,

apparently in association with an investigation conducted by the Broome

County Department of Social Services.  Accompanying her complaint is

an application to proceed *in forma pauperis* ("IFP").

Plaintiff is a familiar litigant to this court.  Over the past eighteen

years, she has filed sixteen lawsuits in this district,[1] including the lead

_____

[1]        *Powell v. Powell*, 3:94-CV-0430; *Powell v. Marine Midland, et al.*, 3:95-
CV-0063; *Powell v. Manny, et al.*, 3:96-CV-1703; *Powell v. Sedula*, 3:96-CV-0436;
*Powell v. Galesi, et al.*, 3:97-CV-0900; *Powell v. Social Services, et al.*, 3:99-CV-2043;
*Powell v. Houser*, 3:00-CV-0666; *Powell v. Nyhoff*, 3:01-CV-1604; *Powell v. American
General, et al.*, 3:02-CV-1605; *Powell v. New York State Board of Law Examiners, et
al.*, 3:04-CV-1125; *Powell v. Mayor Richard A. Bucci, et al.*, 3:04-CV-1192; *Powell v.
Williams*, 3:06-CV-078; *Powell v. U-Haul Int'l*, No.3:10-CV-1531; and, *Powell v. Delta
Airlines*, No. 3:11-CV-1432.

2

action as well the member case, filed eight days later.[2]  In all of these lawsuits she has sought permission to proceed IFP, without the requirement of paying the initial $350 filing fee for commencing an action. Almost all of the these actions brought by plaintiff have been dismissed, the majority *sua sponte* by the court for failure to state a cause of action and/or as frivolous, and the remainder on motions made by the defendants.[3]

        For the reasons set forth below, I recommend that plaintiff's complaints in both actions be *sua sponte* dismissed with prejudice pursuant to 28 U.S.C. § 1915(e)(2)(b) for failure to state a cause of action and as frivolous, and that plaintiff be directed to show cause to this court why she should not be barred from filing any future *pro se* actions in this court without first obtaining leave of the court.

_____

        [2]        Plaintiff's IFP application is presently pending in the later filed action, for which I am also the assigned magistrate judge and which was originally assigned to Senior District Judge Thomas J. McAvoy.  Given the similarity of issues raised by plaintiff's IFP applications in both matters, the court has exercised its discretion in accordance Rule 42(a) of the Federal Rules of Civil Procedure and consolidated *Powell v. Johnson, et al.*, No. 3:11-CV-1432, with *Powell v. Nicely, et al.*, No. 3:11-CV-1471, for the purposes of addressing plaintiff's request to proceed IFP in both cases, designating the former as the lead case and the later as the member case.  *See* Text Order of 12/29/11.

        [3]        Plaintiff sought and was granted leave to withdrawn her complaint in *Powell v. Manny, et al.*, 3:96-CV-1703, Dkt. No. 86.

I.      PROCEDURAL HISTORY

Plaintiff filed her complaint in the lead action on December 8, 2011

under the authority of 42 U.S.C. § 1983, alleging violations of her Fourth,

Fifth, Ninth, and Fourteenth amendment rights.   On December 16, 2011,

plaintiff filed a second, unrelated action.   In that action plaintiff names five

individual defendants and two corporations, alleging a claim for breach of

the implied covenant of good faith and fair dealing apparently arising out

of an automobile insurance claim.   *Powell v. Johnson, et al.*, No. 3:11-CV-

1432. With both complaints she filed applications to proceed IFP,[4] which,

---

[4]      Plaintiff's IFP applications, which she has signed and verified as true
under penalty of perjury, are incomplete and seemingly inconsistent.   *Compare Powell
v. Johnson*, No. 3:11-CV-1432, Dkt. No. 2, *with Powell v. Nicely, et al.*, No. 3:11-CV-
1471, Dkt. No. 2.   On her application in the lead case plaintiff has neglected to fully
answer question three, which requests plaintiff to identify sources of income,
responding only that she is on Medicare, that her disability payments have been
terminated, and that she has received approximately $400-600 per month from self-
employment.   *See Powell v. Johnson*, No. 3:11-CV-1432, Dkt. No. 2, at ¶ 3.   She also
states that she owns nothing of value and that she supports a grandson, for whom she
receives $200 per month for support.   *Id.* at ¶¶ 5-6.   In her second IFP application, filed
just eight days later, plaintiff similarly fails to completely respond to question three, and
identifies a greater monthly income of $900 from part-time self-employment, described
as mail orders of books or CDs.   *Powell v. Nicely, et al.*, No. 3:11-CV-147, Dkt. No. 2,
at ¶ 3.   In contrast to the earlier application, plaintiff identifies a vehicle valued at
$10,000-10,500 as property that she owns.   *Id.* at ¶ 5.   Again, she identifies a
grandson as a depend and vaguely states "100%.  I receives [sic] child support for
him."  Plaintiff's failure to fully complete these IFP applications alone is sufficient to
warrant denial of her request.   *See Oparaji v. Atlantic Container Line*, No. 07 Civ. 2124
(GEL), 2008 WL 4344522, at * 2 (S.D.N.Y. Sep. 23, 2008).   Additionally, section
1915(e) provides that if at any time the court determines that an allegation of poverty in
an IFP application is untrue, it "shall" dismiss the case.   *Vann v. Horn*, No. 10 Cv.
6777(PKC), 2011 WL 3501880, at *1 (S.D.N.Y. Aug. 9, 2011) (quoting 28 U.S.C. §
1915(e)(2)(A)).   In this regard, it is worth noting that while a mere misstatement on an

if granted, would allow plaintiff to proceed without paying the $350 filing

fee for commencement of an action.  Those IFP applications, filed

pursuant to 28 U.S.C. § 1915, require the court to engage in a *sua sponte*

review of the complaints to determine their facial sufficiency.

II.     GENERAL PRINCIPLES GOVERNING THE COURT'S REVIEW

        A.     Section 1915 Standard of Review

        Section 1915(e) directs that, when a plaintiff seeks to proceed *in*

*forma pauperis*,

>       (2) . . . the court shall dismiss the case at any time if the court
>       determines that – . . . (B) the action . . . (I) is frivolous or
>       malicious; (ii) fails to state a claim on which relief may be
>       granted; or (iii) seeks monetary relief against a defendant who
>       is immune from such relief.

28 U.S.C. § 1915(e)(2)(B).  Thus, the court has a gatekeeping

responsibility to determine that a complaint may be properly maintained in

this district before it may permit a plaintiff to proceed with an action *in*

*forma pauperis*.  *See id*.

        In deciding whether a complaint states a colorable claim a court

_____

IFP application does not justify dismissal, where the misstatement is so egregious as
to rise to the level of fraud or bad faith dismissal will eventuate.  *Morales v. E.I. Du*
*Pont De Nemours and Co.*, No. 02-CV-786A(F), 2004 WL 2106590, at *2 (W.D.N.Y.
Sep. 21, 2004) (citing cases).  At this juncture, it does not appear that plaintiff's
misstatement of her assets is so flagrant as to constitute fraud or bad faith.

must extend a certain measure of deference towards *pro se* litigants,
*Nance v. Kelly*, 912 F.2d 605, 606 (2d Cir. 1990) (per curiam), and
extreme caution should be exercised in ordering *sua sponte* dismissal of a
*pro se* complaint before the adverse party has been served and the
parties have had an opportunity to respond, *Anderson v. Coughlin*, 700
F.2d 37, 41 (2d Cir. 1983).  There is, nonetheless, an obligation on the
part of the court to determine that a claim is not frivolous before permitting
a plaintiff to proceed.[5]  *See Fitzgerald v. First East Seventh St. Tenants
Corp.*, 221 F.3d 362, 363 (2d Cir. 2000) (District Court may dismiss
frivolous complaint *sua sponte* notwithstanding fact the plaintiff has paid
statutory filing fee); *Wachtler v. County of Herkimer*, 35 F.3d 77, 82 (2d
Cir. 1994) (District Court has power to dismiss case *sua sponte* for failure
to state a claim).

When reviewing a complaint under section 1915(e), the court may

---

[5]    "Legal frivolity . . . occurs where 'the claim is based on an indisputably
meritless legal theory [such as] when either the claim lacks an arguable basis in law, or
a dispositive defense clearly exists on the face of the complaint.'"  *Aguilar v. United
States*, Nos. 3:99-MC-304, 3:99-MC-408, 1999 WL 1067841, at *2 (D. Conn. Nov. 8,
1999) (quoting *Livingston v. Adirondack Beverage Co.*, 141 F.3d 434, 437 (2d Cir.
1998)); *see also Neitzke v. Williams*, 490 U.S. 319, 325, 109 S. Ct. 1827, 1831 (1989)
and *Pino v. Ryan*, 49 F.3d. 51, 53 (2d Cir.1995) ("[T]he decision that a complaint is
based on an indisputably meritless legal theory, for the purposes of dismissal under
section 1915(d), may be based upon a defense that appears on the face of the
complaint.").

also look to the Federal Rules of Civil Procedure.  Rule 8 of the Federal

Rules of Civil Procedure provides that a pleading that sets forth a claim for

relief shall contain "a short and plain statement of the claim showing that

the pleader is entitled to relief [.]"  Fed.R.Civ.P. 8(a)(2).  The purpose of

Rule 8 "'is to give fair notice of the claim being asserted so as to permit

the adverse party the opportunity to file a responsive answer [and]

prepare an adequate defense.'"  *Hudson v. Artuz*, No. 95 CIV. 4768, 1998

WL 832708, *1 (S.D.N.Y. Nov. 30, 1998) (quoting *Powell v. Marine

Midland Bank*, 162 F.R.D. 15, 16 (N.D.N.Y.1995) (quoting *Brown v.

Califano*, 75 F.R.D. 497, 498 (D.D.C.1977))) (other citation omitted).[6]

When evaluating the facial sufficiency of a pleading, a court should

not dismiss a complaint if the plaintiff has stated "enough facts to state a

claim to relief that is plausible on its face."  *Bell Atl. Corp. v. Twombly*, 550

U.S. 544, 570, 127 S. Ct. 1955, 1974 (2007).  "A claim has facial

plausibility when the plaintiff pleads factual content that allows the court to

draw the reasonable inference that the defendant is liable for the

misconduct alleged."  *Ashcroft v. Iqbal*, 556 U.S. 662, 129 S. Ct. 1937,

1949 (2009) (citation omitted).  Although the court should construe the

---

[6]      Copies of all unreported decisions cited in this document have been
appended for the convenience of the *pro se* plaintiff.

factual allegations in the light most favorable to the plaintiff, "the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions." *Id.*, 129 S. Ct. at 1949  "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.*  (citing *Twombly*, 550 U.S. at 555, 127 S. Ct.1955).  Thus, "where the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged-but it has not 'show[n]'-'that the pleader is entitled to relief.'"  *Id.* at 1950 (quoting Fed. Rule Civ. Proc. 8(a)(2)).

III.   ANALYSIS OF PLAINTIFF'S CLAIMS IN POWELL v. JOHNSON, ET AL.

   A.   Background[7]

   In her complaint,[8] plaintiff alleges that her civil rights were violated when an investigation of a false claim of child abuse was conducted and

---

   [7]   Since the court will employ the same standard applicable on a Rule 12(b)(6) motion to dismiss in reviewing plaintiff's complaint, the following recitation is drawn principally from plaintiff's complaint, the contents of which have been accepted as true for purposes of the court's section 1915 review.  *See Erickson v. Pardus,* 551 U.S. 89, 94, 127 S. Ct. 2197, 2200 (2007) (citing *Bell Atl. Corp.*, 550 U.S. at 555-56, 127 S. Ct. at 1965); *see also Cooper v. Pate*, 378 U.S. 546, 546, 84 S. Ct. 1733, 1734 (1964).

   [8]   Instead of a single integrated pleading, plaintiff filed a document identified as a complaint and attached thereto a motion for permission to pursue an action for violation of 42 U.S.C. § 1983, accompanied by a memorandum of law and an affidavit with an attachment thereto.  In deference to plaintiff's *pro se* status, I will treat these documents together as constituting one pleading.

her name was reported to New York State's central register of suspected child abusers.  It appears from plaintiff's complaint that in or about 2009 she was arrested, held in jail, and criminally accused in connection with the alleged abuse of a child, a charge which she claims was made upon the false accusation of the child's mother.[9]  Thereafter, plaintiff was "notified by the Department of Social Services", although plaintiff's complaint does not provide any detail regarding the notification, and was visited at her home by defendant Murko, an employee of the Broome County Department of Social Services, who advised that she was there to investigate a complaint of endangerment of the welfare of a child.  According to plaintiff, on Murko's arrival, Powell maintained that she was innocent of any such conduct, and advised Murko that the child was fine and that there was no need for an investigation.  Murko "stressed" that she "must" see the child and make a report, and plaintiff apparently permitted her to do so.

Plaintiff claims that she was ultimately cleared of any criminal wrongdoing and attaches to her complaint a letter dated May 7, 2010 from the New York State Office of Children and Family Services, advising that the report of suspected child abuse or maltreatment was determined to be

---

[9]       Plaintiff does identify the date of any of the alleged occurrences in the complaint.  The attachment to her pleading suggests that the investigation by Broome County Department of Social Services began on October 2, 2009.

"unfounded", and that in accordance with New York Social Services Law,
all identifying information in the report has been legally sealed from the
New York State Child Abuse and Maltreatment Register ("State Central
Register").  Plaintiff generally alleges that she has lost income due to the
"false charge" because she could not supplement her income by receiving
children for daycare.  As relief, plaintiff seeks an award of $150,000 "or
more" in compensatory damages.

     B.   <u>Section 1983</u>

Plaintiff brings this action pursuant to 42 U.S.C. § 1983, which
"establishes a cause of action for 'the deprivation of any rights, privileges,
or immunities secured by the Constitution and laws' of the United States."
*German v. Fed. Home Loan Mortgage Corp.*, 885 F. Supp. 537, 573
(S.D.N.Y. 1995) (citing *Wilder v. Virginia Hosp. Ass'n*, 496 U.S. 498, 508,
110 S. Ct. 2510, 2516 (1990) (quoting 42 U.S.C. § 1983)) (footnote
omitted); *see also Myers v. Wollowitz*, No. 95-CV-0272, 1995 WL 236245,
*2 (N.D.N.Y. Apr. 10, 1995) (McAvoy, J.) ("§ 1983 is the vehicle by which
individuals may seek redress for alleged violations of their constitutional
rights." (citation omitted)).  In order to state a claim under section 1983, a
plaintiff must allege that (1) the challenged conduct was attributable, at
least in part, to a person or entity acting under color of state law, and (2)
such conduct deprived the plaintiff of a right, privilege, or immunity

secured by the Constitution or laws of the United States.  *Dwares v. City of New York*, 985 F.2d 94, 98 (2d Cir. 1993); *see also Torres v. Mazzuca*, 246 F. Supp. 2d 334, 342 (S.D.N.Y. 2003) (quoting *West v. Atkins*, 487 U.S. 42, 48, 108 S. Ct. 2250 (1988)).  For the reasons set forth below, I recommend a finding that plaintiff has failed to state a cause of action under section 1983.

          1.    <u>Procedural Due Process</u>

      The essence of plaintiff's complaint appears to be that she was deprived of her Fourteenth Amendment right to due process when her name was placed on the State Central Register without notice and an opportunity to be hear and as a result deprived of supplemental income from her daycare business.  To successfully state a claim under 42 U.S.C. § 1983 for the denial of procedural due process, a plaintiff must show that he or she 1) possessed an actual liberty interest and 2) was deprived of that interest without being afforded sufficient process.  *See Tellier v. Fields*, 280 F.3d 69, 79-80 (2d Cir. 2000) (citations omitted); *Hynes v. Squillace*, 143 F.3d 653, 658 (2d Cir.), *cert. denied*, 525 U.S. 907, 119 S. Ct. 246 (1998); *Bedoya v. Coughlin*, 91 F.3d 349, 351-52 (2d Cir. 1996).

      Plaintiff's claims arise out of an investigation conducted pursuant to Article 6 of New York Social Services Law ("Social Services Law"), which governs the recording and investigation of reports of suspected

11

maltreatment of children and the administrative process by which
substantiated reports may be reviewed.  *See generally* N.Y. Soc. Serv.
Law § 411-428; *see also Valmonte v. Bane*, 18 F.3d 992, 995 (2d Cir.
1994).  Section 422 of the Social Services Law establishes the State
Central Register, which is a database of reports of child abuse maintained
by both the state and various county departments of social services.  N.Y.
Soc. Serv. Law §§ 422(1); *see also id.* at §§ 423(1), 424(2); *Valmonte*, 18
F.3d at 995.  Under that section, when an allegation of child abuse or
maltreatment is received through use of the telephone hotline and "could
reasonably constitute a report of child abuse or maltreatment",[10] such
allegation must immediately be transmitted from the office of children and
family services to the appropriate local child protective service for
investigation.  *Id.* at § 422(2).  The local child protective service is required
to initiate an investigation within twenty-four hours of receiving a report of
abuse or maltreatment and to determine within sixty days whether the
report is "indicated" or "unfounded".  *Id.* at § 424(6) and (7).  The State
Central Register includes all information in the written report, including the
final disposition.  *Id.* at § 422(3).

Separate and apart from reports transmitted by the State Central

---

[10]     These terms are statutorily defined in section 412 of the Social Services
Law.

Register, each local child protective service is required to be available to receive reports of suspected child abuse or maltreatment twenty-four hours a day, seven days a week.  *See* N.Y. Soc. Serv. Law § 424(1) and(3); *see also* 18 N.Y.C.R.R. § 423.3.  Upon receipt of such a report, the local department of social services is required to report the fact of its receipt to the State Central Register and to conduct an investigation, including "an evaluation of the environment of the child named in the report and any other children in the same home . . .."[11]  N.Y. Soc. Serv. Law § 424(3) and (6). In this case, it appears from plaintiff's submissions that a report implicating plaintiff as an abuser was made, the State Central Register was notified of its receipt, and, in compliance with the above referenced provisions, an investigation was conducted.[12]

    In *Valmonte*, the Second Circuit was presented with the issue of whether New York's maintenance of its State Central Register, which identifies individuals accused of child abuse or neglect, and its communication of those on this list to potential employers in the childcare

---

[11]     Should a parent or guardian of a child who is the subject of a report of maltreatment refuse the local department of social services access to the child and/or home, the child protective investigator is authorized to seek an immediate family court order to gain access, and law enforcement may be contacted.  N.Y. Soc. Serv. Law § 424(6-a).

[12]     The complaint does not indicate whether the state or local authorities received the initial report of abuse.

field implicated a protectible liberty interest.  *Valmonte*, 18 F.3d at 994.  In that case, upon receipt of a complaint to the child abuse hotline and after a resulting child abuse investigation, the county department of social services had determined that the complaint against the plaintiff was "indicated".  *Valmonte*, 18 F.3d at 996.  Following resolution of such charges in a family court proceeding in her favor, the plaintiff requested expungement of the indicated report from the State Central Register; her request was denied both initially and on her administrative appeal on the grounds that the state found "some credible evidence" to support the allegations against her.  *Id.* at 997.  The plaintiff then brought an action in district court challenging the constitutionality of the statutory scheme under section 1983.  *Id.* at 997-98.  On motion of the defendants, the district court dismissed her claims.

On her appeal to the Second Circuit, the court initially found that the plaintiff had established a liberty interest of constitutional proportions, holding that the dissemination of information from the State's Central Register to potential employers, coupled with the defamatory nature of inclusion on the list, was sufficient to implicate a liberty interest.  *Id.* at 995; *see also Finch v. New York State Office of Children and Family Servs., et al.*, No. 04 Civ. 1668, 2008 WL 5330616, at *2 (S.D.N.Y. Dec. 18, 2008).  Proceeding to consider whether the statutory scheme provided

constitutionally adequate procedural safeguards of that interest, the
*Valmonte* court found that it did not; the statute required only "some
credible evidence" to initially include a subject on the list, and it was not
until later, at a post-deprivation hearing, after the subject had already
likely been denied employment due to his or her inclusion on the State
Central Register, that the local department of social services was required
to prove the allegations of abuse against the subject by a fair
preponderance of the evidence.  *Valmonte*, 13 F.3d at 1003.  Holding that
"the high risk of error produced by the procedural protections established
by New York [was] unacceptable," the court reversed the district court and
remanded the matter for further proceedings.[13]  *Id.* at 1004-1005.

The facts alleged by the plaintiff in this case are vastly different from
those upon which the Second Circuit's *Valmonte* decision was predicated.
In her complaint, plaintiff alleges that her name was placed upon the State
Central Register based upon false information, and she claims further that
in consequence she lost supplemental income because she could not
receive children for her daycare.  In general, "[t]he names of individuals on
the Central Register are not publicly available . . .."  *Valmonte*, 18 F.3d at
995.  Crucial to the *Valmonte* court's finding that the plaintiff in that case

---

[13]     It appears that there have been numerous amendments to Article 6 of
the Social Services Law since *Valmonte* was decided in 1994.

had sufficiently stated a protectible liberty interest was the fact that the she had "allege[d] much more than a loss of employment flowing from the effects of simple defamation", or the appearance of her name on the child abuse registry; the court found that her listing on the State Central Register had placed a tangible burden on her employment prospects because plaintiff alleged that she would look for a job in the childcare field, and the statute required childcare providers to consult the State Central Register. *Valmonte*, 18 F.3d at 1001. In other words, the court found that plaintiff had alleged that as a result of her inclusion on the list she would be unable to find a job in her chosen field. *See id.*

Here, according to her own allegations, plaintiff is self-employed as a home child daycare provider.[14] Under New York regulations, an operator of a home child care must obtain both a license and registration to operate such a service, which requires the operator to provide statewide clearance forms necessary to complete required screening by the State Central Register to determine if he or she has been the subject of an "indicated" report of child abuse or maltreatment. *See* 18 N.Y.C.R.R. § 413.2(l) and (m), 416.2(a)(8), and 417.2(a)(8). There are no allegations in plaintiff's

---

[14]     A "family day care home" is defined as "a residence in which child day care is provided on a regular basis for more than three hours per day per child for three to six children for compensation or otherwise, except as provided in this subdivision. . . ."  18 N.Y.C.R.R. § 413.2(h)(2)(l).

complaint that her child daycare license or registration, if any, was affected by the investigation at issue. While plaintiff here alleges a loss of income, she does not claim she was deprived of any employment due to the inclusion of her name on the list, and even more, the attachment to her complaint shows that within seven months of the initiation of the local child abuse investigation she was notified by the state that the complaint had been determined "unfounded" and that the agency's records were sealed. As a result, any burden on her employment prospects that may have existed was eliminated. Moreover, there are no allegations that the fact that her name was entered into the State Central Register was in any way disclosed or disseminated by the defendants, thereby subjecting the plaintiff to the stigmatization that was of concern to the *Valmonte* court. Considering that the information in the State Central Register is maintained confidential, except in limited circumstances not applicable here,[15] it seems unlikely that the mere entry of plaintiff's name into the

---

[15] Under the statute certain persons are legally bound to report abuse or maltreatment of a child, including,

> any physician; registered physician assistant; surgeon; medical examiner; coroner; dentist; dental hygienist; osteopath; optometrist; chiropractor; podiatrist; resident; intern; psychologist; registered nurse; social worker; emergency medical technician; licensed creative arts therapist; licensed marriage and family therapist; licensed mental health counselor; licensed psychoanalyst; hospital personnel engaged in the admission, examination, care or treatment of persons; a Christian Science practitioner; school official, which includes but is not limited to school teacher, school guidance counselor, school psychologist, school

State Central Register without any disclosure of that fact and with no resulting loss of or burden upon her employment, or other right, gives rise to a protectible liberty interest.

Nonetheless, broadly construing plaintiff's complaint, without making any determination as to the merits of plaintiff's claims, I have assumed solely for the purposes of my section 1915 review that plaintiff has sufficiently alleged a plausible claim for violation of her right to procedural due process.  Even if plaintiff has done so, however, she ultimately fails to state a cause of action because she has not alleged sufficient facts to support such a claim against either of the named defendants

------

social worker, school nurse, school administrator or other school personnel required to hold a teaching or administrative license or certificate; social services worker; director of a children's overnight camp, summer day camp or traveling summer day camp, as such camps are defined in section thirteen hundred ninety-two of the public health law; day care center worker; school-age child care worker; provider of family or group family day care; employee or volunteer in a residential care facility defined in subdivision four of section four hundred twelve-a of this title or any other child care or foster care worker; mental health professional; substance abuse counselor; alcoholism counselor; all persons credentialed by the office of alcoholism and substance abuse services; peace officer; police officer; district attorney or assistant district attorney; investigator employed in the office of a district attorney; or other law enforcement official.

N.Y. Soc. Serv. Law § 413(1)(a).  The statute additionally provides that "a person or official required to make a report of suspected child abuse or maltreatment pursuant to section four hundred thirteen of this chapter . . . shall receive, upon request, the findings of the investigation . . .".  *Id.* at § 422(4)(A)(aa).  If such a request is made after completion of an investigation, the information that may be released is limited to whether the report is "indicated" or "unfounded."  *Id.*

2.    Immunity

a.    Social Services Law Section 419

Addressing first plaintiff's claims against defendant Murko, who is apparently a caseworker employed by the Broome County Department of Social Services, the complaint alleges that she conducted the investigation regarding the charge of abuse.  Section 419 of the Social Services Law provides:

> Any person, official, or institution participating in good faith in the providing of a service pursuant to section four hundred twenty-four of this title, the making of a report, the taking of photographs, the removal or keeping of a child pursuant to this title, or the disclosure of child protective services information in compliance with sections twenty, four hundred twenty-two and four hundred twenty-two-a of this chapter shall have immunity from any liability, civil or criminal, that might otherwise result by reason of such actions. For the purpose of any proceeding, civil or criminal, the good faith of any such person, official, or institution required to report cases of child abuse or maltreatment or providing a service pursuant to section four hundred twenty-four or the disclosure of child protective services information in compliance with sections twenty, four hundred twenty-two and four hundred twenty-two-a of this chapter shall be presumed, provided such person, official or institution was acting in discharge of their duties and within the scope of their employment, and that such liability did not result from the willful misconduct or gross negligence of such person, official or institution.

N.Y. Soc. Serv. Law § 419.  This provision creates qualified immunity from civil and criminal liability resulting from an investigation conducted under

Social Services Law Article 6 as long as the individual conducting that investigation was acting within the scope of his or her employment and did not engage in willful misconduct or gross negligence. *Preston v. New York*, 223 F. Supp. 2d 452 (S.D.N.Y. Jun. 27, 2002) (citation omitted), *aff'd*, 87 Fed. App'x 221 (2d Cir. 2004) (affirming for substantially the same reasons stated by the district court and noting also that defendants possessed qualified immunity under federal law) (citing *Harlow v. Fitzgerald*, 457 U.S. 800, 818, 102 S. Ct. 2727 (1982)); *see also Powell v. Johnson, et al.*, No. 3:11-CV-1304, slip op. (N.D.N.Y. Dec. 6, 2011) (D'Agostino, J.); *Rine v. Chase*, 2309 A.D.2d 796, 765 N.Y.S.2d 648 (2d Dep't 2003).  "Under the [Social Services Law], conclusive proof of child abuse is not a requisite threshold to trigger reporting under § 424." *Preston*, 223 F. Supp. 2d at 471.  "Morever, [the Social Services Law] creates a statutory presumption that actions taken to protect a child are made in good faith[,]" and only a persuasive showing bad faith can over come that presumption, even on a section 1915(e) review.  *Preston*, 223 F. Supp. 2d at 471-72. (citation omitted).

Even when broadly construing plaintiff's complaint to raise the strongest possible arguments, defendant Murko's conduct was entirely

consistent with the requirements of the governing statute.  By plaintiff's own admission, the mother of the child who was the subject of the alleged abuse made a complaint.  Evidently, as a result, in accordance with the Social Services Law, a determination was made that the allegations, if true, would be legally sufficient to constitute abuse or neglect.  *See* N.Y. Soc. Serv. Law § 422(a).  Upon that determination, the local department of social services was obligated to initiate an investigation, which was apparently assigned to defendant Murko, including an evaluation of the child's environment.  *See id.* at § § 424(3) and(6).  It seems clear that the complaint of the child's mother and/or the criminal charges against plaintiff provided defendant Murko a good faith basis for her investigation.[16]  *See Preston*, 223 F. Supp. 2d at 472 (noting that the facts demonstrated a "substantial basis" for defendants' report "because the mother of the Minor and the Minor herself came forward to report the incident.") (citing *Kubik v. New York State Dep't of Soc. Serv.*, 244 A.D.2d 606, 664 N.Y.S.2d 365,

---

[16]     Additionally, I note that there are no allegations in the complaint suggesting Murko's personal involvement in the alleged due process violation insofar as there are no allegations that any action taken by Murko resulted in the placement of plaintiff's name on the state register.  *Wright v. Smith*, 21 F.3d 496, 501 (2d Cir. 1994) (personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under Section 1983) (citing *Moffitt v. Town of Brookfield*, 950 F.2d 880, 885 (2d Cir. 1991) and *McKinnon v. Patterson*, 568 F.2d 930, 934 (2d Cir. 1977), *cert. denied*, 434 U.S. 1087, 98 S. Ct. 1282 (1978)).

368 (3d Dep't 1997); *Isabelle V. v. City of New York*, 150 A.D.2d 312, 541 N.Y.S.2d 809, 809 (1st Dep't 1989)).  The complaint is devoid of any allegations that defendant Murko took any action that was not either authorized or required by the Social Services Law.  Indeed, even the most generous reading of plaintiff's complaint does not even remotely suggest that Murko acted with bad faith.  As a result, plaintiff's claims against Murko in her official capacity must be dismissed.  *See Preston*, 223 F. Supp.2d at 472.

Plaintiff's claims against this defendant is her individual capacity are likewise subject to dismissal because she has nowhere alleged facts showing that Murko acted outside the scope of her employment; rather, her claims are clearly focused on Murko's actions an caseworker for the Broome County Department of Social Services.  *See Preston*, 223 F. Supp. 2d at 472.  Accordingly, plaintiff's claims against Murko are subject to dismissal for failure to state a cause of action and as frivolous based upon the immunity she is afforded by Social Services Law § 419 and the lack of any allegations to impose personal liability upon her.  *See id.*

b.   The Doctrine of Qualified Immunity

While the district court's decision in *Preston* suggests that Social

22

Services Law § 419 protects local child protective workers even from federal law violations, *see id.* at 470-72, even if that were not the case, plaintiff's claims against Murko would be precluded under the federal doctrine of qualified immunity.  As developed in federal common law, qualified immunity shields government officials performing discretionary functions from liability for damages "insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known."  *Harlow*, 457 U.S. at 818, 102 S. Ct. at 2738 (citations omitted).  "In assessing an [official's] eligibility for the shield, 'the appropriate question is the objective inquiry whether a reasonable [official] could have believed that [his or her actions were] lawful, in light of clearly established law and the information the [official] possessed."  *Kelsey v. County of Schoharie*, 567 F.3d 54, 61 (2d Cir. 2009) (quoting *Wilson v. Layne*, 526 U.S. 603, 615, 119 S.Ct. 1692 (1999)).  The law of qualified immunity seeks to strike a balance between the need to hold government officials accountable for irresponsible conduct and the need to protect them from "harassment, distraction, and liability when they perform their duties reasonably."  *Pearson v. Callahan*, 555 U.S. 223, 129 S. Ct. 808, 815 (2009); *see also Nagle v. Marron*, –

F.3d —, 2011 WL 6142196, at *11 (2d Cir. Dec. 12, 2011).

In *Saucier v. Katz*, 533 U.S. 194, 121 S.Ct. 2151 (2001), the

Supreme Court "mandated a two-step sequence for resolving government

official's qualified immunity claims."  *Pearson*, 555 U.S. at 232, 129 S.Ct.

at 815-16.  The first step requires the court to consider whether, taken in

the light most favorable to the party asserting immunity, the facts alleged

show that the conduct at issue violated a constitutional right,[17] *Kelsey*, 567

F.3d at 61, with "the second step being whether the right is clearly

established", *Okin v. Village of Cornwall-On-Hudson Police Dept.*, 577

F.3d 415, 430 n.9 (citing *Saucier*).[18]  Expressly recognizing that the

purpose of the qualified immunity doctrine is to ensure that insubstantial

claims are resolved prior to discovery, the Supreme Court recently

retreated from the prior *Saucier* two-step mandate, concluding in *Pearson*

that because "[t]he judges of the district courts and courts of appeals are

---

[17]    In making the threshold inquiry, "[i]f no constitutional right would have been violated were the allegations established, there is no necessity for further inquiries concerning qualified immunity.  *Saucier,* 533 U.S. at 201, 121 S. Ct. 2151.

[18]    In *Okin*, the Second Circuit clarified that the "'objectively reasonable' inquiry is part of the 'clearly established' inquiry", also noting that "once a court has found that the law was clearly established at the time of the challenged conduct and for the particular context in which it occurred, it is no defense for the [government] officer who violated the clearly established law to respond that he held an objectively reasonable belief that his conduct was lawful."  *Okin*, 577 F.3d at 433, n.11 (citation omitted).

in the best position to determine the order of decisionmaking [that] will

best facilitate the fair and efficient disposition of each case", those

decision makers "should be permitted to exercise their sound discretion in

deciding which of the . . .  prongs of the qualified immunity analysis should

be addressed first in light of the circumstances of the particular case at

hand."[19]  *Pearson*, 555 U.S. at 236, 242, 129 S. Ct. at 818, 821.  In other

words, as recently emphasized by the Second Circuit, the courts "are no

longer *required* to make a 'threshold inquiry' as to the violation of a

constitutional right in a qualified immunity context, but we are free to do

so."  *Kelsey*, 567 F.3d at 61(citing *Pearson*, 129 S. Ct. at 821) (emphasis

in original).

    For courts engaging in a qualified immunity analysis, "the question

after *Pearson* is 'which of the two prongs . . . should be addressed in light

of the circumstances in the particular case at hand.'"  *Okin*, 577 F.3d 430

n.9 (quoting *Pearson*).  "The [*Saucier* two-step] inquiry is said to be

appropriate in those cases where 'discussion of why the relevant facts do

---

[19]     Indeed, because qualified immunity is "an immunity from suit rather than
a mere defense to liability. . .", *Mitchell v. Forsyth*, 472 U.S. 511, 526, 105 S.Ct. 2806
(1985), the Court has "repeatedly . . . stressed the importance of resolving immunity
questions at the earliest possible stage in the litigation."  *Pearson*, 555 U.S. at 231,
129 S.Ct. at 815 (quoting *Hunter v. Bryant*, 502 U.S. 224, 227, 112 S.Ct. 524 (1991)
(per curiam)).

not violate clearly established law may make it apparent that in fact the relevant facts do not make out a constitutional violation at all.'" *Kelsey*, 567 F.3d at 61 (quoting *Pearson*, 129 S. Ct. at 818).

Addressing the second prong of the analysis, " '[t]he relevant, dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted.' "  *Nagle*, 2011 WL 614296, at *11 (quoting *Saucier*, 533 U.S. at 202, 121 S.Ct. at 2156).  When deciding whether a right was clearly established at the relevant time, a court should consider

> (1) whether the right in question was defined with "reasonable specificity"; (2) whether the decisional law of the Supreme Court and the [Second Circuit] support the existence of the right in question; and (3) whether under preexisting law a reasonable defendant official would have understood that his or her acts were unlawful.

*Wright v. Smith*, 21 F.3d 496, 500 (2d Cir. 1994) (quoting *Benitez v. Wolff*, 985 F.2d 662, 666 (2d Cir. 1993)).  The objective reasonableness test will be met, and qualified immunity enjoyed, where government officers of reasonable competence could disagree as to whether by his or her alleged conduct the defendant would be violating the plaintiff's rights. *Okin*, 577 F.3d at 433 (quoting *Malley v. Briggs*, 475 U.S. 335, 341, 106

S.Ct. 1092 (1986)).  "If, on the other hand, no officer of reasonable

competence would conclude that the conduct in question is lawful, there is

no immunity."  *Okin*, 577 F.3d at 433 (citing *Lennon v. Miller*, 66 F.3d 416,

420-21 (2d Cir. 1995)).

 In this instance, plaintiff alleges that her right to procedural due

process was violated when her name was entered in the State Central

Register without notice and an opportunity to be heard.  Whether plaintiff

can show a violation of a constitutional right in this case turns on whether

she can establish that she was deprived of a liberty or property interest

without adequate procedural safeguards, a premise which, as was

discussed above, seems highly unlikely.  Nonetheless, reading plaintiff's

complaint in a light most favorable to her, as the court must at this

juncture, I cannot unequivocally conclude that the alleged conduct did not

violate a constitutional right.

Turning to the second prong of the qualified immunity test, it is worth

noting that in recognition of the competing interests and difficult

alternatives presented to child protective workers faced with allegations of

abuse, the Second Circuit has recognized that qualified immunity

protection is essential and provides "substantial protection for case

workers" so long as their conduct was objectively reasonable.[20]

*Tenenbaum v. Williams*, 193 F.3d 581, 596 (2d Cir. 1999) (quoting

*Lennon v. Miller*, 66 F.3d 416, 420 (2d Cir. 1995) (other citation omitted).

Under the Social Services Law, the placement of an individual's name on

that list is automatically triggered by a report of suspected abuse that

would be legally sufficient to support such a charge.  *Valmonte*, 18 F.3d at

995.  The statute does not provide a right to a hearing prior to that

occurrence.  *See generally* N.Y. Soc. Serv. Law §§ 422 and 424.  The

court's research has revealed no authority suggesting that the current

relevant provisions of the Social Services Law are constitutionally

defective.  Under the circumstances presented, I have therefore

concluded that at the time of the occurrences in the complaint, there was

no clearly established right to notice and an opportunity to be heard before

---

[20]    Indeed, that court has expressly stated that,

protective services caseworkers [must] choose between difficult
alternatives.... If they err in interrupting parental custody, they may be
accused of infringing the parents' constitutional rights. If they err in not
removing the child, they risk injury to the child and may be accused of
infringing the child's rights. It is precisely the function of qualified
immunity to protect state officials in choosing between such alternatives,
provided that there is an objectively reasonable basis for their decision,
whichever way they make it.

*Tenenbaum*, 193 F.3d at 597 (quoting *van Emrik v. Chemung Cty. Dep't of Social
Servs.*, 911 F.2d 863, 866 (2d Cir. 1990) (footnote omitted)) (other citation omitted)
(alterations in original).

plaintiff's name was entered on the State Central Register, and that Murko's alleged misconduct, which was entirely consistent with the statutory provisions, was objectively reasonable.[21]

### 3.   Personal Involvement

With respect to defendant Johnson, the Commissioner of Broome County Social Services, there are no facts alleged in the complaint which support plaintiff's claims against him.   Personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under section 1983.   *Wright*, 21 F.3d at 501 (citations omitted). As the Supreme Court has noted, a defendant may only be held accountable for his or her actions under section 1983.   *Iqbal*, 129 S. Ct. at 1952.   In order to prevail on a section 1983 cause of action against an individual, a plaintiff must show some tangible connection between the constitutional violation alleged and that particular defendant.   *See Bass v. Jackson*, 790 F.2d 260, 263 (2d Cir. 1986).

Although defendant Johnson is named in the caption of plaintiff's complaint, there are no allegations against this defendant contained in

---

[21]      "The reasonableness of the official's action is . . . 'assessed in light of the legal rules that were clearly established at the time [the action] was taken.' " *Nagle*, 2011 WL 6142196, at *12 (quoting *Anderson*, 483 U.S. at 639, 107 S. Ct. 3034) (alteration in original).

plaintiff's submissions, and thus no showing that he was personally involved in any of the alleged misconduct.  Moreover, to the extent that he is named solely as a result of his position as commissioner, it is well established that a supervisor cannot be liable for damages under Section 1983 solely by virtue of being a supervisor; there is no *respondeat superior* liability under Section 1983.  *Richardson v. Goord*, 347 F.3d 431, 435 (2d Cir. 2003); *Wright*, 21 F.3d at 501.  Culpability on the part of a supervisory official for a civil rights violation can, however, be established in one of several ways, including when that individual 1) has directly participated in the challenged conduct; 2) after learning of the violation through a report or appeal, has failed to remedy the wrong; 3) created or allowed to continue a policy or custom under which unconstitutional practices occurred; 4) was grossly negligent in managing the subordinates who caused the unlawful event; or 5) failed to act on information indicating that unconstitutional acts were occurring.  *Iqbal v. Hasty*, 490 F.3d 143, 152-53 (2d Cir. 2007), *rev'd on other grounds sub nom., Ashcroft v. Iqbal*, 556 U.S. 662,129 S. Ct. 1937 (2009);[22] *see also Richardson*, 347 F.3d at

---

[22]      The issue of supervisory liability for civil rights violation was addressed by the Supreme Court recently in its decision in *Ashcroft v. Iqbal*.  The Second Circuit has yet to address the impact of Iqbal upon the categories of supervisory liability under *Colon*.  Lower courts have struggled with this issue, and specifically whether *Iqbal*

435; *Colon v. Coughlin*, 58 F.3d 865, 873 (2d Cir. 1995); *Wright*, 21 F.3d at 501.

Because there are no allegations in plaintiff's pleading that would support a plausible basis for a finding of liability against defendant Johnson, I recommend that the claims against him be dismissed.

### 4.    Plaintiff's Remaining Claims

Liberally construed, plaintiff's complaint may be interpreted to assert additional constitutional violations, including the Fourth, Fifth, and Ninth Amendments.  All of these claims are readily resolved.

Addressing the later first, "[t]he Ninth Amendment is a rule of construction, not one that protects any specific right, and so no independent constitutional protection is recognized which derives from the

---

effectively calls into question certain prongs of the Colon five-part test for supervisory liability.  *See Sash v. United States*, 674 F. Supp. 2d 531, 542-544 (S.D.N.Y. 2009); *see also Stewart v. Howard*, No. 9:09-CV-0069 (GLS/GHL), 2010 WL 3907227, at *12 n.10 (N.D.N.Y. Apr. 26, 2010) ("The Supreme Court's decision in [*Iqbal*] arguably casts in doubt the continued vitality of some of the categories set forth in *Colon*.") (citations omitted), *report and recommendation adopted*, 2010 WL 3907137 (Sept. 30, 2010).  While some courts have taken the position that only the first and third of the five *Colon* categories remain viable and can support a finding of supervisory liability, *see, e.g., Bellamy v. Mount Vernon Hosp.*, No.07 CIV. 1801, 2009 WL1835939, at *6 (S.D.N.Y. June 26, 2009), *aff'd*, 387 Fed. App'x 55 (2d Cir. 2010), others disagree and conclude that whether any of the five categories apply in any particular case depends upon the particular violations alleged and the supervisor's participatory role, *see, e.g., D'Olimpio v. Crisafi*, Nos. 09 Civ. 7283 (JSR), 09 Civ. 9952 (JSR), 2010 WL 2428128, at *5 (S.D.N.Y. Jun. 15, 2010); *Qasem v. Toro*, No. 09 Civ. 8361 (SHS), 2010 WL 3156031, at *4 (S.D.N.Y. Aug. 10, 2010).

Ninth Amendment and which may support a § 1983 cause of action."

*McZorn v. Johnson City Police Dep't*, No. 3:08-CV-0726, 2009 WL

5216946, at * 7 (N.D.N.Y. Dec. 30, 2009) (McAvoy, S.J.) (quoting *McZorn*

*v. Endicott Police Dep't*, 2008 WL 163581, at *11 (N.D.N.Y. 2008) (in turn

citing *Diaz v. City of New York*, No. 00-CV-2944, 2006 WL 3833164, at *7

(E.D.N.Y. Dec. 29, 2006) (internal quotation marks and citations omitted)).

Accordingly, the Ninth Amendment provides no basis for plaintiff's section

1983 claim.

Turning to the Fifth Amendment, plaintiff seems to allege that her

*Miranda* rights were violated when defendant Murko entered her home.[23]

The court's research has not identified any legal authority providing

plaintiff with such right.  *See Ward v. Murphy*, 330 F. Supp. 2d 83, 96

(D.Conn. 2004).  Moreover, as observed by the district court in *Ward*,

even if the court were to assume that *Miranda* applies, the plaintiff's claim

would nonetheless fail because her remedy would be exclusion from

evidence of any ensuing self-incriminating statements, not a claim under

section 1983.  *Id.* (quoting *Neighbour v. Covert*, 68 F.3d 1508, 1510 (2d

---

[23]     Plaintiff apparently contends that, in the context of a child protective investigation, an individual has rights similar to those articulated in *Miranda v. Arizona*, 384 U.S. 436, 86 S. Ct. 1602 (1966) (holding that an individual subjected to custodial interrogation must be advised of his right to counsel and right to silence).

Cir.1995), *cert. denied*, 516 U.S. 1174, 116 S. Ct. 1267 (1996)).  As a result, plaintiff's Fifth Amendment claim likewise fails to support her section 1983 cause of action.

Plaintiff's Fourth Amendment claim similarly gives the court little pause.  In this regard, plaintiff's complaint suggests that the investigation conducted by defendant Murko at plaintiff's home constituted an unconstitutional search.  "A warrantless search, although generally considered unreasonable, is permissible under the Fourth Amendment if conducted on the basis of consent of an authorized person."  *United States v. Pollaro*, 733 F. Supp. 2d 364, 368 (E.D.N.Y. Aug. 16, 2010) (citing *Schneckloth v. Bustamonte*, 412 U.S. 214, 245, 93 S. Ct. 2041 (1973) (other citations omitted); *Koch v. Town of Brattleboro*, 287 F.3d 162, 167 (2002) ("A search conducted pursuant to consent . . . does not require probable cause or a warrant.") (citation omitted).  By plaintiff's own admission, she allowed defendant Murko to enter her home; as a result, she has failed to state a violation of the Fourth Amendment.  *Ward*, 330 F. Supp. 2d at 94-95 (finding no Fourth Amendment claim where plaintiff consented to child protective investigator's entry into his home).[24, 25]

_____

[24]     Even if plaintiff had alleged a Fourth Amendment violation, I have already concluded that defendant Murko's actions were objectively reasonable and that

Finally, plaintiff's complaint may be interpreted to also assert a claim

for conspiracy.  To sustain a conspiracy claim under 42 U.S.C. § 1983, a

plaintiff must demonstrate that a defendant "acted in a wilful manner,

culminating in an agreement, understanding or meeting of the minds, that

violated the plaintiff's rights . . . secured by the Constitution or the federal

courts."  *Malsh v. Austin*, 901 F. Supp. 757, 763 (S.D.N.Y. 1995) (citations

and internal quotation marks omitted).  Conclusory, vague or general

allegations of a conspiracy to deprive a person of constitutional rights do

not state a claim for relief under section 1983.  *See Sommer v. Dixon*, 709

F.2d 173, 175 (2d Cir.), *cert. denied*, 464 U.S. 857, 104 S. Ct. 177 (1983).

Plaintiff's complaint does not allege facts showing an agreement or

a "meeting of the minds" between the named defendants, or any details as

to the time and place of the alleged conspiracy, or its objective.  Such

deficiencies are fatal to plaintiff's conspiracy claim.  *Warren v. Fischl*, 33

F. Supp. 2d 171, 177 (E.D.N.Y. 1999).  Because plaintiff has asserted her

claim of conspiracy in only vague and conclusory terms, that claim is

---

plaintiff's claims are therefore precluded by the doctrine of qualified immunity.

[25]    Because Fourth Amendment rights are personal, plaintiff cannot assert a
claim on behalf of the child who was the subject of the investigation.  *Tenenbaum*, 193
F.3d at 602 n.13.  *Ward*, F. Supp. 2d at 94 n.8.

subject to dismissal as well.[26]

For all of the foregoing reasons, I recommend dismissal of plaintiff's complaint against defendants Murko and Johnson.

IV.    ANALYSIS OF PLAINTIFF'S CLAIMS IN POWELL v. NICELY, ET AL.

A.    Background[27]

In her second action, filed in December 2011, plaintiff asserts a breach of contract claim against five individuals, four of whom appear to

---

[26]    Plaintiff's complaint also alleges negligence and references the Federal Tort Claims Act ("FTCA"), 28 U.S.C. §§ 2671, *et seq.*   It is well established that section 1983 does not provide remedy for every common law tort. . .." *Johnson v. Wigger*, 2009 WL 2424186, at * 8 (N.D.N.Y. 2009) (Scullin, S.J. & Lowe, M.J.) (citing *Williams v. Pecchio*, 543 F. Supp. 878, 879 (W.D.N.Y. 1982)).  As stated by the Second Circuit,

> The Supreme Court has recognized that, "[i]n some circumstances, the interests protected by a particular brand of the common law of torts may parallel closely the interests protected by a particular constitutional right," (citation omitted); still, it is only the violation of a constitutional right that is actionable and compensable under section 1983.  "The validity of the claim must [therefore] be judged by reference to the specific constitutional standard which governs that right . . . ."

*Singer v. Fulton County Sheriff*, 63 F.3d 110, 116 (2d Cir. 1995) (quoting *Carey v. Piphus*, 435 U.S. 247, 258059, 98 S. Ct. 1042, 104901050 (1978)).  Consequently, to the extent plaintiff claims defendants were negligent, she has failed to state a claim under section 1983.  She similarly has failed to state a claim under the FTCA because that statute does not give rise to federal tort claims against county employees. *Cisnevas-Garcia v. Shipman*, No. 9:10-CV-179, 2010 WL 3491359, at *2 (N.D.N.Y. Aug. 31, 2010) (Scullin, S.J.).

[27]    Again, in light of the procedural posture of this case, the following recitation is drawn principally from plaintiff's complaint, the contents of which have been accepted as true for purposes of the court's section 1915 review.  *See Erickson,* 551 U.S. at 94, 127 S. Ct. at  2200 (citation omitted).

be insurance adjusters, as well as Geico Insurance Company, together with CCS Information Services, and an individual apparently employed by that entity.[28]  On September 8, 2011, plaintiff submitted a claim for water damage to her vehicle to her automobile insurance carrier.  Shortly thereafter, plaintiff was issued a check fo $6,249.00, which she accepted under protest.  Plaintiff alleges that defendants relied upon information contained within "CCC Value Market Report/CCC Information Services Inc." to pay the claim and refused to negotiate with her in good faith.  Plaintiff subsequently received an additional check in the amount of $1,107.00.  Plaintiff claims that the value of her vehicle, and apparently the amount she was entitled to be reimbursed, is $10,500.00.  The essence of plaintiff's claim is a breach of contract based upon defendants' failure to deal with her in good faith.

B.    Jurisdiction

The subject matter jurisdiction of the federal district courts is limited and is set forth generally in 28 U.S.C. §§ 1331 and 1332.  Under these

---

[28]    As is the case with her earlier filed action, plaintiff has not filed a single integrated pleading.  Instead, she has filed a document identified as a complaint and attached thereto a motion for permission to pursue an action for breach of contract, accompanied by a memorandum of law and an affidavit.  Once again, in deference to plaintiff's *pro* se status, the court will treat these documents as one pleading.

statutes, federal jurisdiction is available only when a federal question is presented, or when the parties are of diverse citizenship, and the amount in question exceeds $75,000.  It is well established that the court may raise the question of jurisdiction *sua sponte* and that where jurisdiction is lacking, "dismissal is mandatory."  *United Food & Commercial Workers Union, Local 919, AFL-CIO v. Centermark Properties Meriden Square, Inc.*, 30 F.3d 298, 301 (2d Cir.1994); *see also* Fed.R.Civ.P. 12(h)(3).

To the extent that plaintiff's complaint seeks to invoke the court's diversity jurisdiction,  28 U.S.C. §1332 provides that

> the district courts shall have original jurisdiction of all civil actions where the matter in controversy exceeds the sum of value of $75,000, exclusive of interest and costs, and is between – (1) citizens of different States; (2) citizens of a State and citizens or subjects of a foreign matter; (3) citizens of different States and in which citizens or subjects of a foreign state are additional parties; and (4) a foreign state, defined in section 1603(a) of this title, as plaintiff and citizens of a State or different States.

28 U.S.C. § 1332(a).  Thus, diversity jurisdiction exists only if there is diversity of citizenship between the parties, and the matter in controversy exceeds the sum or value of $75,000.  *See* 28 U.S.C. § 1332(a); *see also Dakari v. Dawson*,  No. 5:05-CV-1494, 2006 WL 88659, at *2 (N.D.N.Y. Jan 11, 2006).

Additionally, where "jurisdiction is premised on diversity of citizenship, diversity must exist at the time the action is commenced." *Universal Licensing Corp. v. Paola del Lungo S.p.A.*, 293 F.3d 579, 581 (2d Cir.2002).  Section 1332 requires complete diversity of citizenship. *Owen Equipment & Erection Co. v. Kroger,* 437 U.S. 365, 373, 98 S. Ct. 2396, 2402 (1978).  In other words, "diversity jurisdiction is not . . . available when any plaintiff is a citizen of the same State as any defendant." *Id.* at 374, 98 S.Ct. at 2403.  The general rule is that " '[t]he party seeking to invoke jurisdiction under 28 U.S.C. § 1332 bears the burden of demonstrating that the grounds for diversity exist and that diversity is complete.' " *Herrick Co. v. SCS Commc'ns Inc*., 251 F.3d 315, 322-23 (2d Cir.2001) (quoting *Advani Enters., Inc. v. Underwriters at Lloyds*, 140 F.3d 157, 160 (2d Cir.1998)).  Thus, it is a plaintiff's burden to demonstrate the existence of diversity jurisdiction on the face of the complaint.  *See John Birch Soc'y v. Nat'l Broadcasting Co.*, 377 F.2d 194, 198 (2d Cir.1967); *Baker v. Latham Sparrowbush Assocs.*, 808 F. Supp. 992, 1001 (S.D.N.Y.1992).

In this case, it is not at all clear from the face of plaintiff's complaint that diversity of citizenship exists.  Plaintiff merely alleges that the five

38

individual defendants transact business in Broome County, New York, and there are no allegations suggesting that they are domiciled in another state.  For this reason alone, plaintiff's complaint is subject to dismissal.

Plaintiff has similarly failed to establish the requisite jurisdictional threshold for damages.  "A party invoking the jurisdiction of the federal court has the burden of proving that it appears to a reasonable probability the claim is in excess of the statutory jurisdictional amount."  *Scherer v. The Equitable Life Assurance Soc'y of the U.S.*, 347 F.3d 394, 397 (2d Cir. 2003).  A rebuttable presumption exists that "the face of the complaint is a good faith representation of the actual amount in controversy."  *Id.* at 396 (citing *Wolde-Meskel v. Vocational Instruction Project Cmty. Servs., Inc.*, 166 F.3d 59, 63 (2d Cir.1999)).  As observed by the Second Circuit nearly half a century ago, yet resonating perhaps even more today,

> [w]ith mounting caseloads . . . and increasing numbers of cases awaiting trial, it has become doubly important that the district courts take measures to discover those suits which ought never to have been brought in the federal court and to dismiss them when the court is convinced to a legal certainty that the plaintiff cannot recover an amount in excess of [the jurisdictional limit].

*Arnold v.Troccoli*, 344 F.2d 842, 845 (2d Cir. 1965).  "[I]f [the] court makes a face-of-the-complaint determination that the $75,000 amount in

controversy cannot be recovered 'to a legal certainty,' the case is dismissed for lack of subject matter jurisdiction."  *Hall v. Earthlink Network, Inc.*, 396 F.3d 500, 507 n.5 (2d Cir. 2005) (quoting *Scherer*).

Even when liberally construed, the most the court can glean from plaintiff's pleading is a potential claim for breach of contract.  More importantly, affording plaintiff the benefit of ever favorable inference that can be drawn from her complaint, the damages that plaintiff has sustained, if any, by her own admission, total no more than $3,144.00, which is the difference between the amount she was paid on her insurance claim and the alleged value of her vehicle.[29]

For these reasons, notwithstanding plaintiff's demand for $100,000 in compensatory damages and $200,000 in punitive damages, I have concluded to a legal certainty that plaintiff cannot satisfy the jurisdictional minimum of $75,000 necessary to invoke this court's diversity jurisdiction and therefore recommend that plaintiff's second lawsuit be dismissed for lack of jurisdiction.

## V.    NATURE OF DISMISSAL

---

[29]    Even this amount, however, appears to overstate plaintiff's damages since it seems implausible that she would be entitled to be compensated for the market value of her vehicle if it was not completely destroyed, and plaintiff alleges that she has received offers for the purchase of her vehicle in the amount of $10,500.00.

Generally, when a *pro se* action is dismissed *sua sponte*, the plaintiff should be allowed to amend his or her complaint.  *See Gomez v. USAA Federal Savings Bank*, 171 F.3d 794, 796 (2d Cir. 1999).  However, an opportunity to amend is not required where "the problem with [plaintiff's] causes of action is substantive" such that "[b]etter pleading will not cure it."  *Cuoco v. Moritsugu*, 222 F.3d 99, 112 (2d Cir. 2000) (finding that repleading would be futile) (citation omitted); *see also Cortec Indus. Inc. v. Sum Holding L.P.*, 949 F.2d 42, 48 (2d Cir. 1991) ("Of course, where a plaintiff is unable to allege any fact sufficient to support its claim, a complaint should be dismissed with prejudice.")  (affirming, in part, dismissal of claim with prejudice) (citation omitted); *cf. Gomez*, 171 F.3d at 796 (granting leave to amend is appropriate "unless the court can rule out any possibility, however unlikely it might be, that an amended complaint would succeed in stating a claim.").  Stated differently, "[w]here it appears that granting leave to amend is unlikely to be productive, . . . it is not an abuse of discretion to deny leave to amend."  *Ruffolo v. Oppenheimer & Co.*, 987 F.2d 129, 131 (2d Cir. 1993) (citations omitted); *accord, Brown v. Peters*, 95-CV-1641, 1997 WL 599355, at *1 (N.D.N.Y. Sept. 22, 1997) (Pooler, J.) ("[T]he court need not grant leave to amend

41

where it appears that amendment would prove to be unproductive or futile.") (citation omitted).

Here, I have concluded that the problem with plaintiff's pleadings in these actions is substantive and therefore recommend dismissal without leave to amend.

VI.   BAR ORDER

A review of plaintiff's litigation history reveals that in addition to filing the two current actions, she has previously filed fourteen other lawsuits in this district in which she sought leave to proceed *in forma pauperis;* with one exception, all of those actions were dismissed.  In the first action the court's research has identified, *Powell v. Powell*, 3:94-CV-0430 (N.D.N.Y. filed on March 31, 1994), plaintiff's IFP application was denied, and the complaint was dismissed *sua sponte* by the court pursuant to section 1915(d).[30] In another, *Powell v. Marine Midland, et al.*, 3:95-CV-0063 (N.D.N.Y. filed January 17, 1995), after plaintiff was granted IFP status, the complaint was dismissed upon the defendants' pre-answer motion to

---

[30]    Section 1915 was amended in 1996 and subsection (d) was redesignated as subsection (e).  Pub. L. 104-134.  As was discussed above, upon an initial review of an complaint submitted with an application to proceed IFP, section 1915(e) requires the court to dismiss an action found to be frivolous or malicious, that fails to state a cause of action, and/or brought against a defendant who is immune from such relief.  *See* 28 U.S.C. § 1915(e).

42

dismiss.  Senior District Judge Thomas J. McAvoy denied plaintiff's IFP application and *sua sponte* dismissed plaintiff's complaint in *Powell v. Sedula*, 3:96-CV-0436 (N.D.N.Y. filed November 13, 1996), pursuant to the predecessor provision to section 1915(e).  In *Powell v. Galesi, et al.*, 3:97-CV-0900 (N.D.N.Y. filed June 26, 1997), Senior District Judge McAvoy granted plaintiff leave to proceed IFP, but *sua sponte* dismissed her complaint pursuant to section 1915(e)(2)(B), ordering that any appeal would not be taken in good faith pursuant to 28 U.S.C. § 1915(a)(3).[31]

Plaintiff withdrew her complaint in *Powell v. Manny, et al.*, 3:96-CV-1703 (N.D.N.Y. filed October 25, 1996), following over a year of litigation, after advising the court that she could not meet a court-imposed deadline for joining parties.  In *Powell v. Social Services et al.*, 3:99-CV-2043 (N.D.N.Y. filed November 24, 1999), plaintiff's IFP application was denied, her complaint dismissed *sua sponte* by the court pursuant to section 1915(e)(2)(B), and her appeal of that order of dismissal was dismissed by

---

[31]     Section 1915(a)(3) provides,

An appeal may not be taken *in forma pauperis* if the trial court certifies in writing that it is not taken in good faith.

28 U.S.C.§ 1915(a)(3) (emphasis added).

43

the Second Circuit as frivolous.  *Powell v. Houser*, 3:00-CV-0666

(N.D.N.Y. file April 28, 2000), another matter in which plaintiff was granted

IFP status, was dismissed on defendants' motion for summary judgment.

In *Powell v. Nyhoff*, 3:01-CV-1604 (N.D.N.Y. filed October 19, 2001),

plaintiff's request to proceed *in forma pauperis* was denied and her

complaint *sua sponte* dismissed for failure to state a cause of action.

*Powell v. American General, et al.*, 3:02-CV-1605 (N.D.N.Y. filed

December 31, 2002), in which plaintiff was granted leave to proceed IFP,

was dismissed for failure to state a cause of action upon defendants' Rule

12(b)(6) motion.  Plaintiff again was granted IFP status in *Powell v. New*

*York State Board of Law Examiners, et al.*, 3:04-CV-1125 (filed

September 27, 2004); her amended complaint, filed with leave of court

after dismissal of the original complaint, was *sua sponte* dismissed

pursuant to section 1915(e)(2)(B).

     In *Powell v. Mayor Richard A. Bucci, et al.*, 3:04-CV-1192 (filed

October 15, 2004), after filing an IFP application, plaintiff submitted an

amended complaint before the court had an opportunity review her original

filing; the amended complaint was *sua sponte* dismissed without prejudice

for failure to comply with the pleading requirements set forth in Rule 8 of

the Federal Rules of Civil Procedure, and her IFP application was denied without prejudice as incomplete.  Her second amended complaint and second IFP application were likewise *sua sponte* dismissed and denied, respectively, for the same reasons.  Plaintiff's third amended complaint was accepted for filing, and her corresponding request to proceed IFP was granted.  Her claims were subsequently dismissed as a matter of law on defendants' motions for summary judgment.

In *Powell v. Williams*, 3:06-CV-0781 (N.D.N.Y. filed June 23, 2006), plaintiff was once again granted permission to proceed IFP, and her was complaint dismissed *sua sponte* by the court.  In *Powell v. U-Haul Int'l*, No.3:10-CV-1531 (N.D.N.Y. filed December 20, 2010), proceeding IFP, the majority of plaintiff's claim were *sua sponte* dismissed by the court, and the remainder of her claims were dismissed on defendants' Rule 12(b)(6) motion.  Most recently, in *Powell v. Delta Airlines*, No. 3:11-CV-1432 (N.D.N.Y. October 20, 2011), though granting plaintiff's request to proceed IFP, the court *sua sponte* dismissed her complaint with prejudice for failure to state a cause of action.

The court's authority to sanction litigants for "vexatious, harassing or duplicative lawsuits" is well-established.  *Hong v. Mai Sa v. Doe*, 406 F.3d

155, 156 (2d Cir. 2005) (citing *Iwachiw v. N.Y. State Dep't of Motor Vehicles*, 396 F.3d 525, 528 (2d Cir. 2005)) (other citation omitted).  The court's authority derives from "Fed.R.Civ.P. 11, 28 U.S.C. § 1651(a), and its inherent authority to control and manage its own docket so as to prevent abuse in its proceedings."  *O'Neil v. Bebee*, No.5:09-CV-1133, 2010 WL 502948, at *11 (N.D.N.Y. Feb. 10, 2010) (Suddaby, J.).  Such sanctions are clearly appropriate where, as here, "a litigant has demonstrated a clear pattern of abusing the litigation process by filing vexatious and frivolous complaints."  *In re Sassower*, 20 F.3d 42, 44 (2d Cir. 1994) (citing cases).  The array of sanctions the court may impose includes restrictions on future access to the judicial system, including a prohibition on filing matters absent leave of court.  *Id.*  The court may not, however, issue such an injunction *sua sponte* without providing the litigant notice and an opportunity to be heard.  *Moates v. Barkley*, 147 F.3d 207, 208 (2d Cir. 1998) (citing cases).

As detailed above, at least eight of the previous fourteen actions filed by plaintiff have been dismissed *sua sponte* by the court for failure to state a cause of action and/or as frivolous, and all of the rest, except for one, have been dismissed as matter of law upon motion of the

defendants.  In my view, plaintiff's litigation history has resulted in a waste of judicial resources and exhibits precisely the type of frivolous and vexatious conduct that warrants imposition of a filing injunction.

In light of the foregoing, I will recommend that the court issue an order directing that plaintiff appear and show cause as to why an injunction prohibiting her from any future *pro se* filings without prior permission of the court should not be entered.  *See Azubuko v. Unknown Boston Police Officers*, Nos. 5:08-CV-69 (NPM)(GJD), 5:08-CV-75 (NPM)(GJD), 5:08-CV-330 (NPM)(GJD), 5:08-CV-331 (NPM)(GJD), 2008 WL 1767067 (N.D.N.Y. Apr. 16, 2008) (McCurn, S.J.) (imposing injunction on the plaintiff, after notice and an opportunity to be heard, prohibiting the *pro se* filing of any future pleadings or documents of any kind with the court absent leave of court); *O'Neil v. Bebee, et al.*, No. 5:09-CV-1133, slip op. (N.D.N.Y. filed March 19, 2010) (Suddaby, J.) (barring plaintiff, after notice and an opportunity to be heard, from filing any future *pro se* actions without leave of the court).

## VI.   CONCLUSION

Plaintiff, a prolific *pro se* litigant who has many times been afforded the privilege of proceeding in this court *in forma pauperis*, has exhibited a

clear pattern of filing meritless and harassing actions in this district.  Her litigiousness over the years has imposed a burden on this court's resources and caused those whom she has sued to devote time and expense to defend against her frivolous claims.  After carefully analyzing plaintiff's pleadings, I have concluded that her two most recent actions, consistent with the fourteen previously filed lawsuits, are wholly lacking in merit and must be dismissed.  In addition, after considering plaintiff's extensive litigation history and the imposition upon the court and private parties caused by her vexatious actions, I find that an injunction against any future *pro se* filings absent court permission secured in advance is warranted.

WHEREFORE, it is hereby respectfully,

RECOMMENDED these actions be dismissed and that plaintiff be directed to show cause, within thirty (30) days of any decision and order adopting this report and recommendation in full, as to why the court should not issue an order barring her from filing any future *pro se* actions or documents in this court without prior leave of the court.

NOTICE: Pursuant to 28 U.S.C. § 636(b)(1), the parties may lodge written objections to the foregoing report.  Such objections must be filed

with the clerk of the court within FOURTEEN days of service of this report.

 FAILURE TO SO OBJECT TO THIS REPORT WILL PRECLUDE

APPELLATE REVIEW.  28 U.S.C. § 636(b)(1); Fed. R. Civ. P.  6(a), 6(d),

72; *Roldan v. Racette,* 984 F.2d 85 (2d Cir. 1993).

It is hereby ORDERED that the clerk of the court serve a copy of this

report and recommendation upon the plaintiff in accordance with this

court's local rules.

David E. Peebles
U.S. Magistrate Judge

Dated:      January 6, 2012
             Syracuse, New York

49



Not Reported in F.Supp.2d, 2008 WL 4344522 (S.D.N.Y.)

(Cite as: 2008 WL 4344522 (S.D.N.Y.))

**H**

Only the Westlaw citation is currently available.
United States District Court,

S.D. New York.
Maurice OPARAJI, Plaintiff,
v.
ATLANTIC CONTAINER LINE and Penbroke Marine
Services, Inc., Defendants.
No. 07 Civ. 2124(GEL).

Sept. 23, 2008.
**OPINION AND ORDER**

GERARD E. LYNCH, District Judge.

**\*1** Plaintiff has applied for leave to proceed in forma pauperis ("IFP") on appeal in this matter. The Court reviews the application for a showing of indigence. As plaintiff has not adequately demonstrated that he is indigent, leave will be denied, without prejudice to a further application more fully setting forth the basis for plaintiff's claim of indigence.

Under Fed. R.App. P. 24(a), a party who desires to appeal IFP, and who has not already been permitted to proceed IFP in the district court,[FN1] must submit an affidavit that "shows in the detail prescribed by Form 4 of the Appendix of Forms the party's inability to pay or to give security for fees and costs." Rule 24(a)(1)(A). At the outset, it should be noted that plaintiff's affidavit is nowhere near as detailed as Form 4 to the Federal Rules of Appellate Procedure. Given that plaintiff, who is without counsel, utilized a form apparently provided to him by the Pro Se Office of this Court, the Court would not be inclined to reject the application on that ground, if plaintiff s application made a clear showing of his lack of resources. Plaintiff's answers, however, and other facts in the record, raise significant questions about whether he meets the standard for IFP status.

> FN1. *See* Rule 24(a)(3) (permitting a party who was granted IFP status in the district court so to proceed on appeal without further application,

except in circumstances not relevant here).

First, plaintiff indicates he owns property valued at $425,000 in value. (IFP Application ¶ 5.) Although the form asks that plaintiff "describe the property" as well as listing its "approximate value," plaintiff provides no description of the nature of the property. Defendant Penbroke Marine Services, Inc., which opposes the application, has provided the Court with a copy of a previous application for IFP status made in a different action in the District of New Jersey in October 2007, in which petitioner stated that he owns a residence in Queens with a value of $245,000. (Letter of Garth S. Wolfson, Esq., to the Court, dated Sept. 12, 2008, Ex. B.) The application in this matter gives no indication of whether the property referred to is the same residence, and if so whether the value declared is intended to represent the property's gross market value or its equity.[FN2]

> FN2. Plaintiff states that he pays $1500 per month "for rent or for a mortgage" (IFP Application ¶ 6), without specifying which it is. This answer thus provides no assistance in inferring whether plaintiff owns a house or whether, if he does, it is encumbered by a mortgage.

Second, although plaintiff identifies one "Prince Operaji" as a person "that you pay money to support," he does not state, as requested by the form "the amount you pay each month." (IFP Application ¶ 7.) The New Jersey application similarly lists Prince Operaji, and identifies him as plaintiff's son, but also fails to state the amount of support provided, although that information is requested on that form as well.

Third, defendants, who oppose the IFP application, note that plaintiff's request to proceed IFP on appeal in the New Jersey was denied because of inconsistencies between plaintiff's trial testimony and his IFP application with respect to his business income and his support responsibilities. *Oparaji v. N.E. Auto-Marine Term., 2007 WL 3226605, at \*1 (D.N.J. Oct. 29, 2007).*[FN3]

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 4344522 (S.D.N.Y.)

(Cite as: 2008 WL 4344522 (S.D.N.Y.))

FN3. It is also worth noting, as Penbroke further points out, that in the New Jersey action plaintiff claimed ownership of dredging equipment of substantial value. (Wolfson Letter at 1 & Ex. C; *see also* Oparaji v. N.E. Auto-Marine Term., 2007 WL 3226605, at *1.)

Finally, the Court notes that plaintiff did not seek IFP status in this Court, and apparently was able to meet the fees and expenses of proceeding here.

**\*2** On the facts and circumstances of this case plaintiff's application is plainly insufficient. Plaintiff has not provided all the information called for on the form, omitting information crucial to an assessment of his financial circumstances. Moreover, plaintiff's credibility has been found lacking in connection with a similar application in a sister federal district court. Based on the incomplete status of plaintiff's IFP application, and the apparent credibility issues with respect to plaintiff's reporting of assets, the Court cannot determine on the present record whether plaintiff is indigent. Accordingly, the Court denies the application to proceed in forma pauperis on appeal without prejudice to re-application.

While a fully completed and otherwise credible version of this Court's ordinary form for IFP status on appeal may well be sufficient to warrant a grant of IFP status, the questions raised by plaintiff's application clearly warrant a more searching inquiry. Accordingly, in any subsequent application, the plaintiff is directed to provide complete and detailed information regarding his inability to pay or to give security for fees and costs, including all financial information requested in Form 4 of the Federal Rules of Appellate Procedure, as referenced in Rule 24(a)(1)(A). The Court notes in this regard that unlike the form submitted by plaintiff, both the Rule and the Form specify that the submission must take the form of an affidavit or affirmation under penalty of perjury. Any subsequent application by plaintiff must comply with this requirement.

SO ORDERED.

S.D.N.Y.,2008.

Oparaji v. Atlantic Container Line
Not Reported in F.Supp.2d, 2008 WL 4344522 (S.D.N.Y.)
END OF DOCUMENT

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.



Page 1

Slip Copy, 2011 WL 3501880 (S.D.N.Y.)

(Cite as: 2011 WL 3501880 (S.D.N.Y.))

Only the Westlaw citation is currently available.

United States District Court,

S.D. New York.
Kouriockein VANN, Plaintiff,
v.
N.Y.C. D.O.C.A. Commissioner—Martin HORN,
G.R.V.C. Warden—Lambrazzon, Captain at
G.R.V.C.—Dunbar, Defendants.
No. 10 Cv. 6777(PKC).

Aug. 9, 2011.
*MEMORANDUM AND ORDER*

P. KEVIN CASTEL, District Judge.
    **\*1** Plaintiff Kouriockein Vann, proceeding *pro se,*
brings this action against defendants the New York City
Department of Corrections ("DOCS") Commissioner
Martin Horn, DOCS Warden Lambrazzon of the George
R. Vierno Center on Riker's Island ("GRVC"), and DOCS
Captain Dunbar of GRVC, alleging deliberate indifference
to his serious medical needs. Plaintiff claims that he is
entitled to relief under 42 U.S.C. § 1983 because
defendants violated his constitutional rights between
December 2, 2008 and February 26, 2009 by taking away
corrective footwear that he wore for medical purposes.
(Compl.§§ II.D, III.) Defendants have moved to dismiss
the Complaint pursuant to Rule 12(b), Fed.R.Civ.P. I need
not reach the merits of plaintiff's claim. Plaintiff has
falsely and materially misrepresented his financial assets
in applying to this Court to proceed *in forma pauperis*
("IFP") and, for this reason, plaintiff's Complaint is
dismissed with prejudice.
DISCUSSION

    A prisoner may apply to the court for authorization to
commence an action without prepayment of filing fees
upon a showing that he or she is unable to pay the fees. 28
U.S.C. § 1915(a)(2). If IFP status is granted, the prisoner
will pay the fees gradually from his or her prison trust
account. *Id.* § 1915(b); *see Cuoco v. U.S. Bureau of*

*Prisons,* 328 F.Supp.2d 463, 467 (S.D.N.Y.2004). To
obtain IFP status, the prisoner must submit an affidavit
that includes a statement of all assets the prisoner
possesses. 28 U.S.C. § 1915(a)(2). The prisoner must also
submit a certified copy of his or her trust fund account
summary (or institutional equivalent) for the six months
preceding filing of the complaint from each prison where
the prisoner is or was confined. *Id.*
    If at any time the court determines that, in an
application for IFP status, the prisoner's "allegation of
poverty is untrue," the court "shall dismiss the case." *Id.*
§ 1915(e)(2)(A). The purpose of section 1915(e) is to
prevent abuse of the judicial system by "weed[ing] out the
litigants who falsely understate their net worth in order to
obtain *in forma pauperis* status when they are not entitled
to that status based on their true net worth." *Hobbs v.
Cnty. of Westchester,* 00 Civ. 8170(JSM), 2002 WL
868269, \*2 (S.D.N.Y. May 3, 2002) (quoting *Attwood v.
Singletary,* 105 F.3d 610, 613 (11th Cir.1997)).

    A misrepresentation by a plaintiff as to his or her
financial assets is not necessarily fatal to the plaintiff's
claims. *See Morales v. E.I. Du Pont De Nemours & Co.,*
02 Civ. 786A (F), 2004 WL 2106590, \*2 (W.D.N.Y. Sept.
21, 2004); *Hobbs,* 2002 WL 868269, at \*2. However,
dismissal is appropriate where a plaintiff "misrepresents
[his or] her financial arrangements in bad faith to obtain
IFP status." *Cuoco,* 328 F.Supp.2d at 468. Bad faith
includes "conceal[ing] a source of income in order to gain
access to a court without prepayment of fees." *See id.* A
plaintiff's familiarity with the IFP system may be
considered in determining whether the plaintiff has acted
in bad faith. *See id.* at 466, 469 (finding that plaintiff who
obtained IFP status in fifteen previous civil suits acted in
bad faith in concealing income on her IFP form); *see also
Morales,* 2004 WL 2106590, at \*2 (finding that plaintiff
who was not familiar with the IFP system did not
misrepresent his income in bad faith),

    **\*2** The *Cuoco* case is instructive in determining
whether a plaintiff's misrepresentation on an IFP
application requires dismissal. In *Cuoco,* the plaintiff, a
prisoner, received two settlements totaling $13,500, which

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2011 WL 3501880 (S.D.N.Y.)

(Cite as: 2011 WL 3501880 (S.D.N.Y.))

she requested be sent to her mother rather than deposited into her prison account. 328 F.Supp.2d at 465. Despite having extensive litigation experience—she previously sued the Government seventeen times and obtained IFP status in fifteen of those suits—plaintiff did not report the settlements on two IFP applications. *Id.* at 466. These were not her first misrepresentations; she also misrepresented her financial assets when applying for IFP status in other federal actions. *Id.* at 469. The Court dismissed plaintiff's complaint with prejudice, finding that plaintiff acted in bad faith by deliberately attempting to conceal her assets in filing for IFP status. *Id.* at 468–69.

Here, plaintiff's actions represent a deliberate effort to conceal assets in order to obtain IFP status. In his IFP application received August 9, 2010, plaintiff stated that he was receiving $13.00 per month as a salary from the DOC, as well as $50 bimonthly from his mother-in-law. (IFP Application, attached at Decl. of Martin Bowe in Supp. of City Defs.' Mot. to Dismiss ("Bowe Decl.") Ex. A.) He claimed that he had not received money from any other source, did not have any money, and did not pay money to support anyone. (*Id.*) Plaintiff signed the application directly beneath the following statements: "I understand that the Court may dismiss this case if I give a false answer to any questions in this declaration. I declare under penalty of perjury that the foregoing is true and correct." (*Id.*)

Despite having sworn to the above, plaintiff did not disclose on his IFP application that he received a $30,000 settlement from the City of New York on February 2, 2010—approximately six months before he filed for IFP status. (Execution with Notice to Garnishee, attached at Pl.'s Opp. to Defs.' Mot. to Dismiss ("Pl.'s Opp.").) Furthermore, even though plaintiff stated that he did not pay money to support anyone, $19,886.00 of the settlement amount was garnished for past-due child support payments. (*Id.*) After the garnishment, the New York City Comptroller sent plaintiff a check for the remaining balance of $10,114.00. (Check, attached at Bowe Decl. Ex. B.)

The check was endorsed on April 30, 2010 and cleared on May 3, 2010—approximately three months before plaintiff filed for IFP status. (*Id.;* Comptroller

Financial Records, attached at Defs.' Letter dated Aug. 1, 2011 Ex. A.) Plaintiff did not deposit the check into his prison account. (Pl.'s Letter dated July 3, 2011.) Rather, plaintiff had his sister endorse the check in his name and allegedly distribute the money amongst his children, wife, and grandson. (*Id.;* Pl.'s Opp. at Point V.) Plaintiff did not report the $10,114.00 settlement amount at any time when applying for IFP status in this case.

**\*3** I conclude that this is not a circumstance in which the plaintiff may claim that he did not have the money when he applied for IFP status because he made a bona fide gift to family members. I reach this conclusion for several reasons: first, the claim of distribution to family members is made by plaintiff, an experienced litigant, in an unsworn memorandum, not in an affidavit or declaration, and there is no evidentiary support for the claim (Pl.'s Opp. at Point V.); second, the assertion is devoid of any detail such as dates and amounts; third, the factual basis for the underlying claim arose nearly a year before his receipt of the $10,114.00, and, hence, he knew that he had a potential federal claim at the time he purported to give away the money; and, fourth, by his own account, he effectuated the transfer in a surreptitious way. Rather than depositing the settlement amount into his prison account, he routed the check to his sister to endorse with his name and then distribute to other family members without keeping any documentation of the transfers. (*Id.;* Pl.'s Letter dated July 3, 2011.)

Furthermore, plaintiff's deliberate omission of the receipt of the settlement in response to a direct question on the IFP application undermines his claim of a bona fide gift and demonstrates bad faith. The IFP application asks: "Have you *received,* within the past twelve months, any money from any source?" (IFP Application, attached at Bowe Decl. Ex. A (emphasis added).)) Plaintiff responded as follows: "My mother in law $50.00 a month or bi-monthly." (*Id.*) This statement was knowingly and materially false because it omitted the substantial sum on money he had received from the City. Plaintiff had received over $10,000 from the New York City Comptroller. (Check, attached at Bowe Decl. Ex. B.) Instead of disclosing these funds and what became of them after he received them, plaintiff intentionally concealed this money when filing for IFP status.

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2011 WL 3501880 (S.D.N.Y.)

(Cite as: 2011 WL 3501880 (S.D.N.Y.))

Plaintiff's litigation experience and familiarity with the IFP system further compound the severity of the misrepresentation. His omission "smacks of bad faith." *Cuoco, 328 F.Supp.2d at 468.* Plaintiff knew that for an incarcerated person with minimal living expenses beyond child support, truthfully reporting the settlement would likely have lead the Court to deny IFP status.

Plaintiff filed three actions in federal court prior to this one. Complaint, *Vann v. N.Y.C. Dep't of Corr. Comm'r,* 10 Civ. 4601 (S .D.N.Y. June 14, 2010), ECF No. 2; Complaint, *Vann v. Hughes,* 08 Civ. 4012 (S.D.N.Y. Apr. 29, 2008), ECF No. 2; Petition for Writ of Habeas Corpus, *Vann v. Herbert,* 01 Civ. 986 (N.D.N.Y. June 19, 2001), ECF No. 1. He also recently filed a fifth action. Complaint, *Vann v. Fischer,* 11 Civ.1958 (S.D.N.Y. March 17, 2011), ECF No. 1. In all five actions, plaintiff applied for IFP status. Declaration in Support of Request to Proceed IFP, *Vann. v.. Fischer,* 11 Civ.1958 (S.D.N.Y. Mar. 17, 2011), ECF No. 3; IFP Application, attached at Def. Dec. Ex. A; Endorsement on Declaration in Support of Request to Proceed IFP, *Vann v. N.Y.C. Dep't of Corr. Comm'r,* 10 Civ. 4601 (S.D.N.Y. June 14, 2010), ECF No. 1; Endorsement on Declaration in Support of Request to Proceed IFP, *Vann v. Hughes,* 08 Civ. 4012 (S.D.N.Y. Apr. 29, 2008), ECF No. 1; IFP Application, *Vann v. Herbert,* 01 Civ. 986 (N.D.N.Y. June 19, 2001), ECF No. 3.

**\*4** In addition to these federal court actions, plaintiff has filed numerous state court actions as well. In 2000, plaintiff filed two civil actions in state court—one against the New York State Commissioner for Correctional Services and the other against DOCS employees. *Vann v. Goorde,* No. 000812/2000 (N.Y. Sup.Ct. Oneida County 2000); *Vann v. DOCS Employees at Mid–State Corr. Facility,* No. 001171/2000 (N.Y. Sup.Ct. Oneida County 2000). In 2001 and 2003, plaintiff appealed two DOCS determinations that he had violated prison disciplinary rules. *Vann v. Goord,* 308 A.D.2d 611, 764 N.Y.S.2d 219 (App. Div.3d Dep't 2003); *Vann v. Costello,* 285 A.D.2d 924, 727 N.Y.S.2d 918 (App. Div.3d Dep't 2001). Most recently, in 2010, plaintiff brought a collateral attack on his conviction. *Vann v. Heath–Supt.,* No. 000402/2010 (N.Y. Sup.Ct. Westchester County 2010).

This is also not the first time plaintiff has misrepresented his financial assets in applying to proceed IFP. In plaintiff's third action in federal court, Judge Pauley dismissed the complaint with prejudice after finding that plaintiff made false statements on his IFP application. Order, *Vann v. N.Y.C. Dep't of Corr. Comm'r,* 10 Civ. 4601 (S.D.N.Y. Apr. 5, 2010), ECF No. 23. In that case, plaintiff stated that his only source of income between January 2009 and January 2010 was $30 from his mother-in-law. *Id.* However, $2,059.10 had been deposited into plaintiff's prison account during that time. *Id.* Judge Pauley found that plaintiff intentionally concealed his available assets to obtain IFP status. *Id.*

The entirety of the foregoing leads me to conclude that plaintiff falsely and materially misstated his assets on his IFP application and did so in bad faith. His allegation of poverty was untrue at the time he made it. The statute requires dismissal under this circumstance. *See* 28 U.S.C. § 1915(e)(2)(A) ( "[T]he court shall dismiss the case at any time if the court determines that—(A) the allegation of poverty is untrue ....").

CONCLUSION

For the reasons outlined above, defendants' motion to dismiss (Docket # 13) is GRANTED. The Court certifies, pursuant to 28 U.S.C. § 1915(a)(3), that any appeal from this Order would not be taken in good faith, and therefore *in forma pauperis* status is denied for the purpose of an appeal. *See Coppedge v. United States,* 369 U.S. 438, 444–45 (1962). The Clerk of the Court is directed to enter judgment in favor of the defendants.

SO ORDERED.

S.D.N.Y.,2011.

Vann v. Horn
Slip Copy, 2011 WL 3501880 (S.D.N.Y.)
END OF DOCUMENT

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2004 WL 2106590 (W.D.N.Y.)

(Cite as: 2004 WL 2106590 (W.D.N.Y.))

**C**

Only the Westlaw citation is currently available.
United States District Court,

W.D. New York.
David MORALES, Plaintiff,
v.
E.I. DU PONT DE NEMOURS AND COMPANY,
Defendant.
No. 02-CV-786A(F).

Sept. 21, 2004.

Chiacchia & Fleming, LLP, Andrew P. Fleming, Buffalo, New York, for Plaintiff, of counsel.

Phillips, Lytle, Hitchcock, Blaine & Huber, LLP, James D. Donathan, and Jacqueline Phipps Polito, Rochester, New York, for Defendant, of counsel.

REPORT and RECOMMENDATION

FOSCHIO, Magistrate J.

*JURISDICTION*

**\*1** This matter was referred to the undersigned by the Hon. Richard J. Arcara on January 30, 2003 for determination of all pretrial matters pursuant to 28 U.S.C. §§ 636(b)(1)(A), (B), and (C), including all dispositive and non-dispositive motions. It is presently before the court on the Defendant's motion, filed March 7, 2003, to dismiss the complaint on the grounds that Plaintiff's allegations of poverty in his motion to proceed *in forma pauperis* are false (Docket No. 9).

*BACKGROUND and FACTS*

Plaintiff, a current Du Pont employee, filed this action *pro se* on November 12, 2002 alleging discrimination under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.* Plaintiff alleges that he was harassed and retaliated against on the basis of his national origin after he filed a grievance against a supervisor (Docket No. 1). Plaintiff filed a charge of discrimination with the Equal Employment Opportunity Commission ("EEOC") and received a right to sue letter on August 21, 2002.

At the time he filed the complaint, Plaintiff filed a request to proceed *in forma pauperis* ("IFP") (Docket No. 2). Plaintiff stated that his gross monthly wages were

$2,000 and, elsewhere on the application, he stated that his total gross monthly income was $2,500. The motion for IFP status was granted on November 14, 2002 (Docket No. 3).

Defendant filed an answer to the Complaint on January 24, 2003, denying any discriminatory conduct and asserting that Plaintiff had misrepresented his income in his motion for IFP status (Docket No. 5, ¶ 9). On March 7, 2003, Defendant moved to dismiss the Complaint on the basis of false allegations in the IFP motion (Docket No. 9). In support of the motion, Defendant offered an affidavit of Deborah A. Brauer, Superintendent of Employee Relations for Defendant, who stated that at the time of the filing of the IFP application, Plaintiff earned a weekly salary of $1,176.24. For the calendar year 2002, Plaintiff earned $53,509.76 (Docket No. 11, ¶ 4).

Plaintiff has now retained an attorney. In response to the motion for summary judgment, Plaintiff filed an affidavit in which he explained that he was unfamiliar with IFP status and completed the application at the suggestion of an employee in the office of the Clerk of the District Court for the Western District of New York (Docket No. 19, ¶ 2). He was confused about the meaning of the term "gross," and mistakenly recorded his "net" income on the application. *Id.,* ¶ 3. Plaintiff stated that his errors were "not fraudulent or in bad faith" and were the result of "an honest misunderstanding of the terms...." *Id.,* ¶¶ 4-5.

Defendant filed a reply affidavit on May 19, 2003 (Docket No. 21). In the affidavit, Ms. Brauer stated that at the time of the filing of Plaintiff's IFP application, his gross monthly pay was $5,466.08 and his net monthly pay was $3,231.75. *Id.,* ¶ 6. Ms. Brauer further stated that it was "abundantly clear that [Plaintiff] was not confused in filling out the application, but rather intentionally misrepresented his income to avoid payment of the appropriate filing fees." *Id.,* ¶ 8.

**\*2** Oral argument was deemed not necessary. For the reasons that follow, Defendant's motion to dismiss should be DENIED.

*DISCUSSION*

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2004 WL 2106590 (W.D.N.Y.)

(Cite as: 2004 WL 2106590 (W.D.N.Y.))

Title 28 U.S.C. § 1915 governs IFP proceedings. Section 1915(e)(2)(A) provides that the court shall dismiss the case at any time if it determines that "the allegation of poverty is untrue...." Despite this mandatory language, dismissal is addressed to the discretion of the district court, and is a harsh remedy to be reserved for the most extreme cases. *Hobbs v. County of Westchester,* 2002 WL 868269, *1 (S.D.N.Y. May 3, 2002).*

"Dismissal of a case with prejudice is appropriate when an applicant misrepresents her financial arrangements in bad faith to obtain IFP status." *Cuoco v. United States Bureau of Prisons,* 328 F.Supp.2d 463, 468 (S.D.N.Y.2004). The question before the court is not the accuracy of every specific representation, but whether the applicant's allegation of poverty is untrue. *Hobbs,* 2002 WL 868269, at *1.* An IFP application is sufficient if the applicant cannot pay the costs of litigation and still provide for his needs and those of his dependents. *Id.* A review of the caselaw reveals that dismissal of an action under § 1915(e)(2)(A) has been reserved for those egregious cases in which an IFP applicant deliberately concealed finances and property far in excess of the misstatement here. *See, e.g., Cuoco,* 329 F.Supp.2d at 468 (case dismissed where plaintiff, an experienced prison litigant, omitted $13,500 in court settlements and manipulated prison account system, demonstrating a "total disregard for the truth"); *see also Thomas v. Gen. Motors Acceptance Corp.,* 288 F.3d 305 (7th Cir.2002) (case dismissed where plaintiff failed to disclose retirement distribution of $73,000); *Mathis v. New York Life Ins. Co.,* 133 F.3d 546 (7th Cir.1998) (case dismissed where plaintiff, experienced in IFP system, failed to disclose home with $14,000 of equity); *Bell v. Dobbs Int'l Serv.,* 6 F.Supp.2d 863, 865 (E.D.Mo.1998) (plaintiff failed to disclose four properties with value in excess of over $150,000-court found omitted information to be of "significant magnitude").

Here, Plaintiff understated his monthly income on the IFP application, although he contends it was an honest mistake. Defendant argues that Plaintiff so underestimated even his net earnings that the only conclusion the court can draw is that the misstatement was fraudulent and in bad faith. Despite the fact that Plaintiff understated his monthly net income by over $1,000, there is no proof that Plaintiff intentionally misrepresented his income in an

attempt to gain IFP status and avoid the payment of filing fees. Before he filed the application, Plaintiff was not familiar with the IFP system, and completed the form at the suggestion of a court employee. Defendant has not shown that the misstatement of monthly income was fraudulent or in bad faith, warranting dismissal of the case. Taking into account an accurate statement of Plaintiff's income, the court finds that Plaintiff is no longer eligible for IFP status. As such, the proper sanction is a revocation of IFP status *nunc pro tunc* and an order of dismissal conditioned on the payment of the filing fee should be entered. *See Christensen v. Bristol-Myers Co.,* 1990 WL 6554, *2 (S.D.N.Y. January 22, 1990).*

*CONCLUSION*

**\*3** The Defendant's motion to dismiss (Docket No. 9) should be DENIED and the Complaint should be dismissed unless, within 10 days following the District Judge's acceptance of this Report and Recommendation, Plaintiff pays the required filing fee to the Clerk of the Court.

Pursuant to 28 U.S.C. § 636(b)(1), it is hereby

ORDERED that this Report and Recommendation be filed with the Clerk of the Court.

ANY OBJECTIONS to this Report and Recommendation must be filed with the Clerk of the Court within ten (10) days of receipt of this Report and Recommendation in accordance with the above statute, Rules 72(b), 6(a) and 6(e) of the Federal Rules of Civil Procedure and Local Rule 72.3.

*Failure to file objections within the specified time or to request an extension of such time waives the right to appeal the District Court's Order.* *Thomas v. Arn,* 474 U.S. 140 (1985); *Small v. Secretary of Health and Human Services,* 892 F.2d 15 (2d Cir.1989); *Wesolek v. Canadair Limited,* 838 F.2d 55 (2d Cir.1988).

Let the Clerk send a copy of this Report and Recommendation to the attorneys for the Plaintiff and the Defendant.

SO ORDERED.

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2004 WL 2106590 (W.D.N.Y.)

(Cite as: 2004 WL 2106590 (W.D.N.Y.))

W.D.N.Y.,2004.

Morales v. E.I. Du Pont De Nemours and Co
Not Reported in F.Supp.2d, 2004 WL 2106590
(W.D.N.Y.)
END OF DOCUMENT

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.



Not Reported in F.Supp.2d, 1999 WL 1067841 (D.Conn.)

(Cite as: 1999 WL 1067841 (D.Conn.))



Only the Westlaw citation is currently available.
United States District Court, D. Connecticut.

Francisco AGUILAR, Plaintiff,
v.
UNITED STATES OF AMERICA, Defendant.
Nos. 3:99–MC–304 (EBB), 3:99–MC–408 (EBB).

Nov. 8, 1999.
*Dismissal of Plaintiff's Complaints*

BURNS, Senior J.

    **\*1** Francisco Aguilar, pro se, seeks leave to proceed in forma pauperis ("IFP") to press two meritless complaints against the government, which is prosecuting related civil forfeiture actions against his properties. Although Aguilar is otherwise financially eligible, the court dismisses these complaints sua sponte pursuant to 28 U.S.C. § 1915(e)(2)(B) because the purported claims are frivolous, baseless and irremediable.

*Background*

    Would-be plaintiff Aguilar is no stranger to this court. He is currently serving a forty-year sentence for drug trafficking at the federal penitentiary in Leavenworth, Kansas. *See United States v. Tracy,* 12 F.3d 1186, 1189 (2d Cir.1993) (affirming conviction and sentence). In connection with his conviction for narcotics offenses, the government filed civil forfeiture actions pursuant to 21 U.S.C. § 881(a) in 1990 and 1991 against four of Aguilar's Connecticut properties, which have since been sold. With the help of CJA-appointed counsel, Aguilar has vigorously defended each of these four actions, three of which remain pending before this court, and are scheduled for trial in January 2000.[FN1]

        FN1. *See United States v. One Parcel Of Property Located At 2030–32 Main St.,* No. 5:90–cv–544(EBB) (pending); *United States v. One Parcel Of Property Located At 8 Drumlin Rd.,* No. 5:90–cv–545 (EBB) (pending); *United States v. One Parcel Of Property Located At 2034–38 Main St.,* No. 5:90–cv–546(EBB) (pending); *see also United States v. One Parcel Of Property Located At 414 Kings Hwy.,* No. 5:91–cv–158(EBB) (closed).

    Now Aguilar seeks to take the offensive by filing these purported claims against the government, and serving the current property owners as well as the Assistant United States Attorney who is prosecuting the related forfeiture cases. This court denied without prejudice Aguilar's initial complaint, which was erroneously captioned "United States v. One Parcel Of Property Located At 414 Kings Hwy.," one of the cases already docketed and then pending. *See* Order of June 15, 1999. Upon refiling an amended complaint (the "Amended Complaint") with the appropriate caption, Aguilar also filed a second complaint (the "Second Complaint"), seeking the same relief and asserting essentially the same claims against the government for bringing the other three forfeiture cases. The clerk returned these pleadings because Aguilar failed to complete the IFP forms. *See* Order of August 25, 1999. After Aguilar cured these pleading deficiencies, miscellaneous docket numbers were assigned to the complaints.

    In Aguilar's Amended Complaint—the one originally filed against his own property at 414 Kings Highway—Aguilar seeks return of the property, compensatory damages and $100,000,000 in punitive damages "to deter the United States of America from committing a similar Abuse of Power." Aguilar pleads his case in four "Articles," asserting sundry state and federal "constitutional" claims, including conversion, false pretenses, mail fraud, and breach of fiduciary duty. The Amended Complaint also suggests an allegation that the government falsified and deliberately omitted known material facts from its probable cause affidavit in "disregard" of 19 U.S.C. § 1615, the statute outlining the burden of proof in administrative forfeiture proceedings.

    The Second Complaint—the one related to the government's seizure of the other three properties—seeks similar equitable and monetary relief, including return of

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 1999 WL 1067841 (D.Conn.)

(Cite as: 1999 WL 1067841 (D.Conn.))

the properties, compensation for "suffering," "usurpation," denial of his use and enjoyment of the properties and lost rents, and one billion dollars in punitive damages. Liberally construed, the Second Complaint simply repeats the claims of the Amended Complaint except for one additional allegation: that Aguilar was entitled to, and did not receive, a hearing prior to the seizure and sale of his properties.

*Discussion*

A. *§ 1915(e)(2)(B) Standards*

**\*2** The Prisoner Litigation Reform Act ("PLRA") mandates dismissal of an IFP action if it: "(i) is frivolous or malicious; (ii) fails to state a claim on which relief may be granted; or (iii) seeks monetary relief against a defendant who is immune from such relief." 28 U.S.C. § 1915(e)(2)(B) (as amended in 1996). Prior to the adoption of the PLRA, district courts had discretion to dismiss frivolous actions; now they are required to do so. *See* Pub.L. 104–134, 110 Stat. 1321 (1996) (making dismissal of frivolous actions mandatory, and also requiring dismissal for failing to state a claim or seeking damages from an immune defendant). Because Aguilar's claims qualify for dismissal under all three of these prongs, the standards for each are set out in turn.

1. *Frivolous or Malicious*

A complaint is frivolous if "it lacks an arguable basis either in law or in fact." *Neitzke v. Williams,* 490 U.S. 319, 325, 109 S.Ct. 1827, 1831–32, 104 L.Ed.2d 338 (1989) (interpreting § 1915(d), later redesignated as § 1915(e)(2)(B)(i), to preclude "not only the inarguable legal conclusion, but also the fanciful factual allegation"). Factual frivolity occurs where "the 'factual contentions are clearly baseless,' such as when allegations are the product of delusion or fantasy." *Livingston v. Adirondack Beverage Co.,* 141 F.3d 434, 437 (2d Cir.1998) (quoting *Neitzke,* 490 U.S. at 327, 109 S.Ct. at 1833). Legal frivolity, by contrast, occurs where "the claim is based on an indisputably meritless legal theory [such as] when either the claim lacks an arguable basis in law, or a dispositive defense clearly exists on the face of the complaint." *Livingston,* 141 F.3d at 327 (internal quotes

and citation omitted); *see also Tapia–Ortiz v. Winter,* 185 F.3d 8, 11 (2d Cir.1999) (upholding dismissal as frivolous where "[t]he complaint's conclusory, vague, and general allegations ... d[id] not [ ] suffice to establish" plaintiff's claims).

In addition to frivolous claims, the court must also dismiss any malicious claims, i.e., where "[t]he manifest purpose of appellant's complaint [i]s not to rectify any cognizable harm, but only to harass and disparage." *Tapia–Ortiz,* 185 F.3d at 11.

2. *Failure To State A Claim*

An IFP action must also be dismissed sua sponte if it fails to state a claim on which relief may be granted. *See* 28 U.S.C. § 1915(e)(2)(B)(ii); *see also Star v. Burlington Police Dep't,* 189 F.3d 462, 1999 WL 710235 (2d Cir.1999) (summarily affirming dismissal made pursuant to § 1915(e)(2)(B)(ii) of purported due process challenge that failed to state a claim). As in a motion to dismiss under Fed.R.Civ.P. 12(b)(6), a § 1915(e)(2)(B)(ii) dismissal is warranted only if "it is clear that no relief could be granted under any set of facts that could be proved consistent with the allegations." *Hishon v. King & Spalding,* 467 U.S. 69, 73, 104 S.Ct. 2229, 2232, 81 L.Ed.2d 59 (1984).

**\*3** Pro se complaints, such as these, however, must be read broadly, *see Haines v. Kerner,* 404 U.S. 519, 520–21, 92 S.Ct. 594, 595–96, 30 L.Ed.2d 652 (1972) (per curiam), and may not be dismissed "simply because the court finds the plaintiff's allegations unlikely." *Denton v. Hernandez,* 504 U.S. 25, 33, 112 S.Ct. 1728, 1733, 118 L.Ed.2d 340 (1982) (construing pre-PLRA complaint as frivolous). Therefore,

a pro se plaintiff who is proceeding in forma pauperis should be afforded the same opportunity as a pro se fee-paid plaintiff to amend his complaint prior to its dismissal for failure to state a claim [under § 1915(e)(2)(B)(ii) ], unless the court can rule out any possibility, however unlikely it might be, that an amended complaint would succeed in stating a claim.

*Gomez v. USAA Federal Sav. Bank,* 171 F.3d 794, 796 (2d Cir.1999) (per curiam) (vacating § 1915(e)(2)(B)(ii) dismissal where "the district court did

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 1999 WL 1067841 (D.Conn.)

(Cite as: 1999 WL 1067841 (D.Conn.))

not give th[e] pro se litigant an opportunity to amend his complaint, and because [the court] cannot rule out the possibility that such an amendment will result in a claim being successfully pleaded").

### 3. *Relief Against An Immune Defendant*

Dismissal of an IFP case is also required where plaintiff seeks monetary damages against a defendant who is immune from such relief. *See* 28 U.S.C. § 1915(e)(2)(B)(iii); *see also,* *Spencer v. Doe,* 139 F.3d 107, 111 (2d Cir.1998) (affirming dismissal pursuant to § 1915(e)(2)(B)(iii) of official-capacity claims in § 1983 civil rights action because "the Eleventh Amendment immunizes state officials sued for damages in their official capacity"). Here, even if Aguilar's claims had any merit, the complaints must be dismissed nevertheless because each seeks monetary damages from the United States, which is immune from such relief. *See* *Presidential Gardens Assocs. v. United States,* 175 F.3d 132, 139 (2d Cir.1999) (noting "[t]he sovereign immunity of the United States may only be waived by federal statute").

### B. *Dismissal Standards Applied*

Aguilar's complaints are devoid of any arguable basis in law or fact. Most of his factual allegations—to the extent they are even comprehensible—are conclusory, vague and baseless. For example, he purports to allege: "The United States of America has misused its power against the Francisco Aguilar's Intangible Rights." (Amended Complaint at 2); and "The United States of America overpassed its bound of its authority and make a tyrannic use of its powers." (Second Complaint at 4). Even the Second Circuit has recognized Aguilar's prior handiwork to be "so indisputably lacking in merit as to be frivolous within the meaning of 28 U.S.C. § 1915(e)." *See United States v. One Parcel Of Property Located At 414 Kings Hwy.,* No. 97–6004 (2d Cir. April 23, 1997) (mandate [Doc. No. 167] dismissing appeal of Aguilar's motion to enjoin state default proceedings).

Only two allegations asserted by Aguilar are even arguably actionable: the lack-of-probable-cause argument in the Amended Complaint and the due process claim in the Second Complaint. Both of these, however, must be dismissed because each fails to state a claim for which relief may be granted.

### 1. *Probable Cause*

**\*4** The one potentially cogent legal claim that can be derived from a liberal reading of the Amended Complaint has already been conclusively decided by the court and is therefore barred from relitigation. *See United States v. One Parcel Of Property Located At 414 Kings Hwy.,* No. 5:91–cv–158 (denying lack-of-probable-cause argument in motion to dismiss [Doc. No. 64] in 1993, and in motions for summary judgment [Doc. Nos. 55, 96] in 1996). Here again, Aguilar reiterates his allegation that the government's affidavit in support of probable cause was tainted because it failed to disclose that the 414 Kings Highway property was subject to a mortgage held by People's Bank, and therefore could not have been purchased with funds traceable to drug sales.

After the government voluntarily dismissed that forfeiture action, this court initially ordered the sale proceeds of the property disbursed to Aguilar. *See id.,* Order of Oct. 25, 1996 [Doc. No. 151]. The bank appealed the order and, during the pendency of the appeal, secured a default judgment in state court against Aguilar. *See People's Bank v. Aguilar,* No. CV–96–0337761–S (Conn.Super.Ct.1997). On the Bank's appeal from this court's disbursal of proceeds to Aguilar, the Second Circuit reversed and remanded. *See United States v. One Parcel Of Property Located At 414 Kings Hwy.,* 128 F.3d 125, 128 (2d Cir.1997). On remand, in accordance with the Second Circuit mandate, this court disbursed the proceeds from the sale of 414 Kings Highway to the bank in partial satisfaction of Aguilar's debt owed on the defaulted mortgage. *See United States v. One Parcel Of Property Located At 414 Kings Hwy.,* No. 5:91–cv–158, 1999 WL 301704 (D.Conn. May 11, 1999).

Because the lack-of-probable-cause claim, perfunctorily adverted to in Aguilar's otherwise meritless Amended Complaint, has already been addressed in the *414 Kings Highway* forfeiture case, the court will not consider it again. As such, it must be dismissed because it fails to state a claim for which this court could grant further relief.

### 2. *Due Process*

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 1999 WL 1067841 (D.Conn.)

(Cite as: 1999 WL 1067841 (D.Conn.))

In addition to his now-stale probable cause allegation about 414 Kings Highway, Aguilar claims in the Second Complaint that he was wrongfully denied a hearing prior to the seizure and sale of the other three properties. However, the constitutional right to a preseizure hearing in civil forfeiture proceedings was not recognized until 1993, two years after the seizure in this case. *See United States v. James Daniel Good Real Property,* 510 U.S. 43, 114 S.Ct. 492, 126 L.Ed.2d 490 (1993) (holding that Fifth Amendment Due Process protections apply to civil forfeiture proceedings against real property). Even if such due process protections applied retroactively, Aguilar's challenge to the sale of the properties would lack merit because exigent circumstances required their interlocutory sale.

In civil forfeiture proceedings "[u]nless exigent circumstances are present, the Due Process Clause requires the Government to afford notice and a meaningful opportunity to be heard before seizing real property subject to civil forfeiture." *Id.* at 62, 114 S.Ct. at 505; *see also United States v. One Parcel Of Property Located At 194 Quaker Farms Rd.,* 85 F.3d 985, 988 (2d Cir.1996) ("[a]bsent exigent circumstances, a hearing, with notice to record owners, is held before seizure."). "To establish exigent circumstances, the Government must show that less restrictive measures—i.e., a lis pendens, restraining order, or bond—would not suffice to protect the Government's interest in preventing the sale, destruction, or continued unlawful use of the real property." *Id.* at 62, 114 S.Ct. at 505.

**\*5** Aguilar's properties addressed in the Second Complaint were seized because there was probable cause that each had been used to facilitate the offenses for which he was convicted. *See* 21 U.S.C. § 881(a)(7) (1999). This civil forfeiture statute authorizes interlocutory sale of seized properties by two methods, which are incorporated by reference into the statute. *See* 21 U.S.C. § 881(b) (authorizing sale of property subject to civil forfeiture upon process issued pursuant to the Supplemental Rules for Certain Admiralty and Maritime Claims; 21 U.S.C. § 881(d) (authorizing seizure and summary sale governed by the customs laws codified in the Tariff Act of 1930, 19 U.S.C. §§ 1602–1619). Though the source of authority differs, the standards for sale under each are virtually indistinguishable.

Rule E(9)(b) of the Maritime Rules permits the interlocutory sale of seized property if such property

is perishable, or liable to deterioration, decay, or injury by being detained in custody pending the action, or if the expenses of keeping the property is [sic] excessive or disproportionate, or if there is unreasonable delay in securing the release of property....

Supplemental Rule for Certain Admiralty and Maritime Claims E(9)(b). Section 1612(a) of the customs laws, by contrast, provides for seizure and summary sale whenever it appears that such property

is liable to perish or to waste or to be greatly reduced in value by keeping, or that the expense of keeping the same is disproportionate to the value thereof....

19 U.S.C. § 1612(a) (1999).

Here, the Chief Deputy United States Marshal certified that the properties located at both 2030–32 Main St., Bridgeport (No. 5:90–cv–544), and 8 Drumlin Rd., Westport (No. 5:90–cv–545), were abandoned and therefore subject to vandalism, deterioration and depreciation. *See* 2/20/91 Declaration in Support of Motion for Interlocutory Sale [Doc. Nos. 28 (5:90–cv–544), 31 (5:90–cv–545) ] at ¶¶ 4, 5. The marshal also certified that the mortgage obligations exceeded by over $ 1,000 per month the rental income of the 2034–38 Main St., Bridgeport (No. 5:90–cv–546), property, which was several months in arrears and had little or no equity. *See* 2/21/90 Declaration in Support of Motion for Interlocutory Sale [Doc. No. 27 (5:90–cv–546) ] at ¶ 4. This court found these reasons sufficiently exigent to order the interlocutory sales. *See* 8/1/90 Order for an Interlocutory Sale [Doc. Nos. 34 (5:90–cv–544), 50 (5:90–cv–545), 31 (5:90–cv–546)]. Interlocutory sale was thus warranted under both Rule E(9)(b) and § 1612(a) because the two abandoned properties were liable to deteriorate or lose value and the mortgage liabilities of the rented property were disproportionate in comparison to its value. *Cf. United States v. Esposito,* 970 F.2d 1156, 1161 (2d Cir.1992) (vacating order of interlocutory sale of forfeited home where "there was no finding that t[he amount expended for maintenance and repairs] was

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 1999 WL 1067841 (D.Conn.)

(Cite as: 1999 WL 1067841 (D.Conn.))

excessive or disproportionate").

**\*6** Aguilar's claim that he was wrongfully denied an opportunity to be heard prior to the sale of his properties is therefore not a cognizable due process challenge because the exigency of the properties' abandonment and disproportionate cost of upkeep required their interlocutory sale. Thus, sua sponte dismissal is warranted because Aguilar's due process claim fails to state a remediable cause of action.

3. *Other Claims*

The remainder of Aguilar's claims are frivolous and can be disposed of readily. To the extent Aguilar's claim invoking 19 U.S.C. § 1615 can be construed as challenging the constitutionality of shifting the burden to the claimant upon the government's showing of probable cause, the Second Circuit has "h[e]ld that it does not violate due process to place the burden of proving an innocent owner affirmative defense on the claimant." *194 Quaker Farms Rd.,* 85 F.3d at 987. In addition, the tort claims for false pretenses and conversion are not actionable as these are intentional torts to which the limited waiver of sovereign immunity of the Federal Tort Claims Act ("FTCA") is inapplicable. *See* 28 U.S.C. § 2680(h); *see also Bernard v. United States,* 25 F.3d 98, 104 (2d Cir.1994) ("the FTCA does not authorize suits for intentional torts based on the actions of Government prosecutors"). Furthermore, because the United States government is not a fiduciary and owes no associated duties to Aguilar, his breach of fiduciary duty allegation against the government fails to state a claim. Finally, Aguilar also fails to state a valid mail fraud claim as that criminal code provision, 18 U.S.C. § 1341, may only be prosecuted by the government, not against it.

*Conclusion*

For the foregoing reasons, Aguilar's complaints [Nos. 3:99–mc–304 and 3:99–mc–408] are dismissed pursuant to 28 U.S.C. § 1915(e)(2)(B) because they present frivolous allegations, none of which state a cognizable claim, and seek monetary relief from an immune defendant. Because the court cannot definitively rule out the possibility that amendment to the pleadings might result in an actionable claim, *see Gomez,* 171 F.3d at 796,

these dismissals are made without prejudice and may be replead after the conclusion of the related forfeiture proceedings.

D.Conn.,1999.

Aguilar v. U.S.

Not Reported in F.Supp.2d, 1999 WL 1067841 (D.Conn.)

END OF DOCUMENT

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.



Not Reported in F.Supp.2d, 1998 WL 832708 (S.D.N.Y.)

(Cite as: 1998 WL 832708 (S.D.N.Y.))

**c**

Only the Westlaw citation is currently available.
United States District Court, S.D. New York.

Theodore HUDSON, Plaintiff,
v.
Christopher ARTUZ, Warden Philip Coombe,
Commissioner Sergeant Ambrosino Doctor Manion
Defendants.
No. 95 CIV. 4768(JSR).

Nov. 30, 1998.

Mr. Theodore Hudson, Great Meadow Correctional Facility, Comstock.

Alfred A. Delicata, Esq., Assistant Attorney General, New York.

MEMORANDUM AND ORDER

BUCHWALD, Magistrate J.

**\*1** Plaintiff Theodore Hudson filed this *pro se* action pursuant to 42 U.S.C. § 1983 on April 26, 1995. Plaintiff's complaint alleges defendants violated his constitutional rights while he was an inmate at Green Haven Correctional Facility.[FN1] Plaintiff's complaint was dismissed *sua sponte* by Judge Thomas P. Griesa on June 26, 1995 pursuant to 28 U.S.C. § 1915(d). On September 26, 1995, the Second Circuit Court of Appeals vacated the judgment and remanded the case to the district court for further proceedings.

   FN1. Plaintiff is presently incarcerated at Sullivan Correctional Facility.

The case was reassigned to Judge Barbara S. Jones on January 31, 1996. Defendants moved to dismiss the complaint pursuant to Fed.R.Civ.P. 12(c) on November 25, 1996. Thereafter, the case was reassigned to Judge Jed S. Rakoff on February 26, 1997. On February 26, 1998, Judge Rakoff granted defendants' motion to dismiss, but vacated the judgment on April 10, 1998 in response to plaintiff's motion for reconsideration in which plaintiff claimed that he never received defendants' motion to dismiss.

By Judge Rakoff's Order dated April 14, 1998, this case was referred to me for general pretrial purposes and for a Report and Recommendation on any dispositive motion. Presently pending is defendants' renewed motion to dismiss. Plaintiff filed a reply on July 6, 1998. For the reasons discussed below, plaintiff's complaint is dismissed without prejudice, and plaintiff is granted leave to replead within thirty (30) days of the date of the entry of this order.

FACTS

Plaintiff alleges that he was assaulted by four inmates in the Green Haven Correctional Facility mess hall on March 14, 1995. (Complaint at 4.) He alleges that he was struck with a pipe and a fork while in the "pop room" between 6:00 p.m. and 6:30 p.m. (Complaint at 4–5.) Plaintiff contends that the attack left him with 11 stitches in his head, chronic headaches, nightmares, and pain in his arm, shoulder, and back. (*Id.*) Plaintiff also states that Sergeant Ambrosino "failed to secure [the] area and separate" him from his attackers. (Reply at 5.) Plaintiff's claim against Warden Artuz is that he "fail [sic] to qualify as warden." (Complaint at 4.) Plaintiff names Commissioner Coombes as a defendant, alleging Coombes "fail [sic] to appoint a qualified warden over security." (Amended Complaint at 5.) Plaintiff further alleges that Dr. Manion refused to give him pain medication. (Complaint at 5.) Plaintiff seeks to "prevent violent crimes" and demands $6,000,000 in damages. (Amended Complaint at 5.)

Defendants moved to dismiss the complaint, arguing that: (1) the Eleventh Amendment bars suit against state defendants for money damages; (2) the plaintiff's allegations fail to state a claim for a constitutional violation; (3) the defendants are qualifiedly immune from damages; and (4) plaintiff must exhaust his administrative remedies before bringing this suit.

DISCUSSION

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 1998 WL 832708 (S.D.N.Y.)

(Cite as: 1998 WL 832708 (S.D.N.Y.))

I find that plaintiff's complaint runs afoul of Rules 8 and 10 of the Federal Rules of Civil Procedure and dismiss the complaint without prejudice and with leave to amend. Federal Rule 8 requires that a complaint contain "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed.R.Civ.P. 8(a)(2). The purpose of this Rule "is to give fair notice of the claim being asserted so as to permit the adverse party the opportunity to file a responsive answer [and] prepare an adequate defense." Powell v. Marine Midland Bank, 162 F.R.D. 15, 16 (N.D.N.Y.1995) (quoting Brown v. Califano, 75 F.R.D. 497, 498 (D.D.C.1977)); see Salahuddin v. Cuomo, 861 F.2d 40, 42 (2d Cir.1988) (stating that the "principal function of pleadings under the Federal Rules is to give the adverse party fair notice of the claim asserted so as to enable him to answer and prepare for trial").

*2 Rule 10 of the Federal Rules of Civil Procedure requires, inter alia, that the allegations in a plaintiff's complaint be made in numbered paragraphs, each of which should recite, as far as practicable, only a single set of circumstances. Moore's Federal Practice, Vol. 2A, ¶ 10.03 (1996). Rule 10 also requires that each claim upon which plaintiff seeks relief be founded upon a separate transaction or occurrence. Id.[FN2] The purpose of Rule 10 is to "provide an easy mode of identification for referring to a particular paragraph in a prior pleading." Sandler v. Capanna, 92 Civ. 4838, 1992 WL 392597, *3 (E.D.Pa. Dec.17, 1992) (citing 5 C. Wright & A. Miller, Federal Practice and Procedure, § 1323 at 735 (1990)).

FN2. Rule 10 states:

(b) Paragraphs; Separate Statements. All averments of claim or defense shall be made in numbered paragraphs, the contents of each of which shall be limited as far as practicable to a statement of a single set of circumstances; and a paragraph may be referred to by number in all succeeding pleadings. Each claim founded upon a separate transaction or occurrence and each defense other than denials shall be stated in a separate count or defense whenever a separation facilitates the clear presentation of the matters set forth.

A complaint that fails to comply with these pleading rules "presents far too heavy a burden in terms of defendants' duty to shape a comprehensive defense and provides no meaningful basis for the Court to assess the sufficiency of" a plaintiff's claims. Gonzales v. Wing, 167 F.R.D. 352, 355 (N.D.N.Y.1996). It may therefore be dismissed by the court. Id.; see also Salahuddin v. Cuomo, 861 F.2d at 42 ("When a complaint does not comply with the requirement that it be short and plain, the court has the power to, on its own initiative, ... dismiss the complaint"). Dismissal, however, is "usually reserved for those cases in which the complaint is so confused, ambiguous, vague, or otherwise unintelligible that its true substance, if any, is well disguised." Id. In those cases in which the court dismisses a pro se complaint for failure to comply with Rule 8, it should give the plaintiff leave to amend when the complaint states a claim that is on its face nonfrivolous. Simmons v. Abruzzo, 49 F.3d 83, 87 (2d Cir.1995).

In determining whether a nonfrivolous claim is stated, the complaint's allegations are taken as true, and the "complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." Conley v.. Gibson, 355 U.S. 41, 45–46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957). The complaint of a pro se litigant is to be liberally construed in his favor when determining whether he has stated a meritorious claim. See Haines v. Kerner, 404 U.S. 519, 520, 92 S.Ct. 594, 30 L.Ed.2d 652 (1972). Even if it is difficult to determine the actual substance of the plaintiff's complaint, outright dismissal without leave to amend the complaint is generally disfavored as an abuse of discretion. See Salahuddin, 861 F.2d at 42–42; see also Doe v. City of New York, No. 97 Civ. 420, 1997 WL 124214, at *2 (E.D.N.Y. Mar.12, 1997).

Here, plaintiff's pro se complaint fails to satisfy the requirements of Federal Rules 8 and 10. The complaint is often illegible and largely incomprehensible, scattering what appear to be allegations specific to plaintiff within a forest of headnotes copied from prior opinions. Defendants have answered with a boilerplate brief, which is perhaps all a defendant can do when faced with such a complaint. The Court is left with an insurmountable burden in attempting to make a reasoned ruling on such

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 1998 WL 832708 (S.D.N.Y.)

(Cite as: 1998 WL 832708 (S.D.N.Y.))

muddled pleadings.

**\*3** Although plaintiff's complaint is substantially incomprehensible, it appears to plead at least some claims that cannot be termed frivolous on their face. For example, plaintiff clearly alleges that inmates assaulted him and that Dr. Manion refused to provide him medical attention. He also appears to assert that Sergeant Ambrosino failed to protect him from the attack or take steps to prevent future attacks. (Plaintiff's Reply at 5). It is well established that an inmate's constitutional rights are violated when prison officials act with deliberate indifference to his safety or with intent to cause him harm. *Hendricks v. Coughlin,* 942 F.2d 109 (2d Cir.1991). It is similarly well established that an inmate's constitutional rights are violated when a prison doctor denies his request for medical care with deliberate indifference to the inmate's serious medical needs. *Estelle v. Gamble,* 429 U.S. 97, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976); *Hathaway v. Coughlin,* 37 F.3d 63 (2d Cir.1994), *cert. denied,* 513 U.S. 1154, 115 S.Ct. 1108, 130 L.Ed.2d 1074 (1995). Although plaintiff provides few facts to support his allegations, I disagree with defendants' assertion that outright dismissal is appropriate because it "appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." Defendant's Memorandum at 5 (quoting *Conley v. Gibson,* 355 U.S. 41, 45–46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957)).

Because plaintiff's complaint does not comply with Rules 8 and 10, it is hereby dismissed without prejudice, and plaintiff is granted leave to replead within thirty (30) days of the date of the entry of this Order. In drafting his second amended complaint, plaintiff is directed to number each paragraph and order the paragraphs chronologically, so that each incident in which he alleges a constitutional violation is described in the order that it occurred. Plaintiff is also directed to specifically describe the actions of each defendant that caused plaintiff harm, and to do so in separate paragraphs for each defendant. Plaintiff's complaint shall contain the facts specific to the incidents plaintiff alleges occurred, and not any facts relating to any case that has been decided previously by a court of law. Plaintiff's complaint shall also contain a clear statement of the relief he seeks in addition to monetary damages.

CONCLUSION

For the reasons set forth above, plaintiff's complaint is dismissed without prejudice, and plaintiff is granted leave to replead within thirty (30) days of the date of the entry of this Order.

IT IS SO ORDERED.

S.D.N.Y.,1998.

Hudson v. Artuz
Not Reported in F.Supp.2d, 1998 WL 832708 (S.D.N.Y.)
END OF DOCUMENT

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.



Not Reported in F.Supp., 1995 WL 236245 (N.D.N.Y.)

(Cite as: 1995 WL 236245 (N.D.N.Y.))

**c**

Only the Westlaw citation is currently available.
United States District Court, N.D. New York.

James N. MYERS, Jr., Plaintiff,
v.
Heather WOLLOWITZ, Attorney, Defendant.
No. 95–CV–0272 (TJM) (RWS).

April 10, 1995.
James N. Myers, Jr., Troy, NY, pro se.

*DECISION AND ORDER*

McAVOY, Chief Judge.
*I. Background*
**\*1** Presently before this Court is the above-captioned plaintiff's application to proceed in forma pauperis and civil rights complaint. Plaintiff has not paid the partial filing fee required to maintain this action.

For the reasons stated below, plaintiff's complaint is dismissed pursuant to 28 U.S.C. § 1915(d) and Local Rule 5.4(a) of the General Rules of this Court as without arguable basis in law.

In his *pro se* complaint, plaintiff seems to claim that plaintiff was represented by defendant Wollowitz, a public defender for the County of Rensselaer, in a County Court proceeding. Plaintiff alleges that after a criminal proceeding in that Court, plaintiff was "sentenced to a illegal sentence." *Id.* at 2. Plaintiff contends that due to the ineffective assistance of his counsel, defendant Wollowitz, his constitutional rights were violated. For a more complete statement of plaintiff's claims, reference is made to the entire complaint filed herein.

*II. Discussion*

Consideration of whether a *pro se* plaintiff should be permitted to proceed in forma pauperis is a two-step process. First, the court must determine whether the plaintiff's economic status warrants waiver of fees and costs under 28 U.S.C. § 1915(a). If the plaintiff qualifies by economic status, the court must then consider whether the cause of action stated in the complaint is frivolous or malicious. *Moreman v. Douglas,* 848 F.Supp. 332, 333 (N.D.N.Y.1994) (Scullin, J.); *Potnick v. Eastern State Hosp.,* 701 F.2d 243, 244 (2d Cir.1983) (per curiam).

In the present case, upon review of the plaintiff's inmate account statements, the Court has determined that plaintiff's financial status qualifies him to file or "commence" this action in forma pauperis. 28 U.S.C. § 1915(a). Turning to the second inquiry, a court may "dismiss the proceeding under 28 U.S.C. § 1915(d) if the court thereafter determines that ... the action is frivolous or malicious." *Moreman,* 848 F.Supp. at 333 (citation omitted).

In determining whether an action is frivolous, the court must look to see whether the complaint lacks an arguable basis either in law or in fact. *Neitzke v. Williams,* 490 U.S. 319, 325 (1989). Although the court has the duty to show liberality towards *pro se* litigants, *Nance v. Kelly,* 912 F.2d 605, 606 (2d Cir.1990) (per curiam), and extreme caution should be exercised in ordering sua sponte dismissal of a *pro se* complaint before the adverse party has been served and the parties have had an opportunity to respond, *Anderson v. Coughlin,* 700 F.2d 37, 41 (2d Cir.1983), there is a responsibility on the court to determine that a claim is not frivolous before permitting a plaintiff to proceed with an action in forma pauperis. Dismissal of frivolous actions pursuant to 28 U.S.C. § 1915(d) is appropriate to prevent abuses of the process of the court, *Harkins v. Eldredge,* 505 F.2d 802, 804 (8th Cir.1974), as well as to discourage the waste of judicial resources. *Neitzke,* 490 U.S. at 327. *See generally Moreman,* 848 F.Supp. at 334.

**\*2** 42 U.S.C. § 1983 is the vehicle by which individuals may seek redress for alleged violations of their constitutional rights. *See, e.g., Von Ritter v. Heald,* 91–CV–612, 1994 WL 688306, *3, 1994 U.S.Dist. LEXIS 17698, *8–9 (N.D.N.Y. Nov. 14, 1994) (McAvoy, C.J.). A party may not be held liable under this section unless it can be established that the defendant has acted

Not Reported in F.Supp., 1995 WL 236245 (N.D.N.Y.)

(Cite as: 1995 WL 236245 (N.D.N.Y.))

under the color of state law. *See, e.g., Rounseville v. Zahl, 13 F.3rd 625, 628 (2d Cir.1994)* (noting state action requirement under § 1983); *Wise v. Battistoni, 92–Civ–4288, 1992 WL 380914, *1, 1992 U.S.Dist. LEXIS 18864, *2–3 (S.D.N.Y. Dec. 10, 1992)* (same) (citations omitted).

In the present case, the sole defendant named by plaintiff is the Rensselaer County public defender who apparently represented plaintiff in the criminal proceeding discussed in his complaint. *See* Complaint at 2. However, "[i]t is well settled that an attorney's representation of a party to a court proceeding does not satisfy the Section 1983 requirement that the defendant is alleged to have acted under color of state law...." *Wise, 1992 WL 380914 at *1, 1992 U.S.Dist. LEXIS 18864 at *2–3; see also D'Ottavio v. Depetris, 91–Civ–6133, 1991 WL 206278, *1, 1991 U.S.Dist. LEXIS 13526, *1–2 (S.D.N.Y. Sept. 26, 1991).*

Since the plaintiff has not alleged any state action with respect to the Section 1983 claim presently before the Court, plaintiff's complaint, as presented to this Court, cannot be supported by any arguable basis in law and must therefore be dismissed pursuant to 28 U.S.C. § 1915(d). *Neitzke,* 490 U.S. at 328.

Accordingly, it is hereby

ORDERED, that leave to proceed or prosecute this action in forma pauperis is denied, and it is further

ORDERED, that this action is dismissed pursuant to 28 U.S.C. § 1915(d) and Local Rule 5.4(a) of the General Rules of this Court as lacking any arguable basis in law, and it is further

ORDERED, that the Clerk serve a copy of this Order on the plaintiff by regular mail.

I further certify that any appeal from this matter would not be taken in good faith pursuant to 28 U.S.C. § 1915(a).

IT IS SO ORDERED.

N.D.N.Y.,1995.

Myers v. Wollowitz
Not Reported in F.Supp., 1995 WL 236245 (N.D.N.Y.)
END OF DOCUMENT

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.



Not Reported in F.Supp.2d, 2008 WL 5330616 (S.D.N.Y.)

(Cite as: 2008 WL 5330616 (S.D.N.Y.))

**H**

Only the Westlaw citation is currently available.
United States District Court,

S.D. New York.
Barbara FINCH, individually, on behalf of Manny Moe
and on behalf of all others similarly situated, Carol
Jordan, individually and on behalf of all others similarly
situated, and Barbara Ortiz, individually and on behalf
of all others similarly situated, Plaintiffs,
v.
NEW YORK STATE OFFICE OF CHILDREN AND
FAMILY SERVICES; John A. Johnson, individually
and in his capacity as the Commissioner of the New
York State Office of Children and Family Services; the
City of New York, Administration for Children's
Services; William C. Bell, individually and in his
capacity as Commissioner of the Administration for
Children's Services of the City of New York; Dave R.
Peters, individually and in his capacity as Director, State
Central Register, New York State Office of Children
and Family Services, Division of Development and
Prevention Services; Jane Doe 1, individually and in her
capacity as a Supervisor of the State Central Register;
Jane Doe 2, individually and in her capacity as an
employee of the State Central Register; John Doe 1,
individually and in his capacity as a Supervisor of
Administration for Children's Services; and John Doe 2,
individually and in his capacity as an employee of
Administration for Children's Services, Defendants.
No. 04 Civ. 1668(SAS).

Dec. 18, 2008.

West KeySummary**Federal Civil Procedure 170A**
☞ **2491.5**

170A Federal Civil Procedure

170AXVII Judgment
170AXVII(C) Summary Judgment
170AXVII(C)2 Particular Cases
170Ak2491.5 k. Civil rights cases in

general. Most Cited Cases
A genuine issue of material fact existed as to whether
delays in the scheduling of administrative hearings in
which prospective child care workers could challenge their
listing as subjects of reports of child abuse or
maltreatment in the Statewide Central Register of Child
Abuse and Maltreatment (SCR) infringed a liberty interest
of the workers. Therefore, summary judgment would be
denied, in a class action brought by workers against the
New York State Office of Children and Family Services
(OCFS) and the New York City Administration for
Children's Services (ACS). New York Social Services
Law § 424-a; 42 U.S.C.A. § 1983; U.S.C.A.
Const.Amend. 14.

Thomas Hoffman, Esq., Law Offices of Thomas Hoffman,
P.C., New York, NY, for Plaintiffs.

Robert L. Kraft, Assistant Attorney General, New York,
NY, for State Defendants.

***MEMORANDUM OPINION AND ORDER***

SHIRA A. SCHEINDLIN, District Judge.
**I. INTRODUCTION**
**\*1** Barbara Finch, Carol Jordan, and Barbara Ortiz
bring this class action [FN1] against, *inter alia,* the New York
State Office of Children and Family Services ("OCFS")
and the New York City Administration for Children's
Services ("ACS").[FN2] The named plaintiffs allege that
inordinate delays in the scheduling of administrative
hearings in which class members can challenge their
listing as subjects of "indicated" reports of child
abuse/maltreatment in the Statewide Central Register of
Child Abuse and Maltreatment ("SCR" or the "State
Registry") violate their due process rights. In particular,
plaintiffs claim that the delays unconstitutionally infringe
their protected liberty interest to pursue the employment
of their choice. Plaintiffs bring this action pursuant to 42
U.S.C. § 1983 seeking the following injunctive relief:

FN1. The following class was certified by this
Court on August 11, 2008:

all persons: (1) who are working or desire to

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 5330616 (S.D.N.Y.)

(Cite as: 2008 WL 5330616 (S.D.N.Y.))

work or to be licensed in the childcare field; (2) who are now, or in the future will be, listed on the Statewide Central Register as subjects of indicated reports of child abuse that were investigated by and indicated by a designated investigative agency; (3) who timely requested amendment of the indicated reports; and (4) whose requests for amendment have not been disposed of.

*Finch v. New York State Office of Children and Family Servs.,* 252 F.R.D. 192, 194 (S.D.N.Y.2008).

**FN2.** In addition to the OCFS, the "State defendants" include John A. Johnson, individually and as Commissioner of the OCFS ("Commissioner Johnson"), and Dave R. Peters, individually and as Director of the Statewide Central Register of Child Abuse and Maltreatment ("Director Peters"). John Johnson's term in office as Commissioner of OCFS ended on December 31, 2006. Gladys Carrion, Esq., is now the Commissioner.

(a) That the notice of a right to a section 422 hearing contain the right to request an expedited hearing:

(b) That within five days of a class members' request for a hearing, the member be provided with a copy of the reports and records that will be considered at the internal review;

(c) That within ten days after a class member's request for a hearing, the member be provided the opportunity, by telephone conference or by written material, to present his or her views to the internal reviewer;

(d) That the post-deprivation section 424-a administrative hearing be held within thirty days after request for hearing, and that the decision be issued fourteen days after the conclusion of the hearing; and

(e) That the post-deprivation section 422 administrative hearing be held within forty-five days after request for hearing, and that the decision be issued fourteen days

after the conclusion of the hearing.

## II. BACKGROUND

New York Social Services Law § 424-a provides that licensing and provider agencies ("inquiring employers") are required to request a search of the SCR database ("SCR database check") before employing, certifying or licensing persons for employment, certification or licensure in the field of child care. The SCR database check process may yield three different outcomes. If the SCR database check shows that an applicant is not the subject of an indicated report, the SCR sends a letter to the inquiring employer notifying it of that fact, generally within ten days of receiving a clearance request.[FN3] If the SCR database check identifies an applicant as a subject of an indicated report who has had an administrative hearing confirming the applicant's indicated status, the SCR sends a letter to the inquiring employer notifying it that the applicant is the subject of an indicated report. If the SCR database check identifies the applicant as a subject of an indicated report who has not had an administrative hearing, the SCR does not respond to the inquiring employer. Instead, the SCR sends a letter to the applicant informing her of the right to an administrative hearing. Under *Valmonte,* an inquiring employer may not be notified of the existence of an indicated report before an adminstrative hearing is held.[FN4]

**FN3.** State Defendants' Statement of Material Facts Pursuant to Local Civil Rule 56.1 ("State Def. 56.1") ¶ 31.

**FN4.** Before *Valmonte v. Bane,* 18 F.3d 992 (2d Cir.1994), the State Register disclosed a person's indicated status to an inquiring employer before an administrative hearing was held. The issue framed in *Valmonte* was "whether the state's maintenance of a Central Reigster that identifies individuals accused of child abuse or neglect, and its communication of the names of those on the list to potential employers in the child care field, implicates a protectible liberty interest under the Fourteenth Amendment." *Id* . at 994. The court held in the affirmative, stating that "the procedures established violate due process, primarily because the risk of error in evaluating the allegations against those included on the list

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 5330616 (S.D.N.Y.)

(Cite as: 2008 WL 5330616 (S.D.N.Y.))

is too great." *Id.* The State defendants have interpreted *Valmonte* to require silence on the part of the State Register when a potential employer makes a clearance request regarding a job applicant who is the subject of an indicated report and has not yet had an administrative hearing.

## III. DISCUSSION

**\*2** Plaintiffs now move for summary judgment and seek an Order "declaring the provisions of Section 422 and 424(a) of the New York Social Service Law that allow substantial delays in deciding name-clearing hearings [to be] unconstitutional as applied to the certified class members." [FN5] The State defendants cross-move for summary judgment and request that all remaining claims in the Complaint be dismissed. Because there are genuine issues of material fact with regard to whether a liberty interest is infringed and to the contours of what process is due class members, both motions are denied.

> FN5. Notice of Motion for Summary Judgment ¶ *1. This is a rather inartful* way of framing the issue as neither section 422 nor 424-a contains any express provision: (1) permitting substantial delays in the scheduling of adminstrative hearings; or (2) imposing any sort of deadlines or timeframes for the scheduling and completion of administrative hearings. Thus, plaintiffs are challenging the delays resulting from the State's current method of carrying out its statutory mandate. This is, of course, an as-applied, procedural due process challenge, as opposed to a facial challenge to a state statute.
>
> At least since the landmark decision of *Marbury v. Madison,* 5 U.S. (1 Cranch) 137, 2 L.Ed. 60 (1803), federal courts have traditionally reviewed the constitutionality of legislation as applied to particular facts on a case-by-case basis. Under this mode of judicial review, a litigant is required to make a showing that a statute will work an unconstitutional result as applied to the facts and circumstances associated with that litigant's conduct. Once a court determines that

a statute will work an unconstitutional result, it will typically prevent the enforcement of that statute against the challenger.

> *National Abortion Fed'n v. Gonzalez,* 437 F.3d 278, 293 (2d Cir.2006) (Walker, C.J., concurring), *vacated on other grounds by* 224 Fed. Appx. 88 (2d Cir.2007).

"To formulate a claim under the Due Process Clause of the Fourteenth Amendment, a plaintiff must demonstrate that he or she possesses a constitutionally protected interest in life, liberty, or property, and that state action has deprived him or her of that interest." [FN6] The Supreme has held that procedural due process questions must be analyzed in two steps: " 'the first asks whether there exists a liberty or property interest which has been interfered with by the State; the second examines whether the procedures attendant upon that deprivation were constitutionally sufficient.' " [FN7] The *Valmonte* court held that "the dissemination of information from the Central Register to potential child care employers, coupled with the defamatory nature of inclusion on the list, does implicate a liberty interest." [FN8] This Court must now decide whether a further extension of *Valmonte* is warranted. In particular, the issue *sub judice* is whether a protected liberty interest is implicated when the SCR is silent and fails to respond to an inquiring employer's clearance request within a reasonable time of receiving that request.[FN9]

> FN6. *Valmonte,* 18 F.3d at 998 (citing U.S. Const. amend. XIV, § 1).
>
> FN7. *Id.* (quoting *Kentucky Dep't of Corr. v. Thompson,* 490 U.S. 454, 460, 109 S.Ct. 1904, 104 L.Ed.2d 506 (1989)).
>
> FN8. *Id.* at 994. The *Valmonte* court explained that,
>
> > the fact that the defamation occurs precisely in conjunction with an individual's attempt to attain employment within the child care field, and is coupled with a statutory impediment mandating that employers justify hiring the

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 5330616 (S.D.N.Y.)

(Cite as: 2008 WL 5330616 (S.D.N.Y.))

individual, is enough to compel a finding that there is a liberty interest implicated.

*Id.* at 1002.

FN9. The State defendants have admitted that "[i]f the SCR database check shows that the applicant is not the subject of an indicated report. the SCR sends a letter to the inquiring agency notifying it of that fact within ten days of receiving a clearance request." State Def. 56.1 ¶ 31. It is unclear whether this ten-day period is statutorily mandated or simply the practice of the SCR. It is also unclear whether inquiring employers are somehow notified of this ten-day rule or if they learn of it after having made numerous, repeat clearance requests. *Cf.* N.Y. Social Services Law § 424-a(e)(ii).

There is a disputed issue of fact as to whether the SCR's failure to respond to a request for clearance from an inquiring employer affects a class members' protected liberty interest in pursuing the employment of his or her choice. FN10 When the State Register fails to respond within ten days of receiving a request or shortly thereafter, an inquiring employer *may* presume that the applicant is the subject of an indicated report, albeit one who has not yet had an administrative hearing. Silence, when there is an expectation of speech, can communicate a message. There is insufficient evidence in the record, however, for this Court to infer that silence by the SCR is the equivalent of actual notice of an indicated report. This issue must be resolved at trial.

FN10. In ruling on the State defendants' motion to dismiss, this Court stated:

The requirement that potential employers consult the list of indicated child abusers before hiring prospective employees results in an employer learning of an applicant's inclusion in the Registry, by operation of law. This is true whether SCR responds with notice of indication *or does not respond at all.*

*Finch v. New York State Office of Children and Family Servs.,* 499 F.Supp.2d 521, 534 (S.D.N.Y.2007) (footnote omitted, emphasis added).

If this Court were to find an infringed-upon protected liberty interest, the next question to decide is how much "process" is "due." As stated by the Supreme Court,

resolution of the issue whether the administrative procedures provided here are constitutionally sufficient requires analysis of the governmental and private interests that are affected .... More precisely, our prior decisions indicate that identification of the specific dictates of due process generally requires consideration of three distinct factors: First, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and finally, the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail.FN11

FN11. *Mathews v. Eldridge,* 424 U.S. 319, 334-35, 96 S.Ct. 893, 47 L.Ed.2d 18 (1976) (citations omitted).

**\*3** This Court must balance the three *Mathews* factors to determine "when, under our constitutional system, judicial-type procedures must be imposed upon administrative action to assure fairness." FN12

FN12. *Id.* at 348.

Plaintiffs have made a strong showing on two of the three factors. The liberty interest at hand, freedom to pursue the employment of one's choice, is undoubtedly a valuable interest worthy of serious attention. So, too, plaintiffs have made a strong showing of the high risk of erroneous deprivation of this interest by offering a study indicating that the expungement rate for indicated reports is approximately 74%.FN13 On the other side of the equation, the State defendants have asserted a very strong interest in protecting children.

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 5330616 (S.D.N.Y.)

(Cite as: 2008 WL 5330616 (S.D.N.Y.))

FN13. *See* Ex. I to the 10/6/08 Declaration of Thomas Hoffman, plaintiffs' counsel, at 5.

The New York Legislature has declared that "[a]bused and maltreated children in this state are in urgent need of an effective child protective service to prevent them from suffering further injury and impairment," and that "[i]t is the purpose of this title to encourage more complete reporting of suspected child abuse and maltreatment and to establish in each county of the state a child protective service capable of investigating such reports swiftly and competently and capable of providing protection for the child or children from further abuse or maltreatment ...." [FN14]

FN14. NY Social Services Law § 411.

Furthermore, the State defendants argue that compliance with the specific injunctive relief requested by plaintiffs would cost the State of New York approximately $3,860,000 in annual salaries for additional staff. [FN15] While plaintiffs' counsel disputed this estimate at oral argument, he did not point to any countervailing evidence. Assuming these numbers to be accurate, there is still not enough evidence in the record regarding the fiscal component of any constitutionally-required modifications to current procedures. Without knowing the cost of additional safeguards or expedited hearings, there is no way of knowing how much process is due and, therefore, whether there is a constitutional deprivation of due process in the first place.

FN15. *See* State Defendants' Statement of Material Facts Pursuant to Local Civil Rule 56.1 ¶ 79. This estimate was prepared by Edna Mae Reilly, Associate Commissioner for Financial Management with the OCFS. *See* Declaration of Edna Mae Reilly, Ex. 5 to the Declaration of Robert L. Kraft in Support of State Defendants' Motion for Summary Judgment.

The inadequacy of the current cost evidence is highlighted by the hypothetical I proposed to the parties at oral argument. To settle this case, I suggested the following:

• 422 hearings be completed within six months from the date of request, with decisions issued thirty days from the conclusion of the hearing, provided that appellants residing in Upstate New York consent to having the hearing held in one of three centers located in Rochester, Syracuse and Albany; [FN16]

FN16. Because this is a Rule 23(b)(2) class, this requirement will not spawn further litigation from those class members who object to the amount of travel that will be required on their part.

• 424-a hearings be completed within sixty days from the date of request, with decisions issued fifteen days from the conclusion of the hearing, provided that appellants residing in Upstate New York consent to having the hearing held in one of three centers located in Rochester, Syracuse and Albany. [FN17]

FN17. This will necessitate a change in the internal timetable currently in effect. For example, local child protective services would be given fourteen days to complete their investigations. The State Register would then have thirty days to complete its investigations. To meet the sixty-day cap, administrative hearings would then have to be scheduled within the next sixteen days. These deadlines are subject to further negotiation by the parties.

The State defendants are hereby ordered to determine the costs associated with the above suggestions. If the State defendants have substitute suggestions, they are also ordered to determine the costs of each such proposal. This evidence, which will become part of the trial record, is due by January 9, 2009.

**IV. CONCLUSION**

**\*4** For the foregoing reasons, plaintiffs' motion for summary judgment and defendants' cross-motion for summary judgment are denied. Counsel are directed to contact Chambers by January 5, 2009, to schedule the non-jury trial in this matter. The Clerk of the Court is directed to close these motions (Documents # 54 and 60).

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 5330616 (S.D.N.Y.)

(Cite as: 2008 WL 5330616 (S.D.N.Y.))

SO ORDERED:

S.D.N.Y.,2008.

Finch v. New York State office of Children and Family
Services
Not Reported in F.Supp.2d, 2008 WL 5330616
(S.D.N.Y.)
END OF DOCUMENT

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Westlaw.

663 F.3d 100

(Cite as: 663 F.3d 100)

C

United States Court of Appeals,

Second Circuit.
Nancy L. NAGLE, Plaintiff–Appellant,
v.
Paula MARRON, Rosemarie Coletti, and Barbara
Merling, Defendants,
and
Paul R. Fried, individually, Steven Castar, individually,
and Mamaroneck Union Free School District, New
York, Defendants–Appellees.[FN1]

FN1. The Clerk of Court is directed to amend the
official caption to read as shown above.

Docket No. 10–1420–cv.

Argued: March 24, 2011.
Decided: Dec. 12, 2011.

**Background:** Teacher brought action against school
district, its officials, and school principal, alleging that
defendants had retaliated against her for exercising her
rights under the First Amendment. The United States
District Court for the Southern District of New York,
Thomas S. Zilly, J., granted summary judgment to
defendants, and teacher appealed.

**Holdings:** The Court of Appeals, Calabresi, Circuit Judge,
held that:

(1) teacher's reporting of assistant principal's forgery of
teacher's signature was not protected under First
Amendment;

(2) teacher's showing of adverse employment action six
weeks after her First Amendment-protected speech
satisfied causation element of prima facie claim of
retaliation; and

(3) summary judgment in favor of school district and
superintendent was precluded on teacher's First
Amendment retaliation claim.

Vacated and remanded.

West Headnotes

**[1] Constitutional Law 92 ☛ 1929**

92 Constitutional Law

    92XVIII Freedom of Speech, Expression, and Press
        92XVIII(P) Public Employees and Officials
            92k1929 k. Public or private concern; speaking
as "citizen". Most Cited Cases
    For a public employee's speech to be protected by the
First Amendment, it must be on a matter of public
concern, which includes speech relating to any matter of
political, social, or other concern to the community; in
contrast, when a public employee speaks not as a citizen
upon matters of public concern, but instead as an
employee upon matters only of personal interest, courts
should not review the wisdom of a personnel decision
taken in response. U.S.C.A. Const.Amend. 1.

**[2] Constitutional Law 92 ☛ 1929**

92 Constitutional Law

    92XVIII Freedom of Speech, Expression, and Press
        92XVIII(P) Public Employees and Officials
            92k1929 k. Public or private concern; speaking
as "citizen". Most Cited Cases
    Public employee's statements made pursuant to
official duties are not protected by First Amendment.
U.S.C.A. Const.Amend. 1.

**[3] Constitutional Law 92 ☛ 1991**

92 Constitutional Law

    92XVIII Freedom of Speech, Expression, and Press
        92XVIII(Q) Education
            92XVIII(Q)1 In General
                92k1988 Employees
                    92k1991 k. Public or private concern;
speaking as "citizen". Most Cited Cases

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

663 F.3d 100

(Cite as: 663 F.3d 100)

**Schools 345 ☞      147.12**

345 Schools

    345II Public Schools
      345II(K) Teachers
        345II(K)2 Adverse Personnel Actions
          345k147.8 Grounds for Adverse Action
            345k147.12 k. Exercise of rights;
protected activity. Most Cited Cases
    Teacher's reporting of assistant principal's forgery of teacher's signature on teaching observation report of her class, even if such conduct were criminal, was not a matter of public concern, and therefore was not protected under First Amendment; the forgery had no practical significance to the general public since teacher's signature did not indicate agreement with the document or have any other effect beyond confirming its receipt, which was not disputed. U.S.C.A. Const.Amend. 1.

**[4] Constitutional Law 92 ☞      1929**

92 Constitutional Law

    92XVIII Freedom of Speech, Expression, and Press
      92XVIII(P) Public Employees and Officials
        92k1929 k. Public or private concern; speaking as "citizen". Most Cited Cases
    A public employee's failure to follow protocols in speaking about a matter of public concern may give rise to an alternative, non-retaliatory ground for an adverse employment action which does not violate free speech protections of First Amendment. U.S.C.A. Const.Amend. 1.

**[5] Constitutional Law 92 ☞      1992**

92 Constitutional Law

    92XVIII Freedom of Speech, Expression, and Press
      92XVIII(Q) Education
        92XVIII(Q)1 In General
          92k1988 Employees
            92k1992 k. Political speech, beliefs, or activity. Most Cited Cases
**Schools 345 ☞      147.12**

345 Schools

    345II Public Schools
      345II(K) Teachers
        345II(K)2 Adverse Personnel Actions
          345k147.8 Grounds for Adverse Action
            345k147.12 k. Exercise of rights;
protected activity. Most Cited Cases
    A teacher's expressive conduct made in the course of working for a candidate's political campaign would constitute protected speech under First Amendment even if the candidate lost and his candidacy therefore ceased being a matter of immediate public concern, and the speech would remain protected if the teacher moved to an area where the candidate had not been on the ballot. U.S.C.A. Const.Amend. 1.

**[6] Constitutional Law 92 ☞      1932**

92 Constitutional Law

    92XVIII Freedom of Speech, Expression, and Press
      92XVIII(P) Public Employees and Officials
        92k1932 k. Causation; substantial or motivating factor. Most Cited Cases
    To establish causation element of First Amendment retaliation claim, a public employee must show that the protected speech was a substantial motivating factor in the adverse employment action. U.S.C.A. Const.Amend. 1.

**[7] Constitutional Law 92 ☞      1928**

92 Constitutional Law

    92XVIII Freedom of Speech, Expression, and Press
      92XVIII(P) Public Employees and Officials
        92k1928 k. Retaliation in general. Most Cited Cases
    For purposes of a public employee's First Amendment retaliation claim, an adverse employment action occurs on the date that a decision was formally reached; while events leading up to a formal decision will, in many situations, be relevant to the analysis of causation, an employer cannot insulate itself from liability simply by asserting that an adverse employment decision had in fact already been made, without being memorialized or conveyed to anyone, before the employer learned of the protected conduct.

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

663 F.3d 100

(Cite as: 663 F.3d 100)

U.S.C.A. Const.Amend. 1.

**[8] Constitutional Law 92 ☞ 1184(1)**

92 Constitutional Law
    92X First Amendment in General
        92X(B) Particular Issues and Applications
            92k1180 Public Employees and Officials
                92k1184 Retaliation
                    92k1184(1) k. In general. Most Cited Cases

A public employee can establish a causal connection to support a First Amendment retaliation claim by showing that the protected activity was closely followed in time by the adverse employment action. U.S.C.A. Const.Amend. 1.

**[9] Constitutional Law 92 ☞ 1993**

92 Constitutional Law
    92XVIII Freedom of Speech, Expression, and Press
        92XVIII(Q) Education
            92XVIII(Q)1 In General
                92k1988 Employees
                    92k1993 k. Discipline or reprimand. Most Cited Cases
Schools 345 ☞ 147.12

345 Schools
    345II Public Schools
        345II(K) Teachers
            345II(K)2 Adverse Personnel Actions
                345k147.8 Grounds for Adverse Action
                    345k147.12 k. Exercise of rights; protected activity. Most Cited Cases

Teacher's showing of adverse employment action six weeks after her First Amendment-protected speech satisfied causation element of prima facie claim of retaliation under the First Amendment. U.S.C.A. Const.Amend. 1.

**[10] Federal Civil Procedure 170A ☞ 2497.1**

170A Federal Civil Procedure

170AXVII Judgment
    170AXVII(C) Summary Judgment
        170AXVII(C)2 Particular Cases
            170Ak2497 Employees and Employment Discrimination, Actions Involving
                170Ak2497.1 k. In general. Most Cited Cases

Genuine issues of material fact existed as to whether content of teacher's protected speech in reporting abuse, or rather only teacher's violation of school rules in reporting abuse to the police instead of her principal, influenced superintendent's decision not to recommend teacher for tenure, and whether superintendent would have made his decision irrespective of learning of teacher's report of abuse, precluding summary judgment in favor of school district and superintendent on teacher's First Amendment retaliation claim. U.S.C.A. Const.Amend. 1.

**[11] Civil Rights 78 ☞ 1421**

78 Civil Rights
    78III Federal Remedies in General
        78k1416 Weight and Sufficiency of Evidence
            78k1421 k. Employment practices. Most Cited Cases
**Constitutional Law 92 ☞ 1038**

92 Constitutional Law
    92VI Enforcement of Constitutional Provisions
        92VI(C) Determination of Constitutional Questions
            92VI(C)4 Burden of Proof
                92k1032 Particular Issues and Applications
                    92k1038 k. Freedom of speech, expression, and press. Most Cited Cases

Because protected speech could not substantially cause an adverse action if the employer would have taken that action in any event, a public employer can rebut a prima facie showing of retaliation in violation of First Amendment by demonstrating by a preponderance of the evidence that it would have taken the same adverse employment action against public employee even in the absence of the protected conduct. U.S.C.A. Const.Amend. 1.

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

663 F.3d 100

(Cite as: 663 F.3d 100)

**[12]** Civil Rights 78 &#128273;   1376(2)

78 Civil Rights

   78III Federal Remedies in General
     78k1372 Privilege or Immunity; Good Faith and Probable Cause
      78k1376 Government Agencies and Officers
       78k1376(2) k. Good faith and reasonableness; knowledge and clarity of law; motive and intent, in general. Most Cited Cases
   Dispositive inquiry in determining whether a right is clearly established for purposes of qualified immunity analysis is whether it would be clear to a reasonable official that his conduct was unlawful in the situation he confronted; standard requires the level of generality at which the relevant legal rule is identified to strike the appropriate balance between the interests in vindication of private persons' constitutional rights and in public officials' effective performance of their duties. 42 U.S.C.A. § 1983.

**[13]** Civil Rights 78 &#128273;   1376(2)

78 Civil Rights

   78III Federal Remedies in General
     78k1372 Privilege or Immunity; Good Faith and Probable Cause
      78k1376 Government Agencies and Officers
       78k1376(2) k. Good faith and reasonableness; knowledge and clarity of law; motive and intent, in general. Most Cited Cases
   Subjective good faith of government officials plays no part in the inquiry when determining whether a right is clearly established for purposes of qualified immunity analysis; inquiry is confined to the objectively ascertainable question whether a reasonably well-trained official would have known that his conduct was illegal. 42 U.S.C.A. § 1983.

**[14]** Civil Rights 78 &#128273;   1376(10)

78 Civil Rights

   78III Federal Remedies in General

     78k1372 Privilege or Immunity; Good Faith and Probable Cause
      78k1376 Government Agencies and Officers
       78k1376(10) k. Employment practices. Most Cited Cases
   For purposes of determining whether school district officials were entitled to qualified immunity with respect to teacher's First Amendment retaliation claim, it was clearly established that teacher's speech protected in Virginia in 2004 remained protected when discovered in New York in 2007. U.S.C.A. Const.Amend. 1; 42 U.S.C.A. § 1983.

**[15]** Civil Rights 78 &#128273;   1351(1)

78 Civil Rights

   78III Federal Remedies in General
     78k1342 Liability of Municipalities and Other Governmental Bodies
      78k1351 Governmental Ordinance, Policy, Practice, or Custom
       78k1351(1) k. In general. Most Cited Cases
   When a municipal official has final authority over significant matters involving the exercise of discretion, the choices he makes represent government policy for purposes of § 1983 liability, and municipal liability may be imposed for a single decision by municipal policymakers. 42 U.S.C.A. § 1983.

**[16]** Civil Rights 78 &#128273;   1351(5)

78 Civil Rights

   78III Federal Remedies in General
     78k1342 Liability of Municipalities and Other Governmental Bodies
      78k1351 Governmental Ordinance, Policy, Practice, or Custom
       78k1351(5) k. Employment practices. Most Cited Cases
   If no potential employee could obtain full school board approval without the superintendent's recommendation, such that a person whom superintendent did not recommend for tenure was effectively denied tenure by that act, superintendent could be deemed the final decisionmaker with respect to personnel

663 F.3d 100

(Cite as: 663 F.3d 100)

appointments under "cat's paw" theory for purposes of determining school district's liability for superintendent's alleged refusal to recommend teacher for tenure in retaliation for her exercise of her First Amendment free speech rights. U.S.C.A. Const.Amend. 1; 42 U.S.C.A. § 1983.

**\*102** Jane Bilus Gould, Gould & Berg, LLP, White Plains, NY, for Plaintiff–Appellant.

Maurizio Savoiardo (Michael A. Miranda on the brief), Miranda Sambursky Slone Sklarin Verveniotis LLP, Mineola, NY, for Defendants–Appellees.

Before: CALABRESI, RAGGI, Circuit Judges, and GLEESON, District Judge.[FN2]

> **FN2.** The Honorable John Gleeson of the United States District Court for the Eastern District of New York, sitting by designation.

CALABRESI, Circuit Judge:

Plaintiff–Appellant Nancy L. Nagle brought suit under 42 U.S.C. § 1983, alleging that Defendants–Appellees Paul R. Fried, Steven Castar, and the Mamaroneck Union Free School District of New York had retaliated against her for exercising her rights under the First Amendment. The court below (Thomas S. Zilly, *Judge*) granted summary judgment to Defendants–Appellees, holding that the speech on which Nagle based her claim was not protected under the First Amendment and that the individual defendants had qualified immunity from suit. The court held, alternatively, that summary judgment would have been appropriate if the speech had been protected, because the District would have fired Nagle even in **\*103** the absence of the speech.[FN3] Nagle appeals. For the reasons stated below, we vacate the district court's grant of summary judgment and remand the case to that court.

> **FN3.** The case was initially assigned to Judge Stephen C. Robinson of the Southern District of New York, but was reassigned to Judge Thomas S. Zilly of the Western District of Washington, sitting by designation in the Southern District of New York, on February 3, 2010. Judge Zilly

issued his order following briefing and telephonic oral argument. In addition to Appellees, Nagle's complaint named as defendants Paula Marron, Barbara Merling, and Rosemarie Coletti, all employees of the Mamaroneck Union Free School District. The action was voluntarily discontinued as to those defendants before answers had been filed for them.

## BACKGROUND

### I. The Incidents

From 2004 until 2007, Nagle worked as a tenure-track special education teacher at the Chatsworth Avenue School in the Mamaroneck Union Free School District of New York (the "District"). On March 2, 2007, the school's principal, Defendant–Appellee Steven Castar, and the District's assistant superintendent for human resources, Rosemarie Coletti, informed Nagle that the District's superintendent of schools, Defendant–Appellee Paul Fried, had decided not to recommend her for tenure. Castar and Coletti informed Nagle that, therefore, her probationary employment with the District would be terminated at the end of the school year. Nagle filed suit, claiming that Fried's decision not to recommend her for tenure violated her First Amendment rights because it was made in retaliation for two acts that, she argued, were protected by the First Amendment.

The more recent of these acts took place in January 2007, after Nagle received a copy of a teaching observation report of her class written and signed by the Chatsworth Avenue School's assistant principal, Paula Marron. Nagle had declined to sign the report, but the copy she received appeared to bear her signature. Upon receiving the report, Nagle told Marron, Castar, and John Esposito, the president of Nagle's teachers' union, about the seemingly false signature. After Castar informed him of the alleged forgery, Fried called the police, who determined that no *crime* had been committed. Nevertheless, Nagle and the District separately hired handwriting experts, each of whom concluded that Marron had signed Nagle's name. Thereafter, Fried declined to renew Marron's contract for the following year, and Marron resigned.

The other act on which Nagle based her claim took

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

663 F.3d 100

(Cite as: 663 F.3d 100)

place during the 2002–2003 school year, while Nagle was a special education teacher in a public school in Henrico County, Virginia. Nagle had reported to her principal in Virginia that she overheard Betty Moore, a teacher in a neighboring classroom, verbally abusing children in her class. Nagle also informed the chair of the Henrico County Early Childhood Special Education Program Department of reports Nagle had gotten from other adults working in the school who had witnessed Moore both verbally and physically abusing children under her care.[FN4] After a private nurse attending to one of Moore's students reported that she had witnessed Moore strike a child in the chest, Moore resigned from the school, citing family reasons. But Moore kept her **104 teaching license. Nagle then conveyed what she had told school administrators to Virginia's Department of Child Protective Services and to the state police. After a police investigation, Moore was charged with several counts of felony child abuse; she eventually pled guilty to assault.

> FN4. Nagle testified that she had been told by other adults working at the school that they had witnessed Moore, *inter alia,* push a child out of a wheelchair, put a child's head underwater in the sink, frequently eat the children's snacks, and often use abusive language with children.

Nagle's conduct in Virginia took place approximately four years before Superintendent Fried declined to recommend her for tenure in New York; according to record testimony, however, Castar and Fried only learned of Nagle's conduct in early 2007, shortly before Nagle was informed of Fried's tenure decision. Nagle argues that the temporal proximity between Fried's learning of the reported abuse incident and his decision not to recommend her for tenure gives rise to an inference of retaliation. Appellees contend that Fried had already made his decision regarding Nagle's tenure before he found out about her report of abuse in Virginia; thus, the Virginia report played no role in the employment decision.

Instead, they assert, the tenure decision was based on Nagle's alleged behavior during a December 2006 meeting. Over the course of this meeting, Castar raised his concerns regarding two instances where Nagle allegedly violated school protocols. The first involved Nagle

choosing a book to read with her class without first consulting the school psychologist; the second involved Nagle sending a child home from school early without first consulting school administrators. Nagle was so distraught by what she heard that she left the meeting crying.

**II. The Opinion Below**

As an initial matter, the district court held that neither the forgery incident, nor the report of abuse were protected under the First Amendment. With respect to the forgery incident, the court determined that because the incident did not involve a crime and may have furthered some "personal agenda" of Nagle's, it was not a matter of public concern and therefore was not protected by the First Amendment. *Nagle v. Fried,* Order, No. 07–cv–2860 (TSZ) (S.D.N.Y. March 19, 2010) ("Order") at 19. With regard to the abuse report, the court held that Nagle's conduct was not protected by the First Amendment "because it undisputedly violated reasonable protocols." *Id.* at 13. The court further opined that, even had Nagle's abuse report been protected at the time it occurred, "due to temporal and geographic remoteness, ... to the extent it was protected speech when uttered," it "was no longer protected speech when [D]efendants learned of [it] and/or denied her tenure." *Id.* at 16.

The court then held, in the alternative, that Nagle could not prove causation. Specifically, the court determined that the District had "established, as a matter of law, [that it] would have made the same tenure decision in the absence of [Nagle's] expressive conduct," and that therefore summary judgment would be appropriate even were one or both incidents protected under the First Amendment. *Id.* at 22.

On the basis of the holdings described above, the district court granted Castar and Fried qualified immunity from Nagle's suit. The court held that, because Nagle's "expressive conduct did not 'clearly' constitute protected speech," a reasonable official in the position of Castar or Fried "would not have known that considering such conduct in reaching an adverse employment decision" might violate Nagle's rights. *Id.*

**DISCUSSION**

We review a grant of summary judgment *de novo* to

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

663 F.3d 100

(Cite as: 663 F.3d 100)

determine "whether genuine disputes over material fact exist ... **105 which should properly be submitted to a jury or whether, where no issues of material fact are found, the moving party is entitled to judgment as a matter of law." *Byrnie v. Town of Cromwell Bd. of Ed.,* 243 F.3d 93, 101 (2d Cir.2001). We "resolve all ambiguities and draw all inferences in favor of the non-moving party." *Id.*

"To survive a motion for summary judgment on a First Amendment retaliation claim" in the public employment context, "the plaintiff must present evidence which shows '[1] that the speech at issue was protected, [2] that he suffered an adverse employment action, and [3] that there was a causal connection between the protected speech and the adverse employment action.' " *Cotarelo v. Vill. of Sleepy Hollow Police Dep't,* 460 F.3d 247, 251 (2d Cir.2006) (quoting *Diesel v. Town of Lewisboro,* 232 F.3d 92, 107 (2d Cir.2000)).[FN5] "If a plaintiff establishes these three factors, the defendant has the opportunity to show by a preponderance of the evidence that it would have taken the same adverse employment action even in the absence of the protected conduct." *Morris v. Lindau,* 196 F.3d 102, 110 (2d Cir.1999) (internal quotation marks omitted); *see also Ezekwo v. New York City Health & Hosp. Corp.,* 940 F.2d 775, 780–81 (2d Cir.1991) (noting that a retaliation claim requires that "the adverse action would not have occurred *but for* the employee's protected actions"). Since courts do not themselves weigh evidence at the summary judgment stage, this standard requires us to determine whether any reasonable trier of fact would have to conclude that the evidence was so strongly in the defendant's favor that there remained no genuine issue of material fact for it to resolve. *See Gorman–Bakos v. Cornell Coop. Extension of Schenectady Cnty.,* 252 F.3d 545, 558 (2d Cir.2001) (" 'The function of the district court in considering the motion for summary judgment is ... only to determine whether there is a genuine issue to be tried.' ") (quoting *Vital v. Interfaith Med. Ctr.,* 168 F.3d 615, 622 (2d Cir.1999)).

FN5. Other cases have phrased this inquiry as "(1) 'whether the employee spoke as a citizen on a matter of public concern' and, if so, (2) 'whether the relevant government entity had an adequate justification for treating the employee differently from any other member of the general public.' " *Ruotolo v. City of New York,* 514 F.3d

184, 188 (2d Cir.2008) (quoting *Garcetti v. Ceballos,* 547 U.S. 410, 418, 126 S.Ct. 1951, 164 L.Ed.2d 689 (2006)); *see also Anemone v. Metro. Transp. Auth.,* 629 F.3d 97, 114 (2d Cir.2011) (same). This alternative phrasing divides the same inquiry into different segments, with the protected status of the speech forming one part and the justification, or lack thereof, for adverse action forming the other. The "overarching objectives," however, remain the same: to ensure that "[s]o long as employees are speaking as citizens about matters of public concern, they ... face only those speech restrictions that are necessary for their employers to operate efficiently and effectively." *Garcetti,* 547 U.S. at 419, 126 S.Ct. 1951.

In the present case, Appellees do not dispute that the decisions not to recommend Nagle for tenure and to recommend the termination of her probationary employment were adverse employment actions. We must therefore determine whether Nagle's speech was protected under the First Amendment and, if so, whether the evidence presented was sufficient to give rise to an inference of causality. We then examine the record to determine whether Appellees have shown—as a matter of law—that they would have taken the same action in the absence of Nagle's speech, thereby rebutting the requisite causality. Finally, we address whether Castar and Fried are entitled to qualified immunity from Nagle's suit and whether the District may be subject to municipal liability.

**\*106 I. First Amendment Claims**

*A. First Amendment Protections for Public Employees*

" '[W]hile the government enjoys significantly greater latitude when it acts in its capacity as employer than when it acts as sovereign, the First Amendment nonetheless prohibits it from punishing its employees in retaliation for the content of their protected speech.' " *Reuland v. Hynes,* 460 F.3d 409, 415 (2d Cir.2006) (quoting *Locurto v. Safir,* 264 F.3d 154, 166 (2d Cir.2001)). Recognizing both that public employees do not "relinquish the First Amendment rights they would otherwise enjoy as citizens" simply because of their public employment, *Pickering v.*

663 F.3d 100

(Cite as: 663 F.3d 100)

*Bd. of Educ.,* 391 U.S. 563, 568, 88 S.Ct. 1731, 20 L.Ed.2d 811 (1968), and that "government offices could not function if every employment decision became a constitutional matter," *Connick v. Myers,* 461 U.S. 138, 143, 103 S.Ct. 1684, 75 L.Ed.2d 708 (1983), courts try "to arrive at a balance between the interests of the teacher, as a citizen, in commenting upon matters of public concern and the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees." *Pickering,* 391 U.S. at 568, 88 S.Ct. 1731. In *Pickering,* the Supreme Court held that "a teacher's exercise of his right to speak on issues of public importance may not furnish the basis for his dismissal from public employment." *Id.* at 574, 88 S.Ct. 1731. In the circumstances of that case, "the interest of the school administration in limiting teachers' opportunities to contribute to public debate [was] not significantly greater than its interest in limiting a similar contribution by any member of the general public." *Id.* at 573, 88 S.Ct. 1731.

[1] As *Pickering* indicated, for speech to be protected by the First Amendment, it must be "on a matter of public concern," which includes speech "relating to any matter of political, social, or other concern to the community." *Connick,* 461 U.S. at 146, 103 S.Ct. 1684. In contrast, when a public employee "speaks not as a citizen upon matters of public concern, but instead as an employee upon matters only of personal interest," courts should not "review the wisdom of a personnel decision taken" in response. *Id.* at 147, 103 S.Ct. 1684. This is because the First Amendment "does not require a grant of immunity for employee grievances not afforded ... to those who do not work for the State"; it merely "ensure[s] that citizens are not deprived of fundamental rights by virtue of working for the government." *Id.* To determine "[w]hether an employee's speech addresses a matter of public concern," courts look to "the content, form, and context of a given statement, as revealed by the whole record." *Id.* at 147–48, 103 S.Ct. 1684.

[2] More recently, the Supreme Court has held that First Amendment protection applies only when the public employee speaks as a citizen and not in her role as employee. Statements made pursuant to official duties are not protected. *Garcetti v. Ceballos,* 547 U.S. 410, 421, 126 S.Ct. 1951, 164 L.Ed.2d 689 (2006). "Restricting

speech that owes its existence to a public employee's professional responsibilities does not infringe any liberties the employee might have enjoyed as a private citizen. It simply reflects the exercise of employer control over [speech] the employer itself has commissioned or created." *Id.* at 421–22, 126 S.Ct. 1951.

Our Court has explained that, even if a public employee's speech "is not required by, or included in, [his] job description, or [made] in response to a request by the employer," he speaks as an employee and not as a citizen if the speech is " 'part-and-*107 parcel' of his concerns' about his ability to 'properly execute his duties.' " *Weintraub v. Bd. of Educ.,* 593 F.3d 196, 203 (2d Cir.2010) (quoting *Williams v. Dallas Indep. Sch. Dist.,* 480 F.3d 689, 694 (5th Cir.2007)). *Weintraub* held that the filing of a union grievance by a teacher, regarding school administrators' handling of discipline problems in his classroom, was not protected because it implicated the teacher's "core duties" of "maintaining class discipline." *Id.* at 198.

*B. First Amendment Protection for Nagle's Expressive Conduct*

In applying these principles to Nagle's complaints of forgery, we need go no further than the public-concern prong of analysis, because, like the district court, we conclude that Nagle fails, as a matter of law, to satisfy this requirement. As to Nagle's report of abuse, defendants conceded in the district court that these statements would have enjoyed First Amendment protection when uttered had Nagle not violated school protocols, and they do not argue otherwise here. Thus, we need not pursue the question of whether the reports could claim First Amendment protection, except insofar as the district court ruled that First Amendment protection for these statements was lost because of (1) non-compliance with employer protocols, and (2) the passage of time and distance between their utterance in Virginia and the complained-of adverse employment action in New York. After analyzing the relevant considerations, we determine that, for the reasons stated below, the New York forgery accusation was not protected speech, but that the Virginia abuse report is.

*1. The Forgery Incident*

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

663 F.3d 100

(Cite as: 663 F.3d 100)

[3] Nagle argues that any personal interest she may have had in speaking about the forgery incident does not do away with whatever First Amendment protection the speech is entitled to. We agree that the primary question for First Amendment purposes is whether the matter is of public concern, not whether the speech was also made to serve some private interest. *Cf. Reuland,* 460 F.3d at 415 (holding that the absence of a motivating "desire to address a matter of public concern" was "not dispositive as to whether [the] speech addressed a matter of public concern"). Nagle further argues that the fact that the forgery was not considered criminal activity by the police does not by itself negate First Amendment protection. We, similarly, do not "doubt that non-criminal activities may also be ... matters of public concern." *Cioffi v. Averill Park Cent. Sch. Dist. Bd. of Educ.,* 444 F.3d 158, 164 (2d Cir.2006).

Accordingly, we believe that the district court erred in its conclusion that because Nagle's speech about the forgery "was not focused on the public welfare" but was instead "advanc[ing] some ... personal agenda," that speech necessarily was not protected. *Order* at 19. The court below also erred in stating that because "no authority ... would treat the events at issue as a crime," the speech could not be of public concern. *Id.* at 16. The district court's reasoning contradicts *Reuland*'s holding that motivation is not dispositive and *Cioffi*'s conclusion that matters of public concern need not involve crimes.

Nevertheless, we conclude that the forgery incident did not implicate a matter of public concern. No authority supports Nagle's argument that reporting an alleged crime always implicates matters of public concern. The forgery of Nagle's signature, even if such conduct were criminal, had no practical significance to the general public. As Nagle well understood, her signature did not indicate agreement **\*108** with the document or have any other effect beyond confirming its receipt—which is not disputed. Viewed in the light most favorable to Nagle, the evidence suggests (a) that Assistant Principal Marron forged Nagle's signature on the document, (b) that Marron then denied having done so, and (c) that Marron did this even though Nagle's signature had no bearing on the report's efficacy. Although Nagle's own desire to get to the bottom of this puzzling situation is understandable, Nagle

does not claim that the forgery revealed an ongoing pattern of conduct or even a particularly important instance of bad judgment on Marron's part that might have elevated the forgery to a matter of public concern. We therefore affirm, albeit on different grounds, the district court's holding that Nagle's speech related to the alleged forgery was not protected under the First Amendment.

*2. The Abuse Report*

*a. Protocol Violations*

Defendants conceded below that Nagle's report of abuse in Virginia raised a matter of public concern, but the district court concluded that the report "was not protected when uttered because it undisputedly violated reasonable protocols." *Order* at 13. We doubt that this question could be decided as a matter of law on the present record, which indicates that Nagle may well have followed school procedures by reporting to her principal the verbal abuse that she had overheard. Some time later—after Moore had already left Nagle's school—Nagle informed both Child Protective Services and the state police of what she had personally overheard and what others had told her. It is not clear from the record that Nagle's conduct in these circumstances violated any protocols.

[4] This lack of factual clarity does not matter, because the district court's reasoning finds no support in Second Circuit or Supreme Court case law, which has never conditioned First Amendment protection on adherence to employer protocols. An employee's failure to follow protocols may give rise to an alternative, non-retaliatory ground for an adverse employment action. And as such, it could be the basis of a successful causation defense. That possibility, which is discussed *infra,* is very different from the lower court's holding that failure to abide by rules deprived the speech of First Amendment protections. Here, as it did also with respect to "obsolescence," *see infra* subsection B.2.b., the district court confused a question of causation with the very different question of whether speech is protected.

In sum, neither the record nor the law permitted the district court to find that Nagle's Virginia speech lost its First Amendment protection because of protocol violations. Defendants conceded below that Nagle's report of abuse would have been protected when uttered but for

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

663 F.3d 100

(Cite as: 663 F.3d 100)

the alleged protocol violation. We therefore need only consider defendants' remaining argument that the report lost its First Amendment protection due to obsolescence.

### b. Obsolescence of First Amendment Protection

The district court held that Nagle's Virginia speech presented a " 'transferred speech' scenario." *Order* at 10.[FN6] This, it said, required the court to determine not only whether Nagle's report of abuse was "protected when originally uttered" in Virginia, but also, separately, whether it "remained protected after the passage of time **\*109** and [Nagle's] relocation to a new community." *Id.* at 10–11. The court concluded that, even had Nagle's Virginia speech been protected when it was first made, it had become "old news" by the time of the events at issue in this lawsuit. It would therefore have lost, in New York, any First Amendment protection it might have had in Virginia. *Order* at 16. The district court cited no authority for its conclusion that the situation required two separate determinations with respect to First Amendment protection.[FN7] This novel approach is neither necessary nor warranted by First Amendment law.

> FN6. Although the district court put "transferred speech" in quotation marks, we have been unable to locate the term in any other federal or state court decision.

> FN7. The district court did cite *Ashcroft v. ACLU,* 535 U.S. 564, 122 S.Ct. 1700, 152 L.Ed.2d 771 (2002), in support of its conclusion that, just as "community standards" play a role in determining what constitutes obscenity, "time and place must play a role in deciding what constitutes a 'matter of public concern.' " *Order* at 15. Time and place, the court argues, must play a role because "the scope of public concern, like the standards of decency [in obscenity cases], might differ significantly from one community and/or era to another." *Id.* The court cited no authority for its assumption that the "community" that defines standards of decency in criminal obscenity cases has anything to do with the "public" who defines speech to be of public concern in First Amendment retaliation cases. Additionally, *Ashcroft* assumed that what

constituted community standards was a fact question to be decided by a jury, a conclusion that would have precluded summary judgment in the present case in any event. *See Ashcroft,* 535 U.S. at 574, 122 S.Ct. 1700.

[5] The district court appears to have confused the first prong of the First Amendment inquiry, which asks whether the speech at issue was protected, with the last, which examines whether the protected speech caused the adverse employment action. Whether speech pertained to a matter of public concern and whether it was uttered in the speaker's capacity as a private person are not facts that change over time. A teacher's expressive conduct made in the course of working for a candidate's political campaign, for instance, would constitute protected speech even if the candidate lost and his candidacy therefore ceased being a matter of immediate public concern. And the speech would remain protected if the teacher moved to an area where the candidate had not been on the ballot. The First Amendment protects precisely such public participation, both at the time it occurs and ever after.

[6] What can grow stale, over time and distance, is not an expressive act's First Amendment protection but its *relevance* to the plaintiff's employers. "To establish causation, a plaintiff must show that the protected speech 'was a substantial motivating factor in the adverse employment action.' " *Cioffi,* 444 F.3d at 167 (quoting *Morris,* 196 F.3d at 110). It is quite plausible that an employer would simply have no interest, or lose any interest it once had, in an employee's long-ago protected speech. Speech that did not matter to an employer would likely not be a motivating factor in an employment action. And we may assume that this is what the district court meant when it made the factual determination that Nagle's actions would have been "old news" and of "limited interest" to Appellees. *Order* at 16. But that says nothing about whether the speech was protected. The inquiry into causation is legally, as well as logically, distinct from the question of whether the speech was protected to begin with and must be kept separate from that preliminary question.

### c. Causation

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

663 F.3d 100

(Cite as: 663 F.3d 100)

The district court concluded that Nagle's speech could not have caused the adverse employment action because Fried had already decided not to recommend her for tenure before he learned of her Virginia speech: "[a]lthough Superintendent Fried **110 cannot recall exactly when he became aware of [Nagle's protected speech in Virginia], he believes he was, at the time, already leaning toward not recommending [Nagle] for tenure." *Order* at 20. This testimony, however, by itself, indicates that a grant of summary judgment against Nagle is reversible error.

[7] First, it is established that an adverse employment action occurs on the date that a decision was formally reached. *Cioffi,* 444 F.3d at 163 (holding that an adverse employment action dated not from a closed meeting at which an "informal consensus" regarding the matter was reached, but rather from an official meeting with a formal vote and a publicly declared outcome). Events leading up to a formal decision will, in many situations, be relevant to the analysis of causation. But an employer cannot insulate itself from liability at the summary judgment stage simply by asserting that an adverse employment decision had in fact already been made, without being memorialized or conveyed to anyone, before the employer learned of the protected conduct. [FN8] Nagle was informed that she would not be recommended for tenure on March 2, 2007. On the facts of this case, that is the date on which the adverse employment action took place.

> FN8. At any rate, the record evidence the Appellees cite does not support an assertion along these lines. Appellees claim that "[i]n January 2007, Fried informed Castar, Assistant Superintendent for Personnel Rosemarie Coletti ... and the 'central staff team' of his decision not to recommend the appellant for tenure." Appellees' Br. 12. Yet, Fried testified that he "d[id]n't recall" when he told the others of his decision. Coletti testified that Fried "indicat[ed].... he was ... thinking about what his decision was going to be" at a meeting in January, but informed her in "another conversation ... that he ... had decided that he would not be granting Ms. Nagle tenure." She did not state when this other conversation took place.

Second, and as important, Fried did not testify that a decision had already been made, or even that a consensus had been reached, not to retain Nagle when the information about the Virginia events reached him in early 2007. All Fried said was that he was leaning that way. [FN9] In such circumstances, a jury would be entitled to find that the Virginia events convinced him to follow his inclinations, and thereby played a part in his ultimate decision.

> FN9. Fried's full testimony was first that in January 2007 he was "very, very concerned and was heavily leaning toward not granting [Nagle] tenure" and that "it was very doubtful that I was going to be looking to grant [Nagle] tenure." He later said he had in fact "made the decision that [Nagle] would not receive tenure" by that time. A jury could, of course, believe the first rather than the second statement. And this is so apart from the evidence, produced by Appellees themselves, *infra* n. 10 and accompanying text, that their mischaracterization of Nagle's Virginia acts as violating protocol did in fact affect their decision.

[8] A "plaintiff can ... establish a causal connection to support a ... retaliation claim by 'showing that the protected activity was closely followed in time by the adverse [employment] action.'" *Gorman–Bakos,* 252 F.3d at 554 (alteration in original) (quoting *Reed v. A.W. Lawrence & Co.,* 95 F.3d 1170, 1178 (2d Cir.1996)); *see also Higdon v. Jackson,* 393 F.3d 1211, 1220 (11th Cir.2004) (noting that causality can be shown through a "close temporal proximity between [the employer's] awareness [of protected conduct] and the adverse action" (internal quotation marks and alteration omitted)); *Wyatt v. City of Boston,* 35 F.3d 13, 16 (1st Cir.1994) (per curiam) ("One way of showing causation is by establishing that the employer's knowledge**111 of the protected activity was close in time to the employer's adverse action.").

[9] Fried testified that he became aware of Nagle's report of abuse in Virginia in "late January or February" of 2007, that is, at most six weeks before the adverse

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

663 F.3d 100

(Cite as: 663 F.3d 100)

employment action on March 2, 2007. While we have not "drawn a bright line" defining the maximum time period that can give rise to an inference of causation, *Gorman–Bakos,* 252 F.3d at 554, six weeks fits comfortably within any line we might draw. It follows that Nagle's showing of temporal proximity suffices to make out a *prima facie* claim of retaliation under the First Amendment.

[10] Appellees counter that, to the extent Nagle's Virginia speech influenced them, it was not the content of that speech that mattered but what they took to be Nagle's violation of school rules in reporting the abuse to the police rather than to her principal. But on the question of whether *protected speech* played a significant part of the decision to dismiss Nagle, this "counter," if anything, is evidence against Appellees' position. Just what Appellees believed about Nagle's conduct in Virginia, and how, if at all, those beliefs influenced their actions may well be issues critical to resolving this case.[FN10] That these questions turn on unresolved factual disputes, however, precludes summary judgment.

> FN10. Because Castar and Fried did not recall exactly what sources about Nagle they had seen, there is uncertainty as to whether they knew that Nagle had first reported her concerns to her principal in Virginia, and a jury could find that they did. If Castar and Fried did know that Nagle had followed whatever "inside" reporting rules existed in Virginia, and had only then gone to the police and the Department of Child Protective Services, then Appellees' characterization of what Nagle did—which they concede may have caused them to dismiss her—as a rule violation was both wrong and unreasonable.

Appellees characterize Castar and Fried's understanding of Nagle's Virginia speech as "mirror[ing] Castar's experience with [Nagle's] failing to follow ... District[ ] protocol on two occasions" in New York, a claim they rest on two specific events. Appellees' Br. 29. The factual bases Appellees present, however, are insufficient to dispose of the question at summary judgment. On one cited occasion, Nagle chose a particular book to read with her class without first consulting the

school psychologist, Barbara Merling. Beyond stating that Merling "believed that [Nagle] should have consulted with her," however, Appellees have provided no evidence that school customs or protocols required such a consultation. On the second occasion, Nagle did not confer with administrative staff before sending a child home from school early. But Principal Castar himself testified that Nagle's decision to send a child home early without speaking to administrators did not violate any existing rules, protocols, or customs at the school. While, with further factual development, a jury could conceivably conclude that these events caused Appellees in good faith to question Nagle's judgment and her amenability to supervision, Appellees have not presented sufficient evidence to dispose of this question at summary judgment.

#### d. Same Decision Defense

[11] Because protected speech could not substantially cause an adverse action if the employer would have taken that action in any event, a defendant can rebut a *prima facie* showing of retaliation by demonstrating "by a preponderance of the evidence that it would have taken the same adverse employment action 'even in the absence of the protected conduct.' " *Morris,* 196 F.3d at 110 (quoting *Mount Healthy City Sch. Dist. Bd. of Educ. v. Doyle,* 429 U.S. 274, 287, 97 S.Ct. 568, 50 L.Ed.2d 471 (1977)). Under this standard, at this stage of the proceedings, Appellees are entitled to summary judgment if they can show that a reasonable jury would have to find by a preponderance of the evidence that Appellees would have dismissed Nagle even had they not learned of her Virginia speech.

Appellees specifically point to *Cosgrove v. Federal Home Loan Bank of New York,* Nos. 90–civ–6455 (RPP), 92–civ–4225 (RPP), 1999 WL 163218 (S.D.N.Y. Mar. 23, 1999), as "directly analogous" to the present case. In *Cosgrove,* a bank examiner claimed her employer had impermissibly fired her for reporting to the FBI improper lending practices that the examiner had discovered in an investigation. The plaintiff in that case had received numerous indications (several memoranda, evaluations, and warnings per year) that her work failed to meet her employer's standards and that her interpersonal skills were interfering with her job performance. *Id.* at *12–*14. The district court concluded in *Cosgrove* that, although the

663 F.3d 100

(Cite as: 663 F.3d 100)

plaintiff's FBI report may have constituted protected speech, the plentiful documentation of her ongoing problems showed as a matter of law that her employer would have fired her irrespective of the FBI report. *Id.* at *15.

Unlike *Cosgrove,* however, Appellees themselves have characterized evaluations of Nagle during her probationary period as "ranging from fair to positive." Fried testified that official "in-classroom observations [of Nagle] were positive." Also in contrast to the plaintiff in *Cosgrove,* Nagle had not received years of warnings about problems with her interpersonal skills. On the contrary, Castar testified that, besides a complaint from the school psychologist regarding Nagle's choice of a particular book to read with her class, "[t]here weren't complaints" about Nagle. He further testified that, as the school implemented a new teaching model that integrated special education students into the mainstream student population, "other teachers told [him] that they would not teach in this program unless [Nagle] was the special ed teacher there." Defendants have, in sum, provided no evidence of ongoing problems with Nagle's work or work relationships of the sort documented in *Cosgrove.*

According to Fried's testimony, his decision not to recommend Nagle for tenure rested not on an accumulation of negative evaluations and problems but on what he heard from third parties about Nagle's behavior at a single meeting in December 2006. At that meeting, Nagle had intimated that she knew she would not be granted tenure and had become so upset that she cried and left the room for a while to calm down. At one point—and in tension with some of the other testimony regarding the effect of the Virginia events—Fried testified that he "came to the conclusion that [Nagle] should not receive tenure because of her behavior at the meeting." Fried did not himself attend this meeting but learned of it from conversations with Castar and Esposito.

Viewing this record in the light most favorable to Nagle, we cannot find as a matter of law that Fried would have made his decision irrespective of learning of Nagle's report of abuse in Virginia. There was no pattern of bad evaluations, complaints, and warnings, as there was in *Cosgrove.* There was no specific instance of misconduct.

All this is in direct contrast with most of the cases Appellees cite to support their position. Moreover, there is no documentation of Fried's decision-making process prior to learning of Nagle's Virginia speech. While it is certainly possible that an employee's behavior at a single**113** meeting can be so egregious as to merit dismissal, we do not think that crying and leaving the room to calm down suffices, as a matter of law, to overcome a *prima facie* showing of retaliation. The record raises genuine issues of material fact as to why Appellees acted as they did, and "[s]ummary judgment is precluded where questions regarding an employer's motive predominate in the inquiry regarding how important a role the protected speech played in the adverse employment decision." *Morris,* 196 F.3d at 110. [FN11]

> [FN11.] Appellees additionally state that any speech protections Nagle might have enjoyed were outweighed by "the employer's interest in maintaining an efficient and disrupti[on] free workplace." An employer can avoid liability for retaliation if it shows that it reasonably predicted that the plaintiff's speech would be disruptive, the disruptive potential outweighed the value of the speech, and the adverse employment action was taken not in retaliation but to prevent disruption. *See Anemone,* 629 F.3d at 115. Appellees, however, have not attempted to show any of these facts. Moreover, this argument was not raised below, and is therefore forfeited. *Order* at 9 (noting that "defendants have not asserted the 'potential disruption' defense").

## II. Limitations on Liability

Nagle's successful presentation of a *prima facie* claim and Appellees' proffer of a rebuttal that is subject to credibility questions do not, however, fully resolve this appeal. We must also determine whether each of the particular Appellees may be held liable for the acts alleged. Specifically, we must examine (1) whether Castar and Fried are entitled to qualified immunity from Nagle's suit, and (2) whether the District is subject to municipal liability in the circumstances of this case.

*A. Qualified Immunity*

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

663 F.3d 100

(Cite as: 663 F.3d 100)

Although the statutory text of § 1983 provides for no immunities, it has been read " 'in harmony with general principles of tort immunities' " to provide qualified immunity for most government officials.[FN12] *Malley v. Briggs,* 475 U.S. 335, 339, 106 S.Ct. 1092, 89 L.Ed.2d 271 (1986) (quoting *Imbler v. Pachtman,* 424 U.S. 409, 418, 96 S.Ct. 984, 47 L.Ed.2d 128 (1976)). "Qualified immunity is 'an entitlement not to stand trial or face the other burdens of litigation.' " *Saucier v. Katz,* 533 U.S. 194, 200, 121 S.Ct. 2151, 150 L.Ed.2d 272 (2001) (quoting *Mitchell v. Forsyth,* 472 U.S. 511, 526, 105 S.Ct. 2806, 86 L.Ed.2d 411 (1985)), *modified by Pearson v. Callahan,* 555 U.S. 223, 129 S.Ct. 808, 172 L.Ed.2d 565 (2009). It "protects government officials 'from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.' " *Pearson,* 555 U.S. at 231, 129 S.Ct. 808 (quoting *Harlow v. Fitzgerald,* 457 U.S. 800, 818, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982)). "Qualified immunity balances two important interests—the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably." *Id.*

FN12. The statute provides, in pertinent part, that "[e]very person who, under color of any statute ... of any State ..., subjects, or causes to be subjected, any ... person within the jurisdiction [of the United States] to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress." 42 U.S.C. § 1983.

In the present case, the district court granted Fried and Castar immunity. Having determined that neither instance of Nagle's expressive conduct was protected, and certainly was not "clearly" so, the court necessarily concluded that a reasonable official would not have been on notice **114 that "considering such conduct in reaching an adverse employment decision violated" Nagle's rights. *Order* at 22. Because we hold that one of Nagle's acts of expressive conduct was protected, we must revisit the district court's decision on qualified immunity. We conclude that neither Fried nor Castar have such

immunity.

Qualified immunity depends on whether, "[t]aken in the light most favorable to the party asserting the injury, ... the facts alleged show the [official's] conduct violated a ... right," and, if so, whether that right was "clearly established" at the time of the events at issue. *Saucier,* 533 U.S. at 201, 121 S.Ct. 2151. As indicated previously, we have no difficulty in concluding that, taking Nagle's allegations as true and resolving all ambiguities and drawing all inferences in her favor, the facts she alleges, if proved, constituted a violation of her right not to experience an adverse employment action in retaliation for speaking as a private person on a matter of public concern. We therefore turn to the other prong of the test.

[12] "The relevant, dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable [official] that his conduct was unlawful in the situation he confronted." *Id.* at 202, 121 S.Ct. 2151. This standard requires "the level of generality at which the relevant 'legal rule' is ... identified" to strike the appropriate "balance ... between the interests in vindication of [private persons'] constitutional rights and in public officials' effective performance of their duties." *Anderson v. Creighton,* 483 U.S. 635, 639, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987) (internal quotation marks omitted). That level of generality must allow officials " 'reasonably [to] anticipate when their conduct may give rise to liability.' " *Id.* at 646, 107 S.Ct. 3034 (alteration in original) (quoting *Davis v. Scherer,* 468 U.S. 183, 195, 104 S.Ct. 3012, 82 L.Ed.2d 139 (1984)). Describing the right at issue overly broadly eviscerates the protections of qualified immunity; describing it too narrowly negates the possibility of redress. The Supreme Court has, therefore, required the rights at issue in such cases to be sufficiently "particularized" to be "relevant" to the inquiry: "The contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Id.* at 640, 107 S.Ct. 3034.

At the same time, the standard must not be so specific that qualified immunity could be overcome only if "the very action in question has previously been held unlawful." *Id.* Rather, "the unlawfulness" of the alleged action "must be apparent" to a reasonable official "in the

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

663 F.3d 100

(Cite as: 663 F.3d 100)

light of pre-existing law." *Id.; see also Saucier,* 533 U.S. at 202, 121 S.Ct. 2151 ("If the law did not put the officer on notice that his conduct would be clearly unlawful, summary judgment based on qualified immunity is appropriate.").

[13] The "subjective good faith of government officials" plays no part in the inquiry. *Harlow,* 457 U.S. at 816, 102 S.Ct. 2727. Our "inquiry is confined to the objectively ascertainable question whether a reasonably well-trained [official] would have known that [his conduct] was illegal." *Malley,* 475 U.S. at 345, 106 S.Ct. 1092 (internal quotation marks omitted). "Implicit in the idea that officials have some immunity ... is a recognition that they may err" and a determination that "it is better to risk some error ... than not to ... act at all." *Scheuer v. Rhodes,* 416 U.S. 232, 242, 94 S.Ct. 1683, 40 L.Ed.2d 90 (1974), *abrogated by Harlow,* 457 U.S. 800, 102 S.Ct. 2727 (1982). The objective inquiry allows room for error by guaranteeing officials "immunity for reasonable mistakes as to the legality of their actions," **115**Saucier, 533 U.S. at 206, 121 S.Ct. 2151, but not for unreasonable mistakes, which should be prevented by an official's knowledge of the "law governing his conduct," *Harlow,* 457 U.S. at 819, 102 S.Ct. 2727. The reasonableness of the official's action, in turn, is "assessed in light of the legal rules that were clearly established at the time [the action] was taken." *Anderson,* 483 U.S. at 639, 107 S.Ct. 3034 (internal quotation marks and citation omitted). The focus therefore remains on whether, at the time of the alleged conduct, the right was clearly established, rendering it objectively unreasonable for an official to think that his action was lawful. *See Okin v. Vill. of Cornwall–on–Hudson Police Dep't,* 577 F.3d 415, 433 n. 11 (2d Cir.2009) (noting that an official "who violates clearly established law necessarily lacks an objectively reasonable belief that his conduct was lawful"); *Locurto,* 264 F.3d at 169 ("[I]t can never be objectively reasonable for a governmental official to act with the intent that is prohibited by law.").

[14] In the present case, Appellees do not argue that Nagle did not have a clearly established right not to suffer adverse employment actions in retaliation for her protected speech. Rather, they argue that it is not clearly established that speech protected at one time "remains

protected when discovered years later" in a "geographically remote community." FN13 Appellees cite no cases suggesting that First Amendment protection wanes over time. More importantly, they point to no basis on which a reasonable official might conclude that it would so wane, thereby permitting the official to retaliate for the speech. As we have previously observed, there are material questions of fact in this case as to whether the complained-of tenure decision was made in retaliation for Nagle's speech. But assuming, as we must, that this causation question is decided against Appellees at trial, no reasonable official could think that such speech-retaliatory conduct was constitutionally permissible based simply on the passage of time. Insofar as Appellees mean to rest on the cases cited by the district court in its discussion of this issue, we note that none of those cases held, or even supported the conclusion, that First Amendment protection deteriorates over time and space. On the contrary, every case the district court cited held or assumed that earlier expressive acts could give rise to a claim of retaliation.

FN13. Appellees also contend that Nagle has failed to show improper motive. To the extent Appellees reference motive as indicative of causation, we have already explained that material questions of fact preclude resolution of the causation issue as a matter of law. Otherwise, as we have also explained, subjective motive plays no part in the qualified immunity inquiry. To the extent that Appellees argue otherwise on the basis of *Blue v. Koren,* 72 F.3d 1075 (2d Cir.1995), they misconstrue that decision's discussion of motive. *Blue* concluded that, where "a constitutional claim contains a subjective component," *id.* at 1082, "a conclusory proffer of an unconstitutional motive should not defeat the motion for summary judgment" *if* the court determines that "the conduct was objectively reasonable." *Id.* at 1084. Because "[t]he reasonableness of the conduct is itself substantial evidence in support of the motion" for summary judgment, a plaintiff in such a situation may be required to allege more specific facts about the official's motivation. *Id.* But subjective intent has no role in the initial determination of whether the conduct was objectively reasonable.

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

663 F.3d 100

(Cite as: 663 F.3d 100)

It is true that no case in our Circuit has specifically held that First Amendment protection does not grow weaker over time and space. But as the Supreme Court has explained, "the very action in question" need not have been the subject of a holding in order for a right to be clearly established. **\*116**_Anderson, 483 U.S. at 640, 107 S.Ct. 3034._ If the "contours of the right [are] sufficiently clear," _id.,_ then "officials can still be on notice that their conduct violates established law even in novel factual circumstances," _Hope v. Pelzer,_ 536 U.S. 730, 741, 122 S.Ct. 2508, 153 L.Ed.2d 666 (2002).

Fried and Castar knew or should have known that retaliation for protected speech would violate an employee's First Amendment rights, and they had no reason to think that speech protected in Virginia in 2004 would _not_ be protected in New York in 2007. We therefore hold that, based on the record on appeal, neither Fried nor Castar are subject to qualified immunity from Nagle's suit.[FN14]

> FN14. Since there is no basis in the record for finding that there was a protocol violation, we need not decide whether, if there were such a violation, that violation would become a basis for a qualified immunity defense.

_B. Municipal Liability_

The parties did not brief, and the district court did not determine, the availability of a § 1983 suit against the District under the circumstances of this case. Municipal entities, including school districts, are "persons" within the meaning of § 1983 and therefore subject to suit under that provision. _Monell v. Dep't of Soc. Serv. of City of New York,_ 436 U.S. 658, 663, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978); _Back v. Hastings on Hudson Union Free Sch. Dist.,_ 365 F.3d 107, 128 (2d Cir.2004). But municipalities are not liable "on a _respondeat superior_ theory," simply because an employee committed a tort. _Monell,_ 436 U.S. at 691, 98 S.Ct. 2018. Section 1983 "distinguish[es] acts of the _municipality_ from acts of _employees_ of the municipality," and imposes liability only for "action for which the municipality is actually responsible." _Pembaur v. City of Cincinnati,_ 475 U.S. 469, 479, 106 S.Ct. 1292,

89 L.Ed.2d 452 (1986).

[15] The municipality is responsible if a violation of rights resulted from the "government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy." _Monell,_ 436 U.S. at 694, 98 S.Ct. 2018. When " 'an official has final authority over significant matters involving the exercise of discretion, the choices he makes represent government policy.' " _Clue v. Johnson,_ 179 F.3d 57, 62 (2d Cir.1999) (quoting _Rookard v. Health & Hosps. Corp.,_ 710 F.2d 41, 45 (2d Cir.1983)). Because of this, "municipal liability may be imposed for a single decision by municipal policymakers." _Pembaur,_ 475 U.S. at 480, 106 S.Ct. 1292. "[W]hether an official had final policymaking authority is a question of state law." _Id._ at 483, 106 S.Ct. 1292 (plurality opinion); _see also Jett v. Dallas Ind. Sch. Dist.,_ 491 U.S. 701, 737, 109 S.Ct. 2702, 105 L.Ed.2d 598 (1989).

Under New York law, boards of education or trustees of common school districts appoint teachers "upon the recommendation of the superintendent of schools, for a probationary period of three years." N.Y. Educ. Law § 3012(1)(a). This probationary period "may be discontinued at any time ... on the recommendation of the superintendent of schools, by a majority vote of the board of education or the trustees of a common school district." _Id._ At the end of the probationary term, "the superintendent of schools shall make a written report to the board of education" recommending the grant or denial of tenure. _Id._ § 3012(2). The board or the trustees "shall review all recommendations not to appoint a person on tenure." _Id._ § 3031(a).

[16] The District is clearly a final policymaker with respect to a teacher's tenure **\*117** and employment, and Nagle does not allege that the District acted with intent to violate her rights. Nevertheless, because "no potential employee can obtain full school board approval without [the superintendent's] recommendation," Superintendent Fried may himself be deemed the "final decisionmaker with respect to personnel appointments," because "his recommendations are essentially those of the governmental body." _Hamilton v. Montgomery Cnty. Bd. of Educ.,_ 122 F.Supp.2d 1273, 1289 (M.D.Ala.2000).

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

663 F.3d 100

(Cite as: 663 F.3d 100)

Additionally, the record suggests that, although Fried technically recommended candidates on whom the District board voted, that process was treated largely as a formality. Accordingly, a factfinder could decide that a person whom Fried did not recommend for tenure was effectively denied tenure by that act. Fried himself testified that he "had made the decision that [Nagle] would not receive tenure." A jury could conclude from this and similar testimony that the District customarily accepted the superintendent's recommendations against tenure.

Some Circuits have held that "an employer cannot shield itself from liability ... by using a purportedly independent person or committee as the decisionmaker where th[at] decisionmaker merely serves as the conduit, vehicle, or rubber stamp by which another achieves his or her unlawful design." *Dedmon v. Staley,* 315 F.3d 948, 949 n. 2 (8th Cir.2003). Under this so-called "cat's paw" theory,[FN15] a final decisionmaker that relies entirely on an improperly motivated recommendation from a subordinate may render the municipality liable because the subordinate, although not formally delegated the power to make decisions, acts as the municipality's agent.[FN16]

> FN15. The term "cat's paw" is apparently drawn from a La Fontaine poem (perhaps itself drawn from an Aesop fable) about a monkey who convinces a cat to get chestnuts roasting in a fire. As the cat pushes the chestnuts out one by one, the monkey eats them; the monkey gets the chestnuts while the cat gets only burnt paws. *See Staub v. Proctor Hosp.,* ––– U.S. ––––, 131 S.Ct. 1186, 1190 n. 1, 179 L.Ed.2d 144 (2011). " 'Today the term 'cat's paw' refers to one used by another to accomplish his purposes.' " *Arendale v. City of Memphis,* 519 F.3d 587, 604 n. 13 (6th Cir.2008) (quoting *EEOC v. BCI Coca–Cola Bottling Co.,* 450 F.3d 476, 484 (10th Cir.2006)).

> FN16. The Supreme Court has recently indicated its approval of this approach in a case involving discrimination under the Uniformed Services Employment and Reemployment Rights Act (USERRA), 38 U.S.C. § 4311(c). *Staub,* 131 S.Ct. at 1194 ("We ... hold that if a supervisor

performs an act motivated by antimilitary animus that is *intended* by the supervisor to cause an adverse employment action, and if that act is a proximate cause of the ultimate employment action, then the employer is liable under USERRA." (footnote omitted)). *Staub* noted that USERRA is "very similar to Title VII." *Id.* at 1191. In certain circumstances, we have analogized Title VII to § 1983. *E.g. Demoret v. Zegarelli,* 451 F.3d 140, 149 (2d Cir.2006) ("[T]he analysis for [§ 1983 employment discrimination claims] is similar to that used for employment discrimination claims brought under Title VII....").

Moreover, several Circuits have either held or assumed that cat's paw liability would be available under § 1983. *See, e.g., Campion, Barrow & Assocs., Inc. v. City of Springfield, Ill.,* 559 F.3d 765, 771 (7th Cir.2009) ( "[E]vidence could support a finding that X (the [City] Council) relied on Y's (the Mayor's or [an alderman's] ) intent, making it permissible to base municipal liability on Y's discriminatory animus."); *Arendale v. City of Memphis,* 519 F.3d 587, 604 n. 13 (6th Cir.2008) ("When an adverse hiring decision is made by a supervisor who lacks impermissible bias, but that supervisor was influenced by another individual who was motivated by such bias, this Court has held that the **118** employer may be held liable under a 'rubber-stamp' or 'cat's paw' theory of liability."); *Dedmon,* 315 F.3d at 949 n. 2 ("[A]n employer can be liable, under certain circumstances, where the formal decisionmaker is not the person who harbored an unlawful motive to terminate the employee." (emphasis omitted)). *But see Hull v. Cuyahoga Valley Joint Vocational Sch. Dist. Bd. of Ed.,* 926 F.2d 505, 515 (6th Cir.1991) ("Plaintiff's argument that [the person who recommended his termination] exercises final authority, because the Board allegedly 'rubber-stamps' his recommendations is contrary to *P[r]aprotnik's* explicit warning not to look beyond where 'applicable law purports' to vest power." (quoting *City of St. Louis v. Praprotnik,* 485 U.S. 112, 126, 108 S.Ct. 915, 99 L.Ed.2d 107 (1988) (plurality opinion))).

To date, our Circuit has neither accepted nor rejected the cat's paw approach. Since the matter has not been

663 F.3d 100

(Cite as: 663 F.3d 100)

briefed to us, we deem it advisable to remand the question of the District's possible liability to the district court for its decision in the first instance.

## CONCLUSION

Because Nagle has made a *prima facie* showing that retaliation in violation of the First Amendment caused her to be denied tenure; because Appellees' rebuttal is subject to credibility questions that cannot be resolved as a matter of law; and because Fried and Castar are not, at this stage of the proceedings, entitled to qualified immunity, we VACATE the district court's grant of summary judgment and REMAND for further proceedings in accordance with this opinion.

C.A.2 (N.Y.),2011.

Nagle v. Marron
663 F.3d 100
END OF DOCUMENT

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.



Slip Copy, 2010 WL 3907227 (N.D.N.Y.)

(Cite as: 2010 WL 3907227 (N.D.N.Y.))



Only the Westlaw citation is currently available.

United States District Court,

N.D. New York.

Jesse L. STEWART, Jr., Plaintiff,

v.

Gary HOWARD, D. Monell, N. Marsh, D. Spangenburg, D. Swarts, E. Hollenbeck, J. Edwards, D. Russell, Defendants.

No. 9:09-CV-0069 (GLS/GHL).

April 26, 2010.

Jesse L. Stewart, Jr., Marienville, PA, pro se.

Office of Frank W. Miller, Frank W. Miller, Esq., Michael J. Livolsi, Esq., of Counsel, East Syracuse, NY, for Defendants.

### REPORT-RECOMMENDATION

GEORGE H. LOWE, United States Magistrate Judge.

**\*1** This *pro se* prisoner civil rights action, commenced pursuant to 42 U.S.C. § 1983, has been referred to me for Report and Recommendation by the Honorable Gary L. Sharpe, United States District Judge, pursuant to 28 U.S.C. § 636(b) and Local Rule 72.3(c). Plaintiff Jesse L. Stewart alleges that Defendants, all employees of the Tioga County Jail, violated his constitutional rights by limiting his ability to send legal mail, depriving him of his mattress and bedding during daytime hours, subjecting him to excessive force, denying him medical care after the alleged use of excessive force, and conducting biased disciplinary hearings. Currently pending before the Court is Defendants' motion for summary judgment pursuant to Federal Rule of Civil Procedure 56. (Dkt. No. 30.) Plaintiff has opposed the motion. (Dkt. No. 32.) For the reasons that follow, I recommend that Defendants' motion be granted.

### I. FACTUAL AND PROCEDURAL SUMMARY

This action involves Plaintiff's experiences at Tioga County Jail, where he was incarcerated from August 19, 2008, to January 13, 2009. (Dkt. No. 30-4 at 14:2-11.) The complaint consists almost entirely of copies of grievances and letters that Plaintiff submitted to other individuals and organizations. The "facts" section of the civil complaint form merely directs the reader to "see attached." As such, the precise contours of Plaintiff's claims are difficult to discern. The documents attached to the complaint show that:

On September 22, 2008, Plaintiff requested a grievance form so that he could complain about the facility's legal mail procedures. (Dkt. No. 1 at 41.) A grievance form was issued. *Id.*

On October 27, 2008, Plaintiff requested a grievance form so that he could complain about being denied access to the courts. (Dkt. No. 1 at 44.) Sgt. William "spoke with

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2010 WL 3907227 (N.D.N.Y.)

(Cite as: 2010 WL 3907227 (N.D.N.Y.))

[Plaintiff] but he refuses to sign off. He states he needs these letters to go out to these courts because he's fighting extradition." *Id.*

On October 30, 2008, Defendant Officer Earl Hollenbeck issued an Inmate Rule Infraction Notice to Plaintiff accusing him of sending mail using another inmate's account. (Dkt. No. 1 at 31.)

In a "notice of intention" dated November 30 2008, Plaintiff alleged that, pending disciplinary action against him, staff at the Tioga County Jail deprived him of his mattress, sheets, and blanket when temperatures were as low as fifteen degrees at night and forced him to sit directly on his steel bed for periods up to seventeen hours. (Dkt. No. 1 at 8.) In support of Defendants' summary judgment motion, Defendant Lt. David Monell declares that when inmates are accused of violating a disciplinary rule, they are placed in administrative segregation pending a hearing. During that time, the inmate's bedding is removed during the day. If this was not done, "inmates may intentionally violate rules in order to be assigned to administrative segregation so they could sleep in the cell all day instead of having to adhere to the normal inmate routine." (Dkt. No. 30-11 at 6 ¶ 12.) The parties agree that inmates' mattresses and bedding are returned at night. (Dkt. No. 1 at 10; Dkt. No. 30-11 at 6 ¶¶ 13-15.)

**\*2** In his "notice of intention," Plaintiff alleged that on November 3, 2008, he asked for a grievance form. (Dkt. No. 1 at 8.) Defendant Officer Douglas Swarts told him "if you don't shut the fuck up I'll have a few people shut you up." *Id.* Two or three minutes later, several other officers, including Defendant Sergeant Dennis Spangenburg, arrived and stood in front of Plaintiff's locked cell. *Id.* Plaintiff asked Defendant Spangenburg why he was denying Plaintiff the right to file a grievance. *Id.* at 8-9. Defendant Spangenburg replied "I can deny you anything I want." *Id.* at 9. Defendant Officers Jonathan Edwards and David Russell then entered Plaintiff's cell

and handcuffed Plaintiff so tightly that the handcuffs "stopp[ed] the flow of blood to [Plaintiff's] hands." *Id.* Defendants Edwards and Russell then escorted Plaintiff to the intake area of the facility. Along the way, they used Plaintiff's "head and body as a ram to open the electronically control[l]ed doors," which cut Plaintiff's lip and caused his nose to bleed. *Id.* Attached to Plaintiff's complaint are affidavits from inmates who state that they witnessed this incident. *Id.* at 14-15.

Plaintiff alleged in his "notice of intention" that upon arrival at the intake area, he was placed in a strip isolation cell. (Dkt. No. 1 at 9.) Several officers "entered in behind me, at what time I was hit with closed fist[s] and what felt like kicks from all directions to my head, back, ribs, and groin area several times." *Id.* Plaintiff was punched in the right eye. *Id.* After that, Plaintiff's handcuffs were removed and Defendant Sergeant Nathaniel Marsh entered the cell, grasped Plaintiff around the neck with one hand, held his mace an arm's length away from Plaintiff's face, and repeated "get the fuck up you little asshole" over and over. *Id.*

Defendants Marsh, Spangenburg, Swarts, Edwards, and Russell have submitted notarized affidavits in support of Defendants' motion for summary judgment stating that they did not assault Plaintiff. (Dkt. No. 30-11 at 10, 12, 18, 22, 24.)

At 10:50 a.m., Defendant Swarts issued two Inmate Rule Infraction Notices. The first stated that Plaintiff "refused to lock in his cell after numerous orders to do so. Duress alarm was activated." (Dkt. No. 1 at 32.) The second stated that Plaintiff "disrupted the pod by yelling threats to jail personnel." *Id.* at 33.

In his "notice of intention," Plaintiff alleged that he needed medical attention but was locked in the cell alone

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2010 WL 3907227 (N.D.N.Y.)

(Cite as: 2010 WL 3907227 (N.D.N.Y.))

without such attention for approximately fourteen hours. (Dkt. No. 1 at 9.) At 11:30 p.m., Plaintiff was escorted back to his usual cell. *Id.* All of his personal property had been removed and he was given only a mattress and a blanket. *Id.* The next morning, officers removed the mattress. *Id.* Plaintiff was told that he could only shower if he remained handcuffed and shackled. *Id.* He was given only two sheets of toilet paper. *Id.* at 9-10. This pattern of being given a mattress at night and having it removed in the morning continued for ten days. *Id.* at 10.

**\*3** On November 6, 2008, Plaintiff submitted an Inmate Request Form asking to "be released from ... restraint and receive my property back today." (Dkt. No. 1 at 45.) His request was denied. *Id.*

In his "notice of intention," Plaintiff alleged that when his property was finally returned to him, he "became submissive" and "did not file any more grievances as I was told not to or the next time it may be worse." *Id.* at 10.

In his "notice of intention," Plaintiff alleged that Defendant Marsh conducted a biased disciplinary hearing and found him guilty "on all of the infractions." (Dkt. No. 1 at 10.) Another attachment to the complaint shows that on November 12, 2008, Defendant Marsh found Plaintiff guilty and sentenced him to twenty-eight days of keeplock with no programs, no commissary, twenty minute hygiene, and legal phone calls only. *Id.* at 34.

In his "notice of intention," Plaintiff alleged that there is no "inhouse mail, or legal outgoing mail system" at Tioga County Jail and that Defendants refused to mail any item that would cost more than eighty-four cents. (Dkt. No. 1 at 10.)

On December 1, 2008, Officer Sean Shollenberger issued an Inmate Rule Infraction Notice stating that Plaintiff used stamps from another inmate to send personal mail. (Dkt. No. 1 at 35.) A hearing was scheduled for December 17, 2008. Plaintiff filed a written request stating that he had been informed of the hearing and requesting "that any decision to be determined may be done so without my participation or presence ... I do not wish to participate in such hearing." (Dkt. No. 1 at 36.) Plaintiff's request was approved. *Id.* At the hearing, Defendant Marsh found Plaintiff guilty and sentenced him to fourteen days of keeplock, no programs, no commissary, twenty minute hygiene, and legal calls only. *Id.* at 37. Defendant Marsh noted that "this is not the first infraction hearing due to [Plaintiff's] abusing the U.S. Postal Service." *Id.* On December 18, 2008, Plaintiff appealed the decision. *Id.* at 38. Plaintiff stated that he had refused to attend the hearing because of Defendant Marsh's previous use of force against him and because the hearing was not recorded. *Id.* at 39. The Chief Administrative Officer denied the appeal on December 23, 2008, because the "sanctions imposed are appropriate." *Id.* at 38.

On December 17, 2008, Plaintiff requested two grievance forms so that he could complain about the lack of bedding and facility disciplinary and hearing procedures. Grievance forms were issued. (Dkt. No. 1 at 46-47.)

On December 18, 2008, Plaintiff submitted a grievance complaining about the lack of bedding, visits, food, medical care, access to courts, and water. (Dkt. No. 1 at 20.) The grievance coordinator denied the grievance because "[d]iscipline is not grievable. There is an appeal process which the inmate can follow." *Id.* at 22. Plaintiff appealed to the Chief Administrative Officer. *Id.*

**\*4** On December 18, 2008, Plaintiff submitted a grievance complaining about Defendant Marsh's conduct during the disciplinary hearing [FN1] and requesting that

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2010 WL 3907227 (N.D.N.Y.)

(Cite as: 2010 WL 3907227 (N.D.N.Y.))

disciplinary hearings be recorded or monitored by another hearing officer. (Dkt. No. 1 at 23-24.) The Grievance Coordinator denied the grievance because "NYS Minimum Standards requires that records be kept of infraction hearings. Records are kept of the infraction hearing. The TCJ does not have more than one officer available to do infraction hearings." *Id.* at 25. Plaintiff appealed to the Chief Administrative Officer. *Id* . On December 22, 2008, Defendant Marsh completed a Grievance Investigation Form stating that he interviewed Plaintiff. Defendant Marsh found that "this facility keeps all hearing records as well as provide a copy of the hearing record to the inmate. This facility has more than one hearing officer available." *Id.* at 26.

> [FN1.](#) Although it is not clear, Plaintiff was presumably referring to the November 12, 2008, hearing, which he attended, rather than the December 17, 2008, hearing that he refused to attend.

On December 18, 2008, Plaintiff submitted an Inmate Request Form asking to speak with the Undersheriff or Captain. (Dkt. No. 1 at 48 .)

On December 22, 2008, Plaintiff wrote a letter to the Chairman of the New York Commission of Corrections; the Hon. Thomas J. McAvoy, Senior United States District Judge, and the New York State Attorney General regarding conditions at Tioga County Jail. (Dkt. No. 1 at 16-17.) Specifically, Plaintiff complained about the bedding issue, the grievance and appeal system, and the legal mail system. *Id.*

On December 28, 2008, Plaintiff submitted a grievance complaining about the facility's legal mail procedure. (Dkt. No. 1 at 27.) The Grievance Coordinator denied the grievance because "[t]his facility is not denying

you access to the courts. Minimum standards ha[ve] been and will be controlled by the State of NY, therefore this issue is not grievable. NYSCOC was contacted regarding your reference to a 'new' state directive regarding legal mail. No such directive exists." *Id.* at 28. Plaintiff checked the box indicating that he wanted to appeal to the Chief Administrative Officer and wrote a note that he "was told that Lt. D. Monell is the Chief Officer and that I could not appeal this decision any higher." *Id.*

In his "notice of intention," Plaintiff alleged that on December 31, 2008, he was summoned to the front of the jail for an interview with Defendant Lt. D. Monell. (Dkt. No. 1 at 11.) Defendant Monell questioned Plaintiff about his December 22, 2008, letter to the Commission of Corrections. *Id.* Defendant Monell said that he did not give a damn about federal standards regarding bedding. *Id.* Defendant Monell told Plaintiff he should save his weekly postage allowance until he had enough to send a large document and did not respond when Plaintiff informed him that he was not allowed to do. *Id.* Regarding Plaintiff's complaint that he had received only two sheets of toilet paper, Defendant Monell replied that this was facility policy. (Dkt. No. 1 at 12.) Defendant Monell stated that he had reviewed the videotape of the alleged excessive force incident and did not see anything. *Id.* Defendant Monell asked "in a sarcastic manner" whether Plaintiff wanted protective custody because he felt threatened by the facility's officers. Plaintiff said no. *Id.*

**\*5** On January 1, 2009, Plaintiff filed an Inmate Request Form stating that he had not received responses to his appeals regarding disciplinary hearings. (Dkt. No. 1 at 49.) Defendant Russell responded that "Grievance # 36 was upheld so there is no appeal. Grievance # 35 was not a grievable issue because it regarded disciplinary sanctions." (Dkt. No. 1 at 50.)

On January 1, 2009, Plaintiff wrote to the Commission of Corrections informing them of his

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2010 WL 3907227 (N.D.N.Y.)

(Cite as: 2010 WL 3907227 (N.D.N.Y.))

conversation with Defendant Monell and requesting an outside investigation. (Dkt. No. 1 at 18.)

On January 5, 2009, Plaintiff filed an Inmate Request Form asking for a grievance form. He stated that "the taking of bedding is not a disciplinary sanction but in fact an illegal practice." (Dkt. No. 1 at 42.) Defendant Monell replied that "removal of bedding is a disciplinary sanction and as such is not a grievable issue. Do not put in any more requests on this matter." *Id.*

On January 5, 2009, Plaintiff filed an Inmate Request Form stating that "the grievant has the right to appeal any decision by the grievance committee to the highest level for confirmation of such determination." (Dkt. No. 1 at 43.) Defendant Monell replied that Plaintiff should "read minimum standards-once the action requested has been met-there is no grounds for appeal. Request for grievance is denied. Do not put in any more requests on this matter ." *Id.*

On January 5, 2009, Plaintiff wrote to the Commission of Corrections again. He stated that he was being illegally denied the right to file grievances and that Defendant Monell "attempted to intimidate me." (Dkt. No. 1 at 19.) In a separate letter, he stated that his "grievance is not in regards to any disciplinary sanctions, but in fact an illegal local procedural practice at Tioga County Jail." (Dkt. No. 1 at 29.) He stated that he had been deprived of bedding, food, medical care, visits, and mail without due process. *Id.* at 29-30.

On January 8, 2009, Plaintiff filed an Inmate Request Form stating that he wanted to file a grievance about "the issue of periodicals and the donation/reading of them." (Dkt. No. 1 at 51.) A sergeant (signature illegible) responded that "this is not a grievable issue-this is a requestable issue which will be denied due to security

problems encountered in the D-pod housing unit involving the newspaper. Donations of books and magazines are allowed-you also are allowed to release property to persons outside of the jail." *Id.* at 52.

Plaintiff filed this action on January 21, 2009. (Dkt. No. 1.) Defendants now move for summary judgment. (Dkt. No. 30.) Plaintiff has opposed the motion. (Dkt. No. 32.) Defendants have filed a reply. (Dkt. No. 36.)

## II. APPLICABLE LEGAL STANDARDS

### A. Legal Standard Governing Motions for Summary Judgment

Under Federal Rule of Civil Procedure 56, summary judgment is warranted if "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c)(2). The party moving for summary judgment bears the initial burden of showing, through the production of admissible evidence, that no genuine issue of material fact exists. Only after the moving party has met this burden is the non-moving party required to produce evidence demonstrating that genuine issues of material fact exist. *Salahuddin v. Goord,* 467 F.3d 263, 272-73 (2d Cir.2006). The nonmoving party must do more than "rest upon the mere allegations ... of the [plaintiff's] pleading" or "simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 585-86 (1986). Rather, a dispute regarding a material fact is *genuine* "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986). In determining whether a genuine issue of material [FN2] fact exists, the Court must resolve all ambiguities and draw all reasonable inferences against the moving party. *Major League*

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2010 WL 3907227 (N.D.N.Y.)

(Cite as: 2010 WL 3907227 (N.D.N.Y.))

*Baseball Props., Inc. v. Salvino,* 542 F.3d 290, 309 (2d Cir.2008).

> **FN2.** A fact is "material" only if it would have some effect on the outcome of the suit. *Anderson,* 477 U.S. at 248.

**B. Legal Standard Governing Motion to Dismiss for Failure to State a Claim**

**\*6** To the extent that a defendant's motion for summary judgment under Federal Rule of Civil Procedure 56 is based entirely on the allegations of the plaintiff's complaint, such a motion is functionally the same as a motion to dismiss for failure to state a claim under Federal Rule of Civil Procedure 12(b)(6). As a result, "[w]here appropriate, a trial judge may dismiss for failure to state a cause of action upon motion for summary judgment." *Schwartz v. Compagnise General Transatlantique,* 405 F.2d 270, 273-74 (2d Cir.1968) [citations omitted]; *accord, Katz v. Molic,* 128 F.R.D. 35, 37-38 (S.D.N.Y.1989) ("This Court finds that ... a conversion [of a Rule 56 summary judgment motion to a Rule 12(b)(6) motion to dismiss the complaint] is proper with or without notice to the parties."). Accordingly, it is appropriate to summarize the legal standard governing Federal Rule of Civil Procedure 12(b)(6) motions to dismiss.

A defendant may move to dismiss a complaint under Federal Rule of Civil Procedure 12(b)(6) on the ground that the complaint fails to state a claim upon which relief can be granted. In order to state a claim upon which relief can be granted, a complaint must contain, *inter alia,* "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed.R.Civ.P. 8(a)(2). The requirement that a plaintiff "show" that he or she is entitled to relief means that a complaint "must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is *plausible* on its face.' " *Ashcroft v. Iqbal,* 129 S.Ct. 1937, 1949 (2009) (quoting *Bell Atlantic Corp. v. Twombly,* 550 U .S. 544, 570 (2007)) (emphasis added).

"Determining whether a complaint states a plausible claim for relief ... requires the ... court to draw on its judicial experience and common sense ... [W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged-but it has not shown-that the pleader is entitled to relief." *Id.* at 1950 (internal citation and punctuation omitted).

"In reviewing a complaint for dismissal under Rule 12(b)(6), the court must accept the material facts alleged in the complaint as true and construe all reasonable inferences in the plaintiff's favor ." *Hernandez v. Coughlin,* 18 F.3d 133, 136 (2d Cir.1994) (citation omitted). Courts are "obligated to construe a *pro se* complaint liberally." *Harris v. Mills,* 572 F.3d 66, 72 (2d Cir.2009). However, "the tenet that a court must accept as true all of the allegations contained in the complaint is inapplicable to legal conclusions. Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Iqbal,* 129 S.Ct. at 1949.

**III. ANALYSIS**

Defendants argue that they are entitled to summary judgment because (A) Plaintiff refused to cooperate with his deposition; (B) Plaintiff failed to exhaust his administrative remedies as required by the Prison Litigation Reform Act ("PLRA") regarding the November 3 excessive force incident "and other claims such as lack of toilet paper"; (C) Plaintiff has failed to state an Eighth Amendment conditions of confinement claim; (D) Plaintiff's allegations regarding the lack of bedding do not state a due process claim; (E) Plaintiff has failed to state a claim that he was denied access to the courts; and (F) Plaintiff has not alleged that Defendants Howard or Hollenbeck were personally involved in any alleged constitutional violation.

**A. Deposition**

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2010 WL 3907227 (N.D.N.Y.)

(Cite as: 2010 WL 3907227 (N.D.N.Y.))

**\*7** Defendants move, pursuant to Federal Rule of Civil Procedure 37, to dismiss this action because Plaintiff unilaterally ended his deposition before answering any substantive questions. (Dkt. No. 30-12 at 10-11.) In the alternative, Defendants request an order precluding Plaintiff from offering sworn testimony in opposition to any motion brought by Defendants or at trial. *Id.* at 11. I find that Defendants' motion is untimely.

This Court's Mandatory Pretrial Discovery and Scheduling Order, issued on March 31, 2009, granted Defendants permission to depose Plaintiff. The order stated that "[t]he failure of the plaintiff to attend, be sworn, and answer appropriate questions may result in sanctions, including dismissal of the action pursuant to [Rule] 37." (Dkt. No. 21 at 3 ¶ D.) The order also noted that "any motion to compel discovery in the case must be filed not later than ten (10) days after the deadline for completing discovery." [FN3] *Id.* at 4 n. 5. The order set July 29, 2009, as the deadline for completing discovery. *Id.* at 4 ¶ A.

FN3. Effective January 1, 2010, the deadlines in the local rules were amended. The local rule now requires that discovery motions be filed no later than fourteen days after the discovery cut-off date. Local Rule 7.1(d)(8).

On July 2, 2009, Defendants requested permission to depose Plaintiff. (Dkt. No. 22.) The Court denied the motion as moot, noting that permission had already been granted. (Dkt. No. 23.) On July 31, 2009, Defendants requested an extension of the discovery cut-off date to allow them time to take Plaintiff's deposition. (Dkt. No. 24.) The Court granted Defendants' request and extended the discovery deadline to September 19, 2009. (Dkt. No. 27.)

On September 14, 2009, Defendants conducted Plaintiff's deposition. (Dkt. No. 30-4 at 9-17.) When defense counsel began asking Plaintiff about his criminal history, Plaintiff stated "[y]ou're browbeating me here, and I'll write to the judge and tell him why I didn't cooperate." *Id.* at 15:14-15. Plaintiff then ended the deposition. *Id.* at 15:20-22. No questions were asked or answered about the events at issue in this action.

Discovery in this case closed on September 19, 2009. Defendants did not file a motion to compel Plaintiff's deposition or for sanctions until they filed the pending motion on October 27, 2009. Because Defendants did not file their motion within ten days of the discovery cut-off date or request an extension of time in which to file a discovery motion, I recommend that their motion to dismiss the case as a sanction for Plaintiff's refusal to cooperate with his deposition be denied.

**B. Exhaustion of Administrative Remedies**

Defendants argue that Plaintiff's claims regarding the November 3, 2008, alleged use of excessive force and the alleged failure to provide medical care after the incident must be dismissed because Plaintiff failed to exhaust his administrative remedies. (Dkt. No. 30-12 at 2-3.) Defendants are correct.

Under the PLRA, "[n]o action shall be brought with respect to prison conditions under § 1983 ... by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." 42 U.S.C. § 1997e(a). "[T]he PLRA's exhaustion requirement applies to all inmate suits about prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong." *Porter v. Nussle,* 534 U.S. 516, 532 (2002). In order to properly exhaust administrative remedies under the PLRA, inmates are required to complete the administrative review process in accordance with the rules applicable to the particular

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2010 WL 3907227 (N.D.N.Y.)

(Cite as: 2010 WL 3907227 (N.D.N.Y.))

institution to which they are confined. *Jones v. Bock*, 549 U.S. 199, 218 (2007).

**\*8** Tioga County Jail has an inmate grievance procedure. (Dkt. No. 30-10 at 8-11.) Under the procedure, the Corrections Officer assigned to the inmate's housing unit initially receives complaints either verbally or in writing and attempts to resolve the complaint informally. *Id.* at ¶ 1.2(A)(1-2). If the complaint cannot be resolved informally, the inmate files a written complaint form, which is forwarded to the Shift Supervisor. *Id.* at ¶ 1.2(A)(3-4). If the Shift Supervisor cannot resolve the complaint, the complaint is forwarded to the Grievance Coordinator, who provides the inmate with a grievance form. *Id.* at ¶ 1.2(A)(5-8). The Grievance Coordinator is responsible for investigating and making a determination on the grievance and must give a written copy of his or her decision to the inmate. *Id.* at ¶ 1.2(A)(9). This written decision must be issued within five business days of receipt of the grievance. *Id.* at 1.3(C). If the inmate does not accept the Grievance Coordinator's determination, "an appeal will be forwarded to the Jail Chief Administrative Officer." *Id.* at ¶ 1.2(A)(11). The inmate must appeal within two business days of receipt of the Grievance Coordinator's determination. *Id.* at ¶ 1.3(D). At the request of the inmate, a copy of the appeal will be mailed by the Jail Administrator to the Commission of Corrections. *Id.* at ¶ 1.2(A)(13). The Jail Administrator must make a determination within two working days. *Id.* at ¶ 1.3(E). The inmate may appeal within three business days of receipt of the decision to the Commission of Corrections. *Id.* at ¶ 1.3(F).

Here, Plaintiff did not file a grievance regarding the alleged use of excessive force on November 3, 2008. (Dkt. No. 30-11 ¶ 6.) Therefore, he did not exhaust his administrative remedies.

Plaintiff's failure to exhaust, however, does not end the inquiry. The Second Circuit has held that a three-part inquiry is appropriate where a prisoner has failed to exhaust his available administrative remedies. *Hemphill v. State of New York*, 380 F.3d 680, 686, 691 (2d Cir.2004).[FN4]

> **FN4.** The Second Circuit has not yet decided whether the *Hemphill* rule has survived the Supreme Court's decision in *Woodford v. Ngo*, 548 U.S. 81 (2006), in which the Supreme Court held that each step of an available grievance procedure must be "properly" completed before a plaintiff may proceed in federal court. *Chavis v. Goord*, No. 07-4787-pr, 2009 U.S.App. LEXIS 13681, at \*4, 2009 WL 1803454, at \*1 (2d Cir. June 25, 2009).

First, "the court must ask whether [the] administrative remedies [not pursued by the prisoner] were in fact 'available' to the prisoner." *Hemphill*, 380 F.3d at 686 (citation omitted). Second, if those remedies were available, "the court should ... inquire as to whether [some or all of] the defendants may have forfeited the affirmative defense of non-exhaustion by failing to raise or preserve it ... or whether the defendants' own actions inhibiting the [prisoner's] exhaustion of remedies may estop one or more of the defendants from raising the plaintiff's failure to exhaust as a defense." *Id.* (citations omitted). Third, if the remedies were available and some of the defendants did not forfeit, and were not estopped from raising, the non-exhaustion defense, "the Court should consider whether 'special circumstances' have been plausibly alleged that justify the prisoner's failure to comply with the administrative procedural requirements." *Id.* (citations and internal quotations omitted).

**\*9** Here, as discussed above, administrative remedies were available to Plaintiff. Defendants preserved the exhaustion defense by raising it in their answer. (Dkt. No. 19 at ¶¶ 8-10.) Plaintiff appears to argue that Defendants are estopped from asserting the defense or that special

Slip Copy, 2010 WL 3907227 (N.D.N.Y.)

(Cite as: 2010 WL 3907227 (N.D.N.Y.))

circumstances exist justifying the failure to exhaust. Specifically, Plaintiff states that exhausting his administrative remedies would have been futile and "may have caused more harm to the plaintiff" because the officers who allegedly assaulted him "are the persons that operate and give the decisions" regarding grievances. (Dkt. No. 32 at 1.)

Plaintiff's explanation is belied by his actual conduct. Plaintiff alleges that Defendant Marsh was involved in the use of excessive force. (Dkt. No. 1 at 9.) Despite this fact, Plaintiff filed a grievance three weeks after the incident complaining about Defendant Marsh's conduct during a disciplinary hearing. (Dkt. No. 1 at 23-24.) This indicates that Plaintiff was not, in fact, afraid to file grievances against the Defendants who allegedly assaulted him and denied him medical care. Thus, Plaintiff has not plausibly alleged that special circumstances prevented him from exhausting his administrative remedies. Therefore, I find that Plaintiff failed to exhaust his administrative remedies regarding the alleged use of excessive force and I recommend that the Court dismiss that claim.

**C. Eighth Amendment Conditions of Confinement**

Plaintiff alleges that Defendants violated his Eighth Amendment rights by removing his personal property, taking away his bedding and mattress during the day, allowing him to shower only if he remained handcuffed and shackled, and providing him with only two sheets of toilet paper. (Dkt. No. 1 at 9-10.) Defendants move for summary judgment of this claim. (Dkt. No. 30-12 at 5.)

The Eighth Amendment to the United States Constitution imposes on jail officials the duty to "provide humane conditions of confinement" for prisoners. *Farmer v. Brennan,* 511 U.S. 825, 832 (1994). In fulfilling this duty, prison officials must "ensure that inmates receive adequate food, clothing, shelter, and medical care, and must 'take reasonable measures to guarantee the safety of the inmates.' " *Farmer,* 511 U.S. at 832 (quoting *Hudson*

*v. Palmer,* 468 U.S. 517, 526-27 (1984)).

A viable Eighth Amendment claim must contain both an objective and a subjective component. *Farmer,* 511 U.S. at 834. To prove the objective component of an Eighth Amendment conditions of confinement claim, a prisoner must show that the defendant's "act or omission ... result[ed] in the denial of the minimal civilized measure of life's necessities." *Farmer,* 511 U.S. at 834. Therefore, "extreme deprivations are required to make out a conditions-of-confinement claim." *Hudson v. McMillian,* 503 U.S. 1, 9 (1992). Specifically, an inmate must show that he was deprived of a "single, identifiable human need such as food, warmth, or exercise." *Wilson v. Seiter,* 501 U.S. 294, 304 (1991). Here, Plaintiff does not allege that he was deprived of any human need. He was provided with a mattress and blankets at night, had the opportunity to shower, and received toilet paper. Although his conditions may not have been pleasant, the Eighth Amendment "does not mandate comfortable prisons." *Farmer,* 511 U.S. at 932 (citing *Rhodes v. Chapman,* 452 U.S. 337, 349 (1981)). Therefore, I recommend that the Court grant Defendants' motion and dismiss Plaintiff's conditions of confinement claim.

**D. Due Process**

1. *Bedding*

**\*10** Defendants construe Plaintiff's complaint as asserting a claim that the removal of his bedding during the day violated his right to due process. Defendants argue that this claim should be dismissed. (Dkt. No. 30-12 at 5-6.) Defendants are correct.

An individual claiming that he was deprived of an

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2010 WL 3907227 (N.D.N.Y.)

(Cite as: 2010 WL 3907227 (N.D.N.Y.))

interest in property "must have more than an abstract need or desire for it. He must have more than a unilateral expectation of it. He must, instead, have a legitimate claim of entitlement to it." *Board of Regents v. Roth,* 408 U.S. 564, 577 (1972). Plaintiff had not legitimate claim of entitlement to possessing bedding during the day. Therefore, I recommend that the Court dismiss this claim.

2. *Disciplinary Hearing*

Plaintiff appears to allege that Defendant Marsh deprived him of due process by conducting a biased disciplinary hearing. (Dkt. No. 1 at 10.) Defendants have not addressed this claim. I find that it is subject to *sua sponte* dismissal.

In order to state a claim for violation of his procedural due process rights, a plaintiff must allege facts plausibly suggesting that he was deprived of a liberty interest without due process of law. *Tellier v. Fields,* 280 F.3d 69, 79-80 (2d Cir.2000).

An inmate has a liberty interest in remaining free from a confinement or restraint where (1) the state has granted its inmates, by regulation or statute, an interest in remaining free from that particular confinement or restraint; and (2) the confinement or restraint imposes "an atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life." *Sandin v. Conner,* 515 U.S. 472, 484 (1995); *Tellier,* 280 F.3d at 80; *Frazier v. Coughlin,* 81 F.3d 313, 317 (2d Cir.1996).

Assuming *arguendo* that the state has granted inmates in county jails an interest in remaining free from keeplock confinement, the issue is whether Plaintiff's confinement imposed an "atypical and significant hardship" on him in relation to the ordinary incidents of prison life. Courts in the Second Circuit have routinely declined to find a liberty

interest where an inmate's keeplock confinement is an "exceedingly short" period, less than thirty days, and there is no indication that the inmate suffered any "unusual conditions" during the confinement. *Anderson v. Banks,* No. 06-Cv-0625, 2008 U.S. Dist. LEXIS 60932, 2008 WL 3285917 (N.D.N.Y. Aug. 7, 2008) ("Confinements in ... keeplock of less than thirty days will not suffice to demonstrate a protected liberty interest absent other extraordinary circumstances of the confinement demonstrating that it was atypical or significant for other reasons.") (Sharpe, J.) (Homer, M.J.).[FN5]

FN5. The Court will provide Plaintiff with a copy of this unpublished decision in accordance with the Second Circuit's decision in *LeBron v. Sanders,* 557 F.3d 76 (2d Cir.2009).

Here, Defendant Marsh sentenced Plaintiff to twenty-eight days of keeplock after the November 12, 2008, hearing that followed the alleged excessive force incident. (Dkt. No. 1 at 34.) Defendant Marsh sentenced Plaintiff to fourteen days of keeplock after the December 17, 2008, hearing regarding Plaintiff's alleged use of another inmate's stamps. (Dkt. No. 1 at 37.) There is no indication that Plaintiff suffered any unusual conditions during these keeplock confinements. Notably, Plaintiff's allegations regarding the removal of his bedding occurred not during these keeplock sentences, but rather during earlier administrative segregation periods in October and November. (Dkt. No. 1 at 8-10.) Thus, Plaintiff has not alleged facts plausibly suggesting, or raised a triable issue of fact, that he was deprived of a liberty interest. Therefore, I recommend that the Court dismiss Plaintiff's due process claim against Defendant Marsh *sua sponte.*

**E. Access to the Courts**

**\*11** Defendants argue that Plaintiff's claims regarding Tioga County Jail's legal mail procedures must be dismissed because (1) Plaintiff has not alleged the

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2010 WL 3907227 (N.D.N.Y.)

(Cite as: 2010 WL 3907227 (N.D.N.Y.))

personal involvement of any Defendant; and (2) Plaintiff has not alleged any actual harm resulting from the procedures. (Dkt. No. 36-3 at 1.) Defendants did not raise this argument in their moving papers. Normally, due process would thus require that I disregard the argument or give Plaintiff an opportunity to file a sur-reply. Here, however, Plaintiff addressed this issue in his opposition despite Defendants' failure to raise it initially. (Dkt. No. 32 at 1.) Moreover, even if he had not, I would recommend that the Court dismiss the claim *sua sponte.*

"Interference with legal mail implicates a prison inmate's rights to access to the courts and free speech as guaranteed by the First and Fourteenth Amendments to the U.S. Constitution." *Davis v. Goord,* 320 F.3d 346, 351 (2d Cir.2003). "A prisoner has a constitutional right of access to the courts for the purpose of presenting his claims, a right that prison officials cannot unreasonably obstruct and that states have affirmative obligations to assure." *Washington v. James,* 782 F.2d 1134, 1138 (2d Cir.1986) (citing *Bounds v. Smith,* 430 U.S. 817, 821-23 (1977)). This right of access, however, guarantees a prisoner "no more than reasonable access to the courts." *Herrera v. Scully,* 815 F.Supp. 713, 725 (S.D.N.Y.1993) (citing *Pickett v. Schaefer,* 503 F.Supp. 27, 28 (S.D.N.Y.1980)). A claim for reasonable access to the courts under § 1983 requires that an inmate demonstrate that the alleged act of deprivation "actually interfered with his access to the courts or prejudiced an existing action." *Id.* (citations omitted). Courts have not found an inmate's rights to be violated when the deprivation merely delays work on his legal action or communication with the court. *Id.* To state a claim for denial of access to the courts, a plaintiff must assert non-conclusory allegations demonstrating both (1) that the defendant acted deliberately and maliciously, and (2) that the plaintiff suffered an actual injury. *Lewis v. Casey,* 518 U.S. 343, 353 (1996); *Howard v. Leonardo,* 845 F.Supp. 943, 946 (N.D.N.Y.1994) (Hurd, M.J.).

Here, Plaintiff has not raised a triable issue of fact that he suffered any actual injury. In his "notice of intention," he stated that the facility's mail policies *"could*

cause a great effect" and *"could* cause irreparable harm" to two pending *habeas corpus* cases. (Dkt. No. 1 at 10, emphasis added.) In his opposition to the motion for summary judgment, Plaintiff states that he "suffered the loss of one of the court actions" because he could not mail a brief. (Dkt. No. 32 at 1.) However, I note that this statement is not "evidence" because Plaintiff's opposition was not signed under penalty of perjury and does not contain any other language bringing it into substantial compliance with 28 U.S.C. § 1746. *See, LeBoeuf, Lamb, Greene & MacCrae, L.L.P. v. Worsham,* 185 F.3d 61, 65-66 (2d Cir.1999). Therefore, I recommend that Plaintiff's claim regarding legal mail be dismissed.

**F. Personal Involvement**

**\*12** Defendants argue that Plaintiff has failed to allege personal involvement by Defendants Howard or Hollenbeck. (Dkt. No. 30-12 at 11-12.) Defendants are correct.

" '[P]ersonal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983.' " *Wright v. Smith,* 21 F.3d 496, 501 (2d Cir.1994) (quoting *Moffitt v. Town of Brookfield,* 950 F.2d 880, 885 (2d Cir.1991)).[FN6] In order to prevail on a cause of action under 42 U.S.C. § 1983 against an individual, a plaintiff must show some tangible connection between the unlawful conduct and the defendant.[FN7] If the defendant is a supervisory official, a mere "linkage" to the unlawful conduct through "the prison chain of command" (i.e., under the doctrine of *respondeat superior* ) is insufficient to show his or her personal involvement in that unlawful conduct.[FN8] In other words, supervisory officials may not be held liable merely because they held a position of authority.[FN9] Rather, supervisory personnel may be considered "personally involved" if they (1) directly participated in the violation, (2) failed to remedy that violation after learning of it through a report or appeal, (3) created, or allowed to continue, a policy or custom under which the violation occurred, (4) had been grossly negligent in managing subordinates who caused the

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2010 WL 3907227 (N.D.N.Y.)

(Cite as: 2010 WL 3907227 (N.D.N.Y.))

violation, or (5) exhibited deliberate indifference to the rights of inmates by failing to act on information indicating that the violation was occurring. *Colon v. Coughlin,* 58 F.3d 865, 873 (2d Cir.1995). [FN10]

> **FN6.** *Accord, McKinnon v. Patterson,* 568 F.2d 930, 934 (2d Cir.1977), *cert. denied,* 434 U.S. 1087 (1978); *Gill v. Mooney,* 824 F.2d 192, 196 (2d Cir.1987).

> **FN7.** *Bass v. Jackson,* 790 F.2d 260, 263 (2d Cir.1986).

> **FN8.** *Polk County v. Dodson,* 454 U.S. 312, 325 (1981); *Richardson v. Goord,* 347 F.3d 431, 435 (2d Cir.2003); *Wright,* 21 F.3d at 501; *Ayers v. Coughlin,* 780 F.2d 205, 210 (2d Cir.1985).

> **FN9.** *Black v. Coughlin,* 76 F.3d 72, 74 (2d Cir.1996).

> **FN10.** The Supreme Court's decision in *Ashcroft v. Iqbal,* ---U.S. ----, 129 S.Ct. 1937 (2009) arguably casts in doubt the continued viability of some of the categories set forth in *Colon. See Sash v. United States,* --- F.Supp.2d ----, No. 08-CV-116580, 2009 U.S. Dist. LEXIS 116580, at *32-39, 2009 WL 4824669, at*10-11 (S.D.N.Y. Dec. 15, 2009). Here, the Court will assume *arguendo* that all of the *Colon* categories apply.

The only allegation in the complaint regarding Defendant Hollenbeck is that he issued an Inmate Rule Infraction Notice to Plaintiff on October 30, 2008. (Dkt. No. 1 at 31.) Plaintiff has not alleged any facts plausibly suggesting, or raised a triable issue of fact, that Defendant Hollenbeck's conduct violated Plaintiff's constitutional rights. Therefore, I recommend that any claims against Defendant Hollenbeck be dismissed.

The complaint's only reference to Defendant Howard is in the caption of the "notice of intention." (Dkt. No. 1 at 7.) Plaintiff could, perhaps, have argued that, as Sheriff, Defendant Howard was responsible for creating or allowing to continue unconstitutional policies. However, Plaintiff did not allege any facts plausibly suggesting, or raise a triable issue of fact, that Defendant Howard was responsible for the policies about which Plaintiff complains. Even if he had, as discussed above, Plaintiff has not provided sufficient evidence for any of his claims regarding those policies to survive summary judgment. Therefore, I recommend that any claims against Defendant Howard be dismissed.

**ACCORDINGLY,** it is

**RECOMMENDED** that Defendants' motion for summary judgment (Dkt. No. 30) be ***GRANTED;*** and it is further

**ORDERED** that the Clerk provide Plaintiff with a copy of *Anderson v. Banks,* No. 06-Cv-0625, 2008 U.S. Dist. LEXIS 60932, 2008 WL 3285917 (N.D.N.Y. Aug. 7, 2008) in accordance with the Second Circuit's decision in *LeBron v. Sanders,* 557 F.3d 76 (2d Cir.2009).

**\*13** Pursuant to 28 U.S.C. § 636(b)(1), the parties have fourteen days within which to file written objections to the foregoing report. Such objections shall be filed with

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2010 WL 3907227 (N.D.N.Y.)

(Cite as: 2010 WL 3907227 (N.D.N.Y.))

the Clerk of the Court. *FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN DAYS WILL PRECLUDE APPELLATE REVIEW.* *Roldan v. Racette,* 984 F.2d 85 (2d Cir.1993) (citing *Small v. Secretary of Health and Human Services,* 892 F.2d 15 (2d Cir.1989)); 28 U.S.C. § 636(b)(1); Fed.R.Civ.P. 72, 6(a).

N.D.N.Y.,2010.

Stewart v. Howard

Slip Copy, 2010 WL 3907227 (N.D.N.Y.)

END OF DOCUMENT

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.



Not Reported in F.Supp.2d, 2009 WL 1835939 (S.D.N.Y.)

(Cite as: 2009 WL 1835939 (S.D.N.Y.))

▷

Only the Westlaw citation is currently available.

United States District Court,

S.D. New York.

Jerome BELLAMY, Plaintiff,

v.

MOUNT VERNON HOSPITAL, in its official and individual capacity, Dr. Marc Janis, in his official and individual capacity, New York State Department Of Correctional Services, Dr. Lester Wright, in his official and individual capacity, and Dr. J. Pereli, in his official and individual capacity, Defendants.

No. 07 Civ. 1801(SAS).

June 26, 2009.

West KeySummary**Civil Rights 78** ☞    1358

78 Civil Rights

    78III Federal Remedies in General

        78k1353 Liability of Public Officials

            78k1358 k. Criminal law enforcement; prisons. Most Cited Cases

**Prisons 310** ☞    203

310 Prisons

    310II Prisoners and Inmates

        310II(D) Health and Medical Care

            310k203 k. Reproductive issues. Most Cited Cases

**Sentencing and Punishment 350H** ☞    1546

350H Sentencing and Punishment

    350HVII Cruel and Unusual Punishment in General

        350HVII(H) Conditions of Confinement

            350Hk1546 k. Medical care and treatment. Most Cited Cases

    A correctional services doctor was not deliberately indifferent to a prisoner's serious medical needs under the Eighth Amendment in connection with the alleged denial of testosterone treatments. The prisoner brought a § 1983 action which alleged that he was denied the treatments which he needed after he developed hypogonadism after an epididymectomy. The doctor not liable for the alleged harm because he was not involved with any denials of the prisoner's treatment and did not create a policy that contributed to the prisoner's alleged harm. U.S.C.A. Const.Amend. 8; 42 U.S.C.A. § 1983.

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2009 WL 1835939 (S.D.N.Y.)

(Cite as: 2009 WL 1835939 (S.D.N.Y.))

Jerome Bellamy, Alden, NY, pro se.

Julinda Dawkins, Assistant Attorney General, New York, NY, for Defendants.

*OPINION AND ORDER*

SHIRA A. SCHEINDLIN, District Judge.

## I. INTRODUCTION

**\*1** Jerome Bellamy, presently incarcerated and proceeding pro se, alleges that the New York State Department of Correctional Services ("DOCS") and Dr. Lester Wright, the remaining defendants in this case [FN1], violated Bellamy's constitutional rights. His claims surround denials of requested testosterone treatment by Wright, a doctor and supervisory official for the DOCS. Wright and the DOCS now move for summary judgment. For the reasons stated below, their motion for summary judgment is granted in its entirety.

> FN1. The original and amended complaints were also filed against Mount Vernon Hospital, Dr. Mark Janis, Dr. J. Pereli, in their individual and official capacities. The claims against Mount Vernon Hospital and Dr. Mark Janis were dismissed in *Bellamy I* and the claim against Dr. J. Pereli was dismissed in a subsequent order issued by this Court on January 15, 2009. Wright and the DOCS are the only remaining defendants.

## II. BACKGROUND[FN2]

> FN2. For more detailed background, see *Bellamy v. Mount Vernon Hosp.*, No. 07 Civ. 1801, 2008

WL 3152963 (S.D.N.Y. Aug. 5, 2008) (*"Bellamy I"*). Some of the facts recounted here are drawn from the prior opinion.

### A. Facts

#### 1. Parties

Bellamy is presently in the custody of the DOCS at the Wende Correctional Facility in Alden, New York.[FN3] The DOCS is a state agency responsible for the care, custody and control of inmates convicted of crimes under New York State laws.[FN4] Wright is both a New York-licensed medical doctor and the Deputy Commissioner and Chief Medical Officer ("CMO") of the DOCS.[FN5] As CMO, he is responsible for the development and operation of a system to provide necessary medical care for inmates in the custody of the DOCS.[FN6]

> FN3. *See* Defendants' Rule 56.1 Statement of Facts ¶ 1.

> FN4. *See id.* ¶ 2.

> FN5. *See id.* ¶ 3.

> FN6. *See id.*

#### 2. Bellamy's Surgery

In August 2004, while in DOCS custody at Sing Sing

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2009 WL 1835939 (S.D.N.Y.)

(Cite as: 2009 WL 1835939 (S.D.N.Y.))

Correctional Facility in Ossining, New York, Bellamy underwent an epididymectomy.[FN7] Bellamy was HIV positive at the time of his surgery.[FN8] Around that time, Bellamy developed hypogonadism (a deficiency in the hormone testosterone) as well as a deficiency in the hormone Cortisol.[FN9] As a result of these conditions, Bellamy was prescribed various medications, including a testosterone patch called "Androderm." [FN10] Bellamy contends that without testosterone treatment, he suffers from mood swings, fatigue, nausea, headaches, and lack of appetite.[FN11] However, he also experiences similar symptoms even with medication.[FN12]

FN7. See Bellamy I, 2008 WL 3152963, at *1. An epididymectomy is defined as the surgical removal of the epididymis (the cord-like structure along the posterior border of the testicle). The epididymis is essential to the male reproductive system. See Dorland's Illustrated Medical Dictionary 639, 1342, 1770 (31st ed.2007).

FN8. See 3/6/08 Deposition Testimony of Jerome Bellamy ("Bellamy Dep. I") at 139:15-17 (where Bellamy says that, prior to the surgery, he was on HIV medication).

FN9. See Bellamy I, 2008 WL 3152963, at *2. These conditions had many side effects, including sexual maladies and dramatic weight loss. See id. While Bellamy contends that the surgery caused the hypogonadism, his treating doctor claims "with a reasonable degree of medical certainty" that the hypogonadism preceded the surgery. See 4/22/08 Affidavit of Dr. Harish Moorjani ("Moorjani Aff."), Ex. J to 6/5/09 Supplemental Declaration of Julinda Dawkins, counsel to defendants, ¶ 4.

FN10. See, e.g., Amended Complaint ("Am.Compl."), Statement of Facts ¶¶ 5, 7. Androgel is a similar medication. The Amended Complaint is divided into various parts with overlapping paragraph and page numbers. As a result, references to the Amended Complaint are made by noting first the relevant topic header and then the cited or quoted paragraph number.

FN11. See 1/12/09 Deposition Testimony of Jerome Bellamy ("Bellamy Dep. II") at 35:23-24. Bellamy's hypogonadism may have been caused by his HIV. Bellamy complained of similar symptoms before the surgery and, therefore, before any alleged denial of Androgel or similar medications. See Moorjani Aff. ¶¶ 4-5.

FN12. See Bellamy Dep. II at 43:21-24 (where Bellamy admits that some of his symptoms resumed even after using the testosterone patch). See also Am. Compl., Statement of Facts ¶ 7 ("[T]his treatment [, Androderm,] still has not proven to be effective in keeping my hormone levels elevated, even after the dosages were increased, and my levels rise high at times then suddenly drops real low.").

**3. Bellamy's Letters to Wright**

Following the surgery, Bellamy wrote to Wright on three pertinent occasions. In the first letter, Bellamy provided background into his ailments and asked Wright to provide him with a hormone treatment (Androgel) which had been provided at a previous facility.[FN13] The second letter asked Wright to force Dr. Gennovese at the Shawangunk facility to provide him with Ensure-a nutritional supplement which had been provided at a previous facility. [FN14] Bellamy's third letter to Wright concerned several matters. [FN15] In particular, Bellamy claimed, *first*, that a female officer entered his cell and retrieved his HIV medication, *second*, that an officer

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2009 WL 1835939 (S.D.N.Y.)

(Cite as: 2009 WL 1835939 (S.D.N.Y.))

eavesdropped on a medical consultation with his doctor, and, *third,* that he went four days without HIV medication, five days without Cortisol treatment, and six days without testosterone treatment, all while undergoing a mental health evaluation.[FN16]

> **FN13.** *See* Defendants' Rule 56.1 Statement of Facts ¶ 9. *See also* 7/5/05 Grievance Letter from Bellamy to Wright, Ex. D to 3/30/09 Declaration of Julinda Dawkins, counsel to defendants ("Dawkins Decl.").

> **FN14.** *See* Defendants' Rule 56.1 Statement of Facts ¶ 10. *See also* 1/22/07 Grievance Letter from Bellamy to Wright, Ex. E to Dawkins Decl.

> **FN15.** *See* Defendants' Rule 56.1 Statement of Facts ¶ 11. *See also* 6/5/07 Grievance Letter from Bellamy to Wright, Ex. F to Dawkins Deck

> **FN16.** *See* 6/5/07 Grievance Letter from Bellamy to Wright, Ex. F to Dawkins Decl.

Wright's office routinely receives hundreds of letters each year, addressed to him personally from inmates throughout the DOCS system and from individuals writing on behalf of inmates.[FN17] These letters are screened by staff, who then forward them to the appropriate division or bureau within the DOCS with an instruction to respond or with a notation indicating the appropriate action.[FN18] Wright never sees the actual letters or their responses.[FN19] Inmate letters concerning medical care-such as Bellamy's-are forwarded to the Regional Health Services Administrator or the Regional Medical Director, as appropriate, that oversees the facility housing the inmate.[FN20] The concerns are then investigated and addressed by

the regional staff.[FN21]

> **FN17.** *See* Defendants' Rule 56.1 Statement of Facts ¶ 12.

> **FN18.** *See id.*

> **FN19.** *See id.* ¶ 13.

> **FN20.** *See id.* ¶ 14.

> **FN21.** *See id.*

**\*2** All three of Bellamy's letters received responses. Holly A. Collet, the Facility Health Services Administrator at Elmira Correctional Facility, responded to Bellamy's July 5, 2005 letter.[FN22] Pedro Diaz, the Regional Health Services Administrator at Shawangunk Correctional Facility, responded to Bellamy's January 22, 2007 letter.[FN23] Pedro Diaz, also the Regional Health Services Administrator at Sing Sing Correctional Facility, responded to Bellamy's June 5, 2007 letter.[FN24] Wright and Bellamy have never met each other, nor have they had any other personal contact.[FN25] Bellamy admits that he has no evidence that Wright was involved in the responses to any of the three letters.[FN26]

> **FN22.** *See id.* ¶ 15.

> **FN23.** *See id.*

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2009 WL 1835939 (S.D.N.Y.)

(Cite as: 2009 WL 1835939 (S.D.N.Y.))

FN24. *See id.*

FN25. *See id.* ¶ 16. *See also* 3/27/09 Affidavit of Dr. Lester N. Wright ("Wright Aff."), Ex. G to Dawkins Decl., ¶ 9; Bellamy Dep. II at 20:23-25.

FN26. *See* Bellamy Dep. II at 26:17-20.

**4. Bellamy's Claims**[FN27]

FN27. In addition to the claims listed here, Bellamy originally charged both the DOCS and Wright with violations of the Americans with Disabilities Act of 1990 (the "ADA") and the Rehabilitation Act of 1973 (the "RHA"). *See* Am. Compl., Legal Claims ¶ 15. However, Bellamy later conceded that "Plaintiff['s] Americans With Disabilities Act and Rehabilitation [Act] fails because those statutes are not applicable here at this junction." Plaintiff's Reply to Defendants' Summary Judgment ("Bellamy's Reply") at 7. This Court interprets Bellamy's Reply as a withdrawal of his ADA and RHA claims against the remaining defendants.

Bellamy admits that he has no evidence that Wright denied him testosterone replacement treatment.[FN28] Nonetheless, Bellamy claims that Wright "was responsible for denying plaintiff's testosterone treatment on different occasions" and "was also made aware of plaintiff's complaints, but failed to abate further injury to the plaintiff."[FN29] Bellamy charges the DOCS because he was in its custody when his claims arose.[FN30] Bellamy

specifically alleges that Wright-acting under color of state law-displayed "deliberate indifference to plaintiff's serious medical needs and violated plaintiff's rights and constituted cruel and unusual punishment under the Eight [h] Amendment of the United States Constitution."[FN31] A similar claim is lodged against the DOCS.[FN32] Bellamy also seeks a preliminary and permanent injunction against the DOCS to provide the medical treatment he requests and to comply with various New York State laws.[FN33] Finally, Bellamy seeks compensatory and punitive damages.[FN34]

FN28. *See* Bellamy Dep. II at 33:14 to 34:15 (Question: "Do you have any kind of evidence that Dr. Wright denied you testosterone treatment?" Answer: "Directly, no.").

FN29. *See* Am. Compl., Defendants ¶ 6.

FN30. *See id.* Many of the claims that allegedly occurred under DOCS supervision have since been dismissed.

FN31. *See id.,* Legal Claims ¶ 13. Bellamy brings his claims pursuant to section 1983 of Title 42 of the United States Code ("section 1983").

FN32. *See id.,* Legal Claims ¶ 14 (repeating the same claim but omitting the phrase that the DOCS "violate[d] plaintiff's rights").

FN33. *See id.,* Legal Claims ¶ 18. Bellamy's original Complaint only requested injunctive

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2009 WL 1835939 (S.D.N.Y.)

(Cite as: 2009 WL 1835939 (S.D.N.Y.))

relief against the DOCS. However, he later asked for injunctive relief against Wright. *See* Bellamy's Reply at 1. Because Bellamy is proceeding pro se, the *factual* allegations in his Reply Memoranda are treated as if they were raised in his Complaints. *See Gill v. Mooney,* 824 F.2d 192, 195 (2d Cir.1987) (considering a pro se plaintiff's affidavit in opposition to defendant's motion to dismiss in reviewing district court's dismissal of claim). However, it would be improper to allow a plaintiff, even one proceeding pro se, to add a defendant to a claim he had raised more than a year earlier. Thus, Bellamy's claim for injunctive relief against Wright is dismissed. *See Polanco v. City of New York Dep't of Corr.,* No. 01 Civ. 759, 2002 WL 272401, at *3 (S.D.N.Y. Feb. 26, 2002) ("It is well established that a plaintiff may not amend his pleading through papers offered in opposition to a motion to dismiss ... Plaintiff is bound by the allegations of his Amended Complaint.") (citations omitted).

FN34. *See* Am. Compl., Legal Claims ¶¶ 19-21.

**B. Procedural History**

Bellamy's first Complaint was filed on March 2, 2007, and an Amended Complaint followed on July 16, 2007. On August 5, 2008, this Court granted summary judgment to defendants Dr. Janis and Mount Vernon. The DOCS had not been properly served at that point, but it was subsequently served on August 7, 2008. Dr. J. Pereli was dismissed as a defendant on January 15, 2009, for lack of timely service of process.

**III. LEGAL STANDARD**

**A. Summary Judgment**

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." FN35 An issue of fact is genuine " 'if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.' " FN36 A fact is material when it " 'might affect the outcome of the suit under the governing law.' " FN37 "It is the movant's burden to show that no genuine factual dispute exists." FN38

FN35. Fed.R.Civ.P. 56(c).

FN36. *Roe v. City of Waterbury,* 542 F.3d 31, 34 (2d Cir.2008) (quoting *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986)).

FN37. *Ricci v. DeStefano,* 530 F.3d 88, 109 (2d Cir.2008) (quoting *Anderson,* 477 U.S. at 248.)

FN38. *Vermont Teddy Bear Co. v. 1-800 Beargram Co.,* 373 F.3d 241, 244 (2d Cir.2004) (citing *Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 157, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970)).

In turn, to defeat a motion for summary judgment, the non-moving party must raise a genuine issue of material fact. FN39 "Summary judgment is properly granted when the non-moving party 'fails to make a showing sufficient to establish the existence of an element essential to that

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2009 WL 1835939 (S.D.N.Y.)

(Cite as: 2009 WL 1835939 (S.D.N.Y.))

party's case, and on which that party will bear the burden of proof at trial.' " [FN40] To do so, the non-moving party must do more than show that there is " 'some metaphysical doubt as to the material facts,' " [FN41] and it " 'may not rely on conclusory allegations or unsubstantiated speculation.' " [FN42] However, " 'all that is required [from a non-moving party] is that sufficient evidence supporting the claimed factual dispute be shown to require a jury or judge to resolve the parties' differing versions of the truth at trial.' " [FN43]

FN39. Fed.R.Civ.P. 56(c).

FN40. *Abramson v. Pataki,* 278 F.3d 93, 101 (2d Cir.2002) (quoting *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986)). *Accord In re September 11 Litig.,* No. 21 MC 97, 2007 WL 2332514, at *4 (S.D.N.Y. Aug.15, 2007) ("Where the nonmoving party bears the burden of proof at trial, the burden on the moving party may be discharged by showing-that is, pointing out to the district court-that there is an absence of evidence to support the nonmoving party's case.") (quotation omitted).

FN41. *Higazy v. Templeton,* 505 F.3d 161, 169 (2d Cir.2007) (quoting *Matsushita Elec. Indus. v. Zenith Radio Corp.,* 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986)).

FN42. *Jeffreys v. City of New York,* 426 F.3d 549, 554 (2d Cir.2005) (quoting *Fujitsu Ltd. v. Federal Express Corp.,* 247 F.3d 423, 428 (2d Cir.2001)).

FN43. *Kessler v. Westchester County Dep't of Soc. Servs.,* 461 F.3d 199, 206 (2d Cir.2006) (quoting *Anderson,* 477 U.S. at 248-49).

**\*3** In determining whether a genuine issue of material fact exists, the court must construe the evidence in the light most favorable to the non-moving party and draw all justifiable inferences in that party's favor.[FN44] However, "[i]t is a settled rule that '[c]redibility assessments, choices between conflicting versions of the events, and the weighing of evidence are matters for the jury, not for the court on a motion for summary judgment.' " [FN45] Summary judgment is therefore "only appropriate when there is no genuine issue as to any material fact, making judgment appropriate as a matter of law." [FN46]

FN44. *See Mathirampuzha v. Potter,* 548 F.3d 70, 74 (2d Cir.2008) (quoting *Allianz Ins. Co. v. Lerner,* 416 F.3d 109, 113 (2d Cir.2005)).

FN45. *McClellan v. Smith,* 439 F.3d 137, 144 (2d Cir.2006) (quoting *Fischl v. Armitage,* 128 F.3d 50, 55 (2d Cir.1997)). *Accord Anderson,* 477 U.S. at 249.

FN46. *Karpova v. Snow,* 497 F.3d 262, 270 (2d Cir.2007) (citing *Tocker v. Philip Morris Cos.,* 470 F.3d 481, 486-87 (2d Cir.2006)).

Further, where the plaintiff is proceeding pro se, his or her pleadings must be considered under a more lenient standard than that accorded to "formal pleadings drafted by lawyers," [FN47] and his or her pleadings must be "interpret[ed] ... to raise the strongest arguments they suggest." [FN48] However, a pro se plaintiff must still meet the usual requirements of summary judgment .[FN49] Thus, a

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2009 WL 1835939 (S.D.N.Y.)

(Cite as: 2009 WL 1835939 (S.D.N.Y.))

pro se plaintiff's "failure to allege either specific facts or particular laws that have been violated renders [his or] her attempt to oppose defendants' motion [for summary judgment] ineffectual." [FN50]

> FN47. *Haines v. Kerner,* 404 U.S. 519, 520, 92 S.Ct. 594, 30 L.Ed.2d 652 (1972) (per curiam). *Accord Burgos v. Hopkins,* 14 F.3d 787, 790 (2d Cir.1994) ("Because [plaintiff] is a pro se litigant, we read his supporting papers liberally.").

> FN48. *Burgos,* 14 F.3d at 790.

> FN49. *See Maalouf v. Salomon Smith Barney, Inc.,* No. 02 Civ. 4470, 2004 WL 2008848, at *4 (S.D.N.Y. Sept.8, 2004). (" 'Proceeding pro se does not otherwise relieve a litigant from the usual requirements of summary judgment, and a pro se party's 'bald assertion,' unsupported by evidence, is not sufficient to overcome a motion for summary judgment.' ") (quoting *Cole v. Artuz,* No. 93 Civ. 5981, 1999 WL 983876, at *3 (S.D.N.Y. Oct.28, 1999)).

> FN50. *Kadosh v. TRW,* No. 91 Civ. 5080, 1994 WL 681763, at *5 (S.D.N.Y. Dec. 5, 1994).

**B. Exhaustion of Administrative Remedies**

The Prison Litigation Reform Act (the "PLRA") mandates that a prisoner exhaust all administrative remedies before bringing an action regarding prison conditions.[FN51] Failure to exhaust is an absolute bar to an inmate's action in federal court: "[section] 1997e(a) requires exhaustion of available administrative remedies *before* inmate-plaintiffs may bring their federal claims to

court at all." [FN52] Because the plain language of section 1997e(a) states "no action shall be brought," an inmate must have exhausted his claims at the time of the initial filing, given that "[s]ubsequent exhaustion after suit is filed ... is insufficient." [FN53] Moreover, the exhaustion of administrative remedies must be proper-that is, in compliance with a prison grievance program's deadlines and other critical procedural rules in order to suffice.[FN54] The Supreme Court has held that "the PLRA's exhaustion requirement applies to all inmate suits about prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong." [FN55]

> FN51. *See* 42 U.S.C. § 1997e(a) (providing that: "No action shall be brought with respect to prison conditions under § 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted.") ("section 1997"). *See also Porter v. Nussle,* 534 U.S. 516, 516, 122 S.Ct. 983, 152 L.Ed.2d 12 (2002); Booth v. Churner, 532 U.S. 732, 739 (2001).

> FN52. *Neal v. Goord,* 267 F.3d 116, 122 (2d Cir.2001) (quotation marks and citation omitted, emphasis in original).

> FN53. *Id.*

> FN54. *See Woodford v. Ngo,* 548 U.S. 81, 90-92, 126 S.Ct. 2378, 165 L.Ed.2d 368 (2006).

> FN55. *Porter,* 534 U.S. at 532.

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2009 WL 1835939 (S.D.N.Y.)

(Cite as: 2009 WL 1835939 (S.D.N.Y.))

While the Second Circuit has recognized that the PLRA's exhaustion requirement is mandatory, it has also recognized three exceptions to the exhaustion requirement:

when (1) administrative remedies are not available to the prisoner; (2) defendants have either waived the defense of failure to exhaust or acted in such a way as to estop them from raising the defense; or (3) special circumstances, such as reasonable misunderstanding of the grievance procedure, justify the prisoner's failure to comply with the exhaustion requirement. FN56

FN56. *Ruggiero v. County of Orange,* 467 F.3d 170, 175 (2d Cir.2006).

The Second Circuit has held that " '[a]lert[ing] the prison officials as to the nature of the wrong for which redress is sought,' ... does not constitute proper exhaustion." FN57 "[N]otice alone is insufficient because '[t]he benefits of exhaustion can be realized only if the prison grievance system is given fair opportunity to consider the grievance' and '[t]he ... system will not have such an opportunity unless the grievance complies with the system's critical procedural rules.' " FN58

FN57. *Marias v. Zenk,* 495 F.3d 37, 44 (2d Cir.2007) (quoting *Braham v. Clancy,* 425 F.3d 177, 184 (2d Cir.2005) and citing *Woodford,* 548 U.S. at 94-95) (finding plaintiff "cannot satisfy the PLRA's exhaustion requirement solely by filing two administrative tort claims, or by making informal complaints to the MDC's staff").

FN58. *Id.* (quoting *Woodford,* 548 U.S. at 95).

**C. Eleventh Amendment Immunity**

**\*4** The Eleventh Amendment provides that "[t]he Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State ..." FN59 "A state's Eleventh Amendment protection from suit extends to its agencies and departments." FN60 "This [Eleventh Amendment] bar remains in effect when State officials are sued for damages in their official capacity." FN61 To determine whether the action is an official or individual capacity suit, this Court must look behind the designation and determine whether "the State is the real, substantial party in interest." FN62 State agencies are not immune from suits asking for injunctive relief under the Eleventh Amendment. FN63

FN59. U.S. Const. amend. XI.

FN60. *Morningside Supermarket Corp. v. New York State Dep't of Health,* 432 F.Supp.2d 334, 338 (S.D.N.Y.2006) (citing *Pennhurst State Sch. & Hosp. v. Halderman,* 465 U.S. 89, 100, 104 S.Ct. 900, 79 L.Ed.2d 67 (1984)). *Accord Bryant v. New York State Dep't of Corr. Servs. Albany,* 146 F.Supp.2d 422 (S.D.N.Y.2001) (affirming the dismissal of a section 1983 claim against the DOCS and a correctional facility because Eleventh Amendment immunity abrogated the court's subject matter jurisdiction to hear the claim).

FN61. *Kentucky v. Graham,* 473 U.S. 159, 169, 105 S.Ct. 3099, 87 L.Ed.2d 114 (1985) (citation omitted).

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2009 WL 1835939 (S.D.N.Y.)

(Cite as: 2009 WL 1835939 (S.D.N.Y.))

FN62. *Ford Motor Co. v. Department of Treasury of Ind.,* 323 U.S. 459, 464, 65 S.Ct. 347, 89 L.Ed. 389 (1945), *overruled in part by Lapides v. Board of Regents of the Univ. Sys. of Ga.,* 535 U.S. 613, 122 S.Ct. 1640, 152 L.Ed.2d 806 (2002).

FN63. *See, e.g., Perez v. Westchester County Dep't of Corr.,* No. 05 Civ. 8120, 2007 WL 1288579, at *6-8 (S.D.N.Y. Apr. 30, 2007) (considering, but then denying, injunctive relief against a county's department of corrections).

**D. Section 1983**

Section 1983 "does not create a federal right or benefit; it simply provides a mechanism for enforcing a right or benefit established elsewhere." [FN64] In order to state a claim under section 1983, a plaintiff must show that the conduct complained of was committed by a person or entity acting under color of state law, and that the conduct deprived a person of rights, privileges, or immunities secured by the Constitution. [FN65] "[N]either a State nor its officials acting in their official capacities are 'persons' under [section] 1983." [FN66] Thus, section 1983 "does not provide a federal forum for litigants who seek a remedy against a state for alleged deprivation of rights secured by the United States Constitution." [FN67]

FN64. *Morris-Hayes v. Board of Educ. of Chester Union Free Sch. Dist.,* 423 F.3d 153, 159 (2d Cir.2005) (citing *Oklahoma City v. Tuttle,* 471 U.S. 808, 816, 105 S.Ct. 2427, 85 L.Ed.2d 791 (1985)).

FN65. *See Palmieri v. Lynch,* 392 F.3d 73, 78 (2d Cir.2004) (citation omitted).

FN66. *Will v. Michigan Dep't of State Police,* 491 U.S. 58, 71, 109 S.Ct. 2304, 105 L.Ed.2d 45 (1989). *Accord Huminski v. Corsones,* 396 F.3d 53, 70 (2d Cir.2005).

FN67. *Bryant,* 146 F.Supp.2d at 425.

Furthermore, "[i]t is well settled in this Circuit that 'personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under [section] 1983.' " [FN68] Thus, "[a] supervisory official cannot be liable solely on account of the acts or omissions of his or her subordinates." [FN69] In 1995, the Second Circuit held that a supervisory official is personally involved only when that official: (1) participates directly in the alleged constitutional violation; (2) fails to remedy the violation after being informed of the violation through a report or appeal; (3) creates or allows the continuation of a policy or custom under which unconstitutional practices occurred; (4) acts with gross negligence in supervising subordinates who commit the wrongful acts; or (5) exhibits deliberate indifference to the rights of inmates by failing to act on information indicating that unconstitutional acts were occurring. [FN70] However, in 2009, the Supreme Court held, "[b]ecause vicarious liability is inapplicable to ... [section] 1983 suits, a plaintiff must plead that each Government-official defendant, through the official's *own individual actions,* has violated the Constitution." [FN71] The Supreme Court explicitly rejected the argument that, "a supervisor's mere knowledge of his subordinate's discriminatory purpose amounts to the supervisor's violating the Constitution." [FN72] Thus, "[a]bsent vicarious liability, each Government official, his or her title notwithstanding, is only liable for his or her own misconduct." [FN73] For example, "[t]he allegation that plaintiff sent defendant[ ] letters complaining of prison conditions is not enough to allege personal involvement." [FN74]

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2009 WL 1835939 (S.D.N.Y.)

(Cite as: 2009 WL 1835939 (S.D.N.Y.))

FN68. *Wright v. Smith,* 21 F.3d 496, 501 (2d Cir.1994) (quoting *Moffitt v. Town of Brookfield,* 950 F.2d 880, 885 (2d Cir.1991)).

FN69. *Ford v. Conway,* No. 03 Civ. 0927S, 2004 WL 1071171, at *4 (W.D.N.Y. Mar.16, 2004).

FN70. *See Colon v. Coughlin,* 58 F.3d 865, 873 (2d Cir.1995) (citation omitted).

FN71. *Ashcroft v. Iqbal,* --- U.S. ----, 129 S.Ct. 1937, 1948, 173 L.Ed.2d 868 (2009) (emphasis added).

FN72. *Id.* at 1949.

FN73. *Id.*

FN74. *Laureano v. Pataki,* No. 99 Civ. 10667, 2000 WL 1458807, at *4 (S.D.N.Y. Sept.29, 2000) (granting a motion to dismiss on similar facts). *See also Farid v. Goord,* 200 F.Supp.2d 220, 235 (W.D.N.Y.2002) (dismissing claims of personal involvement against supervisory official who merely sent grievances "down the chain of command for investigation").

**E. Eighth Amendment Right to be Free from Deliberate Indifference to Serious Medical Needs**

**\*5** The Eighth Amendment prohibits the infliction of cruel and unusual punishment on prisoners.[FN75] The Supreme Court has held that "deliberate indifference to serious medical needs of prisoners constitutes the 'unnecessary and wanton infliction of pain' ... proscribed by the Eighth Amendment." [FN76] Because the inadvertent or negligent failure to provide adequate medical care does not rise to the level of deliberate indifference, allegations of medical malpractice or negligent treatment are insufficient to state a claim under section 1983.[FN77] "Prison officials have a duty to provide prisoners with the 'reasonably necessary medical care which would be available to him or her ... if not incarcerated.' " [FN78] However, a prison cannot be required to meet the same standard of medical care found in outside hospitals.[FN79]

FN75. U.S. Const. amend. XIII.

FN76. *Estelle v. Gamble,* 429 U.S. 97, 104, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976) (quoting *Gregg v. Georgia,* 428 U.S. 153, 173, 96 S.Ct. 2909, 49 L.Ed.2d 859 (1976)). *Accord Farmer v. Brennan,* 511 U.S. 825, 834, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994) ("To violate the Cruel and Unusual Punishments Clause, a prison official must have a sufficiently culpable state of mind .... In prison-conditions cases that state of mind is one of 'deliberate indifference' to inmate health or safety ....") (quotations and citations omitted).

FN77. *See Estelle,* 429 U.S. at 105-06.

FN78. *Candeleria v. Coughlin,* No. 91 Civ. 2978, 1996 WL 88555, at *7 (S.D.N.Y. Mar.1, 1996) (quoting *Langley v. Coughlin,* 888 F.2d 252, 254 (2d Cir.1989)). *Accord Edmonds v. Greiner,* No. 99 Civ. 1681, 2002 WL 368446, at

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2009 WL 1835939 (S.D.N.Y.)

(Cite as: 2009 WL 1835939 (S.D.N.Y.))

*8 (S.D.N.Y. Mar. 7, 2002)* ("A person who is incarcerated is entitled to receive adequate medical care.").

FN79. *See Archer v. Dutcher,* 733 F.2d 14, 17 (2d Cir.1984) ("We have no doubt that the same standards of medical care cannot be imposed upon a prison as are presumed to be realized at a hospital.").

" 'The deliberate indifference standard embodies both an objective and a subjective prong.' " FN80 "The objective 'medical need' element measures the severity of the alleged deprivation, while the subjective 'deliberate indifference' element ensures that the defendant prison official acted with a sufficiently culpable state of mind." FN81 "Because the Eighth Amendment is not a vehicle for bringing medical malpractice claims, nor a substitute for state tort law, not every lapse in prison medical care will rise to the level of a constitutional violation." FN82 "[W]hen a prisoner asserts that delay in his treatment constitutes deliberate indifference on the part of a healthcare provider, the Court looks to the severity of the consequences brought about by the alleged delay." FN83

FN80. *Morrison v. Mamis,* No. 08 Civ. 4302, 2008 WL 5451639, at *5 (S.D.N.Y. Dec.18, 2008) (quoting *Hathaway v. Coughlin,* 37 F.3d 63, 66 (2d Cir.1994)).

FN81. *Smith v. Carpenter,* 316 F.3d 178, 183-84 (2d Cir.2003) (quoting *Estelle,* 429 U.S. at 104)).

FN82. *Id.* (citing *Estelle,* 429 U.S. 105-06).

FN83. *Pabon v. Goord,* No. 99 Civ. 5869, 2003 WL 1787268, at *11 (S.D.N.Y. Mar.28, 2003) (citation omitted).

## F. Preliminary and Permanent Injunction

"A plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." FN84 "A preliminary injunction is an extraordinary remedy never awarded as of right." FN85 "When the movant seeks a 'mandatory' injunction-that is, as in this case, an injunction that will alter rather than maintain the status quo-[he or] she must meet the more rigorous standard of demonstrating a 'clear' or 'substantial' likelihood of success on the merits." FN86 The standard for a permanent injunction is essentially the same as for a preliminary injunction, except that a plaintiff seeking a permanent injunction must show actual success on the merits rather than a likelihood of success on the merits. FN87

FN84. *Winter v. Natural Res. Def. Council, Inc.,* --- U.S. ----, 129 S.Ct. 365, 374, 172 L.Ed.2d 249 (2008). *Accord Citigroup Global Markets Inc. v. VCG Special Opportunities Master Fund,* No. 08 Civ. 5520, 2009 WL 1528513, at *1-2 (S.D.N.Y. June 1, 2009) (discussing *Winter* approvingly). *But see Almontaser v. New York City Dep't of Educ.,* 5 19 F.3d 505, 508 (2d Cir.2008) ("A party seeking a preliminary injunction 'must show irreparable harm absent injunctive relief, and either a likelihood of success on the merits, or a serious question going to the merits to make them a fair ground for trial, with a balance of hardships tipping decidedly in plaintiff's favor.' ") (citation omitted).

FN85. *Winter,* 129 S.Ct. at 376 (citation omitted).

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2009 WL 1835939 (S.D.N.Y.)

(Cite as: 2009 WL 1835939 (S.D.N.Y.))

FN86. *Mitchell v. New York State Dep't of Corr. Servs.,* No. 06 Civ. 6278, 2009 WL 185757, at *2 (W.D.N.Y. Jan. 26, 2009) (quoting *Doninger v. Niehoff,* 527 F.3d 41, 47 (2d Cir.2008)).

FN87. *See Winter,* 129 S.Ct. at 381.

## IV. DISCUSSION

Bellamy asserts an Eighth Amendment deliberate indifference claim against Wright and the DOCS. Defendants respond, first, by asserting Eleventh Amendment immunity with respect to all claims against the DOCS and any claims against Wright in his official capacity. As for the claim against Wright in his individual capacity, defendants argue that he was not personally involved in the alleged harm, nor did he create a policy that contributed to that harm. Bellamy also seeks a preliminary and permanent injunction against the DOCS to provide the medical treatment he requests and to comply with several New York State laws. Defendants argue that Bellamy will not win on the merits, nor will he suffer irreparable harm. Defendants urge this Court to decline to exercise supplemental jurisdiction over any remaining New York State law claims. Finally, Bellamy seeks compensatory and punitive damages.

### A. Exhaustion of Administrative Remedies

*6 This Court determined in a previous opinion that "Bellamy did not fail to exhaust his administrative remedies because he was justified in his belief that no administrative remedy was available to him." [FN88] Thus, Bellamy's claims are not barred by the PLRA.

FN88. *Bellamy I,* 2008 WL 3152963, at *5

(citing *Giano v. Goord,* 380 F.3d 670, 678 (2d Cir.2004)).

### B. Eleventh Amendment Immunity

The Eleventh Amendment immunizes state agencies and state officials acting in their official capacity from suit under section 1983. Accordingly, Bellamy's deliberate indifference claims against both the DOCS and Wright, in his official capacity, are dismissed.

### C. Section 1983 Claim of Deliberate Indifference Against Wright in His Individual Capacity

The Supreme Court's decision in *Iqbal v. Ashcroft* abrogates several of the categories of supervisory liability enumerated in *Colon v. Coughlin. Iqbal'* s "active conduct" standard only imposes liability on a supervisor through section 1983 if that supervisor actively had a hand in the alleged constitutional violation. Only the first and part of the third *Colon* categories pass *Iqbal'* s muster-a supervisor is only held liable if that supervisor participates directly in the alleged constitutional violation or if that supervisor creates a policy or custom under which unconstitutional practices occurred. The other *Colon* categories impose the exact types of supervisory liability that *Iqbal* eliminated-situations where the supervisor knew of and acquiesced to a constitutional violation committed by a subordinate.

Bellamy's remaining claim alleges that Wright, in his individual capacity, was deliberately indifferent to Bellamy's medical needs. However, Bellamy offers no evidence that any of Wright's actions fall into any of the remaining exceptions that would permit supervisory liability. *First,* Bellamy admits that Wright was not personally involved in the letter responses. Both parties agree that they have never had any form of contact. *Second,* Bellamy offers no evidence that Wright created or contributed to a policy or custom of unconstitutional practices. Bellamy also admitted that he can provide no

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2009 WL 1835939 (S.D.N.Y.)

(Cite as: 2009 WL 1835939 (S.D.N.Y.))

evidence that Wright was responsible for making any decisions regarding his testosterone medications.[FN89] Bellamy's conclusory allegations that Wright must have known about Bellamy's plight is not enough to impute section 1983 liability.[FN90]

FN89. *See, e.g.,* Bellamy Dep. II at 32:19-21 (Question: "Did Dr. Moorjani say anything that Dr. Wright was involved in the April of 2005 denial?" Answer: "No, he did not.")

FN90. *See Reid v. Artuz,* 984 F.Supp. 191, 195 (S.D.N.Y.1997) (dismissing an asthmatic prisoner's section 1983 claim against a supervisory official when the pleadings "fail[ed] to allege, let alone establish, any factual basis upon which a fact finder could reasonably conclude personal involvement by the supervisory official defendant ... that [defendant] created or continued a policy or custom which allowed the violation to occur, or that [defendant] was grossly negligent in managing the subordinates who caused the unlawful condition").

Finally, Bellamy offers no evidence that Wright demonstrated deliberate indifference to Bellamy's serious medical needs. Bellamy does not contend that Wright unnecessarily and wantonly inflicted any pain-indeed Bellamy conceded that Wright was not involved in the alleged denials of treatment. Accordingly, Bellamy's deliberate indifference claim against Wright in his individual capacity is dismissed.

**D. Preliminary and Permanent Injunction**

Bellamy asks this Court to order the DOCS-through an injunction-to provide him with adequate medical care and to comply with New York State laws. This request is

denied.

**\*7** *First,* Bellamy has not alleged that he is suffering irreparable harm. Instead, he has alleged a number of unrelated and sporadic problems that can be expected in the normal course of incarceration, especially when transferring from facility to facility. It cannot be inferred from his pleadings, his testimony or his letters to Wright that he has consistently been denied any form of treatment. Indeed, each of his three letters address completely different topics without re-addressing prior issues. Bellamy concedes that the disruption of his medication only occurred on a very limited or isolated basis. [FN91]

FN91. *See* Bellamy Dep. II at 56-57, 75-76 (demonstrating that, over the course of three-years, Bellamy was denied treatment for one three-week period, for one allegedly three-month period-while he was transferring facilities-and a few alleged short-term periods, although those dates are unspecified).

*Second,* Bellamy cannot show a clear or substantial likelihood of success on the merits. Bellamy does not offer evidence that either defendant was deliberately indifferent to his serious medical needs.[FN92] For the objective prong, Bellamy offers no evidence that any deprivation of medication was sufficiently serious. Headaches and fatigue do not rise to the level of seriousness necessary to warrant a preliminary injunction-especially when Bellamy admits that he still suffers similar side-effects while receiving the requested treatment.[FN93] For the subjective prong, Bellamy does not offer any evidence that any DOCS employee acted with the requisite state of mind to be deliberately indifferent to his serious medical needs.

FN92. While the DOCS itself is immune from section 1983 liability, the following analysis

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2009 WL 1835939 (S.D.N.Y.)

(Cite as: 2009 WL 1835939 (S.D.N.Y.))

surrounds the DOCS and its employees generally.

FN93. Further, the defendants' affidavits question many of Bellamy's medical propositions. *See, e.g.,* Moorjani Aff. ¶ 4 (claiming that Bellamy exhibited signs of hypogonadism and many of its symptoms, including weight loss, headaches, and fatigue, prior to the surgery).

This Court need not address the balance of equities nor the public interest factors because Bellamy has not shown irreparable harm or a substantial likelihood of success on the merits. Accordingly, Bellamy's request for both a preliminary and permanent injunction is denied.

**E. Supplemental Jurisdiction**

Bellamy asks this Court to compel the DOCS-through an injunction-to comply with New York State Public Health Laws.[FN94] To the extent that there are any remaining state law claims, this Court declines to exercise supplemental jurisdiction over those claims.[FN95]

FN94. *See* Am. Compl., Prayer for Relief ¶ 18.

FN95. *See Carnegie-Mellon Univ. v. Cohill,* 484 U.S. 343, 350, 108 S.Ct. 614, 98 L.Ed.2d 720 (1988) ("[I]n the usual case in which all federal-law claims are eliminated before trial, the balance of factors to be considered under the pendent jurisdiction doctrine-judicial economy, convenience, fairness, and comity-will point toward declining to exercise jurisdiction over the remaining state-law claims"). *See also Kshel Realty Corp. v. City of New York,* No. 01 Civ.

9039, 2006 WL 2506389, at *13 (S.D.N.Y. Aug.30 2006) ("[T]he Second Circuit instructs that 'absent exceptional circumstances,' where federal claims can be disposed of on 12(b)(6) or summary judgment grounds, courts should 'abstain from exercising pendent jurisdiction.' ") (quoting *Walker v. Time Life Films, Inc.,* 784 F.2d 44, 53 (2d Cir.1986)).

**V. CONCLUSION**

For the foregoing reasons, defendants' motion for summary judgment is granted. The Clerk of the Court is directed to close this motion (Docket # 64) and this case.

SO ORDERED:

S.D.N.Y.,2009.

Bellamy v. Mount Vernon Hosp.

Not Reported in F.Supp.2d, 2009 WL 1835939 (S.D.N.Y.)

END OF DOCUMENT

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.



718 F.Supp.2d 340

(Cite as: 718 F.Supp.2d 340)

**H**

United States District Court,

S.D. New York.

Matthew D'OLIMPIO and Michael Kaplan, Plaintiffs,

v.

Louis CRISAFI, in his individual capacity, Brendan Vallely, in his individual capacity, Thomas D'Amicantonio, in his individual capacity, James Giglio, in his individual capacity, Michael Moffett, in his individual capacity, Paul Nadel, in his individual capacity, Jennifer Treacy, in her individual capacity, Kenneth Post, in his individual capacity, and Timothy Dewey, in his individual capacity, Defendants.

Louis Crisafi, Counterclaim-Plaintiff,

v.

Michael Kaplan, Counterclaim-Defendant.

Nos. 09 Civ. 7283(JSR), 09 Civ. 9952(JSR).

June 15, 2010.

**Background:** Arrestee and former narcotics enforcement investigator brought action against another investigator and other narcotics enforcement officials, alleging malicious prosecution, false arrest, unlawful detention, and other constitutional violations against arrestee, and First Amendment retaliation against investigator. Defendant investigator counterclaimed, alleging defamation by

plaintiff investigator. Defendants moved to dismiss for failure to state a claim.

**Holdings:** The District Court, Jed S. Rakoff, J., held that:

(1) allegations were sufficient to state a claim of supervisory liability against officials;

(2) law enforcement officers lacked even arguable probable cause to make arrest;

(3) investigator's statements were not protected by First Amendment; and

(4) plaintiff investigator was not liable for defamation.

Motions denied in part and granted in part.

West Headnotes

**[1] Civil Rights 78 ⊙━━  1358**

78 Civil Rights

    78III Federal Remedies in General

        78k1353 Liability of Public Officials

           78k1358 k. Criminal law enforcement; prisons. Most Cited Cases

    Arrestee was not required to show discriminatory

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

718 F.Supp.2d 340

(Cite as: 718 F.Supp.2d 340)

purpose on the part of law enforcement officers in order to establish the personal involvement needed to support the officers' liability on his § 1983 claim alleging that his search, arrest, and prosecution violated the Fourth Amendment. U.S.C.A. Const.Amend. 4; 42 U.S.C.A. § 1983.

**[2] Civil Rights 78 ☞    1395(6)**

78 Civil Rights

    78III Federal Remedies in General

        78k1392 Pleading

        78k1395 Particular Causes of Action

            78k1395(4) Criminal Law Enforcement; Police and Prosecutors

                78k1395(6) k. Arrest, search, and detention. Most Cited Cases

Allegations against law enforcement officials were sufficient to state a claim under § 1983 that officials failed to supervise narcotics enforcement investigators; complaint incorporated by reference an investigatory report that described various acts of misconduct by investigator that took place prior to arrestee's arrest, and concluded that there was a lack of appropriate supervision by officials, and arrestee alleged that another investigator complained to official in writing regarding investigator's misconduct prior to arrestee's arrest. U.S.C.A. Const.Amend. 4; 42 U.S.C.A. § 1983.

**[3] Arrest 35 ☞    63.4(2)**

35 Arrest

35II On Criminal Charges

    35k63 Officers and Assistants, Arrest Without Warrant

        35k63.4 Probable or Reasonable Cause

            35k63.4(2) k. What constitutes such cause in general. Most Cited Cases

In general, probable cause to arrest exists when the officers have knowledge or reasonably trustworthy information of facts and circumstances that are sufficient to warrant a person of reasonable caution in the belief that the person to be arrested has committed or is committing a crime. U.S.C.A. Const.Amend. 4.

**[4] Civil Rights 78 ☞    1376(6)**

78 Civil Rights

    78III Federal Remedies in General

        78k1372 Privilege or Immunity; Good Faith and Probable Cause

            78k1376 Government Agencies and Officers

                78k1376(6) k. Sheriffs, police, and other peace officers. Most Cited Cases

In the context of a qualified immunity defense to an allegation of false arrest, the defending officer need only show arguable probable cause. U.S.C.A. Const.Amend. 4.

**[5] Civil Rights 78 ☞    1358**

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

718 F.Supp.2d 340

(Cite as: 718 F.Supp.2d 340)

78 Civil Rights

    78III Federal Remedies in General

        78k1353 Liability of Public Officials

            78k1358 k. Criminal law enforcement; prisons. Most Cited Cases

Arrestee's allegations were sufficient to state a § 1983 supervisory liability claim against law enforcement officials, arising out of officials' creation of policy allowing narcotics enforcement investigators to initiate criminal charges based on a phone conversation or faxed affidavit, where arrestee alleged that his arrest for possession of a narcotic and criminal impersonation to obtain prescriptions was predicated on nothing more than his pharmacy's report that it had failed to receive a hard copy of a prescription within a week, which prompted a narcotics enforcement official to call arrestee's doctor's office and speak with an unknown person there, who either stated that he was not aware of any such prescription or effectuated the fax transmission of an affidavit bearing an unverified signature of arrestee's doctor. U.S.C.A. Const.Amend. 4; 42 U.S.C.A. § 1983.

[6] Arrest 35 ☞ 63.4(8)

35 Arrest

    35II On Criminal Charges

        35k63 Officers and Assistants, Arrest Without Warrant

            35k63.4 Probable or Reasonable Cause

                35k63.4(7) Information from Others

                    35k63.4(8) k. Reliability of informer. Most Cited Cases

Law enforcement officers lacked even arguable probable cause to arrest arrestee for possession of a narcotic and impersonation of a physician based solely on unauthenticated report by physician's staff denying knowledge of arrestee's prescription. U.S.C.A. Const.Amend. 4.

[7] Constitutional Law 92 ☞ 1941

92 Constitutional Law

    92XVIII Freedom of Speech, Expression, and Press

        92XVIII(P) Public Employees and Officials

            92k1941 k. Discipline or reprimand. Most Cited Cases

A public employee's cause of action for his employer's discipline based on his speech can proceed only if the employee spoke as a citizen on a matter of public concern; otherwise, the employee's speech is outside the scope of the First Amendment. U.S.C.A. Const.Amend. 1.

[8] Constitutional Law 92 ☞ 1955

92 Constitutional Law

    92XVIII Freedom of Speech, Expression, and Press

        92XVIII(P) Public Employees and Officials

            92k1955 k. Police and other public safety officials. Most Cited Cases

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

718 F.Supp.2d 340

(Cite as: 718 F.Supp.2d 340)

**Municipal Corporations 268 🗝    185(1)**

268 Municipal Corporations

  268V Officers, Agents, and Employees

    268V(B) Municipal Departments and Officers Thereof

      268k179 Police

        268k185 Suspension and Removal of Policemen

          268k185(1) k. Grounds for removal or suspension. Most Cited Cases

Law enforcement officer's complaints to supervisor about fellow officer's behavior, his workplace incident reports, and his complaint to the inspector general, was speech falling within officer's official duties, and thus was not protected under the First Amendment, as required to support employee's retaliation claim; statements were made privately though channels available through officer's employment and were made in a manner that would not be available to a non-public employee citizen, and subject of statements was that other officer was not performing his job properly. U.S.C.A. Const.Amend. 1.

**[9] Libel and Slander 237 🗝    28**

237 Libel and Slander

  237I Words and Acts Actionable, and Liability Therefor

    237k26 Repetition

      237k28 k. By others in general. Most Cited Cases

It was simply implausible that narcotics investigator in any legally relevant sense caused the republication of his statements in an investigatory report or newspaper article regarding actions of a fellow investigator, as required to state a claim of defamation under New York law.

**[10] Libel and Slander 237 🗝    28**

237 Libel and Slander

  237I Words and Acts Actionable, and Liability Therefor

    237k26 Repetition

      237k28 k. By others in general. Most Cited Cases

Under New York law, a plaintiff may not recover damages from the original author for slander arising from the republication of defamatory statements by a third party absent a showing that the original author was responsible for or ratified the republication.

*342 James Brian Lebow, Sr., New York, NY, for Plaintiffs.

Christine Alexandria Rodriguez, Christine A. Rodriguez, Law Office, Ivan B. Rubin, Peter Sangjin Hyun, New York State Office of the Attorney General, New York, NY, for Defendants.

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

718 F.Supp.2d 340

(Cite as: 718 F.Supp.2d 340)

*MEMORANDUM ORDER*

JED S. RAKOFF, District Judge.

On August 18, 2009, Plaintiff Matthew D'Olimpio brought this action (docket-numbered 09 Civ. 7283) against defendants Louis Crisafi, Brendan Vallely, Thomas D'Amicantonio, James Giglio, Michael Moffett, and Paul Nadel for malicious prosecution, false arrest, unlawful detention, and various other violations of the Constitution and 42 U.S.C. §§ 1983 and 1988. An amended complaint filed on October 29, 2009 joined Michael Kaplan as a plaintiff and added a claim against defendants Nadel, Jennifer Treacy, Kenneth Post, and Timothy Dewey for unconstitutionally retaliating against Kaplan based on his reports of misconduct committed by defendant Crisafi, a fellow investigator employed by the New York State Department of Health's Bureau of Narcotics Enforcement, Metropolitan Area Regional Office ("BNE-MARO"), in violation of the First and Fourteenth Amendments and § 1983.

On December 18, 2009, defendants Giglio, Moffett, and Nadel moved to dismiss all of D'Olimpio's claims against them, and defendants Crisafi, Vallely, and D'Amicantonio moved to dismiss D'Olimpio's malicious prosecution claim. That same day, defendants Nadel, Treacy, Post, and Dewey moved to dismiss Kaplan's claims against them. Meanwhile, on December 3, 2009, Crisafi had filed what was styled as a complaint against Kaplan (docket-numbered 09 Civ. 9952) alleging that Kaplan defamed him through publication of the reports of Crisafi's misconduct discussed in Kaplan's complaint. On the parties' consent, the Court converted Crisafi's complaint into a compulsory counterclaim in the action docket-numbered 09 Civ. 7283 and consolidated the two cases. *See* Transcript, 1/14/10, *Crisafi v. Kaplan,* No. 09 **\*343** Civ. 9952. On January 22, 2010, Kaplan moved to dismiss that counterclaim.

By Order dated March 1, 2010 (the "March 1 Order"), the Court granted the motion of Nadel, Treacy, Post, and Dewey to dismiss Kaplan's retaliation claim; granted Kaplan's motion to dismiss Crisafi's defamation counterclaim; and denied all other motions to dismiss.[FN1] The Order also promised that a Memorandum would issue in due course stating the reasons for these rulings. With apologies to counsel for the extended delay, the Court here provides that Memorandum.

> FN1. Although the Order did not explicitly so state, all the dismissals were with prejudice (which, as it happens, is also the default position when an order does not state whether a dismissal is or is not with prejudice).

The Court turns first to the motions of defendants Crisafi, Vallely, and D'Amicantonio to dismiss D'Olimpio's malicious prosecution claim, as set forth in the First Amended Complaint ("FAC") filed on October 29, 2009.[FN2] The relevant allegations are as follows:

> FN2. The first five causes of action in the FAC are D'Olimpio's claims. The sixth cause of action is Kaplan's claim.

Sometime before November 16, 2007, D'Olimpio, a resident of Brooklyn, was prescribed Vicodin by his doctor. FAC ¶ 17. He called that prescription into his pharmacy and obtained the Vicodin. *Id.* ¶ 18. D'Olimpio's pharmacy contacted the BNE-MARO after it had not received a hard copy of the prescription from D'Olimpio's doctor within seven days. *Id.* ¶ 19. A MARO official called D'Olimpio's doctor's office and spoke to an unknown individual there, who either stated by phone that he was not aware of D'Olimpio's Vicodin prescription or provided a faxed affidavit purportedly signed by the doctor to that effect. *Id.* ¶ 20. Based on these occurrences, and without any further investigation, MARO investigator Crisafi began planning Crisafi's arrest. *Id.* ¶ 21.

718 F.Supp.2d 340

(Cite as: 718 F.Supp.2d 340)

On or about November 16, 2007, D'Olimpio was exiting his doctor's office in Brooklyn and walking toward his car when Crisafi and defendants Vallely and D'Amicantonio, also MARO investigators, showed D'Olimpio their badges and asked to speak with him. *Id.* ¶¶ 4, 27-28. They asked D'Olimpio his name, where he was coming from, what he was doing at the doctor's office, and whether the car was his. *Id.* ¶ 29. D'Olimpio replied it was his wife's car. *Id.* ¶ 30. Crisafi asked D'Olimpio if they could search him for weapons; D'Olimpio consented to be frisked, but not to a full search. *Id.* ¶¶ 31-32. Crisafi then frisked D'Olimpio, reached into his pockets, and took out his car keys. *Id.* ¶ 33. Crisafi asked D'Olimpio whether he would consent to a search of the car; D'Olimpio refused, but Crisafi nonetheless carried out the search. *Id.* ¶¶ 34-36. During the search, Crisafi found a bag containing a bottle marked for Klonopin but containing both Vicodin and Klonopin pills, all of which were lawfully prescribed to Crisafi and which he carried in one bottle for convenience. *Id.* ¶¶ 37-38. Upon finding the bottle and discovering that there were two types of pills inside, Crisafi handcuffed D'Olimpio and moved him into the police car, without making any effort to find out whether the drugs were legally prescribed. *Id.* ¶¶ 39-40.

While D'Olimpio was being driven to the police precinct and again when he was being escorted to a bathroom prior to questioning, D'Olimpio requested an attorney, but these requests were denied. *Id.* ¶¶ 41-44. Before questioning began, D'Olimpio asked Crisafi to call an ambulance so that he could take the Klonopin that he needed; Crisafi told D'Olimpio to call his wife and ask her to come to the precinct with his medication. *Id.* ¶¶ 46-47. When **\*344** D'Olimpio's wife arrived, D'Olimpio was brought into a different room, and his wife was given his possessions. *Id.* ¶ 48. Crisafi then offered D'Olimpio a blue pill, which he took, but D'Olimpio now believes that pill was not a Klonopin pill, as he experienced side effects of confusion and drowsiness after taking it, which he had never felt previously when taking Klonopin. *Id.* ¶ 50. Crisafi began to interrogate D'Olimpio, and at one point

threatened to rescind his father's physician license. *Id.* ¶ 51. D'Olimpio at that point again requested an attorney, and Crisafi again denied his request. *Id.* ¶¶ 52-53.

During the interrogation, Crisafi asked D'Olimpio to confess to charges of criminal possession of a controlled substance for possessing the Vicodin and to charges of criminal impersonation for allegedly calling pharmacies and using false information to obtain prescriptions. D'Olimpio, under the influence of the pill, signed a one-page confession presented to him by Crisafi. *Id.* ¶ 54. At Crisafi's request, Vallely signed a form falsely indicating that he had seen Crisafi inform D'Olimpio of his *Miranda* rights. *Id.* ¶ 55. D'Olimpio's forged signature was also added to this "*Miranda* sheet." *Id.* ¶ 56. Crisafi, perhaps with the assistance of Vallely or D'Amicantonio, also wrote a four-page confession and forged D'Olimpio's signature and initials on it. *Id.* ¶ 57. Furthermore, Crisafi, possibly with the assistance of Vallely and D'Amicantonio, drafted an affidavit falsely attesting that D'Olimpio illegally possessed Vicodin and that he impersonated a doctor to obtain his prescriptions. *Id.* ¶ 58.

D'Olimpio was then taken to the Manhattan Detention Center, where he was held for 24 hours prior to being arraigned. *Id.* ¶¶ 59-60. Based on the four-page confession and the affidavit, he was arraigned on the criminal possession and impersonation charges and then released on his own recognizance. *Id.* ¶¶ 61-62. According to the Complaint, D'Olimpio appeared in court about seven times before the charges against him were finally dropped on September 4, 2008. *Id.* ¶ 76.

On the basis of these allegations, D'Olimpio's third cause of action claims that Crisafi, Vallely, and D'Amicantonio maliciously prosecuted D'Olimpio by initiating the criminal charges.[FN3] These defendants moved to dismiss this malicious prosecution claim, primarily on the basis that the charges against D'Olimpio remained pending against him as of the time of their motion, as

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

718 F.Supp.2d 340

(Cite as: 718 F.Supp.2d 340)

demonstrated by a Court Action Sheet of the Criminal Court, New York County. Decl. of Ivan Rubin, 12/22/09, Ex. 1. Because the favorable termination of the prosecution is a necessary element of a malicious prosecution claim under § 1983, *Green v. Mattingly,* 585 F.3d 97, 103 (2d Cir.2009), the pendency of criminal charges would be fatal to this cause of action.

> FN3. In the first, fourth, and fifth causes of action in the FAC, D'Olimpio respectively alleges that Crisafi, Vallely, and D'Amicantonio violated various constitutional rights, falsely arrested him, and unlawfully detained him. No motions to dismiss were filed with respect to these claims.

In his opposition to the motions to dismiss, D'Olimpio asserted that the Assistant District Attorney prosecuting D'Olimpio's criminal case had committed to move orally to dismiss that case at the next court hearing, which was scheduled for February 2, 2010. Based on that representation, this Court granted leave for D'Olimpio to file a Second Amended Complaint ("SAC") following that hearing. The Second Amended Complaint, filed on February 18, 2010, did indeed include the representation that the criminal charges were dismissed on February 2, 2010. SAC **\*345** ¶ 110. Since D'Olimpio had now sufficiently alleged the favorable termination of the criminal charges against him, the March 1 Order therefore denied the motions to dismiss D'Olimpio's malicious prosecution claim.[FN4]

> FN4. Defendants also asserted that the malicious prosecution claim should be dismissed because D'Olimpio's allegations failed to demonstrate the element of malice-*i.e.,* that there was "some deliberate act punctuated with awareness of 'conscious falsity' " with respect to the institution of criminal proceedings. *Bradley v. Vill. of Greenwood Lake,* 376 F.Supp.2d 528,

534-35 (S.D.N.Y.2005). But D'Olimpio's allegations regarding the false affidavits and confessions were clearly more than sufficient to plead malice.

Defendants Giglio, Moffett, and Nadel moved to dismiss D'Olimpio's second cause of action, which charged them with various constitutional violations based on their supervisory authority over Crisafi and their involvement with an alleged policy leading to D'Olimpio's false arrest. In this regard, the FAC contains the following allegations with respect to these defendants: At the time of the events alleged, James Giglio was the director of the BNE, and worked in the BNE's office in Troy, New York. *Id.* ¶ 5. Michael Moffett was the BNE's Section Chief with responsibility over BNE investigators, and also worked in the Troy office. *Id.* ¶ 6. Paul Nadel was the BNE's Program Director for the MARO, and worked in the same Manhattan office as Crisafi, Vallely, and D'Amicantonio. *Id.* ¶ 7. All three of these defendants had supervisory authority over Crisafi, Vallely, D'Amicantonio, and Kaplan. *Id.* ¶¶ 5-7.

The FAC further alleges that at the time of Crisafi's arrest, MARO followed the following protocol in order to determine whether a narcotics prescription was legitimate: First, when a patient called in a prescription to a pharmacy, the pharmacy would expect to receive a hard copy of the prescription from the patient's doctor within a week. Second, pharmacies were instructed to contact the MARO if they failed to receive a hard copy by the end of the seven-day period. Third, when the MARO was contacted by a pharmacy because the pharmacy did not receive a hard copy, a MARO officer would call the doctor's office and would either speak with the doctor to inquire whether the prescription was legitimate or would ask the doctor to fax an affidavit stating that the prescription was legitimate. *Id.* ¶ 11. With respect to this last step, MARO had a practice of confirming complaints from doctors by telephone and fax without taking any other steps to verify the doctors' identities. *Id.* ¶ 12.

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

718 F.Supp.2d 340

(Cite as: 718 F.Supp.2d 340)

The FAC also includes the following allegations regarding the failure of Giglio, Moffett, and Nadel to supervise Crisafi: On March 22, 2007, the *New York Times* published an article detailing the abuse of parking placards by government officials. This article included a photograph of a car belonging to Crisafi. *Id.* ¶ 13. Shortly after the publication of that article, the New York State Inspector General's Office began an investigation of Crisafi, which unearthed evidence of other misconduct. *Id.* ¶ 14. Sometime before November 16, 2007, plaintiff Kaplan, a MARO investigator, sent Nadel a written complaint informing him that Crisafi was violating suspects' Fifth Amendment rights. *Id.* ¶ 15. Nadel took no action in response to this complaint. *Id.* ¶ 16. Kaplan followed up with a series of other complaints, including a report to the Inspector General, which are discussed more fully below in the context of Kaplan's retaliation claim. The Inspector General's investigation culminated in a report issued on December 8, 2008, written by Inspector General Joseph Fisch (the "Fisch Report"), which found that Crisafi committed numerous abuses, including many of those alleged by Kaplan, some of **\*346** which were assisted by Vallely and D'Amicantonio. The Fisch Report also found that Giglio and Moffett failed to supervise Crisafi and the MARO office, and noted the fact that Nadel, who was responsible for approving law enforcement operations, was a licensed pharmacist with no previous law enforcement experience. *Id.* ¶¶ 78-79.

Based on the above allegations, Crisafi in his second cause of action asserted § 1983 claims against Giglio, Moffett, and Nadel arising from (1) their creation of a policy allowing MARO personnel to initiate criminal charges based on a phone conversation or faxed affidavit without confirmation of the doctor's identity or that the alleged signature on the affidavit was authentic (the "Policy"); (2) their failure to supervise Crisafi and the MARO; (3) their allowing Nadel, a pharmacist with no prior law enforcement experience, to be the MARO Program Director; and (4) their deliberate indifference to D'Olimpio's rights. *Id.* ¶¶ 122-25.

Defendants attack these claims on several grounds. First, they assert that these claims are based on a broad theory of "supervisory liability" that has been discredited by the Supreme Court in *Ashcroft v. Iqbal,* --- U.S. ----, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009). Prior to *Iqbal,* well-established Second Circuit law provided five bases for showing that a supervisory defendant had sufficient personal involvement with the alleged violation to maintain a § 1983 claim. A plaintiff could plead personal involvement by showing any of the following:

(1) the defendant participated directly in the alleged constitutional violation, (2) the defendant, after being informed of the violation through a report or appeal, failed to remedy the wrong, (3) the defendant created a policy or custom under which unconstitutional practices occurred, or allowed the continuance of such a policy or custom, (4) the defendant was grossly negligent in supervising subordinates who committed the wrongful acts, or (5) the defendant exhibited deliberate indifference to the rights of inmates by failing to act on information indicating that unconstitutional acts were occurring.

*Colon v. Coughlin,* 58 F.3d 865, 873 (2d Cir.1995). Defendants argue that *Iqbal's* discussion of supervisory liability took a narrower approach than did *Colon,* therefore rendering D'Olimpio's reliance on some of the *Colon* categories unwarranted.

By way of background, the plaintiff in *Iqbal* brought a " *Bivens* " action against several high-ranking federal officials, including the Attorney General and the Director of the Federal Bureau of Investigation, based on allegations that following the September 11 attacks, the FBI "arrested and detained thousands of Arab and Muslim men" substantially on the basis of their race, religion, or national origin, and that as a result plaintiff was unlawfully

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

718 F.Supp.2d 340

(Cite as: 718 F.Supp.2d 340)

subjected to harsh confinement conditions substantially on these discriminatory bases. 129 S.Ct. at 1951. The Supreme Court, however, held, *inter alia,* that the complaint failed to state a claim for intentional discrimination with respect to the Attorney General and FBI Director, and, as part of that discussion, observed that neither *Bivens* itself (*i.e., Bivens v. Six Unknown Fed. Narcotics Agents,* 403 U.S. 388, 91 S.Ct. 1999, 29 L.Ed.2d 619 (1971)) nor § 1983 imposes supervisory liability simply on the basis of *respondeat superior;* rather, "a plaintiff must plead that each Government-official defendant, through the official's own individual actions, has violated the Constitution." *Id.* at 1948; *see also id.* at 1949 ("[T]he term 'supervisory liability' is a misnomer.... [E]ach Government official ... is only liable for his or her own misconduct."). The Court went on to note that the required showing of personal involvement "will vary with the **\*347** constitutional provision at issue"; as the plaintiff's claim in *Iqbal* was for "invidious discrimination" in violation of the First Amendment and Equal Protection Clause, "the plaintiff must plead and prove that the defendant acted with discriminatory purpose." *Id.* at 1948. Accordingly, the Court rejected the plaintiff's theory that "a supervisor's mere knowledge of his subordinate's discriminatory purpose amounts to the supervisor's violating the Constitution." *Id.* at 1949.

[1] The defendants here note that certain courts in this District have read these passages of *Iqbal* to mean that "[o]nly the first and part of the third *Colon* categories pass *Iqbal's* muster ... [t]he other *Colon* categories impose the exact types of supervisory liability that *Iqbal* eliminated." *Bellamy v. Mount Vernon Hosp.,* 2009 WL 1835939, at \*6 (S.D.N.Y. June 26, 2009); *see also Newton v. City of N.Y.,* 640 F.Supp.2d 426, 448 (S.D.N.Y.2009) ("[P]assive failure to train claims impose the under the Supreme Court's recent decision in *Ashcroft v. Iqbal.*"); *Joseph v. Fischer,* 2009 WL 3321011, at \*15 (S.D.N.Y. Oct. 8, 2009) ("Plaintiff's claim, based on [defendant's] 'failure to take corrective measures,' is precisely the type of claim Iqbal eliminated."). This Court respectfully disagrees. As *Iqbal* noted, the degree of personal involvement varies depending on the

constitutional provision at issue; whereas invidious discrimination claims require a showing of discriminatory purpose, there is no analogous requirement applicable to D'Olimpio's allegations regarding his search, arrest, and prosecution. *See, e.g., Whren v. United States,* 517 U.S. 806, 813, 116 S.Ct. 1769, 135 L.Ed.2d 89 (1996) ("Subjective intentions play no role in ordinary, probable-cause Fourth Amendment analysis."). *Colon's* bases for liability are not founded on a theory of *respondeat superior,* but rather on a recognition that "personal involvement of defendants in alleged constitutional deprivations" can be shown by nonfeasance as well as misfeasance. 58 F.3d at 873 (internal quotation marks omitted). Thus, the five *Colon* categories for personal liability of supervisors may still apply as long as they are consistent with the requirements applicable to the particular constitutional provision alleged to have been violated. *See, e.g., Sash v. United States,* 674 F.Supp.2d 531, 544 (S.D.N.Y.2009) ("It was with intent-based constitutional claims in mind, specifically racial discrimination, that the Supreme Court rejected the argument that 'a supervisor's mere knowledge of his subordinate's discriminatory purpose amounts to the supervisor's violating the Constitution.' Where the constitutional claim does not require a showing of discriminatory intent, but instead relies on the unreasonable conduct or deliberate indifference standards of the Fourth and Eighth Amendments, the personal involvement analysis set forth in *Colon v. Coughlin* may still apply." (citation omitted)).

[2] Apart from this argument based on *Iqbal,* Giglio and Moffett assert that D'Olimpio's claims against them should be dismissed insofar as they allege a failure to supervise the MARO investigators. They maintain that D'Olimpio's allegations in this regard are too conclusory to state a claim. The Court disagrees. The FAC incorporates by reference the Fisch Report, which summarizes an investigation beginning in March 2007, describes various acts of misconduct by Crisafi that took place prior to D'Olimpio's arrest, contains a section headed "Lack of Supervision of Crisafi and MARO," and indeed concludes that there was a "lack of appropriate supervision by [Crisafi's] supervisors at MARO and at

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

718 F.Supp.2d 340

(Cite as: 718 F.Supp.2d 340)

BNE's headquarters in Troy," where Giglio and Moffett were in charge. Fisch Report, 12/8/08, at 4, 16-17, *available at http:// www. ig. state. ny. us/ *348 pd fs/Investigationöf% 20Employee% 20Misconduct% 20at% 20the% 20DOH% 20Bureau% 20of% 20Narcotics% 20Enforcement.pdf* (cited in FAC ¶ 78). These findings by the Inspector General strongly suggest that defendants Giglio and Moffett "fail[ed] to act on information indicating unconstitutional acts were occurring," or were "gross[ly] negligen[t] in failing to supervise ... subordinates who commit ... wrongful acts," or were otherwise deliberately indifferent to suspects' rights, and also demonstrate "an affirmative causal link between the supervisor's inaction and [plaintiff's] injury." *Poe v. Leonard,* 282 F.3d 123, 140 (2d Cir.2002). For the foregoing reasons, the March 1 Order held that the claims against Giglio and Moffett in this respect cannot be dismissed.

Nadel also argued that the claims against him for his failure to supervise Crisafi must be dismissed because there were no specific allegations of Nadel's personal involvement. The FAC does allege, however, that Kaplan complained to Nadel in writing of Crisafi's misconduct prior to D'Olimpio's arrest. FAC ¶ 15. The Fisch Report, although it does not dwell on Nadel's actions, cites Nadel's lack of prior law enforcement experience and describes complaints by MARO investigators that the lack of a Program Director with law enforcement experience allowed Crisafi "to attain an inappropriate degree of power within the office." Fisch Report at 1, 16. Because the Court, in ruling on a motion to dismiss, must "take all facts and draw all inferences in the light most favorable" to the plaintiff, *Gross v. Rell,* 585 F.3d 72, 75 n. 1 (2d Cir.2009), and because, as noted, the FAC incorporates by reference the allegations of the Fisch Report, the Fisch Report's conclusion that there was a general failure to supervise Crisafi must be taken for these purposes to apply to Nadel, Crisafi's immediate supervisor.[FN5] Thus, the March 1 Order denied the motion to dismiss the claim alleging Nadel's failure to supervise.

FN5. Defendants' reply memorandum asserted that contrary to what was pleaded in the FAC, Crisafi was a Senior Investigator at the time of D'Olimpio's arrest and thus did not report to Nadel at that time. In support of this, it cited to the Fisch Report, which mentions that Crisafi was temporarily promoted between 2006 and March 2008. Fisch Report at 12. The Report does not, however, state that Crisafi ceased reporting to Nadel during this period. The FAC alleges that Nadel, as MARO Program Director, had supervisory authority over all MARO investigators. FAC ¶ 7. In light of the allegations in the FAC, and taking all inferences in favor of D'Olimpio, the Court cannot conclude that Nadel lacked supervisory authority over Crisafi during this period. In any event, it is undisputed that Nadel supervised Vallely and D'Amicantonio, who are also alleged to have violated D'Olimpio's constitutional rights.

With respect to those aspects of plaintiff D'Olimpio's second cause of action that relate to the alleged "Policy," that Policy allegedly permitted BNE investigators to rely on unverified telephone communications with, or faxed affidavits from, doctors' offices to satisfy the requirement of probable cause to arrest suspects or initiate criminal charges. While defendants appear to concede that Giglio, Moffett, and Nadel were sufficiently involved with the formation and operation of this Policy to satisfy the personal involvement requirement of § 1983, they argue that the alleged Policy is not unconstitutional, or at the very least, that the doctrine of qualified immunity should bar further proceedings with respect to these allegations.

[3][4] "In general, probable cause to arrest exists when the officers have knowledge or reasonably trustworthy information of facts and circumstances that are sufficient to warrant a person of reasonable caution in the belief that the person to be arrested has committed or is **349 committing a crime." *Weyant v. Okst,* 101 F.3d 845, 852 (2d Cir.1996). The probable cause determination is

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

718 F.Supp.2d 340

(Cite as: 718 F.Supp.2d 340)

based on the "totality of the circumstances," and does not readily lend itself to being reduced to a "neat set of legal rules." *Caldarola v. Calabrese,* 298 F.3d 156, 162 (2d Cir.2002) (internal quotation marks omitted). Furthermore, "in the context of a qualified immunity defense to an allegation of false arrest, the defending officer need only show 'arguable' probable cause." *Id.* (internal quotation mark omitted). The Supreme Court has held that tips from informants can provide probable cause to arrest, but only if either the informant or the information in his/her tips has been shown to be reliable or has been sufficiently corroborated. *See Illinois v. Gates,* 462 U.S. 213, 242, 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983) ("[E]ven in making a warrantless arrest[,] an officer 'may rely upon information received through an informant, rather than upon his direct observations, *so long as the informant's statement is reasonably corroborated by other matters within the officer's knowledge.*' " (emphasis added)); *Florida v. J.L.,* 529 U.S. 266, 120 S.Ct. 1375, 146 L.Ed.2d 254 (2000) (anonymous call to police reporting that person was carrying a gun lacked indicia of reliability sufficient to satisfy "reasonable suspicion" standard with respect to a police officer's stop-and-frisk search, even though that standard requires a lesser showing than probable cause to arrest); *see also United States v. Elmore,* 482 F.3d 172, 179 (2d Cir.2007) ("Even a tip from a completely anonymous informant-though it will seldom demonstrate basis of knowledge and the veracity of an anonymous informant is largely unknowable-can form the basis of reasonable suspicion or probable cause *if it is sufficiently corroborated.*" (emphasis added) (citation omitted)); *Oliveira v. Mayer,* 23 F.3d 642, 647 (2d Cir.1994) ("Information about criminal activity provided by a single complainant can establish probable cause *when that information is sufficiently reliable and corroborated.*" (emphasis added)).

[5] Defendants argue that the Policy provides BNE officers with probable cause (either on the merits or sufficient to entitle them to qualified immunity) because the information provided by the doctors' offices is sufficiently reliable to support a reasonable belief that a crime has been committed. For this proposition, the defendants rely primarily on two out-of-circuit cases,

*United States v. Fooladi,* 703 F.2d 180 (5th Cir.1983), and *Edwards v. Cabrera,* 58 F.3d 290 (7th Cir.1995). While these cases do support the proposition that it may be error to discount information provided by disinterested informants absent reason to doubt these informants' veracity, even when their names are not known to the law enforcement officer, these cases do not stand for the proposition that such information alone suffices to establish probable cause. Rather, in *Fooladi,* the probable cause determination was not based solely on information provided by a representative of a glass manufacturer, which the Fifth Circuit held that the trial court had erroneously disregarded. Instead, the arrest was based not only on the employee's tip that the manufacturer had shipped glassware to a purported business address that was in fact the arrestee's personal address, but also on, among other things, the law enforcement agent's personal observation that the arrestee's residence emanated an odor characteristic of methamphetamine manufacturing and that the arrestee left the premises "holding his gloved hands away from his body as if a chemical were on them." 703 F.2d at 181-84. Similarly, in *Edwards,* the Seventh Circuit found that probable cause existed not just because of a tip from a bus **350** driver, relayed through a dispatcher, that the driver thought he saw several men participate in a drug transaction in a bus station, but also based on the police officer's own personal observations of several men, including the arrestee and his brother, who matched the driver's description standing together outside the bus station; the officer's personal observation that the arrestee's brother was so nervous that he appeared to have urinated on himself; and the officer's subsequent consent search of the brother's garment bag, which yielded a plastic bag appearing to contain marijuana. 58 F.3d at 292.

These cases are thus consistent with the law in this Circuit, as articulated in *Caldarola v. Calabrese,* 298 F.3d 156 (2d Cir.2002). The plaintiff in *Caldarola,* a New York corrections officer challenged his arrest on charges that he was unlawfully collecting job injury benefits even though he was no longer a New York resident and thus was not qualified to receive such benefits. The arresting officer determined there was probable cause to believe the plaintiff had moved from New York to Connecticut based

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

718 F.Supp.2d 340

(Cite as: 718 F.Supp.2d 340)

on an investigative file containing reports from two private investigation firms that had been hired by the officer's supervisors. The reports themselves contained, among other things, summaries of investigators' personal interviews with the plaintiff's New York neighbors, surveillance tapes showing the plaintiff emerging from a home in Connecticut and dropping his children off at school, a deed and mortgage for a Connecticut home in the plaintiff's name indicating that it was his primary residence, and work attendance records indicating that the plaintiff had a Connecticut telephone number. The Second Circuit held that it was reasonable for the arresting officer to conclude that these private investigative firms hired by his supervisors were reliable and that the investigators' reports provided information corroborating their conclusions. *Id.* at 163-68. Thus, accepting *arguendo* defendants' assertion that *Caldarola* stands for the proposition that information gathered by private investigators can support probable cause even in the absence of personal knowledge by the arresting officer, the decision certainly does not suggest that an unadorned, unverified phone call or fax can, by itself, without further meaningful corroboration, satisfy probable cause or support qualified immunity.

[6] Returning to the allegations in the FAC, D'Olimpio has asserted that, consistent with the Policy, his arrest was predicated on nothing more than his pharmacy's report that it had failed to receive a hard copy of the prescription within a week, which prompted a MARO official to call D'Olimpio's doctor's office and speak with an unknown person there, who either stated that he was not aware of any such prescription or effectuated the fax transmission of an affidavit bearing an unverified signature of the doctor. None of the above-cited cases suggests that this information originating from an unidentifiable person in a doctor's office can even come close to satisfying probable cause to arrest, absent corroboration or other indicia of reliability. Unlike *Caldarola,* here there is no underlying data providing support for the informant's conclusion. There is no indication that the identity of the informant here could ever be determined. *Cf. J.L.,* 529 U.S. at 270, 120 S.Ct. 1375 ("Unlike a tip from a known informant whose

reputation can be assessed and who can be held responsible if her allegations turn out to be fabricated, 'an anonymous tip alone seldom demonstrates the informant's basis of knowledge or veracity.' " (citation omitted)). There is no suggestion that the MARO investigators had any reason to rely on this particular doctor's office; to the contrary, there are numerous **351** reasons why a doctor or her staff might inadvertently provide inaccurate information, especially given that the relevant information is not affirmatively provided by a tipper, but rather can be elicited by the investigator from whoever happens to pick up the phone in the doctor's office. Moreover, if the doctor herself were involved in wrongdoing with respect to the prescription of narcotics, she would have an incentive to affirmatively mislead the investigators. In sum, while a report from a doctor or her staff denying knowledge of the prescription might be a reasonable basis for further investigation, it is patently deficient as the sole ground for an arrest.

For the foregoing reasons, under the facts alleged and the clearly established law cited herein, defendants lacked even arguable probable cause to arrest D'Olimpio. Because the circumstances of this arrest were consistent with the Policy (as alleged), and because defendants do not dispute that Giglio, Moffett, and Nadel had personal involvement with the establishment and enforcement of this Policy, the March 1 Order declined to dismiss the second cause of action with respect to these allegations.

The Court turns next to those portions of the FAC that assert claims by plaintiff Kaplan, all of which the defendants moved to dismiss. Kaplan's claim of retaliation for expressing his First Amendment rights (the sixth cause of action in the FAC) is based on the following allegations: Kaplan (as noted) is a MARO investigator. FAC ¶ 3. During at least some of the times covered by the FAC, Crisafi was Kaplan's supervisor. *Id.* ¶ 64. As described above, Kaplan complained to Nadel about Crisafi prior to November 16, 2007, but Nadel took no action. *Id.* ¶¶ 15-16. On or about November 17, 2007, Kaplan again went to Nadel and raised concerns about

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

718 F.Supp.2d 340

(Cite as: 718 F.Supp.2d 340)

Crisafi: in particular, he stated that Crisafi took prescription narcotics while on duty; that Crisafi would experience facial tics and "zone out"; that Crisafi accidentally discharged his weapon while on duty; that Crisafi lied about his previous job experience; that Crisafi had investigators perform "ill-conceived" and dangerous arrests and searches; that Crisafi was violating suspects' *Miranda* rights; that Crisafi, without authorization, put sirens and lights on his car; and that Crisafi was working outside jobs during work hours. *Id.* ¶ 63. Despite the fact that Kaplan told Nadel that he was afraid of Crisafi and Nadel assured Kaplan that the conversation would be kept confidential, Nadel reported this conversation to Crisafi. *Id.* ¶¶ 63-64. Thereafter, on or about November 20, 2007, Crisafi threatened Kaplan by walking up behind him and saying, "Bang bang, you're dead." *Id.* ¶ 65. At around that same time, Kaplan filed a Workplace Incident Report with the Department of Health's Bureau of Employee Relations detailing these threats and reporting Crisafi's other misconduct, of which he had previously complained to Nadel. *Id.* ¶ 66. In response, Crisafi sabotaged Kaplan's work product on several occasions and began to spread rumors about him, including rumors that Kaplan appeared tired and slept while at the office. *Id.* ¶¶ 67-68. Kaplan then called the Inspector General to report these concerns about Crisafi, and the Inspector General then widened his ongoing investigation of Crisafi to address these issues. *Id.* ¶¶ 69-70. Because, however, the Inspector General's investigation led to interviews with all the MARO inspectors except for Kaplan, Crisafi and Nadel were able to infer that Kaplan was the whistleblower. *Id.* ¶ 71.

Kaplan, after spraining his ankle while on duty, went on workers' compensation leave on or about February 27, 2008. *Id.* ¶ 72. A bullet was shot at Kaplan's house on April 17, 2008, and on April 25, 2008, his house was vandalized. *Id.* ¶¶ 73-74. **\*352** On August 12, 2008, after Kaplan was notified that Employee Relations never received his first Workplace Incident Report, Kaplan resubmitted it. *Id.* ¶ 75.

After publication of the Fisch Report, Giglio resigned

as the director of the BNE. *Id.* ¶ 81. In December 2008, defendant Jennifer Treacy was appointed Deputy Director of the New York State Department of Health, with supervisory authority over the BNE and the MARO. *Id.* ¶ 82. The Inspector General attempted to persuade Kaplan to return to work, as Crisafi was on leave and would face discipline for his conduct. *Id.* ¶ 83. Kaplan agreed to return to work and received a physician's evaluation that he was fit to return. *Id.* ¶¶ 84-86. Nonetheless, Kaplan was required to undergo three additional physical examinations; after reviewing these, the relevant administrator concluded that Kaplan was fit to return, provided the he be closely monitored, specifically for falling asleep at work. *Id.* ¶¶ 87-90. He was scheduled to return to work on April 10, 2009. *Id.* ¶ 91. The FAC alleges that Treacy, who was romantically involved with Giglio, was upset about Giglio's resignation and blamed Kaplan for causing it; therefore, she ordered the acting director of the BNE not to allow Kaplan to return. *Id.* ¶¶ 92-93. On April 9, 2009, Kaplan was told not to return because of a lack of staff, and on April 23, the Department of Health sent him a letter informing him that he was terminated for failing to complete a study to confirm he did not have a sleep disorder. *Id.* ¶¶ 94-95. Kaplan filed a grievance and, after a hearing, was allowed to return to work. *Id.* ¶ 96.

In May 2009, defendant Kenneth Post was appointed as director of the BNE, and defendant Timothy Dewey was appointed as BNE Section Chief. *Id.* ¶¶ 97-98. In June 2009, Kaplan returned to work, and was informed that he would only be given a temporary assignment and would not perform fieldwork. *Id.* ¶ 99. After his reinstatement, Kaplan was denied access to a state car and was not given a badge, gun, or firearms training; he was confined to desk duties and menial document review. *Id.* ¶¶ 100-101. On July 14, 2009, Kaplan met with Dewey to complain about his treatment. *Id.* ¶ 102. D'Olimpio filed his original complaint in the instant action on August 18, 2009. In September 2009, Stephanie Jubic of Employee Relations confiscated the computers of Crisafi, Vallely, D'Amicantonio, and Kaplan-Kaplan believes Jubic downloaded his emails to find grounds to terminate him. *Id.* ¶ 105. On October 8, 2009, Kaplan was placed on

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

718 F.Supp.2d 340

(Cite as: 718 F.Supp.2d 340)

administrative leave and told not to contact anyone at the BNE. *Id.* ¶ 108. On October 16, Jubic mailed Kaplan a letter stating that he would be interrogated on October 27 and would possibly face discipline. *Id.* ¶ 109. Also on October 16, Kaplan had a grievance hearing to discuss being denied his proper job responsibilities. At this hearing, Post stated that as BNE director, it was in his discretion to decide what duties Kaplan should have. *Id.* ¶ 110.

Based on these facts, Kaplan alleges in that defendants Treacy, Post, Dewey, and Nadel retaliated against him with respect to speech that was protected by the First Amendment. These defendants have moved to dismiss Kaplan's claim on several grounds, including that Kaplan's speech was made pursuant to his official duties and hence is not protected by the First Amendment.

[7] A public employee's cause of action for his employer's discipline based on his speech can proceed only if the employee "spoke as a citizen on a matter of public concern"; otherwise, the employee's speech is outside the scope of the First Amendment. *Sousa v. Roque,* 578 F.3d 164, 170 (2d Cir.2009) (internal quotation *353 mark omitted). In *Garcetti v. Ceballos,* 547 U.S. 410, 126 S.Ct. 1951, 164 L.Ed.2d 689 (2006), the Supreme Court held that "when public employees make statements pursuant to their official duties, the employees are not speaking as citizens for First Amendment purposes, and the Constitution does not insulate their communications from employer discipline." *Id.* at 421, 126 S.Ct. 1951. Though not without reluctance, the Court concludes that this "official duties" exception, as recently elaborated on by the Second Circuit in *Weintraub v. Board of Education,* 593 F.3d 196 (2d Cir.2010), is fatal to Kaplan's retaliation claim.

*Weintraub* made clear that for purposes of determining whether a public employee's speech is protected, a public employee's "official duties" are to be

construed broadly. The plaintiff in *Weintraub* was a public school teacher, and the allegedly protected speech consisted of a grievance he filed with his union challenging a school administrator's decision not to discipline a disruptive student. Quoting *Garcetti,* the Court of Appeals stated that the inquiry into whether a public employee speaks pursuant his official duties is "a practical one," and that the employee's duties should not be interpreted narrowly. 593 F.3d at 202 (internal quotation marks omitted). Thus, *Weintraub* held:

[U]nder the First Amendment, speech can be "pursuant to" a public employee's official job duties even though it is not required by, or included in, the employee's job description, or in response to a request by the employer. In particular, we conclude that Weintraub's grievance was "pursuant to" his official duties because it was "part-and-parcel of his concerns" about his ability to "properly execute his duties," as a public school teacher-namely, to maintain classroom discipline, which is an indispensable prerequisite to effective teaching and classroom learning.... Weintraub's speech challenging the school administration's decision to not discipline a student in his class was a "means to fulfill," and "undertaken in the course of performing," his primary employment responsibility of teaching.

*Id.* at 203 (citations omitted). The court went on to note that its conclusion was supported "by the fact that [Weintraub's] speech ultimately took the form of an employee grievance, for which there is no relevant citizen analogue." *Id.* Whereas actions like writing a letter to a newspaper or informally discussing politics with co-workers are equally available to government employees and ordinary citizens, "[t]he lodging of a union grievance is not a form or channel of discourse available to non-employee citizens." *Id.* at 203-04.

[8] Here, the speech that Kaplan claims is protected falls within Kaplan's official duties as defined by

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

718 F.Supp.2d 340

(Cite as: 718 F.Supp.2d 340)

*Weintraub.* In the FAC, Kaplan alleges that the retaliation he allegedly suffered was in response to the following statements: (1) his complaints to Nadel about Crisafi's behavior; (2) his Workplace Incident Reports; and (3) his complaint to the Inspector General. With the possible exception of the latter, each of these statements, as Kaplan concedes, was "made privately though channels available through his employment, and was "made in a manner that would not be available to a non-public employee citizen." Kaplan Supp. Mem., 2/5/10, at 5. Moreover, the common theme of all these statements was that Crisafi was violating suspects' rights and was not performing his job properly, and by implication that Crisafi was interfering with Kaplan's ability to perform his own duties. It is clear that Kaplan's duties as a MARO officer included ensuring that investigations and arrests of narcotics abuses are lawfully conducted. *See, e.g.,* Fisch Report at 2-3 (describing policies and training manuals **354** applicable to BNE investigators). All of Kaplan's relevant speech was therefore, either directly or indirectly, " 'part-and-parcel of his concerns' about his ability to 'properly execute his duties' " as a BNE investigator. *Weintraub,* 593 F.3d at 203. Just as the speech in *Weintraub* was in furtherance of the teacher's duty to maintain classroom discipline, Kaplan's speech here, which related to ensuring the "safety of citizens" and the "constitutional rights of suspects," Kaplan Supp. Mem. at 5, was made in furtherance of his law enforcement duties as an investigator endowed with the power to arrest. *Cf. Carter v. Inc. Vill. of Ocean Beach,* 693 F.Supp.2d 203, 211 (E.D.N.Y.2010) ( "All of plaintiffs' complaints to their superiors ... related to their concerns about their ability to properly execute their duties as police officers, as they expressed concern [that various acts] affected their ability to perform their job assignments safely and that they were told not to issue summonses to certain individuals and businesses.... Plaintiffs' speech in challenging ... defendants' alleged cover-ups of officer misconduct ... was undertaken in the course of performing one of their core employment responsibilities of enforcing the law and, thus, was speech made pursuant to their official duties."). Accordingly, Kaplan's allegations cannot support a First Amendment retaliation claim.

In addition, the speech contained in Kaplan's Workplace Incident Reports and his complaint to the Inspector General were unprotected by the First Amendment because these statements were required by law. *See* N.Y. Labor Law § 27-b(6)(a) ("Any employee ... who believes that a serious violation of a workplace violence protection program exists or that an imminent danger exists shall bring such matter to the attention of a supervisor in the form of a written notice."); N.Y. Exec. Law § 55(1) ("Every state officer or employee in a covered agency shall report promptly to the state inspector general any information concerning corruption, fraud, criminal activity, conflicts of interest or abuse by another state officer or employee relating to his or her office or employment .... The knowing failure of any officer or employee to so report shall be cause for removal from office or employment or other appropriate penalty.").[FN6] Speech made pursuant to a public employee's legal obligations is not made "as a citizen."[FN7]

FN6. It is these statutory obligations, as well as *Weintraub's* broad definition of speech made in the course of official duties, that distinguish Kaplan's speech from that of the plaintiff in *Freitag v. Ayers,* 468 F.3d 528 (9th Cir.2006). The plaintiff in *Freitag,* a California correctional officer, claimed she was retaliated against after reporting to the California Inspector General that she and other prison guards were being sexually harassed. Although the Ninth Circuit held that the plaintiff "acted as a citizen" in complaining to the Inspector General and in writing letters to a state senator regarding this harassment, the court's holding was based on the fact that "[i]t was certainly not part of [plaintiff's] official tasks to complain to the Senator or the IG about the state's failure to perform its duties properly." *Id.* at 545. Under New York law, however, such complaints *are* within the official duties of BNE investigators.

FN7. Because Kaplan's speech was made

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

718 F.Supp.2d 340

(Cite as: 718 F.Supp.2d 340)

pursuant to his official duties and thus is not constitutionally protected, the Court need not reach other required elements of a First Amendment retaliation claim, including whether his speech addressed matters of "public concern," *see Sousa, 578 F.3d at 170,* and whether the complaint sufficiently alleges a causal connection between the protected speech and the retaliatory acts, *see Gorman-Bakos v. Cornell Coop. Extension of Schenectady County, 252 F.3d 545, 554 (2d Cir.2001).*

For the foregoing reasons, the March 1 Order denied the sixth cause of action in the FAC, and, as the Court now clarifies, the dismissal was with prejudice because it rests on a legal ground that cannot be **\*355** cured by repleading. *Cf. Oliver Schs., Inc. v. Foley,* 930 F.2d 248, 252-53 (2d Cir.1991). The Court notes, however, that the dismissal of Kaplan's First Amendment claim brought pursuant to § 1983 does not alter Kaplan's opportunity under applicable New York law to seek protection from the retaliatory acts he alleges. *See* N.Y. Labor Law § 27-b(6)(e) (prohibiting retaliation based on an employee's filing of a report of workplace violence); N.Y. Exec. Law § 55(1) (providing that employees who report "improper governmental action" to the Inspector General "shall not be subject to dismissal, discipline or other adverse personnel action").

[9] The Court comes finally to Crisafi's counterclaim for defamation, which insinuates that the aforementioned Workplace Incident Reports filed by Kaplan, Kaplan's complaint to the Inspector General, and even Kaplan's allegations in the FAC are defamatory. Crisafi subsequently conceded, however, that the only potentially actionable statements not protected by privilege or barred by the statute of limitations are those that were allegedly republished on December 8, 2008 by the Inspector General and the *New York Times.* Crisafi Mem. Opp. Kaplan's Mot. to Dismiss, 2/5/10, at 4-5. In this respect, the counterclaim, which was filed on December 3, 2009, alleges the following: Kaplan filed Workplace Incident Reports on or about November 20, 2007 and August 12,

2008 reporting various misconduct by Crisafi, and made a complaint to the Inspector General to the same effect on or about November 20, 2007. Crisafi Compl. ¶¶ 15, 17, 20, Exs. C-E. Crisafi alleges, based on information and belief, that Kaplan's report to the Inspector General "prompted an investigation" focused on Crisafi and relating to Kaplan's complaints. *Id.* ¶ 19. Also upon information and belief, Crisafi alleges that a copy of the Fisch Report was provided to Kaplan in advance of its public release. *Id.* ¶ 35. This report was also provided to the *New York Times,* which described this report in an article published on December 8, 2008. *Id.* ¶ 36 & Ex. F. Upon information and belief, Crisafi alleges that Kaplan gave the Fisch Report to the *New York Times. Id.* ¶ 37. The Fisch Report was published on the *New York Times's* and Inspector General's websites, where it remains accessible. *Id.* ¶¶ 39-40. Crisafi alleges that the contents of the *New York Times* article and the Fisch Report reflect false and defamatory statements made by Kaplan, and have caused Crisafi to be vilified and his reputation to suffer. *Id.* ¶¶ 16, 18, 21, 23-33, 41-43. Accordingly, Crisafi asserted two causes of action alleging that Kaplan defamed him. Kaplan then moved to dismiss these counterclaims on the basis that Kaplan is not responsible for the republication of his allegedly defamatory statements by the *New York Times* or the Inspector General.

[10] Under New York law, a plaintiff "may not recover damages from the original author for ... slander arising from the republication of defamatory statements by a third party absent a showing that the original author was responsible for or ratified the republication." *Fashion Boutique of Short Hills, Inc. v. Fendi USA, Inc.,* 314 F.3d 48, 59 (2d Cir.2002). Crisafi argues that a more lenient standard applies, permitting liability based on Kaplan's mere knowledge or reasonable expectation that his allegedly defamatory statements would be republished. *See, e.g., Campo v. Paar,* 18 A.D.2d 364, 368, 239 N.Y.S.2d 494 (1st Dept.1963). The Court need not resolve which standard applies: Crisafi's counterclaim is deficient under either test because it fails to "state a claim to relief that is plausible on its face." *Iqbal,* 129 S.Ct. at 1949 (internal quotation marks omitted).

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

718 F.Supp.2d 340

(Cite as: 718 F.Supp.2d 340)

Even accepting as true Crisafi's non-conclusory factual allegations, including **356** those made only on information and belief, it is simply implausible that Kaplan in any legally relevant sense caused the republication of his statements in the Fisch Report or *New York Times* article. Crisafi alleges that Kaplan's complaint prompted the Inspector General investigation, but this allegation is contradicted by the Fisch Report itself, which indicates that the investigation began after the *New York Times* published an article in March 22, 2007 describing abuses of government-issued parking placards. Fisch Report at 3-4. In any event, even if Kaplan's complaint served to expand the scope the investigation, and included allegations consistent with what the Fisch Report eventually concluded, the Report clearly did more than merely parrot Kaplan's charges. The Report, in a section headed "Methodology," states that the investigation was based on, among other things, interviews with Crisafi himself, other BNE employees, Giglio, and Moffett, as well as other police officers and district attorneys who had interacted with Crisafi. *Id.* at 4. Indeed, the Inspector General is required by statute to "investigate," not merely repeat, allegations of malfeasance. N.Y. Exec. Law § 53. And even if, as alleged, Kaplan acted to bring the Report to the attention of the *New York Times,* the *New York Times* article, which consists entirely of a summary of the Fisch Report, reflects Kaplan's allegations only to the extent that such charges were ratified by the Report itself. *See* Crisafi Compl., Ex. F.

For these reasons, the Court concluded that there is no basis for holding Kaplan liable for the republication of his allegedly defamatory statements, even if he intended that his allegations be republished in this manner and gave the *New York Times* a copy of the Fisch Report. "The rationale for making the originator of a defamatory statement liable for its foreseeable republication is the strong causal link between the actions of the originator and the damage caused by the republication." *Van-Go Transp. Co. v. N.Y. City Bd. of Educ.,* 971 F.Supp. 90, 102 (E.D.N.Y.1997) (internal quotation marks omitted). Here,

the duty of the Inspector General to investigate complaints prior to publishing a written report, the fact that the Fisch Report was based on numerous sources beyond Kaplan's allegations, and the fact that the *New York Times* article merely summarized the Fisch Report together sever any causal link that might exist between Kaplan's actions and the December 8, 2008 republications. Thus, the March 1 Order dismissed Crisafi's counterclaim with prejudice.[FN8]

FN8. This result is not inconsistent with *Campo v. Paar,* 18 A.D.2d 364, 368, 239 N.Y.S.2d 494 (1st Dept.1963), which declared that "[a]nyone giving a statement to a representative of a newspaper authorizing or intending its publication is responsible for any damage caused by the publication." This broad pronouncement was made in the context of a narrower holding that the defendant, Jack Paar, could be held responsible for the *New York Post's* publication of his statement, made by him to a reporter during an interview, that the plaintiff "lacked certain qualities which would fit him to be a performer desirable to [Paar's] program." *Id.* at 365, 239 N.Y.S.2d 494. The causal link between Kaplan's statements and the findings of the Fisch Report, which were subsequently summarized by the *New York Times,* is obviously much more attenuated than the relationship in *Campo* between Paar's statement to the newspaper reporter during an interview and the reporter's publication of that statement.

For the foregoing reasons, the Court hereby confirms its decisions to dismiss the sixth cause of action (*i.e.,* all of Kaplan's claims) and to dismiss both of Crisafi's counterclaims, all with prejudice, and to otherwise deny the motions to dismiss. The Clerk of the Court is directed to close **357** the entries numbered 33, 34, 35, 42, and 47 on the docket of case number 09 Civ. 7283 and to close case number 09 Civ. 9952.

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

718 F.Supp.2d 340

(Cite as: 718 F.Supp.2d 340)

S.D.N.Y.,2010.

D'Olimpio v. Crisafi

718 F.Supp.2d 340

END OF DOCUMENT

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.



Page 1

--- F.Supp.2d ----, 2010 WL 3156031 (S.D.N.Y.)

(Cite as: 2010 WL 3156031 (S.D.N.Y.))

**c**

Only the Westlaw citation is currently available.

United States District Court,

S.D. New York.

Gultela QASEM, Plaintiff,

v.

Luis A. TORO; Superintendent of Taconic Correctional Facility Delores Thornton; Deputy Superintendent for Security William Rogers; John Does 1-10, Defendants.

No. 09 Civ. 8361(SHS).

Aug. 10, 2010.

**Background:** Inmate brought a § 1983 suit against corrections officials regarding injuries suffered by the inmate at the hands of a corrections officer alleged to have sexually assaulted the inmate. Superintendent and deputy superintendent for security moved to dismiss claims that they were deliberately indifferent to the inmate's personal safety.

**Holdings:** The District Court, Sidney H. Stein, J., held that:

(1) inmate stated a claim against the movants for Eighth and Fourteenth Amendment violations, and

(2) movants were not entitled to qualified immunity.

Motion denied.

West Headnotes

**[1] Civil Rights 78 🔑 1358**

78 Civil Rights

 78III Federal Remedies in General

  78k1353 Liability of Public Officials

   78k1358 k. Criminal Law Enforcement; Prisons. Most Cited Cases

**Constitutional Law 92 🔑 4825**

92 Constitutional Law

 92XXVII Due Process

  92XXVII(H) Criminal Law

   92XXVII(H)11 Imprisonment and Incidents Thereof

    92k4825 k. Use of Force; Protection from Violence. Most Cited Cases

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

--- F.Supp.2d ----, 2010 WL 3156031 (S.D.N.Y.)

(Cite as: 2010 WL 3156031 (S.D.N.Y.))

**Prisons 310**  ☞  **234**

310 Prisons

    310II Prisoners and Inmates

        310II(E) Place or Mode of Confinement

            310k234 k. Duty to Protect; Protective Confinement. Most Cited Cases

**Sentencing and Punishment 350H**  ☞  **1537**

350H Sentencing and Punishment

    350HVII Cruel and Unusual Punishment in General

        350HVII(H) Conditions of Confinement

            350Hk1537 k. Protection from Violence. Most Cited Cases

Inmate's allegations against superintendent and deputy superintendent for security in a § 1983 suit, claiming that they were deliberately indifferent to her rights and were responsible for creating or maintaining policies or practices that failed to prevent her from being repeatedly raped and assaulted by a corrections officer, stated a claim for Eighth and Fourteenth Amendment violations; complaint alleged that the officials were responsible for determining where inmates were to be housed and the assignment of guards, and in conjunction with another official, the investigation and response to complaints of staff misconduct. U.S.C.A. Const.Amends. 8, 14; 42 U.S.C.A. § 1983.

**[2] Civil Rights 78**  ☞  **1335**

78 Civil Rights

    78III Federal Remedies in General

        78k1334 Persons Liable in General

            78k1335 k. In General. Most Cited Cases

Degree of personal involvement required to overcome a motion to dismiss a § 1983 claim for failure to state a claim varies depending on the constitutional provision alleged to have been violated. 42 U.S.C.A. § 1983; Fed.Rules Civ.Proc.Rule 12(b)(6), 28 U.S.C.A.

**[3] Civil Rights 78**  ☞  **1355**

78 Civil Rights

    78III Federal Remedies in General

        78k1353 Liability of Public Officials

            78k1355 k. Vicarious Liability and Respondeat Superior in General; Supervisory Liability in General. Most Cited Cases

Categories set forth in case law as supporting personal liability of supervisors under § 1983 apply as long as they are consistent the requirements applicable to the particular constitutional provision alleged to have been violated. 42 U.S.C.A. § 1983.

**[4] Sentencing and Punishment 350H**  ☞  **1532**

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

--- F.Supp.2d ----, 2010 WL 3156031 (S.D.N.Y.)

(Cite as: 2010 WL 3156031 (S.D.N.Y.))

350H Sentencing and Punishment

   350HVII Cruel and Unusual Punishment in General

     350HVII(H) Conditions of Confinement

       350Hk1532 k. In General. Most Cited Cases

Eighth Amendment requires prison officials to take reasonable measures to guarantee the safety of inmates in their custody. U.S.C.A. Const.Amend. 8.

**[5] Sentencing and Punishment 350H ☞ 1533**

350H Sentencing and Punishment

   350HVII Cruel and Unusual Punishment in General

     350HVII(H) Conditions of Confinement

       350Hk1533 k. Deliberate Indifference in General. Most Cited Cases

Official acts with the requisite deliberate indifference for an Eighth Amendment violation when that official knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference. U.S.C.A. Const.Amend. 8.

**[6] Civil Rights 78 ☞ 1376(7)**

78 Civil Rights

   78III Federal Remedies in General

     78k1372 Privilege or Immunity; Good Faith and Probable Cause

      78k1376 Government Agencies and Officers

       78k1376(7) k. Prisons, Jails, and Their Officers; Parole and Probation Officers. Most Cited Cases

Superintendent and deputy superintendent for security were not entitled to qualified immunity in an inmate's § 1983 suit claiming that they were deliberately indifferent to her rights and were responsible for creating or maintaining policies or practices that failed to prevent her from being repeatedly raped and assaulted by a corrections officer, given the extent of the alleged sexual abuse, the numerous warning signs alleged, and the number of questionable, if not unintelligible, decisions made with respect to the inmate during the course of an investigation. 42 U.S.C.A. § 1983.

**[7] Civil Rights 78 ☞ 1376(2)**

78 Civil Rights

   78III Federal Remedies in General

     78k1372 Privilege or Immunity; Good Faith and Probable Cause

      78k1376 Government Agencies and Officers

       78k1376(2) k. Good Faith and Reasonableness; Knowledge and Clarity of Law; Motive and Intent, in General. Most Cited Cases

Individual defendants are shielded from liability for civil damages under § 1983 if their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known. 42 U.S.C.A. § 1983.

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

--- F.Supp.2d ----, 2010 WL 3156031 (S.D.N.Y.)

(Cite as: 2010 WL 3156031 (S.D.N.Y.))

Karen K. Won, Cooley Godward Kronish LLP, William O'Brien, Kronish, Lieb, Weiner & Hellman L.L.P., New York, NY, for Plaintiff.

Thomas Patrick McCloskey, Aliazzo, McCloskey & Gonzalez, LLP, Ozone Park, NY, Julia Hyun-Joo Lee, New York State Department of Law, New York, NY, for Defendants.

OPINION & ORDER

SIDNEY H. STEIN, District Judge.

**\*1** Plaintiff Gultela Qasem brings this action pursuant to 42 U.S.C. § 1983 against defendants Luis Toro, Delores Thornton, William Rogers, and John Does 1-10 in their individual capacities. The lawsuit arises from injuries allegedly suffered by Qasem at the hands of Corrections Officer Luis Toro while Qasem was an inmate under the custody of the New York State Department of Correctional Services ("DOCS") at Taconic Correctional Facility. The complaint alleges that defendants deprived Qasem of her constitutional rights through (1) direct and repeated acts of sexual assault by Toro; (2) Thornton and Rogers's deliberate indifference to her personal safety; and (3) Thornton and Rogers's maintenance of, or failure to remedy, policies and practices that created an unreasonable risk of sexual assault by Toro. Defendants Thornton and Rogers have now moved to dismiss the complaint pursuant to Fed.R.Civ.P. 12(b)(6) for failure to state a claim for relief.

**I. BACKGROUND**

The following facts are taken from the complaint and presumed to be true for the purposes of this motion.

A. *Parties*

Plaintiff Gultela Qasem is currently an inmate at the Bedford Hills Correctional Facility. At the time of the acts alleged in the complaint, plaintiff was an inmate at the Taconic Correctional Facility. (Compl. ¶¶ 5, 21.) Defendant Toro-not a party to the present motion-is a DOCS Corrections Officer. At the time of the acts alleged in the complaint, defendant Delores Thornton was the Superintendent of Taconic and defendant Rogers was the Deputy Superintendent for Security of Taconic. (*Id.* ¶¶ 1, 8-9.)

B. *This Action*

Qasem alleges defendants violated her Eighth and Fourteenth Amendment rights under the United States Constitution as they arise out of a repeated pattern of sexual assault and rape committed against her by Toro.

While an inmate at Taconic, Qasem was assigned to work in Building 93 from approximately February 2007 to November 2007, and for most of that time, she also lived there. (*Id.* ¶¶ 21-22.) Qasem alleges that, on or around March 27, 2007, Toro entered her cell during the afternoon "count time" [FN1] and sexually assaulted her by fondling her breasts, vaginal area, and buttocks while also exposing his penis and forcing Qasem to perform oral sex on him. (*Id.* ¶ 23.) Plaintiff alleges that later that evening Toro ordered her to the officers' station where he raped her. (*Id.* ¶ 24.) Toro then told Qasem that he would write up a disciplinary action against her if she told anyone what he had done to her. (*Id.* ¶ 24.)

Qasem alleges that a pattern of sexual assault emerged over the next eight months. Toro allegedly assaulted and raped Qasem in her cell on numerous occasions during the night count time, in the officers' station, in the shower area, and in the recreation room. (*Id.* ¶¶ 25-26.) Throughout these eight months, Qasem alleges that Toro

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

--- F.Supp.2d ----, 2010 WL 3156031 (S.D.N.Y.)

(Cite as: 2010 WL 3156031 (S.D.N.Y.))

repeatedly threatened to kill her and her family if she reported his actions. As a result, she did not report Toro's conduct. (*Id.* ¶ 27.) Plaintiff alleges, however, that other corrections staff facilitated Toro's repeated sexual abuse by condoning Toro or plaintiff being in unauthorized areas and allowing Toro into plaintiff's housing area when he was not assigned there. (*Id.* ¶ 28.)

**\*2** Although Qasem did not file a report against Toro based on his conduct, others did, and on July 2, 2007, the DOCS Officer of Inspector General ("IG") commenced an investigation into Toro's actions. (*Id.* ¶¶ 31-33.) When interviewed by an IG representative, Qasem denied the allegations because of the prior threats that Toro had made; despite her denials, plaintiff was reassigned to a different building the day after her interview. (*Id.* ¶¶ 33-34.) As the IG continued its investigation, in August 2007 Qasem was transferred back to building 93, which was the building where Toro worked at that time. Plaintiff contends that by causing her to be transferred back to Toro's building, defendants Thornton and Rogers were deliberately indifferent to her safety and allowed Toro to have continued unfettered access to her, which enabled him to continue raping and sexually abusing her. (*Id.* ¶ 38.) Plaintiff alleges that once she returned to building 93 in August 2007, Toro resumed his sexual assaults, including but not limited to raping her and sodomizing her. (*Id.* ¶ 40.)

During this same time period, plaintiff was transferred in and out of the "keeplock" area in building 93. (*Id.* ¶¶ 39-47.) While she was in keeplock, at least one corrections officer delivered a message from Toro to her, while other corrections staff condoned and disregarded the alleged continuing assaults by Toro. (*Id.* ¶¶ 47-48.) In addition to physical, mental, and emotional injuries she suffered from the repeated rapes and sexual abuse, Qasem alleges that in October 2007 she was diagnosed with genital herpes, a sexually transmitted disease, which she believes was transmitted to her by Toro. (*Id.* ¶¶ 61-63.)

Plaintiff alleges that sometime in November 2007, Toro became aware of the IG investigation and started harassing her by asking her what questions the IG representative had asked her and what her responses were. (*Id.* ¶ 45.) Qasem contends that on November 26, 2007, after she was once again raped by Toro, she told him that she was going to report his conduct, and Toro became violent with her-twisting her arm and wrist. (*Id.* ¶ 50.) The next day, plaintiff was transferred out of Taconic and into Bedford. (*Id.* ¶ 51.)

Plaintiff alleges that Thornton and Rogers were deliberately indifferent to her safety and well-being and that despite ample evidence of the assaults, they permitted Toro to have repeated access to her instead of removing either her or Toro from building 93. (*Id.* ¶¶ 55-60.) Plaintiff maintains that Thornton and Rogers were responsible for the inadequate polices and practices that allowed her to be repeatedly raped and assaulted over a number of months, despite the fact that other corrections officers were aware of Toro's misconduct. (*Id.*)

## II. DISCUSSION

A. *Rule 12(b)(6) Standard*

On a motion to dismiss a claim for relief pursuant to Rule 12(b)(6) a court accepts the truth of the facts alleged in the complaint and draws all reasonable inferences in the plaintiff's favor. *Ashcroft v. Iqbal,* ---U.S. ----, 129 S.Ct. 1937, 1949, 173 L.Ed.2d 868 (2009); *Global Network Commc'ns, Inc. v. City of New York,* 458 F.3d 150, 154 (2d Cir.2006). A complaint will be dismissed if it fails to set forth "enough facts to state a claim for relief that is plausible on its face." *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 570, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

--- F.Supp.2d ----, 2010 WL 3156031 (S.D.N.Y.)

(Cite as: 2010 WL 3156031 (S.D.N.Y.))

alleged. The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Iqbal,* 129 S.Ct. at 1949 (quoting *Twombly,* 550 U.S. at 556, 127 S.Ct. 1955).

B. *Supervisory Liability Post-Iqbal*

**\*3** [1] The complaint alleges that defendants deprived Qasem of her constitutional rights through (1) the direct and repeated acts of sexual assault by Toro; (2) defendant Thornton and Rogers's deliberate indifference to her personal safety; and (3) Thornton and Rogers's maintenance of, or failure to remedy, policies and practices that created an unreasonable risk of sexual assault by Toro. Thornton and Rogers respond to the claims against them on several grounds.

First, they assert that Qasem's claims are based on a broad theory of "supervisory liability" that has been discredited by the U.S. Supreme Court in *Ashcroft v. Iqbal,* --- U.S. ----, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009). Prior to *Iqbal,* well-established Second Circuit law provided five bases for alleging that a supervisory defendant had sufficient personal involvement with the alleged violation to maintain a section 1983 claim. A plaintiff could plead personal involvement by showing any of the following five courses of conduct:

(1) the defendant participated directly in the alleged constitutional violation, the defendant, after being informed of the violation through a report or appeal, failed to remedy the wrong, (3) the defendant created a policy or custom under which unconstitutional practices occurred, or allowed the continuance of such a policy or custom, (4) the defendant was grossly negligent in supervising subordinates who committed the wrongful acts, or (5) the defendant exhibited deliberate indifference to the rights of inmates by failing to act on information indicating that unconstitutional acts were

occurring.

*Colon v. Coughlin,* 58 F.3d 865, 873 (2d Cir.1995); *Sanders v. N.Y. City Dep't of Corr.,* 07 Civ. 3390, 2009 WL 222161, at \*5, 2009 U.S. Dist. LEXIS 7709, at \*17-18 (S.D.N.Y. Jan. 30, 2009). Defendants contend that *Iqbal's* discussion of supervisory liability took a narrower approach than did *Colon,* thereby rendering Qasem's reliance on *Colon* categories unwarranted.

The Second Circuit has not yet addressed how *Iqbal* affects the five categories of conduct that give rise to supervisory liability under *Colon.* As explained in detail in *D'Olimpio v. Crisafi,* No. 09 Civ. 7283, ---F.Supp.2d ----, ---- - ----, 2010 WL 2428128, at \*4-6, 2010 U.S. Dist. LEXIS 59563, at \*14-18 (S.D.N.Y. June 15, 2010), in the wake of *Iqbal,* certain courts in this district have found that "[o]nly the first and part of the third *Colon* categories pass *Iqbal's* muster," and that "[t]he other *Colon* categories impose the exact types of supervisory liability that *Iqbal* eliminated," because only the first and third categories allege personal involvement sufficiently to permit supervisory liability to be imposed after *Iqbal. Bellamy v. Mount Vernon Hosp.,* No. 07 Civ. 1801, 2009 WL 1835939, at \*1-2, 2009 U.S. Dist. LEXIS 54141, at \*6 (S.D.N.Y. June 26, 2009); *see also Newton v. City of N.Y.,* 640 F.Supp.2d 426, 448 (S.D.N.Y.2009) ("[P]assive failure to train claims pursuant to section 1983 have not survived the Supreme Court's recent decision in *Ashcroft v. Iqbal.*"); *Joseph v. Fischer,* No. 08 Civ. 2824, 2009 WL 3321011, at \*15, 2009 U.S. Dist. LEXIS 96952, at \*42-43 (S.D.N.Y. Oct. 8, 2009) ("Plaintiff's claim, based on [defendant's] 'failure to take corrective measures,' is precisely the type of claim *Iqbal* eliminated."). This Court, as did the Court in *D'Olimpio,* disagrees with this narrow interpretation of *Iqbal.*

**\*4** [2] As *Iqbal* noted, the degree of personal involvement required to overcome a Rule 12(b)(6) motion varies depending on the constitutional provision alleged to

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

--- F.Supp.2d ----, 2010 WL 3156031 (S.D.N.Y.)

(Cite as: 2010 WL 3156031 (S.D.N.Y.))

have been violated. Invidious discrimination claims require a showing of discriminatory purpose, but there is no analogous requirement applicable to Qasem's allegations of repeated sexual assaults. *See Sash v. United States,* 674 F.Supp.2d 531, 544 (S.D.N.Y.2009) (citing *Chao v. Ballista,* 630 F.Supp.2d 170, 178 n. 2 (D.Mass.2009)); *see also D'Olimpio,* --- F.Supp.2d at ----, 2010 WL 2428128, at *5, 2010 U.S. Dist. LEXIS 59563, at *16. *Colon's* bases for liability are not founded on a theory of respondeat superior, but rather on a recognition that "personal involvement of defendants in alleged constitutional deprivations" can be shown by nonfeasance as well as misfeasance. *Id.* at ----, at *5, 2010 U.S. Dist. LEXIS 59563 at *17 (quoting *Colon,* 58 F.3d at 873).

[3] Thus, the five *Colon* categories supporting personal liability of supervisors still apply as long as they are consistent with the requirements applicable to the particular constitutional provision alleged to have been violated. *Id.*; *see also Sash v. United States,* 674 F.Supp.2d 531, 544 (S.D.N.Y.2009) ("It was with intent-based constitutional claims in mind, specifically racial discrimination, that the Supreme Court rejected the argument that 'a supervisor's mere knowledge of his subordinate's discriminatory purpose amounts to the supervisor's violating the Constitution.' Where the constitutional claim does not require a showing of discriminatory intent, but instead relies on the unreasonable conduct or deliberate indifference standards of the Fourth and Eighth Amendments, the personal involvement analysis set forth in *Colon v. Coughlin* may still apply." (citation omitted)).

Plaintiff's allegations and inferences, if proven, would entitle her to relief under the Fourteenth Amendment and Eighth Amendments. *See Breithaupt v. Abram,* 352 U.S. 432, 435, 77 S.Ct. 408, 1 L.Ed.2d 448 (1957) (sustaining substantive due process claims where state action shocks the conscience); *Farmer v. Brennan,* 511 U.S. 825, 832, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994) ("[T]he treatment a prisoner receives in prison and the conditions under which he is confined are subject to scrutiny under the

Eighth Amendment.") (quoting *Helling v. McKinney,* 509 U.S. 25, 31, 113 S.Ct. 2475, 125 L.Ed.2d 22 (1993)).

**C.** *Colon Categories*

Second and apart from their argument based on *Iqbal,* Thornton and Rogers assert that plaintiff has adequately alleged neither (1) that they were deliberately indifferent to her rights by failing to act on information that unconstitutional acts were occurring nor (2) that they were responsible for creating or maintaining policies or practices that failed to prevent Qasem from being repeatedly raped and assaulted.

[4][5] The Court finds that plaintiff has alleged sufficient facts that Thornton-the Superintendent of the DOCS facility where plaintiff resided-and Rogers-the Deputy Superintendent for Security at that same facility-were deliberately indifferent to her health and safety and that they were responsible for creating or maintaining policies and practices that failed to prevent plaintiff from being raped and assaulted. The Eighth Amendment requires prison officials to take reasonable measures to guarantee the safety of inmates in their custody. *Hayes v. New York City Dep't of Corrections,* 84 F.3d 614, 620 (2d Cir.1996). "An official acts with the requisite deliberate indifference when that official knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Chance v. Armstrong,* 143 F.3d 698, 702 (2d Cir.1998).

**\*5** Specifically, the complaint alleges that defendants were responsible for determining where inmates were to be housed and the assignment of guards, and in conjunction with the IG, the investigation and response to complaints of staff misconduct. Despite an investigation and what plaintiff alleges as substantial evidence of Toro's misconduct known to a variety of individuals (*id.* ¶ 56),

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

--- F.Supp.2d ----, 2010 WL 3156031 (S.D.N.Y.)

(Cite as: 2010 WL 3156031 (S.D.N.Y.))

defendants Thornton and Rogers allowed plaintiff to be housed in the building where Toro worked (*id.* ¶ 58); they failed to remove him from guarding Qasem (*id.* ¶ 57); they failed to reassign Qasem to another building (*id.*); they allowed Qasem to be transferred back to the building where Toro worked (*id.* ¶ 58); and they did not increase supervision of Toro despite their knowledge of allegations of Toro's assaults and the IG's investigation of him (*id.* ¶ 59). The complaint also alleges that a number of acts occurred under defendants' supervision that were violations of DOCS rules and regulations (*id.* ¶¶ 28, 47), and that defendants Thornton and Rogers allowed those practices to take place.

Although discovery may ultimately reveal that defendants Thornton and Rogers made every reasonable effort to prevent the alleged sexual abuse, Qasem has alleged sufficient facts to allow the Court "to draw the reasonable inference" that the defendants "are liable for the misconduct alleged." *Iqbal,* 129 S.Ct. at 1949.

D. *Qualified Immunity*

[6] Third, Thornton and Rogers claim that qualified immunity requires dismissal of this litigation as to them. So far as the Court can ascertain, defendants contend that they are entitled to immunity principally because Qasem herself initially denied the sexual relationship when asked about it by prison security officers. In their view, her denials by themselves operate as a "reasonable" basis for the decision to place plaintiff back into the building where Toro had unfettered access to her.

[7] Individual defendants are " 'shielded from liability for civil damages' " under 42 U.S.C. § 1983 if " 'their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.' " *Wilson v. Layne,* 526 U.S. 603, 609, 119 S.Ct. 1692, 143 L.Ed.2d 818 (1999) (quoting *Harlow v. Fitzgerald,* 457 U.S. 800, 818, 102 S.Ct. 2727, 73 L.Ed.2d

396 (1982)); *accord Gilles v. Repicky,* 511 F.3d 239, 243 (2d Cir.2007). "A right is clearly established if (1) the law is defined with Supreme Court or the Second Circuit has recognized the right, and (3) 'a reasonable defendant [would] have understood from the existing law that [his] conduct was unlawful.' " *Anderson v. Recore,* 317 F.3d 194, 197 (2d Cir.2003) (quoting *Young v. County of Fulton,* 160 F.3d 899, 903 (2d Cir.1998)).

This Court cannot find the defendants immune from suit on this record. It is well established that the sexual exploitation of prisoners by prison guards amounts to a constitutional violation. *See Schwenk v. Hartford,* 204 F.3d 1187, 1197 (9th Cir.2000) ("In the simplest and most absolute terms, the Eighth Amendment right of prisoners to be free from sexual abuse was unquestionably clearly established ... and no reasonable prison guard could possibly have believed otherwise."); *Daskalea v. District of Columbia,* 227 F.3d 433, 440, 343 U.S.App.D.C. 261 (D.C.Cir.2000) (affirming prisoner's Eighth Amendment claim after prison guards sexually assaulted her); *Berryhill v. Schriro,* 137 F.3d 1073, 1076 (8th Cir.1998); *Barney v. Pulsipher,* 143 F.3d 1299, 1310 (10th Cir.1998) ("Clearly plaintiffs' deprivations resulting from the sexual assaults are sufficiently serious to constitute a violation under the Eighth Amendment."). *Cf. Farmer v. Brennan,* 511 U.S. 825, 833-34, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994) ("Being violently assaulted in prison is simply not 'part of the penalty that criminal offenders pay for their offenses against society.' ") (quoting *Rhodes v. Chapman,* 452 U.S. 337, 347, 101 S.Ct. 2392, 69 L.Ed.2d 59 (1981)). Given the extent of the alleged sexual abuse, the numerous warning signs alleged, and the number of questionable-if not unintelligible-decisions made with respect to plaintiff during the course of the IG's investigation, the Court cannot say at this stage of the litigation that Thornton and Rogers are entitled to qualified immunity for their alleged actions.

III. CONCLUSION

*6 Because plaintiff has alleged enough facts to raise

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

--- F.Supp.2d ----, 2010 WL 3156031 (S.D.N.Y.)

(Cite as: 2010 WL 3156031 (S.D.N.Y.))

a plausible claim to relief against the supervisory officials Thornton and Rogers and they are not entitled to qualified immunity on the basis of the record at this stage of the litigation, the motion by Thornton and Rogers to dismiss the complaint is denied.

> FN1. Count time is time during which all activity stops and essentially all inmates are locked into their cells, and corrections staff verify that no inmates are missing. (Compl. ¶ 23 n. 1.)

S.D.N.Y.,2010.

Qasem v. Toro

--- F.Supp.2d ----, 2010 WL 3156031 (S.D.N.Y.)

END OF DOCUMENT

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.



Not Reported in F.Supp.2d, 2009 WL 5216946 (N.D.N.Y.)

(Cite as: 2009 WL 5216946 (N.D.N.Y.))

Only the Westlaw citation is currently available.

**This decision was reviewed by West editorial staff and not assigned editorial enhancements.**

United States District Court,

N.D. New York.
Christopher McZORN, Plaintiff,
v.
JOHNSON CITY POLICE DEPARTMENT and, Sgt.
William Haven, Defendants.
No. 3:08-CV-0726.

Dec. 30, 2009.
Christopher B. McZorn, Ogdensburg, NY, pro se.

Sandra J. Sabourin, Goldberg, Segalla Law Firm, Syracuse, NY, David H. Walsh, IV, Petrone, Petrone Law Firm, Utica, NY, for Defendants.

### DECISION and ORDER

THOMAS J. McAVOY, Senior District Judge.

*1 Plaintiff, Christopher McZorn, brought the instant action pro se seeking damages for the alleged violation of his constitutional rights related to an automobile stop, search, arrest and interrogation by Sgt. William Haven of the Johnson City Police Department. Plaintiff alleges that: (1) he was falsely arrested and imprisoned; (2) he suffered defamation of character; (3) he was coerced and threatened into making an involuntary statement and of self incrimination; and (4) he suffered violations of the First, Fourth, Fifth, Eighth, Ninth, and Fourteenth Amendments. Defendants move for summary judgment arguing that: (1) Defendants did not violate Plaintiff's civil rights; (2) Defendants had probable cause for the search and arrest; (3) Defendants are entitled to qualified immunity; (4) Plaintiff is collaterally estopped from arguing the probable cause issue; and (5) the defamation action has no basis in state or federal law.

## I. FACTS

On July 6, 2007, while on parole, Plaintiff was arrested by Defendant Haven and charged with criminal possession of a controlled substance in the third degree. According to the investigative report, a confidential informant advised Investigator John Ward (New York State Police) that Plaintiff was currently in possession of cocaine and marijuana and that he was operating a 1995 Mitsubishi Mirage, with New York State Registration number DXY8347. The informant also mentioned that Plaintiff's girlfriend, Stephanie Beardsley, was in the car.

Officers approached the vehicle occupied by Plaintiff and Ms. Beardsley. Ms. Beardsley granted Sgt. Haven permission to search her purse. This search resulted in Sgt. Haven finding two bags of suspected marijuana. A parole officer, who was also present, conducted a search of the vehicle and found seven additional bags of marijuana in a back-pack and two bags of suspected cocaine in a deodorant container. Plaintiff was placed under arrest and advised of his Miranda rights. Plaintiff waived his rights and indicated so by initialing and signing a Miranda Warning Report. Plaintiff also gave a statement wherein he admitted possessing crack cocaine the police found in his vehicle and that he intended to sell the cocaine. Plaintiff alleges that this statement was coerced and involuntary. Plaintiff was charged with criminal possession of a controlled substance in the third degree.

Plaintiff was indicted by a Grand Jury and arraigned on that indictment. Plaintiff, represented by counsel, moved to suppress the statement made to police claiming it was involuntary. Plaintiff was present during the entire suppression hearing and his attorney had an opportunity to cross examine the witnesses. Judge Martin E. Smith, Broome County Court Judge, issued a decision and order in the suppression hearing, which concluded in pertinent part, that:

The People have met their burden in establishing that the search in this case was beyond being a parole administrative search participated in by parole officer Richard White. The Court also finds that the search was indeed consensual.

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2009 WL 5216946 (N.D.N.Y.)

(Cite as: 2009 WL 5216946 (N.D.N.Y.))

**\*2** The Court found that Plaintiff was, in fact, brought to Johnson City Police Department, properly advised of his Miranda rights, voluntarily waived those rights, agreed to speak to police officers, and also thereafter gave statements to the police, both verbal and written, that were admitted at trial.

Plaintiff twice went to trial on this charge. The first trial ended in a hung jury. Plaintiff was acquitted following the second trial.

## II. STANDARD OF REVIEW

Summary judgment, pursuant to Fed.R.Civ.P. 56(c), is warranted if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." The party moving for summary judgment bears the initial burden of showing, through the production of admissible evidence, that no genuine issue of material fact exists. *Major League Baseball Properties, Inc. v. Salvino,* 542 F.3d 290, 309 (2d Cir.2008). Only after the moving party has met this burden is the non-moving party required to produce evidence demonstrating that genuine issues of material fact exist. *Salahuddin v. Goord,* 467 F.3d 263, 272-73 (2d Cir.2006). The nonmoving party must do more than "rest upon the mere allegations ... of the [plaintiff's] pleading" or "simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 585-86, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986); *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247-48, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *see also* Fed.R.Civ.P. 56(e) ( "When a motion for summary judgment is made [by a defendant] and supported as provided in this rule, the [plaintiff] may not rest upon the mere allegations ... of the [plaintiff's] pleading ...."). Rather, "[a] dispute regarding a material fact is *genuine* if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Ross v. McGinnis,* 00-CV-0275, 2004 WL 1125177, at \*8 (W.D.N.Y. Mar.29, 2004) [internal quotations omitted] [emphasis added]. It must be apparent that no rational finder of fact could find in favor of the non-moving party

for a Court to grant a motion for summary judgment. *Gallo v. Prudential Residential Servs.,* 22 F.3d 1219, 1223-24 (2d Cir.1994); *Graham v. Lewinski,* 848 F.2d 342, 344 (2d Cir.1988). In determining whether a genuine issue of material fact exists, the Court must resolve all ambiguities and draw all reasonable inferences against the moving party. *Schwapp v. Town of Avon,* 118 F.3d 106, 110 (2d Cir.1997) [citation omitted]; *Thompson v. Gjivoje,* 896 F.2d 716, 720 (2d Cir.1990) [citation omitted].

When, as here, a party seeks summary judgment against a pro se litigant, a court must afford the non-movant special solicitude. *Triestman v. Fed. Bureau of Prisons,* 470 F.3d 471, 477 (2d Cir.2006); *see also Sealed Plaintiff v. Sealed Defendant # 1,* 537 F.3d 185, 191-92 (2d Cir.2008) ("On occasions too numerous to count, we have reminded district courts that 'when [a] plaintiff proceeds *pro se,* ... a court is obliged to construe his pleadings liberally.' " (citations omitted)). However, the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact. Anderson, 477 U.S. at 247-48.

**\*3** Additionally, where the nonmoving party fails to adequately respond to a motion for summary judgment, a district court has no duty to perform an independent review of the record to find proof of a factual dispute. *Cruz v. Lashway,* 2009 U.S. Dist. LEXIS 51270, at \*8 (N.D.N.Y. June 18, 2009) (citing *Amnesty Am. v. Town of W. Hartford,* 288 F.3d 467, 470 (2d Cir.2002) (citations omitted); *accord Lee v. Alfonso,* 112 Fed. Appx. 106 (2d Cir. Oct.14, 2004); *Fox v. Amtrak,* 04-cv-1144, 2006 U.S. Dist. LEXIS 9147, at \*1-4 (N.D.N.Y. Feb. 16, 2006)). Even pro se litigants must obey a district court's procedural rules. *Cruz,* 2009 U.S. Dist. LEXIS 51270, at \*8 (citing *Krug v. County of Rennselaer,* 2006 WL 2669122, at \*3 (N.D.N.Y. Sept.18, 2006) ("When dealing with a pro se party, certain procedural rules apply so as to insure that the pro se litigant is not disadvantaged by the lack of legal training. In this regard, the Local Rules require that [a pro se party be informed of the consequences of failing to respond to a motion for summary judgment, before those consequences may be imposed]."); *see also Champion v. Artuz,* 76 F.3d 483,

Not Reported in F.Supp.2d, 2009 WL 5216946 (N.D.N.Y.)

(Cite as: 2009 WL 5216946 (N.D.N.Y.))

486 (2d Cir.1996) ("This Court has also held that summary judgment should not be entered by default against a pro se plaintiff who has not been given any notice that failure to respond will be deemed a default.")). The Court, in this case, warned Plaintiff of the consequences of failing to respond. *See* Docket No. 58. Local Rule 7.1(a)(3) requires that a nonmoving party file a response to the moving party's Statement of Material Facts, which admits or denies each of the moving party's factual assertions in matching numbered paragraphs, and supports any denials with a specific citation to the record where the factual issue arises. N.D.N.Y. L.R. 7.1(a)(3). Because Plaintiff has failed to comply with Local Rule 7.1(a)(3), the Court deems the Defendants' Statement of Material Facts as admitted.

### III. DISCUSSION

### a. False Arrest and Imprisonment

Plaintiff alleges that he was falsely arrested and imprisoned. "Under New York law, a plaintiff claiming false arrest must show, *inter alia,* that the defendant intentionally confined him without his consent and without justification." *Weyant v. Oaks,* 101 F.3d 845, 852 (2d. Cir.1996) (citations omitted). "A § 1983 claim for false arrest, resting on the Fourth Amendment right of an individual to be free from unreasonable seizures, including arrest without probable cause, is substantially the same as a claim for false arrest under New York law." *Id.* "The existence of probable cause to arrest constitutes justification and 'is a complete defense to an action for false arrest,' whether that action is brought under state law or under § 1983. *Weyant,* 101 F.3d at 852 (citing *Bernard v. United States,* 25 F.3d 98, 102 (2d Cir.1994)); *see also Singer v. Fulton County Sheriff,* 63 F.3d 110, 118 (2d. Cir.1995) ("There can be no federal civil rights claim for false arrest where the arresting officer had probable cause.").[FN1] "Thus, under both New York and federal law, summary judgment dismissing a plaintiff's false arrest claim is appropriate if the undisputed facts indicate that the arresting officer's probable cause determination was objectively reasonable." *Jenkins v. City of New York,* 478 F.3d 76, 88 (2d Cir.2007).

> FN1. "The New York Court of Appeals has expressly held that the presumption of probable cause arising from an indictment applies only in causes of action for malicious prosecution and is totally misplaced when applied in false [arrest] actions." *McClellan v. Smith,* 439 F.3d 137, 145 (2d. Cir.2006) (internal quotes omitted).

*4 In this case, Officer Haven approached Plaintiff after receiving a tip from a confidential informant that Plaintiff was in possession of cocaine and marijuana. Drugs were found, in easy reach of Plaintiff, during a search of Plaintiff's car. Plaintiff alleges that this search violated his Fourth Amendment rights and therefore could not provide the probable cause to arrest. Defendants argue that Broome County Court Judge Martin E. Smith's, decision and order finding that the search was consensual should be given preclusive effect pursuant to the doctrine of collateral estoppel.

In *Jenkins v. City of New York,* 478 F.3d 76, 85 (2d Cir.2007), the Second Circuit Court of Appeals held that:

> In New York, collateral estoppel has two elements. "First, the identical issue necessarily must have been decided in the prior action and be decisive of the present action, and second, the party to be precluded from religating the issue must have had a full and fair opportunity to contest the prior determination." *Juan C. v. Cortines,* 89 N.Y.2d 659, 667, 657 N.Y.S.2d 581, 679 N.E.2d 1061 (N.Y.1997) (internal citation and quotation marks omitted)

In determining whether a party has had a full and fair opportunity to litigate, the Second Circuit held that "[i]f a party has not had an opportunity to appeal an adverse finding, then it has not had a full and fair opportunity to litigate that issue." *Fuchsberg & Fuchsberg v. Galizia,* 300 F.3d 105, 110 (2d Cir.2002) (citing *Johnson v. Watkins,* 101 F.3d 792, 795 (2d Cir.1996)). "New York courts have held that facts determined in a pretrial suppression hearing cannot be given preclusive effect against a defendant subsequently acquitted of the charges." *Jenkins,* 478 F.3d at 92 (citing *Johnson,* 101 F.3d at 795-96). "This rule is predicated on the defendant's lack of opportunity to obtain review of an issue decided against him." *Jenkins,* 478 F.3d at 92. Therefore, Plaintiff's acquittal precludes the Court from giving

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2009 WL 5216946 (N.D.N.Y.)

(Cite as: 2009 WL 5216946 (N.D.N.Y.))

collateral estoppel to the determination made at the suppression hearing that the search was consensual.

Defendants did, however, have probable cause to search Plaintiff's car and therefore to arrest Plaintiff. "Under the automobile exception to the Fourth Amendment warrant requirement, police may conduct a warrantless search of a readily mobile motor vehicle if probable cause exists to believe the vehicle contains contraband or other evidence of a crime." U.S. Const. Amend 4; US v. Gagnon, 373 F.3d 230 (2d Cir.2004). When the police possess probable cause to believe a vehicle contains contraband, "they may conduct a warrantless search of every part of the vehicle and its contents, including all containers and packages in the vehicle. Id. at 235. Here, Defendant Haven asked Ms. Beardsley for consent to search her purse. Ms. Beardsley consented FN2 and Defendant Haven found two bags of suspected marijuana in her purse. This gave Defendant Haven probable cause to search the rest of the car for drugs. Upon finding the suspected drugs, Defendant Haven had probable cause to arrest Plaintiff. Because Defendant Haven had probable cause to search Plaintiff's car and therefore arrest him, the false arrest and false imprisonment claims must be dismissed.

FN2. Although Plaintiff denied that Ms. Beardsley gave consent, he point to insufficient evidence, admissible in form, substantiating his denial. Moreover, Plaintiff failed to properly respond to Defendants' Statement of Material Facts stating that Ms. Beardsley did consent.

**b. Defamation**

*5 Plaintiff alleges that he was defamed as a result of Defendants publishing his name in the newspaper. Additionally, Plaintiff asserts that the arrest and the charge were made a matter of public record on the local news station and radio. These facts, as alleged by Plaintiff, are insufficient as a matter or a law to support a claim pursuant to 42 U.S.C. § 1983.

Generally, defamation is not actionable under 42 U.S.C. § 1983. See Paul v. Davis, 424 U.S. 693, 701, 96 S.Ct. 1155, 47 L.Ed.2d 405 (1976) (holding that damage to one's reputation is not by itself sufficient to invoke the

procedural protection of the Due Process Clause so as to give rise to a § 1983 claim.). The Supreme Court held that loss of reputation must be coupled with some other tangible element in order to rise to the level of a protectible liberty interest. Siegert v. Gilley, 500 U.S. 226, 233, 111 S.Ct. 1789, 114 L.Ed.2d 277 (1991). The Second Circuit has 'interpreted this holding to mean that 'stigma plus' is required to establish a constitutional deprivation."

Houghton v. Cardone, 295 F.Supp.2d 268, 274 (W.D.N.Y.2003) (citing Valmonte v. Bane, 18 F.3d 992, 999 (2d Cir.1994)). The courts have held that the general rule is that, in addition to alleging defamation, the plaintiff must allege "that the defamation occurred in the course of the termination of governmental employment or was coupled with a deprivation of a legal right or status." Houghton, 295 F.Supp.2d at 275 (citing Abramson v. Pataki, 278 F.3d 93, 101 (2d Cir.2002); see Valmonte v. Bane, 18 F.3d 992, 1001 (2d Cir.1994) (A sullied reputation is insufficient for deprivation of a liberty interest); Neu v. Corcoran, 896 F.2d 662, 667 (2d Cir.1989) (the plaintiff must also allege the "plus," which may be "significant damage to a person's employment opportunities [or] dismissal from a government job or deprivation of some other legal right or status."). Therefore, in order to state a claim for defamation under § 1983, a plaintiff must establish both that the statements at issue were defamatory and that they deprived him of a liberty or property interest. See Siegert v. Gilley, 500 U.S. 226, 233, 111 S.Ct. 1789, 114 L.Ed.2d 277 (1991).

In this case, Plaintiff has failed to allege that the statements in the news were defamatory or any specific injury that he sustained from his arrest being reported in the news. Moreover, Plaintiff has not alleged any deprivation of a legal right or status resulting from the alleged defamation. Plaintiff's federal defamation cause of action, therefore, must be dismissed.

**c. Coerced Statements**

Plaintiff alleges that he was coerced into making a confession that he possessed the drugs recovered from his car. In order to state a § 1983 claim stemming from coerced or involuntary statements Defendants must have coerced Plaintiff into making an incriminating statement and used that statement "at any criminal proceeding against the declarant" in violation of the declarant's Fifth

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2009 WL 5216946 (N.D.N.Y.)

(Cite as: 2009 WL 5216946 (N.D.N.Y.))

Amendment rights. *Weaver v. Brenner,* 40 F.3d 527, 535 (2d Cir.1994).

**\*6** In this case, Plaintiff's confession was not coerced. Plaintiff alleges that officers threatened him and his girlfriend and as a result he confessed to owning the drugs at issue. The test for evaluating voluntariness of Plaintiff's confession requires an inquiry into whether Plaintiff's will was overborne by the circumstances surrounding the giving of confession. *Dickerson v. United States,* 530 U.S. 428, 433, 120 S.Ct. 2326, 147 L.Ed.2d 405 (2000). "The determination 'depends upon a weighing of the circumstances of pressure against the power of resistance of the person confessing.' " *Id.* (citing *Stein v. New York,* 346 U.S. 156, 73 S.Ct. 1077, 97 L.Ed. 1522 (1953).

There is no dispute that the interrogation occurred in an office, that Plaintiff was not handcuffed, and that it lasted approximately 23 minutes. Furthermore, Plaintiff was familiar with the process having had prior experience with police interrogation. Plaintiff alleges, in his unsworn memorandum of law, that the Defendants made statements including, "if you man up take the charge I wont [*sic* ] arrest Ms. Beardsley," "if you man up take the charge I just give her violation [*sic* ]," "if you man up take the charge would [*sic* ] give her appearance ticket," "Ms. Beardsley wont [*sic* ] make it in jail with her condition," "if Ms. Beardsley is arrested she wouldn't be able to bring your kids to see you," "if your both arrested you will lose everything in your apartment and your car, and if you don't man up, I will arrest both of you," and "if you don't man up I'm going to have DSS take your kids." These statements, even if accepted as fact, do not rise to the level of coercion. *See McMahon v. Hodges,* 382 F.3d 284, 290 (2d Cir.2004) ("It does not follow, however, that all inducements for a defendant to plead guilty render either a plea or the consequent waiver of the right to trial by jury involuntary."); *United States v. Marquez,* 909 F.2d 738, 742 (2d Cir.1990) (" 'Voluntary' for purposes of entering a lawful plea to a criminal charge has never been meant the absence of benefits influencing the defendant to plead."); *Brady v. United States,* 397 U.S. 742, 755, 90 S.Ct. 1463, 25 L.Ed.2d 747 (1970) (a guilty plea "must stand unless induced by threats (or promises to discontinue improper harassment), misrepresentation (including unfulfilled or unfulfillable promises), or promises that are by their nature improper as having no proper relationship to the prosecutor's business (e.g.bribes).") Therefore, Plaintiff's claim that his Fifth Amendment was violated through the use of his coerced statements must be dismissed.

**d. First Amendment**

Plaintiff alleges a violation of his First Amendment rights. Plaintiff does not allege however that Defendants prevented Plaintiff from making a statement or retaliated against him for engaging in protected speech. Therefore, any First Amendment claim asserted in this action must be dismissed.

**e. Eighth and Fourteenth Amendments**

Plaintiff asserts, in wholly conclusory fashion, that his Eighth Amendment protections against excessive bail and cruel and unusual punishment were violated by Defendants. He provides no factual allegation upon which a fact finder could conclude that Defendants played any role in a bail determination relative to Plaintiff (which, presumably, was made by a neutral magistrate). Therefore, the claim in this regard fails as a matter of law. *See McZorn v. Endicott Police Dept.,* 2008 WL 163581, at *10-11; *Dawkins v. Williams,* 413 F.Supp.2d 161, 170-71 (N.D.N.Y.2006) ("Defendant officers ... were not responsible for the bail decisions made in relation to Plaintiff's detention or release. Therefore, Plaintiff's Eighth Amendment claim fails.") (citations omitted).

**\*7** Similarly, there is no evidence that Plaintiff was convicted of the crime of which Defendants were involved and, therefore, no Eighth Amendment "cruel and unusual punishment" claim attaches. *See Smith v. Ortiz,* 2006 WL 1458404, at *5 (S.D.N.Y. May 25, 2006) ("A plaintiff may state a claim under the Eighth Amendment [for cruel and unusual punishment] only if he or she has been adjudged guilty by a criminal proceeding at the time of the events giving rise to the Eighth Amendment claim.") (citing *SeeIngraham v. Wright,* 430 U.S. 651, 671-72, 97 S.Ct. 1401, 51 L.Ed.2d 711 (1977); *City of Revere v. Massachusetts General Hospital,* 463 U.S. 239, 103 S.Ct. 2979, 77 L.Ed.2d 605 (1983)). Plaintiff's Eighth Amendment claim is dismissed.

Plaintiff also fails to allege any facts sufficient to show a violation of the Fourteenth Amendment. Therefore, for the reasons stated above, and as Plaintiff has not

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2009 WL 5216946 (N.D.N.Y.)

(Cite as: 2009 WL 5216946 (N.D.N.Y.))

alleged facts that he was beaten in prison, Plaintiff's Fourteenth Amendment claim must be dismissed.

**f. Ninth Amendment**

Finally, Plaintiff asserts a violation of the Ninth Amendment. "The Ninth Amendment is a rule of construction, not one that protects any specific right, and so no independent constitutional protection is recognized which derives from the Ninth Amendment and which may support a § 1983 cause of action." *McZorn v. Endicott Police Dept.,* 2008 WL 163581, at *11 (N.D.N.Y.,2008) (citing *Diaz v. City of New York,* 2006 WL 3833164, at *7 (E.D.N.Y.Dec.29, 2006)* (internal quotation marks and citations omitted)). Accordingly, any Ninth Amendment claim is dismissed.

**IV. CONCLUSION**

For the foregoing reasons, Defendants' motion for summary judgment is GRANTED, and the COMPLAINT is DISMISSED IN ITS ENTIRETY.

IT IS SO ORDERED.

N.D.N.Y.,2009.

McZorn v. Johnson City Police Dept.
Not Reported in F.Supp.2d, 2009 WL 5216946 (N.D.N.Y.)
END OF DOCUMENT

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.



Not Reported in F.Supp.2d, 2008 WL 163581 (N.D.N.Y.)

(Cite as: 2008 WL 163581 (N.D.N.Y.))

**c**

Only the Westlaw citation is currently available.
United States District Court,

N.D. New York.
Christopher B. McZORN, Plaintiff,
v.
ENDICOTT POLICE DEPARTMENT; [FN1] arresting
officer detective Scott A. Evans; arresting officer
detective sergeant Michael A. Kaminsky; and reporting
officer J.L. Vanek, Defendants.

FN1. The Village of Endicott Police Department
was dismissed from this action by order of this
Court dated May 9, 2006. See dkt. # 7.

No. 3:06-CV-0033.

Jan. 16, 2008.
Christopher B. McZorn, Binghamton, NY, pro se.

M. Randolph Belkin, Office of M. Randolph Belkin,
Latham, NY, for Defendants.

**DECISION & ORDER**

THOMAS J. McAVOY, Senior District Judge.
**I. INTRODUCTION**
    *1 Plaintiff commenced this action *pro se* pursuant to
42 U.S.C. § 1983 "seek[ing] damages for the false arrest
and false imprisonment of plaintiff C.B. McZorn, and the
defamation of plaintiff['s] character." Am. Compl. ¶ 1
[dkt. # 5]. Plaintiff alleges that his rights under the
"[F]ourteenth, [E]ighth, [F]irst and [F]ifth [A]mendments
to the United States Constitution" were violated. *Id.*
Defendants have moved for summary judgment pursuant
to Fed.R.Civ.P. 56 seeking to dismiss the action. Plaintiff
has opposed the motion.
**II. STANDARD OF REVIEW**

*a. Summary Judgment Standard*

    The Court may grant summary judgment only where

"there is no genuine issue as to any material fact and ... the
moving party is entitled to a judgment as a matter of law."
FED. R. CIV. P. 56(c). An issue is genuine if the relevant
evidence is such that a reasonable jury could return a
verdict for the nonmoving party. *Anderson v. Liberty
Lobby,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d
202 (1986). A party seeking summary judgment bears the
burden of informing the court of the basis for the motion
and of identifying those portions of the record that the
moving party believes demonstrate the absence of a
genuine issue of material fact as to a dispositive issue.
*Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct.
2548, 91 L.Ed.2d 265 (1986).

    If the movant is able to establish a *prima facie* basis
for summary judgment, the burden of production shifts to
the party opposing summary judgment who must produce
evidence establishing the existence of a factual dispute
that a reasonable jury could resolve in his favor.
*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475
U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986).
The nonmoving party must show, by affidavits or other
evidence, admissible in form, that there are specific factual
issues that can only be resolved at trial. *Colon v.
Coughlin,* 58 F.3d 865, 872 (2d Cir.1995). "[P]roceeding
*pro se* does not otherwise relieve a litigant from the usual
requirements of summary judgment." *Viscusi v. Proctor &
Gamble,* 2007 WL 2071546, at * 9 (E.D.N.Y. July 16,
2007).

    In determining whether to grant summary judgment,
the Court must view all facts in the light most favorable to
the nonmoving party, but "only if there is a 'genuine'
dispute as to those facts." *Scott v. Harris,* --- U.S. ----, 127
S.Ct. 1769, 1776, 167 L.Ed.2d 686 (2007). "When
opposing parties tell two different stories, one of which is
blatantly contradicted by the record, so that no reasonable
jury could believe it, a court should not adopt that version
of the facts for purposes of ruling on a motion for
summary judgment." *Id.* at 1776.

    The nonmoving party cannot defeat summary
judgment by "simply show[ing] that there is some

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 163581 (N.D.N.Y.)

(Cite as: 2008 WL 163581 (N.D.N.Y.))

metaphysical doubt as to the material facts," *Matsushita., 475 U.S. at 586,* or by a factual argument based on "conjecture or surmise." *Bryant v. Maffucci, 923 F.2d 979, 982 (2d Cir.1991).* In this regard, a party opposing a properly supported motion for summary judgment may not rest upon "mere allegations or denials" asserted in the pleadings, *Rexnord Holdings, Inc. v. Bidermann, 21 F.3d 522, 525-26 (2d Cir.1994),* or on conclusory allegations or unsubstantiated speculation. *Scotto v. Almenas, 143 F.3d 105, 114 (2d Cir.1998).*

**b. Local Rules Requirements**

*\*2* The Local Rules of the Northern District require a party moving for summary judgment to submit a "Statement of Material Facts" which

shall set forth, in numbered paragraphs, each material fact about which the moving party contends there exists no genuine issue. Each fact listed shall set forth a specific citation to the record where the fact is established. The record for purposes of the Statement of Material Facts includes the pleadings, depositions, answers to interrogatories, admissions and affidavits. It does not, however, include attorney's affidavits.

N.D.N.Y.L.R. 7.1(a)(3). Once a properly supported Local Rule 7.1(a)(3) Statement is submitted, the party opposing the motion must

file a response to the [movant's] Statement of Material Facts. The non-movant's response shall mirror the movant's Statement of Material Facts by admitting and/or denying each of the movant's assertions in matching numbered paragraphs. Each denial shall set forth a specific citation to the record where the factual issue arises. The non-movant's response may also set forth any additional material facts that the non-movant contends are in dispute in separately numbered paragraphs. *Any facts set forth in the Statement of Material Facts shall be deemed admitted unless specifically controverted by the opposing party.*

*Id.* (underscoring in original).

The responding Statement of Material Facts is not a mere formality, and the courts apply this rule strictly. *See N.Y. Teamsters Conference Pension & Ret. Fund v.*

*Express Servs., Inc., 426 F.3d 640, 648-49 (2d Cir.2005)* (upholding grant of summary judgment where "[t]he district court, applying Rule 7.1(a)(3) strictly, reasonably deemed [movant's] statement of facts to be admitted" because the non-movant submitted a responsive Rule 7.1(a) (3) statement that "offered mostly conclusory denials of [movant's] factual assertions and failed to include any record citations."); *Gubitosi v. Kapica, 154 F.3d 30, 31 n. 1 (2d Cir.1998)* (*per curiam* ) (accepting as true material facts contained in unopposed local rule statement of material facts); *Meaney v. CHS Acquisition Corp., 103 F.Supp.2d 104, 108 (N.D.N.Y.2000)* (deeming movant's Rule 7.1(a)(3) Statement admitted where non-movant's response "set forth *no* citations-specific or otherwise-to the record") (emphasis in original); *McKnight v. Dormitory Auth. of State of N.Y., 189 F.R.D. 225, 227 (N.D.N.Y.1999)* (McAvoy, J.) ("deem[ing] the portions of Defendants' 7.1(a)(3) statement that are not specifically controverted by Plaintiff to be admitted"); *Osier v. Broome County, 47 F.Supp.2d 311, 317 (N.D.N.Y.1999)* (McAvoy, J.) (deeming admitted all facts in defendants' Rule 7.1(a) (3) statement where "plaintiff submitted thirteen pages of purported facts without any indication where those facts can be located in the record").

While the Court must construe a *pro se* litigant's pleadings and papers liberally and interpret them to raise the strongest arguments that they suggest, *Govan v. Campbell, 289 F.Supp.2d 289, 295 (N.D.N.Y.2003);* [FN2] *Veloz v. New York, 339 F.Supp.2d 505, 513 (S.D.N.Y.2004),* the application of this lenient standard does not relieve a *pro se* litigant of the requirement to follow the procedural formalities of Local Rule 7.1(a)(3). *Govan, 289 F.Supp.2d at 295; see also Faretta v. California, 422 U.S. 806, 95 S.Ct. 2525, 2541 n. 46, 45 L.Ed.2d 562 (1975)* ("The right of self-representation is not a license ... not to comply with relevant rules of procedural and substantive law."); *Edwards v. INS, 59 F.3d 5, 8 (2nd Cir.1995)* ("While a *pro se* litigant's pleadings must be construed liberally, ... *pro se* litigants generally are required to inform themselves regarding procedural rules and to comply with them.").

FN2. To construe pleadings liberally means the Court must view the submissions by a more lenient standard than that accorded to "formal

Not Reported in F.Supp.2d, 2008 WL 163581 (N.D.N.Y.)

(Cite as: 2008 WL 163581 (N.D.N.Y.))

pleadings drafted by lawyers." *Govan, 289 F.Supp.2d at 295.*

## III. BACKGROUND[FN3]

FN3. With their motion, Defendants served Plaintiff with a Statement of Material Facts pursuant to N.D.N.Y. Local Rule 7.1(a)(3) ("L. R. 7.1 Statement") and a Notification of the Consequence of Failing to Respond to a Summary Judgment Motion ("Critical Notice"). Dkt. # s 25 & 26. The Critical Notice advised Plaintiff, *inter alia,* that he had to file a statement of material facts containing what he contends to be the genuine factual issues in dispute. *Id.* Dkt. # 25-1. Plaintiff did not file a statement of material facts. He did file an affidavit in opposition to the motion that, to a limited degree, is based upon personal knowledge or cites to Defendants' record. Given Plaintiff's *pro se* status, the Court will allow some latitude. Accordingly, the Court accepts as true the properly supported facts set forth in Defendants' L.R. 7.1 Stat. that are not directly contradicted in Plaintiff's papers and supported by admissible evidence. N.D.N.Y.L.R. 7.1(a)(3). Unless indicated otherwise, the facts set forth above are taken from Defendants' L.R. 7.1 Statement or admissible evidence submitted on this motion.

**\*3** On August 25, 2004, Endicott Police Officer J.L. Vanek was dispatched to the scene of a reported sexual assault at 200 North Street, Apt. 9, Endicott, New York. On arrival, Officer Vanek interviewed a number of individuals present at the residence including the putative victim. The putative victim advised that she had been asleep on a couch in the apartment and that a person named "Chris" had also been asleep on the couch with his head on the opposite end of the couch. She stated that she awoke to non-consensual vaginal penetration by Chris, and she screamed and jumped up off the couch. According to the putative victim and other witnesses who were present in the apartment at the time, Chris jumped up off the couch, left the apartment, and drove away in his vehicle. An occupant of the apartment advised Officer Vanek that Chris was known to her only by first name, and

she provided the police with Chris's physical description and his telephone number. Officer Vanek caused dispatch to run the telephone number through their computers, and the inquiry returned with Plaintiff's name and his address in Endicott, New York.

Officer Vanek communicated the substance of his initial investigation to Detective Scott A. Evans who, according to Defendants, put into motion a plan of action for the investigation of what was believed to be a rape. The putative victim was transported to the hospital for administration of a rape kit and DNA analysis. She also gave a sworn statement that indicated, *inter alia,* that she had taken two (2) vicadin pills about an hour and a half before she was awakened by Chris. The putative victim further asserted in her statement: "All I remember was waking up and my pants were down to my thighs and my underwear were [*sic* ] down to my butt, past my butt, and he was pumping his penis inside my vagina from behind me."

Upon learning of Plaintiff's address, police officers went to and remained outside Plaintiff's residence while awaiting a search warrant. Before the warrant arrived, Plaintiff voluntary exited his residence, hands in the air, and agreed to be transported to the Endicott Police Department for questioning.

Plaintiff contends that as he was walking to the interrogation room at the Endicott Police Department with Detective Sergeant Michael A. Kaminsky, he told Kaminsky "that drugs were involved." Plf. Aff. ¶ 10. According to Plaintiff, Detective Kaminsky responded: "We don't want to hear or know about it." *Id.* Plaintiff claims that he then said he "pleads the 5th and want[s] a lawyer." *Id.* Detective Kaminsky then responded: "It would take all day for a lawyer. If you don't give a statement I will arrest you. If you cooperate I[']ll let you go." *Id.* Plaintiff was then lead to the interrogation room for questioning.

A video of the entirety of the questioning was made, and a copy of video was provided to the Court on this motion. At the start of the video, Plaintiff is seen sitting alone in an office next to a desk. He is not handcuffed or shackled and appears to be spitting on his fingers and

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 163581 (N.D.N.Y.)

(Cite as: 2008 WL 163581 (N.D.N.Y.))

cleaning his shoes with his fingers. Then, Detective Kaminsky can be seen entering the office and sitting at the desk and addressing Plaintiff. Plaintiff asks Detective Kaminsky a question (which is inaudible) that results in the following exchange:

**\*4** Kaminsky: Well, to be honest with you, we probably have enough to charge you, but there are always 2 sides to a story, so.

Plaintiff: Should I wait 'till a lawyer gets here, or?

Kaminsky: Well, I'll go through your rights with you, and you tell me what you want to do. I can't make that decision for you.

Plaintiff: Right.

Detective Kaminsky then advises Plaintiff that he is being investigated for a charge of rape, and begins reading Plaintiff the standard Miranda warnings. After each particular warning, Detective Kaminsky asks Plaintiff if he understands the warning, to which Plaintiff answers in the affirmative each time.

After reading the warnings and confirming that Plaintiff understands them, the following discussion can be heard:

Kaminsky: Now that I have advised you of your rights, are you willing to answer my questions at this time without first talking to a lawyer and having your lawyer present during the questioning?

Plaintiff: How long would it take for a lawyer?

Kaminsky: Well, that all depends on who we get a hold of.

[slight pause in the conversation]

Kaminsky: It is up to you. I can't make that decision. It's up to you. If you want to sit and talk, I am more than willing to sit and talk to you.

Plaintiff: Yeah, I'm willing to talk but, um, anything I say might incriminate me or something, I don't know.

Kaminsky: I can't make that decision for you.

Plaintiff: Yeah, I'll talk. I didn't do anything anyway. I ain't got nothing to hide.

At that point, Detective Kaminsky provides Plaintiff with a Miranda Warning sheet which Plaintiff reviews and signs. Detective Kaminsky then opens a laptop computer that is on the desk, and begins asking Plaintiff pedigree information. As Plaintiff answers the questions, Detective Kaminsky can be seen typing the information on the computer's keyboard.

Detective Kaminsky then advises Plaintiff that the police are investigating an alleged rape that is reported to have occurred as 200 North Street in Endicott, and asks Plaintiff about the incident. Plaintiff begins a narrative of the incident with Detective Kaminsky typing into the computer and saying "OK" after each of Plaintiff's sentences. It is apparent that Detective Kaminsky is attempting to type Plaintiff's statement *verbatim* (or close to *verbatim*)

Plaintiff states to Detective Kaminsky that he and the putative victim were both sleeping on the couch in the apartment with their heads at opposite ends, and that the putative victim asked him to turn around so that they were both laying with their heads at the same end. Plaintiff then states, in substance, that the two began kissing and that the putative victim placed Plaintiff's hand on her breast and began rubbing her buttocks on Plaintiff's crotch. Plaintiff contends that he unzipped the putative victim's pants and that her pants started to come down from the movement of her hips. Plaintiff states: "She kept on moving her ass and really that was it. I slipped in through her panties and she kind of freaked out." Detective Kaminsky then confirms the statement "I slipped in through her panties and she kind of freaked out" by reading it to Plaintiff from the computer screen, to which Plaintiff replies: "Yeah."

**\*5** After asking Plaintiff whether he had even met the putative victim before (to which he answers in the negative), the following discussion occurred:

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 163581 (N.D.N.Y.)

(Cite as: 2008 WL 163581 (N.D.N.Y.))

Kaminsky: When you say you slipped in through her panties, are you talking about your penis entering her vagina?

Plaintiff: Yeah, but I don't think it entered.

Kaminsky: But you are not talking about your hands or something else slipping in through her panties.

Plaintiff: No.

After asking some additional questions about the incident and typing the answers into the computer, Detective Kaminsky prints the statement and hands it to Plaintiff. Detective Kaminsky tells Plaintiff: "Chris, take your time and read that over. When I come back let me know if there is anything you want changed." Detective Kaminsky leaves the room and Plaintiff can be seen reading through the three (3) page statement. After apparently finishing reviewing the statement, Plaintiff places the statement on the desk and sits in the chair looking around the room. A few minutes later, Detective Kaminsky reenters the room and asks Plaintiff: "How's that sound? Anything you want to add or change in there?" Plaintiff responds: "Not really." Detective Kaminsky then points to the statement four times and says each time he points at it: "Answer that question, answer that question, read this, and then sign here." All of the places that Detective Kaminsky points to are on the same page. The copy of Plaintiff's statement provided to the Court contains two final questions with two hand-written responses, a New York Penal Law § 210.45 Notice, and a signature line signed by Plaintiff. It is clear that Detective Kaminsky was pointing at these items. Plaintiff can be seen writing on the page. The two questions and handwritten answers on the signed statement are as follows:

Q: After having reviewed this statement is there anything you wish to add or change?

A: Yes. I know that my penis didn[']t enter her virgina [*sic* ].

Q: Is this statement true and correct to the best of your knowledge and belief?

A: Yes.

After providing the statement to Detective Kaminsky, Detective Kaminsky asks Plaintiff some additional questions about the particulars of the incident and then requests that Plaintiff provide a DNA sample *via* a mouth swab. Detective Kaminsky explains the procedure and gives Plaintiff a consent form which Plaintiff reviews and signs. Plaintiff then swabs the inside of his cheek with the swabbing apparatus and provides it to Detective Kaminsky.

After the mouth swab, Detective Kaminsky leaves the office again and returns with Detective Evans. Evans asks Plaintiff numerous questions about the incident, and Plaintiff maintains that there was no vaginal penetration. Detective Kaminsky suggests that Plaintiff consent to a swab of his penis to determine if vaginal fluid is present. After explaining the procedure and presenting Plaintiff with a "Consent to Search" form, Plaintiff agrees to the procedure and signs the form. Plaintiff and the two officers can be seen leaving the office, presumably to have the second swab performed. The video continues to show an empty office. Several minutes later Plaintiff returns to the office, and, shortly after that, Detectives Kaminsky and Evans return. Detective Kaminsky tells Plaintiff that the results of the swabs and tests run on the putative victim will not be available for some time, but that they have "enough evidence" for "probable cause" to believe the putative victim's account and, therefore, they "have to" formally arrest and charge Plaintiff. Detective Kaminsky tells Plaintiff that they will book him and get him before a judge so he can "get out of here."

**\*6** A felony complaint was sworn out by Detective Evans on August 25, 2004 charging Plaintiff with Rape in the First Degree in violation of New York Penal Law § 130.35(2) for engaging in sexual intercourse with a person who was incapable of consent because she was asleep. The matter was turned over to the Broome County District Attorney's Office for further handling. Although unclear from the documents presented, it appears that charges against Plaintiff arising out of the August 25, 2004 incident were presented to two grand juries and, ultimately, resolved without a conviction. *See* Attachments to the Am. Compl.

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 163581 (N.D.N.Y.)

(Cite as: 2008 WL 163581 (N.D.N.Y.))

## IV. DISCUSSION

### a. False Arrest

Plaintiff asserts that he is seeking damages under Section 1983 for his "false arrest and false imprisonment." Am. Compl. ¶ 1. Although not cited in the Amended Complaint, 11 Plaintiff cites the Fourth Amendment in his Memorandum of Law in Opposition to the pending motion as the basis for this claim. *See* Plt. Mem. L. pp. 2, 8. The Court will address the claim accordingly.

The first step in any Section 1983 claim predicated on the Fourth Amendment is to determine if and when a constitutionally cognizable seizure occurred. *Medeiros v. O'Connell,* 150 F.3d 164, 167 (2d Cir.1998). A Fourth Amendment seizure occurs whenever an individual is physically or constructively detained by a police officer in such a manner that a reasonable person would not feel he is free to leave. *County of Sacramento v. Lewis,* 523 U.S. 833, 844, 118 S.Ct. 1708, 140 L.Ed.2d 1043 (1998); *Tennessee v. Garner,* 471 U.S. 1, 105 S.Ct. 1694, 85 L.Ed.2d 1 (1985); *Terry v. Ohio,* 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968). Because Plaintiff voluntarily accompanied the police to the station for questioning, and because there is no evidence or allegation that Plaintiff's freedom was curtailed before he was told he was going to be booked for the rape charge, the Court addresses the false arrest claim from that point.

Defendants assert that, after interviewing the witnesses, including the putative victim, "the officers were possessed of information ... which provided them with probable cause to believe that the crime of rape had been committed by the plaintiff." Reply Mem. L., p. 1. A Fourth Amendment false arrest claim fails as a matter of law if, at the time of the seizure, the arresting officer had probable cause to make an arrest. *Jocks v. Tavernier,* 316 F.3d 128, 135 (2d Cir.2003); *Smith v. Edwards,* 175 F.3d 99, 105 (2d Cir.1999). "Whether probable cause exists depends upon the reasonable conclusion to be drawn from the facts known to the arresting officer at the time of the arrest." *Devenpeck v. Alford,* 543 U.S. 146, 125 S.Ct. 588, 593, 160 L.Ed.2d 537 (2004) (citing *Maryland v. Pringle,* 540 U.S. 366, 371, 124 S.Ct. 795, 157 L.Ed.2d 769 (2003)). Probable cause exists when officers "have

knowledge or reasonably trustworthy information of facts and circumstances that are sufficient to warrant a person of reasonable caution in the belief that the person to be arrested has committed or is committing a crime." *Posr v. Court Officer Shield No. 207,* 180 F.3d 409, 414 (2d Cir.1999). The relevant inquiry is whether "probable cause existed to arrest a defendant" and "it is not relevant whether probable cause existed with respect to each individual charge, or, indeed, any charge actually invoked by the arresting officer at the time of arrest." *Jaegly v. Couch,* 439 F.3d 149, 154 (2d Cir.2006). "A probable cause determination does not require proof beyond a reasonable doubt; it is the mere probability of criminal activity, based on the totality of the circumstances, that satisfies the Fourth Amendment." *Hahn v. County of Otsego,* 820 F.Supp. 54, 55 (N.D.N.Y.1993), aff'd, 52 F.3d 310 (2d Cir.1995). "[T]he eventual disposition of the criminal charges is irrelevant to the probable cause determination." *Hahn,* 820 F.Supp. at 55 (citing *Pierson v. Ray,* 386 U.S. 547, 555, 87 S.Ct. 1213, 18 L.Ed.2d 288 (1967)).

**\*7** "It is well-established that a law enforcement official has probable cause to arrest if he received his information from some person, normally the putative victim or eyewitness." *Martinez v. Simonetti,* 202 F.3d 625, 634 (2d Cir.2000) (quoting *Miroslavsky v. AES Eng'g Soc'y,* 808 F.Supp. 351, 355 (S.D.N.Y.1992), aff'd 993 F.2d 1534 (2d Cir.1993)). "If policemen arrest a person on the basis of a private citizen's complaint that if true would justify the arrest, and they reasonably believe it is true, they cannot be held liable ... merely because it later turns out that the complaint was unfounded." *Lee v. Sandberg,* 136 F.3d 94, 103 (2d Cir.1997); *see Calderola v. Calabrese,* 298 F.3d 156, 165 (2d Cir.2002) ("[W]hen an average citizen tenders information to the police, the police should be permitted to assume that they are dealing with a credible person in the absence of special circumstances suggesting that might not be the case."). Police officers may also rely upon information gained from other officers in making their probable cause assessment. *See Savino v. City of N.Y.,* 331 F.3d 63, 74 (2d Cir.2003). Once a police officer has probable cause, he need not explore "every theoretically plausible claim of innocence before making an arrest." *Ricciuti v. New York City Transit Authority,* 124 F.3d 123, 128 (2d Cir.1997);

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 163581 (N.D.N.Y.)

(Cite as: 2008 WL 163581 (N.D.N.Y.))

*see Hotaling v. LaPlante,* 67 F.Supp.2d 517, 522 (N.D.N.Y.2001) (valid probable cause to arrest rested upon information supplied by an identified witness, and even though a further investigation by the Trooper would have led to a contradictory conclusion, Trooper's conduct was not unreasonable under the circumstances).

Where the facts surrounding the arrest are uncontroverted, the determination as to whether probable cause existed may be made by the Court as a matter of law. *Weyant v. Okst,* 101 F.3d 845, 852 (2d Cir.1996). Even where factual disputes exist, a § 1983 claim may fail if the plaintiff's version of events is sufficient to establish probable cause to arrest. *Mistretta v. Prokesch,* 5 F.Supp.2d 128, 133 (E.D.N.Y.1998).

From the facts gained by the police from the putative victim's statement, the police had probable cause to arrest Plaintiff even before his questioning. Further, although Plaintiff did not confirm all of the putative victim's allegations, he did corroborate much of what the putative victim alleged. Thus, even assuming that there were discrepancies in the various statements and no physical evidence presented on August 25, 2004 of the alleged rape (as Plaintiff contends), Defendants were presented with reasonably trustworthy information of facts and circumstances sufficient to warrant a person of reasonable caution in the belief that Plaintiff committed a rape or some other sexual assault. Accordingly, Plaintiff's claim sounding in false arrest or false imprisonment is **dismissed.**

**b. Right to Counsel**

Plaintiff next asserts that his Sixth Amendment right to counsel was violated when he requested an attorney on the way to the interrogation room but was told that it would take a day to find one and, if he wanted to wait, he would be arrested on the rape charge. Plt. Mem. L. p. 2. Such an allegation, even if true, does not form the basis of an actionable Sixth Amendment claim.

**\*8** The Sixth Amendment to the United States Constitution provides that "[i]n all criminal prosecutions, the accused shall enjoy the right ... to have the Assistance of Counsel for his defence." *Texas v. Cobb,* 532 U.S. 162, 167, 121 S.Ct. 1335, 149 L.Ed.2d 321 (2001). A defendant's Sixth Amendment right to counsel attaches

"only at or after the time that adversary judicial proceedings have been initiated against him." *Kirby v. Illinois,* 406 U.S. 682, 688, 92 S.Ct. 1877, 32 L.Ed.2d 411 (1972). Under New York law, "a criminal proceeding, and the right to counsel, is initiated or commenced by the *filing of an accusatory instrument." Brown v. Martin,* 2004 WL 1774328, at * 5 (W.D.N.Y. Aug.6, 2004) (emphasis in original) (citing *People v. Blake,* 35 N.Y.2d 331, 339, 361 N.Y.S.2d 881, 320 N.E.2d 625 (1974); *Deshawn E. by Charlotte E. v. Safir,* 156 F.3d 340, 349 (2d Cir.1998)). "Since plaintiff had not been arrested or charged with any crime at the time of questioning, [his] Sixth Amendment right had yet to attach." *Contes v. City of New York,* 1999 WL 500140, at * 8 (S.D.N.Y. July 14, 1999) (citing *Neighbour v. Covert,* 68 F.3d 1508, 1511 (2d Cir.1995)). Thus, Plaintiff has no cognizable claim that his Sixth Amendment right to counsel was violated by Defendants, and any such claim is **dismissed.**

**c. Coerced Incriminating Statement**

Plaintiff also asserts that his Fifth Amendment right against compulsory self-incrimination, and his Fourteenth Amendment right to due process, were violated when he told Detective Kaminsky that he was "pleading the Fifth" on the way to the interrogation room yet Detective Kaminsky nonetheless continued with the questioning. The Fifth Amendment provides that no person "shall be compelled in any criminal case to be a witness against himself." U.S. Const. Amend. V. "It can be asserted in any proceeding, civil or criminal, administrative or judicial, investigatory or adjudicatory; and it protects against any disclosures which the witness reasonably believes could be used in a criminal prosecution or could lead to other evidence that might be so used." *Kastigar v. United States,* 406 U.S. 441, 444-45, 92 S.Ct. 1653, 32 L.Ed.2d 212 (1972) (footnotes omitted). In *Kastigar,* the Supreme Court declared that the Amendment's "sole concern is to afford protection against being forced to give testimony leading to the infliction of [criminal] penalties." *Id.* at 453, 406 U.S. 441, 92 S.Ct. 1653, 32 L.Ed.2d 212 (internal quotation marks and citation omitted). The Fifth Amendment's self-incrimination clause bars the government from using a compelled confession in any criminal case.

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 163581 (N.D.N.Y.)

(Cite as: 2008 WL 163581 (N.D.N.Y.))

The test for whether a statement was improperly obtained by coercion is "determined by the totality of the circumstances." *Deshawn E. by Charlotte E. v. Safir,* 156 F.3d 340, 346 (2d Cir.1998).

*Higazy v. Templeton,* 505 F.3d 161, 170 (2d Cir.2007).

The due process question is whether the statements made by [Plaintiff] were voluntary. See *Colorado v. Connelly,* 479 U.S. 157, 164, 107 S.Ct. 515, 93 L.Ed.2d 473 (1986); *see also United States v. Orlandez-Gamboa,* 320 F.3d 328, 332 (2d Cir.2003) ("A confession is admissible under the Constitution only if it is made voluntarily."). The term "voluntary" has a specialty meaning in this analysis; after all, much of the point of custodial interrogation is to obtain statements the suspect would not otherwise have chosen to make. The question is whether the statements were obtained so involuntarily as to render the process of conviction based upon those statements a "mere pretense." *Brown v. Mississippi,* 297 U.S. 278, 286, 56 S.Ct. 461, 80 L.Ed. 682 (1936). " 'No single criterion controls whether an accused's confession is voluntary: whether a confession was obtained by coercion is determined only after careful evaluation of the totality of the surrounding circumstances.' " *Nelson v. Walker,* 121 F.3d 828, 833 (2d Cir.1997) (quoting *Green v. Scully,* 850 F.2d 894, 901 (2d Cir.1988)). Factors include "the characteristics of the accused, such as his experience, background, and education; the conditions of the interrogation; and the conduct of law enforcement officials, notably, whether there was physical abuse, the period of restraint in handcuffs, and use of psychologically coercive tactics." *Id.*

**\*9** *King v. City of New York,* 2007 WL 959696, at \*12 (E.D.N.Y. March 30, 2007).

Assuming, *arguendo,* that Plaintiff's August 25, 2004 statements were used against him in a criminal proceeding, see *Chavez v. Martinez,* 538 U.S. 760, 766, 123 S.Ct. 1994, 155 L.Ed.2d 984 (2003) (holding that a coerced confession cannot serve as the basis for an 42 U.S.C. § 1983 action when that confession was never used in a criminal case); *Weaver v. Brenner,* 40 F.3d 527, 536 (2d Cir.1994) (use of a coerced confession before a grand jury

is a violation of the self-incrimination clause), there is no evidence from which a reasonable fact finder could conclude that Plaintiff's statements were coerced. As indicated by the undisputed evidence, Detective Kaminsky read Plaintiff his Miranda rights before Plaintiff gave his narrative statement and was questioned by police, and Plaintiff stated that he understood and waived those rights. Detective Kaminsky's explanations of the rights, and his questions of whether Plaintiff desired to waive those rights, were done in a non-threatening manner. Plaintiff was repeatedly advised that the decision to continue was "up to [him]." There was no force or threat made to Plaintiff, and his responses evince an understanding of the ramifications of speaking to the police. Indeed, in deciding whether to speak to the police without a lawyer, Plaintiff acknowledged that he might incriminate himself but maintained that he had done nothing wrong and had nothing to hide and, therefore, wanted to "talk."

Plaintiff's contention that the police put the words "I slipped into her panties" "into [his] mouth" appears to be the type that is "blatantly contradicted by the record" such that "no reasonable jury could believe it." *Scott,* 127 S.Ct. at 1776. As evidenced by the video, Plaintiff made this statement in his narrative, and, after he made it, Detective Kaminsky confirmed the statement with Plaintiff. Furthermore, Detective Kaminsky then clarified the statement by asking Plaintiff whether was referring to his penis, which Plaintiff confirmed. After Plaintiff reviewed the written statement, he made no effort to change this contention other than to qualify it by stating that he did not enter the putative victim's vagina. Based upon the undisputed facts, no reasonable fact finder could conclude that Plaintiff's statements were coerced.

Further, while a police officer may not question a suspect once he invokes his right to counsel, the remedy for a violation of this rule is suppression of the resulting statement in ensuing criminal proceedings, not a cause of action for damages under Section 1983. See *Chavez,* 538 U.S. at 770-772; [FN4] *Deshawn E.,* 156 F.3d at 346 ("The remedy for a violation of the right against self-incrimination is 'the exclusion from evidence of any ensuing self-incriminating statements' and "not a § 1983 action.") (quoting *Neighbour v. Covert,* 68 F.3d 1508, 1510 (2d Cir.1995) (*per curiam* ), *cert. denied,* 516 U.S.

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 163581 (N.D.N.Y.)

(Cite as: 2008 WL 163581 (N.D.N.Y.))

1174, 116 S.Ct. 1267, 134 L.Ed.2d 214 (1996)). Accordingly, Plaintiff's claims premised on the Fifth and Fourteenth Amendments for the use of his statements against him are **dismissed**.

> FN4. As the Court explained in *Chavez:*
>
> In the Fifth Amendment context, we have created prophylactic rules designed to safeguard the core constitutional right protected by the Self-Incrimination Clause. *See, e.g.,* [ *Michigan v. Tucker,* 417 U.S. 433, 444, 94 S.Ct. 2357, 41 L.Ed.2d 182 (1974) ] (describing the "procedural safeguards" required by *Miranda* as "not themselves rights protected by the Constitution but ... measures to insure that the right against compulsory self-incrimination was protected" to "provide practical reinforcement for the right"); [ *Oregon v. Elstad,* 470 U.S. 298, 306, 105 S.Ct. 1285, 84 L.Ed.2d 222 (1985) ] (stating that "[t]he *Miranda* exclusionary rule ... serves the Fifth Amendment and sweeps more broadly than the Fifth Amendment itself")....
>
> Rules designed to safeguard a constitutional right, however, do not extend the scope of the constitutional right itself, just as violations of judicially crafted prophylactic rules do not violate the constitutional rights of any person. As we explained, we have allowed the Fifth Amendment privilege to be asserted by witnesses in noncriminal cases in order to safeguard the core constitutional right defined by the Self-Incrimination Clause-the right not to be compelled in any criminal case to be a witness against oneself. We have likewise established the *Miranda* exclusionary rule as a prophylactic measure to prevent violations of the right protected by the text of the Self-Incrimination Clause-the admission into evidence in a criminal case of confessions obtained through coercive custodial questioning.... Accordingly, Chavez's failure to read *Miranda* warnings to Martinez did not violate Martinez's constitutional rights and

cannot be grounds for a § 1983 action. *See Connecticut v. Barrett,* 479 U.S. 523, 528, 107 S.Ct. 828, 93 L.Ed.2d 920 (1987) (*Miranda's* warning requirement is "not itself required by the Fifth Amendmen[t] ... but is instead justified only by reference to its prophylactic purpose"); *Tucker, supra,* at 444, 417 U.S. 433, 94 S.Ct. 2357, 41 L.Ed.2d 182 (*Miranda* 's safeguards "were not themselves rights protected by the Constitution but were instead measures to insure that the right against compulsory self-incrimination was protected").

> *Chavez,* 770-772.

**d. Fourth Amendment Seizure**

**\*10** Plaintiff argues in his Memorandum of Law that his Fourth Amendment right to be free from unreasonable and unwarranted seizures was violated when he was coerced to sign consent forms for the swabs of his mouth and penis. His conclusory allegations of coercion relative to signing these forms regard are belied by the record in which he is depicted voluntarily consenting to such procedures absent any threat or force by police. Plaintiff fails to present any evidence upon which a reasonable fact finder could conclude otherwise. His claim in this regard is **dismissed.**

**e. Presentation of False Evidence**

Plaintiff also alleges that his due process rights were violated when the police presented false evidence of a witness's selection of him from a photo array. In this regard, Detective Kaminsky took the statement from the woman who was at 200 North Street, Apt. 9, Endicott, New York and who knew "Chris" and gave the police "Chris's" physical description and telephone number. While taking the statement, the woman selected Plaintiff from a photo array and Detective Kaminsky reported that the woman selected photo "# 5" which was Chris McZorn. However, sometime later and before the case was presented to the grand jury the first time, Detective Kaminsky realized that his report had a typographical error in it because the woman selected the photo of Chris McZorn "marked # 4." *See* Kaminsky Suppl. Report, Attach to Am. Compl. Detective filed a supplemental

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 163581 (N.D.N.Y.)

(Cite as: 2008 WL 163581 (N.D.N.Y.))

report correcting the error. *Id.* Plaintiff argues: "How do we know [the witness] really didn't pick 'Christopher McZorn' and 'Det. Sgt. Kaminsky' use[d] typographical error as an excuse or cover up[?]." Plt. Mem. L. p. 10.

Assuming *arguendo* that the witness picked the wrong person from the photo array and Detective Kaminsky attempted to cover up this fact, Plaintiff cannot show proximate cause between this action and any damage he may have suffered. Indeed, shortly after the incident at 200 North Street, Apt. 9, Endicott, New York, Plaintiff went to the police station and confirmed that he was the "Chris" who was on the couch with the putative victim. He further stated that the two engaged in some sexual conduct, just not to the extent alleged by the putative victim. Consequently, nothing the witness stated to the police (including her allegedly inaccurate selection of Plaintiff from the photo array) added anything to the allegations against Plaintiff that the police did not already have from another source. Plaintiff's Section 1983 claim alleging the presentation of false evidence is **dismissed** for lack of proximate cause.

### f. Eighth Amendment

Plaintiff asserts, in wholly conclusory fashion, that his Eighth Amendment protections against excessive bail and cruel and unusual punishment were violated by Defendants. *See* Plf. Mem. L. p. 3. He provides no factual allegation upon which a fact finder could conclude that Defendants played any role in a bail determination relative to Plaintiff (which, presumably, was made by a neutral magistrate). Therefore, the claim in this regard fails as a matter of law. *See Dawkins v. Williams,* 413 F.Supp.2d 161, 170-71 (N.D.N.Y.2006) ( "Defendant officers ... were not responsible for the bail decisions made in relation to Plaintiff's detention or release. Therefore, Plaintiff's Eighth Amendment claim fails.") (citations omitted).

**\*11** Similarly, there is no evidence that Plaintiff was convicted of the crime of which Defendants were involved and, therefore, no Eighth Amendment "cruel and unusual punishment" claim attaches. *See Smith v. Ortiz,* 2006 WL 1458404, at \*5 (S.D.N.Y. May 25, 2006) ("A plaintiff may state a claim under the Eighth Amendment [for cruel and unusual punishment] only if he or she has been

adjudged guilty by a criminal proceeding at the time of the events giving rise to the Eighth Amendment claim.") (citing *SeeIngraham v. Wright,* 430 U.S. 651, 671-72, 97 S.Ct. 1401, 51 L.Ed.2d 711 (1977); *City of Revere v. Massachusetts General Hospital,* 463 U.S. 239, 103 S.Ct. 2979, 77 L.Ed.2d 605 (1983)). Plaintiff's Eighth Amendment claim is **dismissed.**

### g. First Amendment

Plaintiff contends that his First Amendment right to free speech was violated because Defendants failed to include in Plaintiff's written statement his assertion that "drugs were involved" in the incident. Plaintiff's contention, even if true, does not constitute an actionable claim under the First Amendment. There is no evidence of any action by the government that prevented Plaintiff from making the statement (or any statement for that matter), and the failure to include the contention in the written statement does not form the basis of an actionable First Amendment claim.

Further, Plaintiff's allegation is belied by the record. As evidenced by the video of Plaintiff's questioning, he was allowed to tell his version of events in narrative fashion. He did not mention in the narrative that "drugs were involved." After being given the statement and before signing it, Plaintiff was repeatedly asked whether he wanted to add anything. He did not add this factual contention.

No reasonable fact finder could conclude that Plaintiff was prevented from making any statement. Accordingly, any First Amendment claim asserted in this action is **dismissed.**

### h. Ninth Amendment

Finally, Plaintiff asserts that Defendants' actions in denying him the right to counsel and coercing him make an incriminating statement constituted a violation of the Ninth Amendment.[FN5] "The Ninth Amendment is a rule of construction, not one that protects any specific right, and so no independent constitutional protection is recognized which derives from the Ninth Amendment and which may support a § 1983 cause of action." *Diaz v. City of New York,* 2006 WL 3833164, ----7-8 (E.D.N.Y. Dec.29, 2006) (internal quotation marks and citations omitted).

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 163581 (N.D.N.Y.)

(Cite as: 2008 WL 163581 (N.D.N.Y.))

Accordingly, any Ninth Amendment claim is **dismissed.**
>    FN5. The Ninth Amendment provides: "The
>    enumeration in the Constitution, of certain rights,
>    shall not be construed to deny or disparage
>    others retained by the people." U.S. Const.
>    Amend. IX.

**V. CONCLUSION**

For the reasons set forth above, Defendants' motion for summary judgment is **GRANTED** and all **Section 1983** claims are DISMISSED. To the extent Plaintiff asserts a state common law claim of defamation, the Court declines to exercise supplemental jurisdiction over the claim and any such claim is **dismissed without prejudice to refiling in state court.** The Clerk of the Court is directed to mark this file as closed.

**\*12 IT IS SO ORDERED.**

N.D.N.Y.,2008.

McZorn v. Endicott Police Dept.
Not Reported in F.Supp.2d, 2008 WL 163581 (N.D.N.Y.)
END OF DOCUMENT

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.



Not Reported in F.Supp.2d, 2006 WL 3833164 (E.D.N.Y.)

(Cite as: 2006 WL 3833164 (E.D.N.Y.))



Only the Westlaw citation is currently available.
United States District Court,

E.D. New York.
Wanda DIAZ, Moises Santana, Gilberto Diaz, Tanairi,
an infant, and Moises Santana, Jr., an infant, the infants
by their parent and guardian Wanda Diaz, Plaintiffs,
v.
CITY OF NEW YORK, P.O. Angelo Burgos, Shield #
17545 and Unidentified New York City Police Officers,
Defendants.
No. 00–CV–2944 (JMA).

Dec. 29, 2006.

Jennifer C. Friedrich, Lewis Johs Avallone Aviles, LLP,
Melville, NY, Attorney for Plaintiffs.

Michael A. Cardozo, Corporation Counsel of the City of
New York, by Leticia J. Santiago, Assistant Corporation
Counsel, Julia Chung Katten Muchin Rosenman LLP New
York, NY, Attorney for Defendants.

### MEMORANDUM AND ORDER

AZRACK, United States Magistrate Judge.
   *1 Plaintiffs Wanda Diaz, Moises Santana, Gilberto
Diaz, Tanairi Rios, and Moises Santana, Jr. bring this
action against the City of New York, police officer Angelo
Burgos, and "Unidentified New York City Police
Officers" alleging violations of their civil rights under 42
U.S.C. § 1983 ("Section 1983") and New York law. More
specifically, plaintiffs allege that defendants violated their
Fourth Amendment rights by conducting an illegal search
and seizure, using unreasonable force, and unlawfully
destroying plaintiffs' property. Plaintiffs further allege that
defendants have interfered with their constitutional right
to family integrity under the Ninth Amendment. Plaintiffs
claim that a captain supervising the officers conducting the
search should be liable for failing to supervise the officers,
and that the City of New York is liable for a policy and
custom that led to the violations attributed to the officers.

Plaintiffs further claim that defendants failed to intervene
to prevent these alleged constitutional violations. And
finally, plaintiffs allege that defendants committed assault
and battery, false arrest, and the negligent hiring,
supervising and training of officers under New York law.
   By motion dated July 15, 2005, defendants move for
summary judgment pursuant to Rule 56 of the Federal
Rules of Civil Procedure. The parties consented to have a
United States Magistrate Judge preside over this case for
all purposes, including entry of judgment, pursuant to 28
U.S.C. § 636(c). Viewing the evidence in a light most
favorable to the plaintiffs, I grant summary judgment as to
plaintiffs': (1) Fourth Amendment claims of unlawful
search and seizure and unlawful detention; (2) Ninth
Amendment claims of interference with family integrity;
(3) Supervisory Liability claim; (4) Monell claim against
defendant City of New York; and (5) New York State
false arrest and negligent hiring, supervision and training
claims. I deny summary judgment on plaintiffs': (1) Fourth
Amendment claims of excessive force, destruction
of property and failure to intervene; and (2) New York State
assault and battery claims. In addition, I find that summary
judgment should not be granted based on the individual
officers' claim of qualified immunity to these surviving
claims.

### I. FACTS

   The following facts are taken from the parties' Local
Civil Rule 56.1 Statements and the Declaration of Wanda
Diaz, and are undisputed unless otherwise noted. On
February 16, 2006, New York City Police Officer Angelo
Burgos obtained a search warrant for 879 Bergen Street,
Apartment 12A, in Brooklyn, New York based on
information provided by a confidential informant ("CI").
(Defs.' Rule 56.1 Stmt. ¶ 1.) According to Burgos'
affidavit, the CI had observed Moises Santana selling
drugs out of the apartment, and had observed a large
quantity of heroin currently in the apartment. (Id. ¶ 2.)
Based on conversations with the CI, Burgos believed that
heroin trafficking was taking place at 879 Bergen Street,
Apartment 12A. (Id. ¶ 3.) A State Supreme Court Justice
granted a "no knock" warrant for a search of 879 Bergen

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2006 WL 3833164 (E.D.N.Y.)

(Cite as: 2006 WL 3833164 (E.D.N.Y.))

Street based on Officer Burgos' affidavit and the testimony of the CI. (*Id.* ¶ 7; *Id.* Ex. 3) The "no knock" provision was approved because the evidence sought in the warrant, heroin, could be disposed of quickly. (*Id.* ¶ 8.)

**\*2** On February 23, 1999 at approximately 7:30 pm Officer Burgos, along with other police officers and an Emergency Service Unit ("ESU"), arrived at 879 Bergen Street to execute the warrant. (Defs.' Rule 56.1 Stmt. ¶ 9.) Officer Burgos pointed ESU to the door of Apartment 12A and waited in the stairwell while ESU executed the entry. (*Id.* ¶ 10.) Once ESU secured the apartment, they gave the officers an "all clear" signal and the officers, including Burgos, entered the apartment. (*Id.* ¶ 12.)

Wanda Diaz was at home with the father of her children, Moises Santana, Sr., and her children Tanairi Rios and Moises Santana, Jr., when her door was forced open with a loud crashing noise as police officers entered the apartment. (Declaration of Wanda Diaz "Diaz Declaration" ¶¶ 3–4.) Moises Santana, Sr. and Wanda Diaz were handcuffed. (Defs.' Rule 56.1 Stmt. ¶ 13.) Diaz described that a police officer "pushed me to the floor with his knee in my back" when she was handcuffed. (Diaz Declaration ¶ 5.) The officers "were yelling and screaming at me to get down on the floor [sic] mixed with obscenities" and "stuck a shot gun in my face and told me to 'Stay still!' " (Diaz Declaration ¶ 6.) Diaz also contends that the officers repeatedly struck her on her legs with the end of the shot gun. (Diaz Declaration ¶ 6.) The officers then "put the shot gun to my head and yelled 'Tell me where the fucking drugs are,' to which she responded 'I don't know what you are talking about.' " (Diaz Declaration ¶ 7.) Diaz states that she was bleeding from her right knee as a result of being pushed onto the floor. (*Id.* ¶ 7.)

Diaz saw Santana, Sr. in the kitchen with red beams of light on his forehead, and believed them to be targeting lights for firearms; "I thought we were all going to be shot and die." (*Id.* ¶ 9.) The children remained in their bedroom during the search and only came out briefly so that the officers could search their bedroom. (Defs.' Rule 56.1 Stmt. ¶ 15.) The defendants contend that a female officer was present with the children during the search, but Diaz disputes that claim. (Defs.' Rule 56.1 Stmt. ¶ 14; Diaz Declaration ¶ 11.) Diaz asked if she could see her

children, explaining that one of her sons suffered from a debilitating asthma condition, but the officers refused. (Diaz Declaration ¶¶ 5, 9.) Diaz then asked if her handcuffs could be loosened because she was beginning to lose feeling in one of her arms, but the officers refused. (*Id.* ¶ 12.) She claims that Officer Burgos took her into the bathroom and "continuously slammed the back of [her] head into the wall," while screaming at her. (*Id.* ¶ 13.) She also states that he threatened to take away her children, and call the Welfare Department. (*Id.*)

The officers searched the apartment. (Defs.' Rule 56.1 Stmt. ¶ 16.) Diaz and Moises, Sr. informed the officers that there was $4,700.00 in cash in the apartment, and when the officers could not find it they grabbed Moises, Sr. and screamed for him to show them where the money was being held. (Diaz Declaration ¶ 15.) Moises, Sr. then showed the officers where the cash was hidden. (*Id.*) When Burgos asked Santana to whom the money belonged, Santana stated that it belonged to him. (Defs.' Rule 56.1 Stmt. ¶ 17.) After further inquiry, Burgos learned that Santana was on public assistance. (Defs.' Rule 56.1 Stmt. ¶ 18.) Lieutenant Mihnovich then instructed Burgos to take the money for forfeiture proceedings because Santana could not account for it. (Defs.' Rule 56.1 Stmt. ¶ 18.)

**\*3** Diaz alleges that she and Moises, Sr. were held on the couch for two hours, and then held standing in their bedroom for two more hours. (Diaz Declaration ¶ 16.) She also contends that the officers "made a mess" and destroyed personal property and furniture, including her platform bed. (*Id.* ¶ 19.) A police captain arrived approximately five hours after the search began, and Diaz claims that "the physical and verbal abuse stopped" once he arrived. (*Id.* ¶ 20.) Diaz heard the captain say "This was a false alarm." (*Id.*) Diaz claims that the children were crying, scared and upset, and Moises, Jr. said he was having trouble breathing so Diaz gave him an oxygen treatment. (Diaz Declaration ¶ 21.)

Burgos took photographs of the apartment, and told Santana and Diaz to come to the precinct to receive copies of the receipt for the money taken from the apartment. (Defs.' Rule 56.1 Stmt. ¶¶ 20–21; *See* Defs.' Memo. in Supp. of Summ. J. Ex. 8) Diaz and the children went to

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2006 WL 3833164 (E.D.N.Y.)

(Cite as: 2006 WL 3833164 (E.D.N.Y.))

Interfaith Hospital, and Diaz claims that she suffered leg pain from being struck with the shot gun, her right knee was swollen, she had limited range of motion, and she was unable to sleep. (Diaz Declaration ¶ 22.) Diaz claims that she "continues to seek psychiatric treatment," she is "scared of everyone and everything," and she "dropped out of school and [is] scared to go outside." (Diaz Declaration ¶ 23.)

## II. DISCUSSION

### 1. Summary Judgment Standard

The standard for granting summary judgment is well established. Summary judgment should be granted only "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c); *see also Celotex Corp. v. Catrett,* 477 U.S. 317, 322 (1986); *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 585–87 (1986). "[T]he burden is upon the moving party to demonstrate that no genuine issue respecting any material fact exists," *Gallo v. Prudential Residential Servs., L.P.,* 22 F.3d 1219, 1223 (2d Cir.1994), but "the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247–48 (1986). "An issue of fact is 'material' for these purposes if it 'might affect the outcome of the suit under the governing law,' " while "[a]n issue of fact is 'genuine' if 'the evidence is such that a reasonable jury could return a verdict for the non-moving party.' " *Konikoff v. Prudential Ins. Co. of Am.,* 234 F.3d 92, 97 (2d Cir.2000) (quoting *Anderson,* 477 U.S. at 248).

In determining whether any material facts are in dispute, the court "must view the evidence in the light most favorable to the non-moving party and draw all reasonable inferences in its favor." *Am. Cas. Co. of Reading, Pa. v. Nordic Leasing, Inc.,* 42 F.3d 725, 728 (2d Cir.1994) (quoting *Consarc Corp. v. Marine Midland Bank, N.A.,* 996 F.2d 568, 572 (2d Cir.1993)); *see also Anderson,* 477 U.S. at 255. To defeat a properly supported motion for summary judgment, the non-moving party must " 'set forth specific facts showing that there is a genuine

issue for trial.' " *Matsushita,* 475 U.S. at 587 (quoting Fed.R.Civ.P. 56(e)). The non-moving party, however, "must do more than simply show that there is some metaphysical doubt as to the material facts." *Id.* at 586 (citations omitted). Mere conclusory allegations, speculation or conjecture will not avail a party resisting summary judgment. *See Kerzer v. Kingly Mfg.,* 156 F.3d 396, 400 (2d Cir.1998); *Kulak v. City of New York,* 88 F.3d 63, 71 (2d Cir.1996). The non-moving party must come forth with "significant probative evidence" demonstrating that a factual dispute does in fact exist. *Anderson,* 477 U.S. at 249. "If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Id.* at 249–250 (citations omitted).

### 2. Section 1983

**\*4** Plaintiffs seek to recover from defendants under 42 U.S.C. § 1983. To establish liability under Section 1983, plaintiffs must show that (1) the defendants acted under color of state law and (2) as a result of the defendants' actions, the plaintiffs suffered a deprivation of rights secured by the Constitution and laws of the United States. *Annis v. County of Westchester,* 136 F.3d 239, 245 (2d Cir.1998); *Eagelson v. Guido,* 41 F.3d 865, 872 (2d Cir.1994); *Lehman v. Kornblau,* 134 F.Supp.2d 281, 287 (E.D.N.Y .2001). Section 1983 creates no substantive rights, but "provides remedies for deprivations of rights established elsewhere." *Oklahoma City v. Tuttle,* 471 U.S. 808, 816 (1985) (plurality opinion).

Here, the fact that the officers acted "under color of state law" is not disputed, because the actions giving rise to the plaintiffs' claims were committed by police officers in the course of their duties. *See Davis v. City of New York,* 373 F.Supp.2d 322, 329 (S.D.N.Y.2005) (defendants acting in their capacity as police officers were "clearly acting 'under color of state law.' ") Therefore, the discussion will focus on the second element—whether as a result of the defendants' actions, the plaintiffs suffered a deprivation of their Constitutional rights.

### A. Fourth Amendment Claims

Plaintiffs make several claims that relate to the entry and search of their apartment. Specifically, the plaintiffs claim that the defendants violated their Fourth

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2006 WL 3833164 (E.D.N.Y.)

(Cite as: 2006 WL 3833164 (E.D.N.Y.))

Amendment rights by an unlawful search and seizure, the unnecessary destruction of property and the unlawful use of force. Defendants argue that they are entitled to summary judgment as to these claims.

**I) Illegal Search and Seizure**

Plaintiffs base their illegal search and seizure claim on their allegations that the officers "unreasonably and unnecessarily" searched and seized the plaintiffs' property, that the plaintiffs "remained in handcuffs for over five hours while the officers searched a small two-bedroom apartment," and that they were "verbally, mentally and physically abused by the officers during the five hours of restraint and confinement." [FN1] (Pls.' Memo. in Opp. to Summ. J. 6.)

> FN1. The alleged verbal, mental and physical abuse by the officers will be addressed in the excessive force section of this decision.

Under the Fourth Amendment, the Warrant Clause requires that, absent certain exceptions, police obtain a warrant from a neutral and detached magistrate to search a person's home. *See Franks v. Delaware,* 438 U.S. 154, 164 (1978). A magistrate issuing a warrant must make a probable cause determination based on the "totality of the circumstances," by making a commonsense decision based on the information set forth in the affidavit before him. *See Illinois v. Gates,* 462 U.S. 213, 238 (1983) (where an informant's tip corroborated by a sworn statement by an affiant was sufficient probable cause for a warrant.) A "no knock" warrant may be obtained to search for contraband drugs. *See Richards v. Wisconsin,* 520 U.S. 385, 395 (1997) (holding that "knock and announce" when executing a search warrant is not needed where officers reasonably suspect that evidence might be destroyed).

**\*5** The plaintiff's illegal search claim fails because defendants had a facially valid warrant based on probable cause. The officers' entry into and search of the plaintiffs' residence was lawful pursuant to a valid search warrant approved by a New York State Supreme Court Justice. The Justice's decision was based on Officer Burgos' sworn affidavit as to his conversations with the CI, as well as the CI's statement to the judge. In addition, the "no knock" provision was approved because narcotics could be disposed of quickly. Thus, the entry into and search of the plaintiffs' apartment was lawful pursuant to a valid search warrant and did not violate their constitutional rights. [FN2]

> FN2. The cases cited by the plaintiff for the propositions that police have *limited* authority to enter a dwelling in which a suspect lives, *Payton v. New York,* 445 U.S. 573, 603 (1980), and that police must reasonably believe that the suspect is present to enter a dwelling, *United States v. Terry,* 702 F.2d 299 (2d Cir.1983) and *United States v. Lauter,* 57 F.3d 212 (2d Cir.1995), are not applicable here because they address *arrest* warrants, whereas this case considers a *search* warrant.

Even should plaintiffs contend that the warrant was issued on less than probable cause, their arguments would fail. A plaintiff who argues that a warrant was issued on less than probable cause faces a heavy burden. *Rivera v. United States,* 928 F.2d 592, 602 (2d Cir.1991). Where a magistrate has found that an affidavit presented to him showed that there was probable cause for the issuance of a warrant, the person challenging the affidavit must make a "substantial preliminary showing" that the affiant knowingly and intentionally, or with reckless disregard to the truth, made a false statement in his affidavit and that this false statement was "necessary to the finding of probable cause." *Rivera,* 928 F.2d at 604 (quoting *Franks,* 438 U.S. at 155–56). Plaintiffs have offered no evidence that the affiant made a false statement to the judge. Plaintiffs' conclusory statement that the officers "illegally entered and searched" their home is not enough to overcome summary judgment on this claim.

The plaintiffs' assertions that their detention during the duration of the search was unreasonable is also without merit. The Supreme Court has held that a search warrant for a house "implicitly carries with it the limited authority to detain the occupants of the premises while a proper search is conducted." *Michigan v. Summers,* 452 U.S. 692, 705 (1981); *see also Rivera v. United States,* 928 F.2d 592, 606 (2d Cir.1991). The "risk of harm to both the police and the occupants is minimized if the officers routinely exercise unquestioned command of the situation." *Summers,* 452 U.S. at 705. The detention of the occupants must be limited, however, and must be

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2006 WL 3833164 (E.D.N.Y.)

(Cite as: 2006 WL 3833164 (E.D.N.Y.))

"substantially less intrusive" than an arrest. *Id.* at 702. "Thus, a detention ... is constitutional so long as the means used to effectuate it are as minimally intrusive as possible to achieve the end of securing the home, preventing flight from the premises and ensuring the safety of officers and occupants." *Barlett v. City of New York,* 03–CV–1961, 2005 WL 887112, at *8 (E.D.N.Y. Feb 11, 2005), *citing United States v. Pichardo,* 92–CR–354, 1992 WL 249964, at *5 (S.D.N.Y. Sept. 22, 1992). The circumstances surrounding the detention must be viewed "through the eyes of a reasonable and cautious police officer on the scene guided by his experience and training." *United States v. Barlin,* 686 F.2d 81, 87 (2d Cir.1982). Furthermore, officers have authority to use handcuffs during the duration of a search for contraband. *Meuhler v. Mena,* 544 U.S. 93, 93 (2005).

**\*6** Defendants contend that their search lasted "approximately two hours," (Defs.' Memo. in Supp. of Summ. J. 3) while plaintiffs allege that the search lasted five hours. (Diaz Declaration ¶¶ 16, 20.) In executing the subject warrant the officers were within lawful authority to detain and handcuff plaintiffs while conducting their lawful search. The search was not unnecessarily long or intrusive: once the search was completed, the plaintiffs were immediately released, and the officers vacated the premises. In sum, the search was according to law, and thus summary judgment is granted to defendants as to the plaintiffs' illegal search and seizure claims.

**ii) Excessive Force**

Plaintiffs also contend that defendants used excessive force when an officer handcuffed Diaz tightly, pushed her to the floor, struck her on the legs with a shot gun, and hit her head against the bathroom wall, and when officers "brutally grabbed" Moises, Sr. Even if lawfully detained, a person has a constitutional right to be free from the use of excessive force. *Graham v. Connor,* 490 U.S. 386, 394 (1989). All claims that law enforcement officers used excessive force in the course of a search are analyzed under the Fourth Amendment "reasonableness standard." *Graham,* 490 U.S. at 395. The pertinent inquiry is "whether the officers' actions are objectively reasonable in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation."

*Id.* at 397. "Not every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers, violates the Fourth Amendment." *Id.* at 396 (quoting *Johnson v. Glick,* 481 F.2d 1028, 1033 (2d Cir.1973)). Officers may not, however, gratuitously inflict pain in a manner that is not a reasonable response to the circumstances. *Amnesty America v. Town of West Hartford,* 361 F.3d 113, 124 (2d Cir.2004). The use of force beyond what is reasonably necessary to prevent violence or the destruction of evidence violates the Fourth Amendment. *Bolden v. Village of Monticello,* 344 F.Supp.2d 407, 419 (S.D.N.Y.2004).

Diaz's allegations that she was pushed to the floor, an officer repeatedly struck her on her legs with the end of a shot gun, and an officer "continuously slammed the back of [her] head against the wall" and Moises Sr.'s allegation that he was "brutally grabbed" are sufficient to overcome summary judgment on their excessive force claims. *See Robison v. Via,* 821 F.2d 913, 923–24 (2d Cir.1987) (summary judgment denied where officer pushed plaintiff against car, threw her against the fender, and twisted her arm behind her back). Even though these officers were conducting a search for contraband drugs and were forced to make split-second decisions, there were no allegations that Diaz or Moises, Sr., were armed, dangerous or a flight risk. Given the unresolved factual issues surrounding the force the officers used in effectuating the search, I deny summary judgment on the excessive force claims.

**iii) Destruction of Property**

**\*7** Plaintiffs also claim that the officers destroyed their property during the search of their residence. Excessive or unnecessary destruction of property in the course of a search may violate the Fourth Amendment, even if the entry itself was lawful. *U.S. v. Ramirez,* 523 U.S. 65, 71 (1998). However, it is well recognized that "officers executing search warrants on occasion must damage property in order to perform their duty." *Cody v. Mello,* 59 F.3d 13, 16 (2d Cir.1995) (internal citation omitted). Before an officer can be liable for property damage resulting from a lawful search, the plaintiff must establish that the police acted unreasonably or maliciously in bringing about the damage. *Notice v. Koshes,* 386 F.Supp.2d 23, 27 (D.Conn.2005).

Plaintiffs claim that photographs taken during the

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2006 WL 3833164 (E.D.N.Y.)

(Cite as: 2006 WL 3833164 (E.D.N.Y.))

search reflect "the destruction of the platform bed located in the master bedroom, dismantled/destroyed furniture leaning up against the living room walls, and the contents of drawers and cabinets broken and placed on top of appliances, covering every usable surface in the home." (Pls.' Memo. in Opp. to Summ. J. 5; See Defs.' Memo. in Supp. of Summ. J. Ex. 8) In fact, most of these photographs illustrate damage or disarray consistent with a reasonable search for narcotics and narcotics paraphernalia. Three of the photographs, however, are less than clear, and therefore a genuine issue of material fact is raised as to whether unnecessary damage resulted from the officers' search. Viewing the evidence in a light most favorable to the plaintiffs, if the officers did indeed destroy the plaintiffs' platform bed, furniture and cabinets, a jury could find this damage unreasonable under the circumstances. Therefore, summary judgment is not appropriate as to the destruction of property claim.

**B. Ninth Amendment—Family Integrity**

Plaintiffs claim that defendants violated their Ninth Amendment rights by interfering with their family integrity. The integrity of the family unit has been found to be protected under the Ninth Amendment. See *Griswold v. Connecticut,* 381 U.S. 479, 496 (1965) (Goldberg, J., concurring). In *Griswold,* the Supreme Court concluded that the Ninth Amendment "shows a belief of the Constitution's authors that fundamental rights exist that are not expressly enumerated in the first eight amendments and an intent that the list of rights included there not be deemed exhaustive." *Griswold,* 381 U.S. at 492. However, the Ninth Amendment is "a rule of construction, not one that protects any specific right, and so "[n]o independent constitutional protection is recognized which derives from the Ninth Amendment and which may support a § 1983 cause of action." *Williams v. Perry,* 960 F.Supp. 534, 540 (D.Conn.1996) (quoting *Rini v. Zwirn,* 886 F.Supp. 270 (E.D.N.Y.1995)). Moreover, plaintiffs' submissions contain no facts or arguments to support their Ninth Amendment claim. Thus, summary judgment is granted as to the plaintiffs' Section 1983 claim based upon a right to family integrity under the Ninth Amendment.

**C. Supervisory Liability**

**\*8** Plaintiffs allege that an unidentified "Captain" who was supervising the officers conducting the search should be liable for failing to supervise or remedy the officers' unconstitutional practices. "Once the Captain entered the plaintiffs' home," plaintiffs claim, he "had the plaintiffs' released from their handcuff confinement and the abuse stopped." (Pls' Memo. in Opp. to Summ. J. 6–7.) Therefore, "[t]he Captain and defendants should be held liable for the action of its officers." *Id.*

The Second Circuit has found that supervisory liability under Section 1983 "can be shown in one or more of the following ways: (1) actual direct participation in the constitutional violation (2) failure to remedy a wrong after being informed through a report or appeal (3) creation of a policy or custom that sanctioned conduct amounting to a constitutional violation, or allowing such policy or custom to continue (4) grossly negligent supervision of subordinates who committed a violation, or (5) failure to act on information indicating that unconstitutional acts were occurring." *Richardson v. Goord,* 347 F.3d 431, 435 (2d Cir.2003), *citing Hernandez v. Keane,* 341 F.3d 137, 144 (2d Cir.2003).

Plaintiffs have provided no evidence that the captain participated in any constitutional violation, was informed of the wrongful acts alleged by the plaintiffs, created or allowed a custom or policy amounting to a constitutional violation, negligently supervised his subordinates, or failed to act on information indicating that unconstitutional acts were occurring.[FN3] Plaintiffs' have simply failed to set forth any specific facts showing a genuine issue for trial on this issue. *See Federal Rule of Civil Procedure 56(e).* For this reason, defendants' motion for summary judgment as to plaintiffs' supervisory liability claim is granted.

FN3. This Court is incredulous that after discovery the plaintiffs were not able to identify the name of the "Captain" allegedly involved in this episode. The issue of whether this violates Federal Rule of Civil Procedure 4(m), which requires the service of process on all defendants within 120 days of filing the complaint, *Soto v. Brooklyn Correctional Facility,* 80 F.3d 34 (2d Cir.1996) (where court found individual officers should have been named as defendants in civil rights action), will not be addressed because the supervisory liability claim is dismissed on the above grounds.

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2006 WL 3833164 (E.D.N.Y.)

(Cite as: 2006 WL 3833164 (E.D.N.Y.))

**D. *Monell***

A municipality may be liable for the actions of its officers under Section 1983. "It is when execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury that the government as an entity is responsible under § 1983." *Monell v. New York City Dep't of Social Services,* 436 U .S. 658, 694 (1978); *see also Patterson v. County of Oneida,* 375 F.3d 206, 226 (2d Cir.2004). Thus, to impose liability on a municipality, the plaintiff must prove that a municipal policy or custom caused a deprivation of the plaintiff's rights. *See Wimmer v. Suffolk County Police Dep't,* 176 F.3d 125, 137 (2d Cir.1999). A municipality may not, however, be held liable under a general theory of *respondeat superior.* *Monell,* 436 U.S. at 694–95.

To establish the existence of a municipal policy or custom, the plaintiff must allege (1) the existence of a formal policy officially endorsed by the municipality, (2) actions taken or decisions made by an official with final decision making authority, (3) a practice so persistent and widespread that it constitutes a custom, or (4) a failure by policymakers to properly train or supervise their subordinates, amounting to a "deliberate indifference" to the rights of those who come in contact with the municipal employees. *David v. Lynbrook Police Dep't,* 224 F.Supp.2d 463, 478 (E.D.N.Y 2002); *Moray v. City of Yonkers,* 924 F.Supp. 8, 12 (S.D.N.Y.1996). "[A] single incident in a complaint, especially if it involved only actors below the policy-making level, does not suffice to show a municipal policy. *DeCarlo v. Fry,* 141 F.3d 56, 61 (2d Cir.1998) (quoting *Ricciuti v. New York City Transit Auth.,* 941 F.2d 119, 123 (2d Cir.1991)).

***9** In the instant case, plaintiffs' *Monell* claim is based on the same assertion as that of the supervisory liability claim: that "once the Captain entered the plaintiffs' home" he "had the plaintiffs' released from their handcuff confinement and the abuse stopped." (Pls.' Memo. in Opp. to Summ. J. 6–7.) Other than this assertion, there is no claim that the unidentified captain was an official with final decision-making authority. In addition, the record is devoid of any facts that establish the existence of a policy endorsed by the municipality, a practice so persistent it

constituted a custom, or a failure by policymakers to adequately train or supervise their subordinates. In order to survive summary judgment, the plaintiff's case cannot rest on mere allegations of its pleading, but must set forth specific facts showing there is a genuine issue for trial. *See Anderson,* 477 U.S. at 248. Accordingly, defendant New York City's motion for summary judgment is granted on the *Monell* claim. *See Danielak v. City of New York,* 02–CV–2349, 2005 WL 2347095, at *14 (E.D.N.Y. Sept. 26, 2005) (granting summary judgment on plaintiff's *Monell* claim because plaintiff failed to allege a governmental custom or policy); *citing Hazan v. City of New York,* 98–CV–1716, 1999 WL 493352, at *2 (S.D.N.Y. Jul. 12, 1999).

**E. Failure to Intervene**

Plaintiffs further allege that defendants are liable for having failed to intervene to prevent the constitutional violations they claimed occurred. A police officer has an affirmative duty to intercede on behalf of a citizen whose constitutional rights are being violated in his presence by other officers. *Ricciuti v. New York City Trans. Authority,* 124 F.3d 123, 129 (2d Cir.1997) (quoting *O'Neill v. Krzeminski,* 839 F.2d 9, 11 (2d Cir.1988)). An officer cannot, however, be found liable for failure to intervene unless (1) "such failure permitted fellow officers to violate a suspect's clearly established statutory or constitutional rights of which a reasonable person would have known" and (2) the failure to intervene was "under circumstances making it objectively unreasonable for him to believe that his fellow officers' conduct did not violate those rights." *Ricciuti,* 124 F.3d at 129. In order for liability to attach, there must have been a realistic opportunity to intervene to prevent the harm from occurring. *Anderson v. Branen,* 17 F.3d 552, 557 (2d Cir.1994).

Because this Court has found that genuine issues of material fact exist as to whether defendants violated plaintiffs' constitutional right to be free of excessive force and unnecessary destruction of property, only these claims are considered for the failure to intervene discussion. It is clear that a person has a clearly established statutory or constitutional right to be free from excessive force and unnecessary destruction of their property. *See Graham v. Connor,* 490 U.S. 386, 394 (1989) (excessive force); *U.S. v. Ramirez,* 523 U.S. 65, 71, (1998) (destruction of property). In viewing the facts in a light most favorable to

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2006 WL 3833164 (E.D.N.Y.)

(Cite as: 2006 WL 3833164 (E.D.N.Y.))

the plaintiffs and assuming these facts to be true (as the Court must), no reasonable officer in the searching officers' position could have thought that it was appropriate to use the amount of force alleged to be used, and commit the type of property destruction alleged to have taken place. Disputes of fact over what happened during this search make it impossible to conclude as a matter of law that no reasonable officer in their position would have known that rights were being violated. Therefore, plaintiffs' failure to intervene claims cannot be disposed of on summary judgment, and the motion is denied as to this claim.

### 3. State Law Claims

#### A. Assault and Battery

**\*10** Plaintiffs bring state law claims against defendants for assault and battery. An "assault" is an intentional placing of another person in fear of imminent harmful or offensive contact; a "battery" is an intentional wrongful physical contact with another person without consent. *United Nat. Ins. Co. v. Waterfront New York Realty Corp.,* 994 F.2d 105, 108 (2d Cir.1993). With respect to actions undertaken by law enforcement officers discharging their official duties, an assault or battery takes place only if the officers used greater force than was necessary under the circumstances. *Paulino v. U.S.,* 94–CV–6453, 1996 WL 457303, at *5 (S.D.N.Y. Aug. 13, 1996), *citing Jones v. State,* 33 N.Y.2d 275, 279, 352 N.Y.S.2d 169 (N.Y.1973).

Viewing the evidence in a light most favorable to the plaintiffs, the defendant officers handcuffed Diaz tightly, pushed her to the floor with a knee in her back, struck her on the legs with a shot gun, and hit her head against the bathroom wall. In addition, Moises, Sr. claims he was "brutally grabbed" by officers. There is no allegation by the defendants that Diaz or Moises, Sr. were violent or were resisting arrest. The question of whether the officers engaged in these activities, or used more force than was necessary, is a question of fact. Therefore, on the basis of this limited information before the Court, these claims cannot be dismissed, and summary judgment is denied.

#### B. False Arrest

To establish a cause of action for false arrest, the plaintiff must show that (1) the defendant intended to confine him, (2) the plaintiff was conscious of the confinement, (3) the plaintiff did not consent to the confinement, and (4) the confinement was not otherwise privileged. *See Broughton v. State of New York,* 37 N.Y.2d 451, 456, 373 N.Y.S.2d 87 (N.Y.1975), *cert. denied* 423 U.S. 929, 96 S.Ct. 277 (1975); *see also Lee v. City of New York,* 272 A.D.2d 586, 586, 709 N.Y.S.2d 102, 103 (N.Y.App.Div.2000). A false arrest claim fails if the underlying detention occurred during a search pursuant to a warrant predicated on probable cause. *Johnson v. City of New York,* 05–CV2357, 2006 WL 2354815, at *3 (S.D.N.Y. Aug. 14, 2006), *citing Michigan v. Summers,* 452 U.S. 692, 705 (1981). Here, the plaintiffs were detained by the police during the execution of a valid search warrant. Furthermore, since the warrant was issued by a judge, a presumption of probable cause for the detention exists. *Lee,* 272 A.D.2d at 586, *citing Broughton,* 37 N.Y.2d at 458. Therefore, defendants are granted summary judgment on the false arrest claim.

#### B. Negligent Hiring and Training

Plaintiffs claim that defendant New York City was negligent in hiring and training the police officers that conducted the search of the Diaz home. When an employee is acting withing the scope of her employment, the employer may be held liable for the employee's negligence only under a theory of *respondeat superior,* and not under a theory of negligent hiring or retention. *See Griffin v. City of New York,* 287 F.Supp.2d 392, 397–98 (S.D.N.Y.2002), *citing Karoon v. New York City Transit Authority,* 659 N.Y. S.2d 27, 27 (N.Y.App.Div.1997). This is the case because if the employee was not negligent, there is no basis for liability, but if the employee was negligent, the employer will be liable regardless of the reasonableness of the hiring or the adequacy of the training. *See Karoon,* 659 N.Y.S.2d at 27. Because it is undisputed that the defendant officers were acting within the scope of their employment when they conducted the search, the plaintiffs claims for negligent hiring and training fail as a matter of law, and summary judgment is granted.

#### 4. Qualified Immunity

**\*11** In addition to arguing that the plaintiffs' claims should be rejected on the merits, the defendant officers

Not Reported in F.Supp.2d, 2006 WL 3833164 (E.D.N.Y.)

(Cite as: 2006 WL 3833164 (E.D.N.Y.))

also contend that they are, in any case, entitled to qualified immunity. Government officials performing discretionary functions have qualified immunity that shields them from civil damages liability as long as their actions could reasonably have been thought consistent with rights they have allegedly violated. *Anderson v. Creighton,* 483 U.S. 635, 638 (1987) (internal citations omitted). The Supreme Court has established a two-part inquiry to determine whether qualified immunity bars a suit against a government official. The court must first consider whether the facts alleged, when taken in the light most favorable to the party asserting the injury, demonstrate a violation of a constitutional right. *Saucier v. Katz,* 533 U.S. 194, 201 (2001). Next, the court must ask whether the officials' actions violated "clearly established statutory or constitutional rights of which a reasonable person would have known." *Hope v. Peltzer,* 536 U.S. 730, 739 (2002).

As discussed above, the plaintiffs have put forth sufficient evidence to raise a material issue of fact as to whether the officers used excessive force, unnecessarily destroyed their property, and failed to intervene to prevent these violations from taking place. *See, supra,* sections 2(A)(iii) and (iv). Thus, the relevant question is whether a reasonable officer could have believed that these actions were lawful in light of the law and the information the officers possessed. *See Hunter v. Bryant,* 502 U .S. 224, 227 (1991).

Regarding the excessive force claim, viewing the evidence in a light most favorable to the plaintiffs, a reasonable officer would have known that pushing Diaz to the floor, striking her on the legs with a shot gun, and hitting her head against the bathroom wall violated her right to be free of excessive force. Therefore, summary judgment will not be granted based on qualified immunity for this claim. *See Smith v. Fields,* 95–CV–8374, 2002 U.S. Dist. LEXIS 3529, at *22 n. 9 (S.D.N.Y. Mar. 1, 2002) (allegation that plaintiff was "slapped and kicked about the face sufficient to defeat claim of qualified immunity at summary judgment stage); *Nogue v. City of New York,* 98–CV3058, 1999 U.S. Dist. LEXIS 13201, at *31 (E.D.N.Y. Aug. 27, 1999) (allegation that officer kicked and punched him while on the ground defeats claim of qualified immunity at summary judgment stage).

As to the destruction of property claim, if the

plaintiffs' claims of malicious destruction of property are true, and the Court must assume that they are, it would be clear to a reasonable officer that this conduct was unlawful in the situation he confronted, for there would be no reason for an officer to maliciously destroy a platform bed, furniture, and cabinets in a search for contraband. Therefore, the defendants are denied summary judgment based on qualified immunity as to this claim. Finally, with regard to the failure to intervene claim, because questions of fact remain as to the extent of the force used and amount of property destroyed in the search, issues of fact also remain as to whether a reasonable officer would have known that failing to intervene was unlawful in the circumstances. In sum, defendants will not be granted qualified immunity based on the plaintiff's excessive force, destruction of property and failure to intervene claims.

**III. CONCLUSION**

**\*12** For the foregoing reasons, summary judgment is granted as to plaintiffs' (1) Fourth Amendment claims of unlawful search and seizure; (2) Ninth Amendment claims of interference with family integrity; (3) *Monell* claims against defendant City of New York; and (4) New York State false arrest and negligent hiring, supervision and training claims. Summary judgment is denied as to plaintiffs' (1) Fourth Amendment excessive force, destruction of property and failure to intervene claims; and (2) New York State assault and battery claims. In addition, summary judgment will not be granted based on the individual officers' claim of qualified immunity to these surviving claims.

SO ORDERED.

E.D.N.Y.,2006.

Diaz v. City of New York
Not Reported in F.Supp.2d, 2006 WL 3833164 (E.D.N.Y.)
END OF DOCUMENT

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.



**C**

Only the Westlaw citation is currently available.

United States District Court,

N.D. New York.

Mark JOHNSON, Sr., Plaintiff,

v.

Mr. WIGGER, et al., Defendants.

No. 9:07-CV-0024 (FJS/GHL).

Aug. 5, 2009.

Mark Johnson, Sr., Albany, NY, pro se.

Office of Robert P. Roche, Robert P. Roche, Esq., of Counsel, Albany, NY, for Defendants.

### *ORDER*

FREDERICK J. SCULLIN, JR., Senior District Judge.

**\*1** After carefully considering the entire file in this matter, including Magistrate Judge Lowe's July 10, 2009 Report-Recommendation to which the parties have not filed any objections; Defendants' motion for summary judgment and Plaintiff's claims against Defendants, the Court hereby

**ORDERS** that Magistrate Judge Lowe's July 10, 2009 Report-Recommendation is **ADOPTED IN ITS ENTIRETY** for the reasons stated therein; and the Court further

**ORDERS** that Defendants' motion for summary judgment is **DENIED;** and the Court further

**ORDERS** that Plaintiff's federal claims against Defendants are **DISMISSED SUA SPONTE** pursuant to 28 U.S.C. § 1915(e); and the Court further

**ORDERS** that Plaintiff's state-law claims against Defendants are **DISMISSED WITHOUT PREJUDICE** pursuant to 28 U.S.C. § 1367; and the Court further

**ORDERS** that the Clerk of the Court shall enter judgment in favor of Defendants and close this case.

**IT IS SO ORDERED.**

### *REPORT-RECOMMENDATION*

GEORGE H. LOWE, United States Magistrate Judge.

This *pro se* prisoner civil rights action, commenced pursuant to 42 U.S.C. § 1983, has been referred to me for Report and Recommendation by the Honorable Frederick J. Scullin, Senior United States District Judge, pursuant to 28 U.S.C. § 636(b) and Local Rule 72.3(c). Plaintiff Mark Johnson, Sr., alleges that Defendants Mr. Wigger (the superintendent of the Albany County Correctional Facility), Albany County Sheriff James Campbell, the County of Albany, Sgt. Kramer, Lt. Edwards, and three John Does violated his constitutional rights by falsely

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 2424186 (N.D.N.Y.)

(Cite as: 2009 WL 2424186 (N.D.N.Y.))

accusing him of sexually assaulting another inmate, subjecting him to excessive force, confining him to the Special Housing Unit ("SHU") for one day, and insulting him. Currently pending before the Court is Defendants' motion for summary judgment pursuant to Federal Rule of Civil Procedure 56. (Dkt. No. 24.) For the reasons that follow, I recommend that Defendants' motion be denied but that the Court *sua sponte* dismiss Plaintiff's complaint pursuant to 28 U.S.C. § 1915(e)(2) (B).

## I. FACTUAL AND PROCEDURAL HISTORY

Plaintiff filed his original complaint on January 8, 2007. (Dkt. No. 1.) Plaintiff alleged that he was accused of raping another inmate at the Albany County Correctional Facility and, as a result, placed in the Special Housing Unit ("SHU"). (Dkt. No. 1 at 4.) Plaintiff was released from the SHU the following day and told that the charges were unfounded. (Dkt. No. 1 at 6.) Plaintiff alleged that he filed a grievance regarding his treatment and suffered retaliation as a result. (Dkt. No. 1 at 6.)

Upon initial review, the Court dismissed the original complaint for three reasons. First, the Court found that Plaintiff had not sufficiently pleaded a due process cause of action based on his one-day SHU confinement because he had not alleged the existence of any atypical and significant hardships. (Dkt. No. 5 at 4.) Second, the Court found that Plaintiff had not stated a cause of action for retaliation because he had alleged only that correctional officers threatened and harassed him, which does not constitute adverse action. (Dkt. No. 5 at 5-6.) Third, the Court found that Plaintiff had not sufficiently alleged that Defendants Wiggins and Campbell were personally involved in any alleged constitutional violations. (Dkt. No. 5 at 6.) The Court granted Plaintiff leave to amend his complaint. (Dkt. No. 5 at 7.)

**\*2** Plaintiff filed the amended complaint on March 22, 2007. (Dkt. No. 6.) The amended complaint alleges

that on November 30, 2006, Plaintiff was falsely accused of sexually assaulting another inmate. Based on this accusation, Plaintiff was escorted to the SHU by an unnamed Correction Officer, two unnamed Sergeants, and Defendant Lt. Edwards. (Dkt. No. 6 at ¶ 13.) Upon arriving at the SHU, Plaintiff was pulled into the SHU by John Doe Correction Officers 1-3, who punched him several times and slammed him against the wall. The officers then ordered Plaintiff to strip, bend over, and spread his buttocks open. The officers placed Plaintiff in mechanical restraints and escorted him barefoot and naked to the SHU tier. When Plaintiff complained that the handcuffs were extremely tight, one Doe tightened the handcuffs and laughed at Plaintiff. (Dkt. No. 6 at ¶ 14.)

Plaintiff alleges that he was released from the SHU the next day. He filed a grievance regarding his treatment. (Dkt. No. 6 at ¶ 14.) On December 4, 2006, Defendant Sgt. Kramer confronted Plaintiff about the grievance, called him a "monkey" several times, and told Plaintiff that no officer would ever apologize to him for the way he was treated. Defendant Lt. Edwards then threw papers across his desk at Plaintiff and ordered him to sign off on the grievance. (Dkt. No. 6 at ¶ 15.)

On December 20, 2006, Plaintiff sent formal complaints to Defendants Wigger and Campbell. Wigger and Campbell did not respond. (Dkt. No. 6 at ¶ 16.)

On April 3, 2007, the Court issued an order directing service of the amended complaint. (Dkt. No. 8.) The Court cautioned Plaintiff that if he did not timely identify the Doe defendants, move for permission to amend the complaint to add them, and serve them with the complaint, "the Court will dismiss his claims against them." (Dkt. No. 8 at 2.) To date, Plaintiff has not identified or served the Does.

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 2424186 (N.D.N.Y.)

(Cite as: 2009 WL 2424186 (N.D.N.Y.))

## II. PROCEDURAL DEFICIENCIES

### A. Defendants' Failure to File a Rule 7.1(a)(3) Statement

Defendants move for summary judgment. As the moving parties, they bear the initial burden of showing, through the production of admissible evidence, that no genuine issue of material fact exists and that they are entitled to judgment as a matter of law. *Major League Baseball Properties, Inc. v. Salvino,* 542 F.3d 290, 309 (2d Cir.2008). Only after they have met this burden is Plaintiff required to produce evidence demonstrating that genuine issues of material fact exist. *Salahuddin v. Goord,* 467 F.3d 263, 272-73 (2d Cir.2006). Federal Rule of Civil Procedure 56 and Local Rule 7 .1(a)(3) provide the procedural guidelines for meeting this initial burden.

Local Rule 7.1(a)(3) requires parties moving for summary judgment to file and serve a Statement of Material Facts. This statement "shall set forth, in numbered paragraphs, each material fact about which the moving party contends there exists no genuine issue." Facts that are not in the Statement of Material Facts need not be considered. *Monahan v. New York City Dep't of Corrections,* 214 F.3d 275, 292 (2d Cir.2000). The rule thus puts the onus on the parties to marshal the evidence that supports the motion. *Id.* A district court has no duty to perform an independent review of the record to find proof of either a factual dispute or the lack of a factual dispute. *See Amnesty Am. v. Town of W. Hartford,* 288 F.3d 467, 470 (2d Cir.2002) ("We agree with those circuits that have held that Fed.R.Civ.P. 56 does not impose an obligation on a district court to perform an independent review of the record to find proof of a factual dispute."); *accord, Prestopnik v. Whelan,* 253 F.Supp.2d 369, 371-72 (N.D.N.Y.2003). "Our District's requirements are not empty formalities. Rules such as L.R. 7.1(a)(3) 'serve to notify the parties of the factual support for their opponent's arguments, but more importantly inform the court of the evidence and arguments in an organized way-thus

facilitating its judgment of the necessity for trial.' " *Jackson v. Broome County Correctional Facility,* 194 F.R.D. 436, 437 (N.D.N.Y.2000) (*citing Little v. Cox's Supermarkets,* 71 F.3d 637, 641 (7th Cir.1995)). Local Rule 7.1(a)(3) clearly states that the *"[f]ailure of the moving party to submit an accurate and complete Statement of Material Facts shall result in a denial of the motion."* (Emphasis in original.)

**\*3** Here, Defendants did not file a Statement of Material Facts. As noted above, in the absence of a proper Statement of Material Facts, this Court has no duty to perform an independent review of the record to find proof of either a factual dispute or the lack of a factual dispute. *See Amnesty Am. v. Town of W. Hartford,* 288 F.3d 467, 470 (2d Cir.2002). I therefore decline to review the affidavits submitted by Defendants. I will instead treat their motion as an attack on the pleadings pursuant to Federal Rule of Civil Procedure 12(c).

### B. Plaintiff's Failure to Respond to the Motion

Plaintiff did not timely oppose Defendants' motion. On February 6, 2009, I issued an order granting Plaintiff an additional 30 days to respond to the motion and cautioning him that if he did not do so "the Court will entertain Defendants' motion without benefit of Plaintiff's arguments. Plaintiff is not required to respond but if the Court determines that Defendants have met their burden to demonstrate entitlement to the relief requested, the Court may grant Defendants' motion, which ... **WILL RESULT IN DISMISSAL** of his action." (Dkt. No. 27) (Emphasis in original). To date, Plaintiff has not filed any opposition to Defendants' motion.

"Where a properly filed motion is unopposed and the Court determines that the moving party has met its burden to demonstrate entitlement to the relief requested therein, the non-moving party's failure to file or serve any papers as required by this Rule shall be deemed as consent to the

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 2424186 (N.D.N.Y.)

(Cite as: 2009 WL 2424186 (N.D.N.Y.))

granting or denial of the motion, as the case may be, unless good cause be shown." N.D.N.Y. L.R. 7.1(b)(3).

Here, Defendants' motion to dismiss is properly filed, Plaintiff has failed to oppose it (despite being warned of the possible consequences of that failure), and Plaintiff has failed to show good cause why his failure to oppose Defendants' motion should not be deemed as consent to the granting of the motion. Therefore, I must determine whether Defendants have met their burden to "demonstrate entitlement to dismissal" under Rule 12(b)(6).[FN1]

> FN1. See also Fed.R.Civ.P. 7(b)(1) (requiring motions to, *inter alia,* "state with particularity the grounds therefor").

An inquiry into whether a movant has met its "burden to demonstrate entitlement" to dismissal under Local Rule 7.1[b][3] is a more limited endeavor than a review of a contested motion to dismiss. Specifically, under such an analysis, the movant's burden has appropriately been characterized as "modest."[FN2] This is because, as a practical matter, the burden requires only that the movant present an argument that is "facially meritorious."[FN3]

> FN2. See, e.g., Ciaprazi v. Goord, 02-CV-0915, 2005 WL 3531464, at *8 (N.D.N.Y. Dec.22, 2005) (Sharpe, J.; Peebles, M.J.) (characterizing defendants' threshold burden on a motion for summary judgment as "modest") [citing *Celotex Corp. v. Catrett,* 477 U.S. 317, 323-324, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986) ]; *accord,* Saunders v. Ricks, 03-CV-0598, 2006 WL 3051792, at *9 & n. 60 (N.D.N.Y. Oct.18, 2006) (Hurd, J., adopting Report-Recommendation of Lowe, M.J.), Smith v. Woods, 03-CV-0480, 2006 WL 1133247, at *17 & n. 109 (N.D.N.Y. Apr.24, 2006) (Hurd, J., adopting

Report-Recommendation of Lowe, M.J.); *see also* Race Safe Sys. v. Indy Racing League, 251 F.Supp.2d 1106, 1109-1110 (N.D.N.Y.2003) (Munson, J.) (reviewing merely whether record contradicted defendant's arguments, and whether record supported plaintiff's claims, in deciding unopposed motion to dismiss, under Local Rule 7.1[b][3] ); *Wilmer v. Torian,* 96-CV-1269, 1997 U.S. Dist. LEXIS 16345, at *2 (N.D.N.Y. Aug. 29, 1997) (Hurd, M.J.) (applying prior version of Rule 7.1[b][3], but recommending dismissal because of plaintiff's failure to respond to motion to dismiss *and* the reasons set forth in defendants' motion papers), *adopted by* 1997 U.S. Dist. LEXIS 16340, at *2 (N .D.N.Y. Oct. 14, 1997) (Pooler, J.); *accord, Carter v. Superintendent Montello,* 95-CV-989, 1996 U.S. Dist. LEXIS 15072, at *3 (N.D.N.Y. Aug. 27, 1996) (Hurd, M.J.), adopted by 983 F.Supp. 595 (N.D.N.Y.1996) (Pooler, J.).

> FN3. See, e.g., Hernandez v. Nash, 00-CV-1564, 2003 U.S. Dist. LEXIS 16258, at *7-8, 2003 WL 22143709 (N.D.N.Y. Sept. 10, 2003) (Sharpe, M.J.) (before a motion to dismiss may be granted under Local Rule 7.1[b] [3], "the court must review the motion to determine whether it is *facially meritorious"* ) [emphasis added; citations omitted]; *accord,* Topliff v. Wal-Mart Stores East LP, 04-CV-0297, 2007 U.S. Dist. LEXIS 20533, at *28 & n. 43, 2007 WL 911891 (N.D.N.Y. March 22, 2007) (Lowe, M .J.); Hynes v. Kirkpatrick, 05-CV-0380, 2007 U.S. Dist. LEXIS 24356, at *5-6 & n. 2, 2007 WL 894375 (N.D.N.Y. March 21, 2007) (Lowe, M.J.); Sledge v. Kooi, 04-CV-1311, 2007 U.S. Dist. LEXIS 26583, at *28-29 & n. 40, 2007 WL 951447 (N.D.N.Y. Feb. 12, 2007) (Lowe, M.J.), *adopted by* 2007 U.S. Dist. LEXIS 22458 (N.D.N.Y. March 28, 2007) (McAvoy, J.); Kele v. Pelkey, 03-CV-0170, 2006 U.S. Dist. LEXIS 95065, at *5 & n. 2, 2006 WL 3940592 (N.D.N.Y. Dec. 19, 2006) (Lowe, M.J.), *adopted by* 2007 U.S. Dist. LEXIS 4336 (N.D.N.Y. Jan.

Slip Copy, 2009 WL 2424186 (N.D.N.Y.)

(Cite as: 2009 WL 2424186 (N.D.N.Y.))

22, 2007) (Kahn, J.).

I find that Defendants have not met this modest burden. Defendants' memorandum of law is a scant three pages long. The first five paragraphs cite no law and discuss evidence submitted via affidavits. As discussed above, I decline to consider these affidavits in light of Defendants' failure to file a Rule 7.1(a)(3) Statement.

The sixth paragraph notes that motions to dismiss may be converted into motions for summary judgment. The seventh paragraph states:

**\*4** Plaintiff enunciates a cause of action in embarrassment, which is not known in the federal lexicon. While the required mechanical restraints (mandatory during transfer) may not have been comfortable, they are a nuisance that goes with the territory, known as jail. Here the movant has shown by affidavits and peripheral sources that the Plaintiff did not-in fact-suffer the loss or diminution of a federally guaranteed Constitutional right.

(Dkt. No. 24-4 at 2-3.)

The eighth paragraph of Defendants' memorandum of law consists entirely of a string cite of cases from the 1940s, with no explanation of how the eight cited cases apply to the case at hand. The relevance of the cited cases is far from clear. The first case, *Boro Hall Corp. v. General Motors Corp.,* 124 F.2d 822 (2d Cir.1942), was an anti-trust action. The second case, *Gallways v. Caldwell,* 120 F.2d 90 (3d Cir.1941), was a stockholder action alleging waste. The third case, *Central Mexico Light & Power v. Munch,* 116 F.2d 85 (2d Cir.1940), was a suit by a corporation to enjoin actions on matured bonds.

The fourth case, *National Labor Relations Board v. Montgomery Ward & Co.,* 144 F.2d 528 (D.C.Cir.1944), involved a request for annulment of an order of the National War Labor Board. The fifth case, *Urquhart v. American La Forance Fomite Corp.,* 144 F.2d 542 (D.C.Cir.1944), was a patent action. The sixth case, *Samoro v. United States,* 129 F.2d 594 (2d Cir.1942), was an action to recover taxes collected under the Agricultural Adjustment Act of 1933. The seventh case, *Cohen v. American Window Glass Company,* 126 F.2d 111 (2d Cir.1942), was a shareholder action protesting a merger. The eighth case, *Sperry Products, Inc. v. Assoc. of American Railroads,* 132 F.2d 408 (2d Cir.1942), was a patent action.

The ninth paragraph of Defendants' memorandum of law states that "[f]ederal courts have come to recognize that a jail can be a contentious place but not every touch or every sleight constitutes a tort or deprivation of a civil right that rises to the level of a federal lawsuit. Such is the stuff of embarrassing interludes and chagrin." (Dkt. No. 24-4 at 3.) Defendants conclude that "[f]or all these reasons, the Complaint should be dismissed." *Id.*

Defendants have not directly addressed, with citations to applicable law, any of the issues raised by Plaintiff's complaint. Accordingly, I find that Defendants have not met their modest burden of demonstrating entitlement to the relief they request. Therefore, I recommend that the Court deny Defendants' motion for summary judgment/judgment on the pleadings.

Although I have recommended that the Court deny Defendants' motion for summary judgment/judgment on the pleadings, I have concluded that the complaint is subject to *sua sponte* dismissal for two reasons. First, Plaintiff has failed to name and serve the Doe defendants. Second, the complaint fails to state a claim against any of the named defendants. I will discuss those findings and recommendations below.

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 2424186 (N.D.N.Y.)

(Cite as: 2009 WL 2424186 (N.D.N.Y.))

## III. FAILURE TO NAME AND SERVE DOE DEFENDANTS

**\*5** Regarding the Doe defendants, under the Federal Rules of Civil Procedure, a defendant must be served with the summons and complaint within **120 days** after the filing of the complaint. Fed.R.Civ.P. 4(m). This 120-day service period is shortened, or "expedited," by the Court's Local Rules of Practice (and the Court's General Order 25), which provide that all defendants must be served with the summons and complaint within **sixty (60) days** of the filing of the complaint. N.D.N.Y. L.R. 4.1(b) [emphasis added]. Here, more than 120 days have elapsed since the filing of the complaint and Plaintiff has not named the Doe defendants or served them with the summons and complaint. Plaintiff was cautioned over two years ago that if he did not timely identify the Doe defendants, move for permission to amend the complaint to add them, and serve them with the complaint, "the Court will dismiss his claims against them." (Dkt. No. 8 at 2.) As a result, Plaintiff is in violation of both the Federal Rules of Civil Procedure and the Local Rules of Practice for this Court. I therefore recommend that all claims against John Does 1-3 be dismissed.

## IV. FAILURE TO STATE A CLAIM AGAINST NAMED DEFENDANTS

As noted above, although I have recommended that the Court deny Defendants' motion for summary judgment/judgment on the pleadings, I have concluded that the complaint is subject to *sua sponte* dismissal under 28 U.S.C. section 1915(e)(2)(B) for failure to state a claim on which relief may be granted against the named defendants.

### A. Legal Standard for Dismissal For Failure to State a Claim

Plaintiff is proceeding *in forma pauperis.* (Dkt. No.

5.) 28 U.S.C. section 1915(e) directs that, when a plaintiff proceeds *in forma pauperis,* "(2) ... the court shall dismiss the case at any time if the court determines that-... (B) the action ... (ii) fails to state a claim on which relief may be granted." 28 U.S.C. § 1915(e)(2)(B).

A complaint fails to state a claim on which relief may be granted if it is insufficient under Federal Rule of Civil Procedure 8(a) (2); [FN4] or if it is not legally cognizable. [FN5] Rule 8(a)(2) requires that a pleading contain "a short and plain statement of the claim *showing* that the pleader is entitled to relief." Fed.R.Civ.P. 8(a)(2) (emphasis added). By requiring this "showing," Rule 8(a)(2) requires that the pleading contain a short and plain statement that "give[s] the defendant *fair notice* of what the plaintiff's claim is and the grounds upon which it rests. " [FN6] The main purpose of this rule is to "facilitate a proper decision on the merits." [FN7] A complaint that fails to comply with this rule "presents far too heavy a burden in terms of defendants' duty to shape a comprehensive defense and provides no meaningful basis for the Court to assess the sufficiency of [plaintiff's] claims." [FN8]

FN4. *See* 5C Wright & Miller, *Federal Practice and Procedure* § 1363 at 112 (3d ed. 2004) ("A motion to dismiss for failure to state a claim for relief under Rule 12(b)(6) goes to the sufficiency of the pleading under Rule 8(a)(2).") [citations omitted]; *Princeton Indus., Inc. v. Rem,* 39 B.R. 140, 141 (Bankr.S.D.N.Y.1984) ("The motion under F.R.Civ.P. 12(b)(6) tests the formal legal sufficiency of the complaint as to whether the plaintiff has conformed to F.R.Civ.P. 8(a)(2) which calls for a 'short and plain statement' that the pleader is entitled to relief."); *Bush v. Masiello,* 55 F.R.D. 72, 74 (S.D.N.Y.1972) ("This motion under Fed.R.Civ.P. 12(b)(6) tests the formal legal sufficiency of the complaint, determining whether the complaint has conformed to Fed.R.Civ.P. 8(a)(2) which calls for a 'short and plain statement that the pleader is entitled to relief.' ").

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 2424186 (N.D.N.Y.)

(Cite as: 2009 WL 2424186 (N.D.N.Y.))

FN5. *See Swierkiewicz v. Sorema N.A.,* 534 U.S. 506, 514, 122 S.Ct. 992, 152 L.Ed.2d 1 (2002) ("These allegations give respondent fair notice of what petitioner's claims are and the grounds upon which they rest.... In addition, they state claims upon which relief could be granted under Title VII and the ADEA."); *Wynder v. McMahon,* 360 F.3d 73, 80 (2d Cir.2004) ( "There is a critical distinction between the notice requirements of Rule 8(a) and the requirement, under Rule 12(b)(6), that a plaintiff state a claim upon which relief can be granted."); *Phelps v. Kapnolas,* 308 F.3d 180, 187 (2d Cir.2002) ("Of course, none of this is to say that a court should hesitate to dismiss a complaint when the plaintiff's allegation ... fails as a matter of law.") [citation omitted]; *Kittay v. Kornstein,* 230 F.3d 531, 541 (2d Cir.2000) (distinguishing between a failure to meet Rule 12[b][6]'s requirement of stating a cognizable claim and Rule 8 [a]'s requirement of disclosing sufficient information to put defendant on fair notice); *In re Methyl Tertiary Butyl Ether Prods. Liab. Litig.,* 379 F.Supp.2d 348, 370 (S.D.N.Y.2005) ("Although Rule 8 does not require plaintiffs to plead a theory of causation, it does not protect a legally insufficient claim [under Rule 12(b)(6) ].") [citation omitted]; *Util. Metal Research & Generac Power Sys.,* 02-CV-6205, 2004 U.S. Dist. LEXIS 23314, at *4-5, 2004 WL 2613993 (E.D.N.Y. Nov. 18, 2004) (distinguishing between the legal sufficiency of the cause of action under Rule 12[b][6] and the sufficiency of the complaint under Rule 8[a] ); *accord, Straker v. Metro Trans. Auth.,* 331 F.Supp.2d 91, 101-102 (E.D.N.Y.2004); *Tangorre v. Mako's, Inc.,* 01-CV-4430, 2002 U.S. Dist. LEXIS 1658, at *6-7, 2002 WL 313156 (S.D.N.Y. Jan. 30, 2002) (identifying two sorts of arguments made on a Rule 12[b][6] motion-one aimed at the sufficiency of the pleadings under Rule 8[a], and the other aimed at the legal sufficiency of the claims).

FN6. *Dura Pharm., Inc. v. Broudo,* 544 U.S. 336, 125 S.Ct. 1627, 1634, 161 L.Ed.2d 577 (2005) (holding that the complaint failed to meet this test) [citation omitted; emphasis added]; *see also Swierkiewicz,* 534 U.S. at 512 [citation omitted]; *Leatherman v. Tarrant County Narcotics Intelligence and Coordination Unit,* 507 U.S. 163, 168, 113 S.Ct. 1160, 122 L.Ed.2d 517 (1993) [citation omitted].

FN7. *Swierkiewicz,* 534 U.S. at 514 (quoting *Conley,* 355 U.S. at 48); *see also Simmons v. Abruzzo,* 49 F.3d 83, 86 (2d Cir.1995) ("Fair notice is that which will enable the adverse party to answer and prepare for trial, allow the application of res judicata, and identify the nature of the case so it may be assigned the proper form of trial.") [citation omitted]; *Salahuddin v. Cuomo,* 861 F.2d 40, 42 (2d Cir.1988) ("[T]he principle function of pleadings under the Federal Rules is to give the adverse party fair notice of the claim asserted so as to enable him to answer and prepare for trial.") [citations omitted].

FN8. *Gonzales v. Wing,* 167 F.R.D. 352, 355 (N.D.N.Y.1996) (McAvoy, J.), *aff'd,* 113 F.3d 1229 (2d Cir.1997) (unpublished table opinion); *accord, Hudson v. Artuz,* 95-CV-4768, 1998 WL 832708, at *2 (S.D.N.Y. Nov.30, 1998), *Flores v. Bessereau,* 98-CV-0293, 1998 WL 315087, at *1 (N.D.N.Y. June 8, 1998) (Pooler, J .). Consistent with the Second Circuit's application of § 0.23 of the Rules of the U.S. Court of Appeals for the Second Circuit, I cite this unpublished table opinion, not as precedential authority, but merely to show the case's subsequent history. *See, e.g., Photopaint Technol., LLC v. Smartlens Corp.,* 335 F.3d 152,

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 2424186 (N.D.N.Y.)

(Cite as: 2009 WL 2424186 (N.D.N.Y.))

156 (2d Cir.2003) (citing, for similar purpose, unpublished table opinion of *Gronager v. Gilmore Sec. & Co.,* 104 F.3d 355 [2d Cir.1996] ).

"[A] complaint must contain sufficient factual matter ... to 'state a claim to relief that is plausible on its face.' A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged. The plausibility standard is not akin to a probability requirement, but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Ashcroft v. Iqbal,* --- U.S. ----, 129 S.Ct. 1937, 1949, 173 L.Ed.2d 868 (2009) (*quoting Bell Atlantic Corp. v. Twombly,* 550 U.S. 544, 556-57, 570, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007)). Accordingly, "where the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged-but has not *shown*-that the pleader is entitled to relief." *Iqbal,* 129 S.Ct. at 1950 (emphasis added).

**\*6** It should also be emphasized that, "[i]n reviewing a complaint for dismissal ... the court must accept the material facts alleged in the complaint as true and construe all reasonable inferences in the plaintiff's favor." [FN9] "This standard is applied with even greater force where the plaintiff alleges civil rights violations or where the complaint is submitted *pro se.*" [FN10] In other words, while all pleadings are to be construed liberally under Rule 8(e), *pro se* civil rights pleadings are to be construed with an *extra* degree of liberality. "[C]ourts must construe *pro se* pleadings broadly, and interpret them to raise the strongest arguments that they suggest." [FN11] Furthermore, when addressing a *pro se* complaint, *generally* a district court "should not dismiss without granting leave to amend at least once when a liberal reading of the complaint gives any indication that a valid claim might be stated." [FN12] Of course, an opportunity to amend is not required where the plaintiff has already amended his complaint. [FN13] In addition, an opportunity to amend is not required where "the problem with [plaintiff's] causes of action is

substantive" such that "[b]etter pleading will not cure it." [FN8]

FN9. *Hernandez v. Coughlin,* 18 F.3d 133, 136 (2d Cir.1994) (affirming grant of motion to dismiss) [citation omitted]; *Sheppard v. Beerman,* 18 F.3d 147, 150 (2d Cir.1994).

FN10. *Hernandez,* 18 F.3d at 136 [citation omitted]; *Deravin v. Kerik,* 335 F.3d 195, 200 (2d Cir.2003) [citations omitted]; *Vital v. Interfaith Med. Ctr.,* 168 F.3d 615, 619 (2d Cir.1999) [citation omitted].

FN11. *Cruz v. Gomez,* 202 F.3d 593, 597 (2d Cir.2000) (finding that plaintiff's conclusory allegations of a due process violation were insufficient) [internal quotation and citation omitted].

FN12. *Cuoco v. Moritsugu,* 222 F.3d 99, 112 (2d Cir.2000) [internal quotation and citation omitted]; *see also* Fed.R.Civ.P. 15(a) (leave to amend "shall be freely given when justice so requires").

FN13. *Yang v. New York City Trans. Auth.,* 01-CV-3933, 2002 WL 31399119, at \*2 (E.D.N.Y. Oct.24, 2002) (denying leave to amend where plaintiff had already amended complaint once); *Advanced Marine Tech. v. Burnham Sec., Inc.,* 16 F.Supp.2d 375, 384 (S.D.N.Y.1998) (denying leave to amend where plaintiff had already amended complaint once).

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 2424186 (N.D.N.Y.)

(Cite as: 2009 WL 2424186 (N.D.N.Y.))

FN14. *Cuoco, 222 F.3d at 112* (finding that repleading would be futile) [citation omitted]; *see also Cortec Indus., Inc. v. Sum Holding L.P., 949 F.2d 42, 48 (2d Cir.1991)* ("Of course, where a plaintiff is unable to allege any fact sufficient to support its claim, a complaint should be dismissed with prejudice.") (affirming, in part, dismissal of claim with prejudice) [citation omitted]; *see, e.g., See Rhodes v. Hoy, 05-CV-0836, 2007 WL 1343649, at *3, 7 (N.D.N.Y. May 5, 2007)* (Scullin, J., adopting Report-Recommendation of Peebles, M.J.) (denying *pro se* plaintiff opportunity to amend before dismissing his complaint because the error in his complaint-the fact that plaintiff enjoyed no constitutional right of access to DOCS' established grievance process-was substantive and not formal in nature, rendering repleading futile); *Thabault v. Sorrell, 2008 WL 3582743, at *2 (D.Vt. Aug.13, 2008)* (denying *pro se* plaintiff opportunity to amend before dismissing his complaint because the errors in his complaint-lack of subject-matter jurisdiction and lack of standing-were substantive and not formal in nature, rendering repleading futile) [citations omitted]; *Hylton v. All Island Cob Co., 05-CV-2355, 2005 WL 1541049, at *2 (E.D.N.Y. June 29, 2005)* (denying *pro se* plaintiff opportunity to amend before dismissing his complaint arising under 42 U.S.C. § 1983 because the errors in his complaint-which included the fact that plaintiff alleged no violation of either the Constitution or laws of the United States, but only negligence-were substantive and not formal in nature, rendering repleading futile); *Sundwall v. Leuba, 00-CV-1309, 2001 WL 58834, at *11 (D.Conn. Jan.23, 2001)* (denying *pro se* plaintiff opportunity to amend before dismissing his complaint arising under 42 U.S.C. § 1983 because the error in his complaint-the fact that the defendants were protected from liability by Eleventh Amendment immunity-was substantive and not formal in nature, rendering repleading futile).

However, while this special leniency may somewhat loosen the procedural rules governing the form of pleadings (as the Second Circuit has observed),[FN15] it does not completely relieve a *pro se* plaintiff of the duty to satisfy the pleading standards set forth in Rules 8, 10 and 12.[FN16] Rather, as both the Supreme Court and Second Circuit have repeatedly recognized, the requirements set forth in Rules 8, 10 and 12 are procedural rules that even *pro se* civil rights plaintiffs must follow.[FN17] Stated more plainly, when a plaintiff is proceeding *pro se*, "all normal rules of pleading are not absolutely suspended."[FN18]

FN15. *Sealed Plaintiff v. Sealed Defendant # 1, No. 06-1590, 2008 WL 3294864, at *5 (2d Cir. Aug.12, 2008)* ("[The obligation to construe the pleadings of *pro se* litigants liberally] entails, at the very least, a permissive application of the rules governing the form of pleadings.") [internal quotation marks and citation omitted]; *see also Traguth v. Zuck, 710 F.2d 90, 95 (2d Cir.1983)* ("[R]easonable allowances to protect *pro se* litigants from inadvertent forfeiture of important rights because of their lack of legal training ... should not be impaired by harsh application of technical rules.") [citation omitted].

FN16. See *Prezzi v. Schelter, 469 F.2d 691, 692 (2d Cir.1972)* (extra liberal pleading standard set forth in *Haines v. Kerner, 404 U.S. 519 [1972]*, did not save *pro se* complaint from dismissal for failing to comply with Fed.R.Civ.P. 8] ); *accord, Shoemaker v. State of Cal., 101 F.3d 108 (2d Cir.1996)* (citing *Prezzi v. Schelter, 469 F.2d 691)* [unpublished disposition cited only to acknowledge the continued precedential effect of *Prezzi v. Schelter, 469 F.2d 691*, within the Second Circuit]; *accord, Praseuth v. Werbe, 99 F.3d 402 (2d Cir.1995)*.

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 2424186 (N.D.N.Y.)

(Cite as: 2009 WL 2424186 (N.D.N.Y.))

FN17. *See* *McNeil v. U.S.,* 508 U.S. 106, 113, 113 S.Ct. 1980, 124 L.Ed.2d 21 (1993) ("While we have insisted that the pleadings prepared by prisoners who do not have access to counsel be liberally construed ... we have never suggested that procedural rules in ordinary civil litigation should be interpreted so as to excuse mistakes by those who proceed without counsel."); *Faretta v. California,* 422 U.S. 806, 834, n. 46, 95 S.Ct. 2525, 45 L.Ed.2d 562 (1975) ("The right of self-representation is not a license ... not to comply with relevant rules of procedural and substantive law."); *Triestman v. Fed. Bureau of Prisons,* 470 F.3d 471, 477 (2d Cir.2006) (*pro se* status "does not exempt a party from compliance with relevant rules of procedural and substantive law") [citation omitted]; *Traguth v. Zuck,* 710 F.2d 90, 95 (2d Cir.1983) (*pro se* status "does not exempt a party from compliance with relevant rules of procedural and substantive law") [citation omitted]; *cf.* *Phillips v. Girdich,* 408 F.3d 124, 128, 130 (2d Cir.2005) (acknowledging that *pro se* plaintiff's complaint could be dismissed for failing to comply with Rules 8 and 10 if his mistakes either "undermine the purpose of notice pleading [ ]or prejudice the adverse party").

FN18. *Stinson v. Sheriff's Dep't of Sullivan Cty.,* 499 F.Supp. 259, 262 & n. 9 (S.D.N.Y.1980).

**B. Claims Against the County of Albany**

Plaintiff alleges that the County of Albany "permitted and tolerated a pattern and practice of unreasonable use of force by Correction Officers or Sheriff Deputies of the County of Albany [and has] maintained a system of review of Correction Officers' or Sheriff Deputies' conduct which is so untimely and cursory as to be ineffective and which permits and tolerates the unreasonable and excessive use of force by Correction Officers of the County of Albany." (Dkt. No. 6 at ¶¶ 24-25.)

It is well established that "[a] municipality may not be held liable in a § 1983 action for the conduct of a lower-echelon employee solely on the basis of *respondeat superior.*"FN19 "Rather, to establish municipal liability under § 1983 for unconstitutional acts by a municipality's employees, a plaintiff must show that the violation of [his or] her constitutional rights resulted from a municipal custom or policy." FN20 "Thus, to hold a [municipality] liable under § 1983 for the unconstitutional actions of its employees, a plaintiff is required to ... prove three elements: (1) an official policy or custom that (2) causes the plaintiff to be subjected to (3) a denial of a constitutional right." FN21

FN19. *Powell v. Bucci,* 04-CV-1192, 2005 WL 3244193, at *5 (N.D.N.Y. Nov.30, 2005) (McAvoy, J.); *see also* *Monell v. Dept. of Soc. Servs.,* 436 U.S. 658, 691, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978) ("[A] local government may not be sued under § 1983 for an injury inflicted solely by its employees or agents."); *Batista v. Rodriguez,* 702 F.2d 393, 397 (2d Cir.1983) ("[A] [municipality] may not be held for the actions of its employees or agents under a theory of *respondeat superior.*" ).

FN20. *Powell,* 2005 WL 3244193, at *5; *Monell,* 436 U.S. at 690-691 ("[L]ocal governments ... may be sued for constitutional deprivations visited pursuant to governmental 'custom' even though such a custom has not received formal approval through the body's official decisionmaking channels."); *Batista,* 702 F.2d at 397 ("[M]unicipalities may be sued directly under § 1983 for constitutional deprivations inflicted upon private individuals pursuant to a governmental custom, policy, ordinance, regulation, or decision."); *Smith v. City of New York,* 290 F.Supp.2d 317, 321 (S.D.N.Y.2003) ("In order to establish the liability of [municipal]

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 2424186 (N.D.N.Y.)

(Cite as: 2009 WL 2424186 (N.D.N.Y.))

defendants in an action under § 1983 for unconstitutional acts by [its] employees, a plaintiff must show that the violation of [his or] her constitutional rights resulted from a municipal custom or policy.").

FN21. *Batista,* 702 F.2d at 397, accord, *Zahra v. Town of Southold,* 48 F.3d 674, 685 (2d Cir.1995), *McKeon v. Daley,* 101 F.Supp.2d 79, 92 (N.D.N.Y.2000) (Hurd, J.), *Merriman v. Town of Colonie, NY,* 934 F.Supp. 501, 508 (N.D.N.Y.1996) (Homer, M.J.); *Douglas v. County of Tompkins,* 90-CV-0841, 1995 WL 105993, at *12 (N.D.N.Y. March 2, 1995) (McCurn, J.), *Keyes v. County of Albany,* 594 F.Supp. 1147, 1156 (N.D.N.Y.1984) (Miner, J.).

**\*7** With regard to the first element (the existence of a policy or custom), a "[p]laintiff may establish the 'policy, custom or practice' requirement by demonstrating: (1) a formal policy officially endorsed by the municipality ...; (2) actions taken by government officials responsible for establishing municipal policies related to the particular deprivation in question ...; (3) a practice so consistent and widespread that it constitutes a 'custom or usage' sufficient to impute constructive knowledge to the practice of policymaking officials ...; or (4) a failure by policymakers to train or supervise subordinates to such an extent that it amounts to 'deliberate indifference' to the rights of those who come in contact with the municipal employees...." FN22

FN22. *Dorsett-Felicelli, Inc.,* 371 F.Supp.2d 183, 194 (N.D.N.Y.2005) (Kahn, J.) (citing three Supreme Court cases for these four ways), accord, *Dunbar v. County of Saratoga,* 358 F.Supp.2d 115, 133-134 (N.D.N.Y.2005) (Munson, J.); see also *Clayton v. City of Kingston,* 44 F.Supp.2d 177, 183 (N.D.N.Y.1999) (McAvoy, J.) (transposing order

of second and third ways, and citing five more Supreme Court cases).

"The mere assertion ... that a municipality has such a custom or policy is insufficient in the absence of allegations of fact tending to support, at least circumstantially, such an inference." *Dwares v. City of New York,* 985 F.2d 94, 100 (2d Cir.1993), overruled on other grounds *Leatherman v. Tarrant County Narcotics Intelligence & Coordination Unit,* 507 U.S. 163, 164, 113 S.Ct. 1160, 122 L.Ed.2d 517 (1993). A complaint that includes only such conclusory allegations is subject to dismissal under Rule 12(b)(6). *Economic Opportunity Comm'n of Nassau County v. County of Nassau, Inc.,* 47 F.Supp.2d 353, 370-71 (E.D.N.Y.1999). "Proof of a single incident of unconstitutional activity is not sufficient to impose liability under *Monell,* unless proof of the incident includes proof that it was caused by an existing, unconstitutional municipal policy, which can be attributed to a municipal policymaker ." *City of Oklahoma v. Tuttle,* 471 U.S. 808, 823-24, 105 S.Ct. 2427, 85 L.Ed.2d 791 (1985).

Here, other than alleging the single incident in which Plaintiff was beaten by correction officers, the complaint does not contain any facts plausibly suggesting that the County of Albany has a custom or practice of permitting and tolerating the use of excessive force by correction officers. Therefore, I recommend that the Court dismiss the claim against the County of Albany *sua sponte* pursuant to 28 U.S.C. § 1915(e)(2)(B) with leave to amend.

**C. Claims Against Defendants Wigger and Campbell**

Plaintiff alleges that he sent formal complaints to Defendants Wigger and Campbell regarding the excessive force incident, the threats he received from officers, and the false accusation against him. (Dkt. No. 6 at ¶ 16.) Defendants Wigger and Campbell "never responded." *Id.*

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 2424186 (N.D.N.Y.)

(Cite as: 2009 WL 2424186 (N.D.N.Y.))

" '[P]ersonal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983.' " *Wright v. Smith,* 21 F.3d 496, 501 (2d Cir.1994) (quoting *Moffitt v. Town of Brookfield,* 950 F.2d 880, 885 [2d Cir.1991] ).[FN23] In order to prevail on a cause of action under 42 U.S.C. § 1983 against an individual, a plaintiff must show some tangible connection between the alleged unlawful conduct and the defendant.[FN24] If the defendant is a supervisory official, a mere "linkage" to the unlawful conduct through "the prison chain of command" (i.e., under the doctrine of *respondeat superior* ) is insufficient to show his or her personal involvement in that unlawful conduct.[FN25] In other words, supervisory officials may not be held liable merely because they held a position of authority.[FN26] Rather, supervisory personnel may be considered "personally involved" only if they (1) directly participated in the violation, (2) failed to remedy that violation after learning of it through a report or appeal, (3) created, or allowed to continue, a policy or custom under which the violation occurred, (4) had been grossly negligent in managing subordinates who caused the violation, or (5) exhibited deliberate indifference to the rights of inmates by failing to act on information indicating that the violation was occurring.[FN27]

> FN23. *Accord, McKinnon v. Patterson,* 568 F.2d 930, 934 (2d Cir.1977), *cert. denied,* 434 U.S. 1087, 98 S.Ct. 1282, 55 L.Ed.2d 792 (1978); *Gill v. Mooney,* 824 F.2d 192, 196 (2d Cir.1987).

> FN24. *Bass v. Jackson,* 790 F.2d 260, 263 (2d Cir.1986).

> FN25. *Polk County v. Dodson,* 454 U.S. 312, 325, 102 S.Ct. 445, 70 L.Ed.2d 509 (1981); *Richardson v. Goord,* 347 F.3d 431, 435 (2d

Cir.2003); *Wright, 21 F.3d at 501; Ayers v. Coughlin,* 780 F.2d 205, 210 (2d Cir.1985).

> FN26. *Black v. Coughlin,* 76 F.3d 72, 74 (2d Cir.1996).

> FN27. *Colon v. Coughlin,* 58 F.3d 865, 873 (2d Cir.1995) (adding fifth prong); *Wright,* 21 F.3d at 501 (adding fifth prong); *Williams v. Smith,* 781 F.2d 319, 323-324 (2d Cir.1986) (setting forth four prongs).

**\*8** A prisoner's allegation that a supervisory official failed to respond to a grievance is insufficient to establish that the official "failed to remedy that violation after learning of it through a report or appeal" or "exhibited deliberate indifference ... by failing to act on information indicating that the violation was occurring." *Rivera v. Goord,* 119 F.Supp.2d 327,344-45 (S.D.N.Y.2000). *See also Watson v. McGinnis,* 964 F.Supp. 127, 130 (S.D.N.Y.1997) ("The law is clear that allegations that an official ignored a prisoner's letter are insufficient to establish liability."). Therefore, I recommend that the Court dismiss Plaintiff's claims against Defendants Wigger and Campbell *sua sponte* pursuant to 28 U.S.C. § 1915(e)(2)(B).

**D. Claims Against Defendant Kramer**

Plaintiff alleges that Defendant Kramer called him a "monkey" and would not apologize. (Dkt. No. 6 at ¶ 15.) "42 U.S.C. § 1983 does not provide a remedy for every common law tort and a suit based on that statute cannot be sustained merely on the basis of verbal abuse." *Williams v. Pecchio,* 543 F.Supp. 878, 879 (W.D.N.Y.1982). "It is well established that mere threatening language and gestures of a custodial officer do not ... amount to constitutional violations." *Alnutt v. Cleary,* 913 F.Supp.

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 2424186 (N.D.N.Y.)

(Cite as: 2009 WL 2424186 (N.D.N.Y.))

160, 165 (W.D.N.Y.1996) (punctuation omitted). Therefore, I recommend that the Court dismiss Plaintiff's claims against Defendant Kramer *sua sponte* pursuant to 28 U.S.C. § 1915(e)(2) (B).

**E. Claims Against Defendant Edwards**

Plaintiff claims that Defendant Edwards escorted him to the SHU when he was falsely accused of sexually assaulting another inmate. (Dkt. No. 6 at ¶¶ 13.) Plaintiff served one day in the SHU. (Dkt. No. 6 at ¶ 14.) I have construed this as a claim that Defendant Edwards violated Plaintiff's procedural due process rights.

In order to state a claim for violation of his procedural due process rights, a plaintiff must allege facts plausibly suggesting that (1) he was deprived of a liberty interest; (2) without due process of law. *Tellier v. Fields,* 280 F.3d 69, 79-80 (2d Cir.2000).

An inmate has a liberty interest in remaining free from a confinement or restraint where (1) the state has granted its inmates, by regulation or statute, an interest in remaining free from that particular confinement or restraint; and (2) the confinement or restraint imposes "an atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life." *Sandin v. Conner,* 515 U.S. 472, 484, 115 S.Ct. 2293, 132 L.Ed.2d 418 (1995); *Tellier,* 280 F.3d at 80; *Frazier v. Coughlin,* 81 F.3d 313, 317 (2d Cir.1996). Regarding the first prong of this test, "[i]t is undisputed ... that New York state law creates a liberty interest in not being confined to the SHU." *Palmer v. Richards,* 364 F.3d 60, 64 n. 2 (2d Cir.2004). The issue, then, is whether Plaintiff's one-day confinement in the SHU imposed "an atypical and significant hardship on [him] in relation to the ordinary incidents of prison life."

**\*9** In the Second Circuit, determining whether a disciplinary confinement in the SHU constituted an "atypical and significant hardship" requires examining "the extent to which the conditions of the disciplinary segregation differ from other routine prison conditions and the duration of the disciplinary segregation compared to discretionary confinement." *Palmer,* 364 F.3d at 64. Where a prisoner has served less than 101 days in disciplinary segregation, the confinement constitutes an "atypical and significant hardship" only if "the conditions were more severe than the normal SHU conditions [FN28]." *Palmer,* 364 F.3d at 65. Allegations of severe conditions are particularly important for stating a cause of action in cases involving SHU confinements of 30 days or less. *Hynes v. Squillace,* 143 F.3d 653, 658 (2d Cir.1998); *Arce v. Walker,* 139 F.3d 329 (2d Cir.1998).

FN28. "Normal" SHU conditions include being kept in solitary confinement for 23 hours per day, provided one hour of exercise in the prison yard per day, and permitted two showers per week. *Ortiz v. McBride,* 380 F.3d 649, 655 (2d Cir.2004).

Here, Plaintiff has not described the conditions he experienced in the SHU, must less alleged the existence of conditions more severe than normal SHU conditions. Plaintiff might argue that his allegations regarding the use of excessive force by the officers escorting him to the SHU tier suffice. However, allegations of excessive force used *en route* to the SHU do not constitute severe SHU conditions, but rather are evaluated separately as Eighth Amendment claims against the individual officers. *See Rodriguez v. McGinnis,* 1 F.Supp.2d 244 (S.D.N.Y.1998). Here, as discussed above, Plaintiff's claims against the correction officers who allegedly beat him should be dismissed for failure to identify and serve them. Therefore, I recommend that the Court dismiss Plaintiff's claim against Defendant Edwards *sua sponte* pursuant to 28 U.S.C. § 1915(e).

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 2424186 (N.D.N.Y.)

(Cite as: 2009 WL 2424186 (N.D.N.Y.))

**F. State Court Claims**

   Plaintiff alleges that Defendants defamed and slandered him by falsely accusing him of sexually assaulting another inmate. He claims that Defendants' actions violated New York state law. (Dkt. No. 6 at ¶¶ 1, 2, 5, 13.) In light of my recommendation that the Court dismiss Plaintiff's federal claims, I recommend that the Court decline to exercise pendent jurisdiction over Plaintiff's state law claims.

   **ACCORDINGLY,** it is

   **RECOMMENDED** that Defendants' motion for summary judgment (Dkt. No. 24) be ***DENIED;*** and it is further

   **RECOMMENDED** that the Court dismiss Plaintiff's complaint *sua sponte* pursuant to 28 U.S.C. § 1915(e).

   Pursuant to 28 U.S.C. § 636(b)(1), the parties have ten days within which to file written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. ***FAILURE TO OBJECT TO THIS REPORT WITHIN TEN DAYS WILL PRECLUDE APPELLATE REVIEW.*** *Roldan v. Racette,* 984 F.2d 85 (2d Cir.1993) (citing *Small v. Secretary of Health and Human Services,* 892 F.2d 15 (2d Cir.1989)); 28 U.S.C. § 636(b)(1); Fed.R.Civ.P. 72, 6(a), 6(e).

N.D.N.Y.,2009.

Johnson v. Wigger

Slip Copy, 2009 WL 2424186 (N.D.N.Y.)

END OF DOCUMENT

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.



Slip Copy, 2010 WL 3491359 (N.D.N.Y.)

(Cite as: 2010 WL 3491359 (N.D.N.Y.))

---

**H**

Only the Westlaw citation is currently available.
United States District Court,

N.D. New York.
Jamie CISNEVAS-GARCIA a/k/a Cisneros Garcia,
a/k/a Jaime Cisneros-Garcia, Plaintiff,
v.
Roy SHIPMAN, Case Counselor; L. Doud, Counsel
Supervisor; John Doe, Educ. Supervisor; and John Doe,
Onondaga County Commissioner, Defendants.
No. 9:10-CV-179 (FJS/RFT).

Aug. 31, 2010.
Jamie Cisnevas-Garcia, a/k/a Cisneros Garcia, a/k/a Jaime
Cisneros-Garcia, Cayuga County Jail, Auburn, NY, pro se.

**MEMORANDUM-DECISION AND ORDER**

SCULLIN, Senior District Judge.
### I. INTRODUCTION
**\*1** The Clerk of the Court has sent Plaintiff Jamie
Cisnevas-Garcia's complaint to the Court for its review,
along with Plaintiff's motions for appointment of counsel,
an investigator, and a translator, and his requests to stay
deportation, set a trial date, and schedule oral argument.
Plaintiff, who is currently confined at Cayuga County Jail,
seeks leave to proceed *in forma pauperis* and has not paid
the filing fee in this action.
### II. DISCUSSION

**A.** *In forma pauperis* **application and sufficiency of the
complaint**
After reviewing the information that Plaintiff
provided in his *in forma pauperis* application, the Court
concludes that he meets the financial criteria for
commencing this action *in forma pauperis*. Therefore, the
Court must now consider the sufficiency of the allegations
that Plaintiff has set forth in his complaint in light of 28
U.S.C. § 1915(e).
Section 1915(e) directs that, when a plaintiff seeks to
proceed *in forma pauperis*, "(2) ... the court shall dismiss

the case at any time if the court determines that-... (B) the
action ... (i) is frivolous or malicious; (ii) fails to state a
claim on which relief may be granted; or (iii) seeks
monetary relief against a defendant who is immune from
such relief." 28 U.S.C. § 1915(e); *see also* 28 U.S.C. §
1915A.[FN1] Thus, although the court has the duty to show
liberality toward *pro se* litigants, *see* Nance v. Kelly, 912
F.2d 605, 606 (2d Cir.1990) (per curiam), and should
exercise "extreme caution ... in ordering *sua sponte*
dismissal of a *pro se* complaint *before* the adverse party
has been served and both parties (but particularly the
plaintiff) have had an opportunity to respond, ..."
Anderson v. Coughlin, 700 F.2d 37, 41 (2d Cir.1983)
(internal citations omitted), the court also has a
responsibility to determine that a claim is not frivolous
before permitting a plaintiff to proceed with an action *in
forma pauperis*.[FN2]

> FN1. To determine whether an action is
> frivolous, a court must look to see whether the
> complaint "lacks an arguable basis either in law
> or in fact." Neitzke v. Williams, 490 U.S. 319,
> 325 (1989).

> FN2. "Dismissal of frivolous actions pursuant to
> 28 U.S.C. § 1915(e) is appropriate to prevent
> abuses of the process of the court, ... [filing of
> baseless lawsuits and the] waste of judicial
> resources...." *Nelson v. Spitzer,* No.
> 9:07-CV-1241, 2008 WL 268215, \*1 n. 3
> (N.D.N.Y. Jan. 29, 2008) (internal citations
> omitted).

When reviewing a complaint, the court may also look
to the Federal Rules of Civil Procedure. Rule 8 of the
Federal Rules of Civil Procedure provides that a pleading
that sets forth a claim for relief shall contain "a short and
plain statement of the claim showing that the pleader is
entitled to relief [.]" Fed.R.Civ.P. 8(a)(2). The purpose of
Rule 8 " 'is to give fair notice of the claim being asserted
so as to permit the adverse party the opportunity to file a
responsive answer, ... prepare an adequate defense' " and
determine whether the doctrine of res judicata is

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2010 WL 3491359 (N.D.N.Y.)

(Cite as: 2010 WL 3491359 (N.D.N.Y.))

applicable. *Hudson v. Artuz,* No. 95 CIV. 4768, 1998 WL 832708, *1 (S.D.N.Y. Nov. 30, 1998) (quoting *Powell v. Marine Midland Bank,* 162 F.R.D. 15, 16 (N.D.N.Y.1995) (quoting *Brown v. Califano,* 75 F.R.D. 497, 498 (D.D.C.1977))) (other citation omitted).

A court should not dismiss a complaint if the plaintiff has stated "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 570 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal,* 129 S.Ct. 1937, 1949 (2009) (citation omitted). Although the court should construe the factual allegations in the light most favorable to the plaintiff, "the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions." *Id.* "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.* (citing *[Twombly,* 550 U.S.] at 555, 127 S.Ct.1955). Thus, "where the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged-but it has not 'show[n]'-'that the pleader is entitled to relief.' " *Id.* at 1950 (quoting Fed. Rule Civ. Proc. 8(a)(2)).

**B. Plaintiff's claims**

**\*2** In his complaint, Plaintiff seeks redress for the alleged violation of his right to access the courts. Plaintiff states that he "is a federal inmate in need for information of federal law." *See* Dkt. No. 1 at 2. According to Plaintiff, his access to the law library at the Onondaga County Correctional Facility, where he was confined when he commenced this action, was extremely limited. *See id.*[FN3] Plaintiff states that he has "two open cases, [ ] 09-2406 and 8:09-CR-0385," and claims that he "has in fact been denied his constitutional right to access to the courts." *See id.* Plaintiff seeks injunctive relief and compensatory damages. *See id.* at 4.

> FN3. Plaintiff is presently confined in the Cayuga County Jail. *See* Dkt. No. 7. As discussed below, Plaintiff claims that the law library at that facility is also constitutionally deficient and that he has been afforded only

limited access to the law library.

At the outset, the Court notes that Plaintiff identifies this action as one arising under the Federal Tort Claims Act, 28 U.S.C. §§ 2671 *et seq.* ("FTCA"). *See* Dkt. No. 1 at 1. The FTCA constitutes a waiver of the Government's sovereign immunity from suit for claims of property damage or personal injury caused by the "negligent or wrongful act or omission" of its employees "under circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred." 28 U.S.C. § 1346(b)(1).[FN4] Claims against the government must be presented to the appropriate federal agency for resolution prior to seeking judicial relief. *See* 28 U.S.C. § 2675(a).

> FN4. The only proper defendant to an action under the FTCA is the United States. *See Watts v. U.S. Fed. Bureau of Prisons,* No. 9:07-CV-773, Report-Recommendation, 2009 WL 81285, *4 & n. 11 (N.D.N.Y. Sept. 30, 2008) (citing cases), *adopted,* 2009 WL 81285, *1 (N.D.N.Y. Jan. 9, 2009). Accordingly, FTCA actions brought against federal agencies such as the Bureau of Prisons are subject to dismissal for lack of jurisdiction. *See id.* (citations omitted).

Here, Plaintiff's claims regarding his access to the courts during his confinement in a county jail, asserted against three individuals identified as employees of Onondaga County, are not cognizable under the FTCA. However, reading the complaint in the light most favorable to Plaintiff and with due regard to his status as *a pro se* litigant, the Court has considered whether the allegations of the complaint are sufficient to state a claim pursuant to 28 U.S.C. § 1983 for the alleged violation of Plaintiff's Sixth Amendment right to access the courts.

In *Bounds v. Smith,* 430 U.S. 817 (1977), the Supreme Court held that access to the courts is a fundamental right that "requires prison authorities to assist inmates in the preparation and filing of meaningful legal papers by providing prisoners with adequate law libraries or adequate assistance from persons trained in the law." *Id.* at 828 (footnote omitted). Interpreting *Bounds,* the

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2010 WL 3491359 (N.D.N.Y.)

(Cite as: 2010 WL 3491359 (N.D.N.Y.))

Supreme Court stated in *Lewis v. Casey,* 518 U.S. 343 (1996), that *Bounds* did not create an "abstract, freestanding right to a law library or legal assistance[.]" *Id.* at 351. Additionally, a law library is only one way for prison officials to provide inmates with access to the courts. *See Bounds,* 430 U.S. at 830-31. Thus, if prison officials afford an inmate counsel, there is no constitutional requirement that they also afford him access to law books. *See id.; Bourdon v. Loughren,* 386 F.3d 88, 93 (2d Cir.2004) ("confirm[ing] that the appointment of counsel can be a valid means of satisfying a prisoner's right of access to the courts").

**\*3** An inmate alleging a denial of access to courts must show "actual injury" as a result of the deficient access to the courts; that is, that he was "hindered [in] his efforts to pursue a legal claim." *Lewis,* 518 U.S. at 351; *accord Bourdon,* 386 F.3d at 93 (quotation omitted); *Thompson v. United States,* No. 09-CV-0964M, 2010 WL 1910293, \*4 (W.D.N.Y. May 7, 2010) (quotation and other citation omitted). The cause of the injury must be the inadequacy of the access. *See Lewis,* 518 U.S. at 350-51. Thus, the mere limitation of access to legal materials, delay in being able to work on legal matters, and/or delay in serving court documents, without more, does not state a constitutional claim. *See, e.g., Gillard v. Burge,* No. 9:03-cv-1537, 2007 WL 1074789, \*9 (N.D.N.Y. Apr. 5, 2007) (holding that missed deadline in federal case is not sufficient to demonstrate actual injury); *Warburton v. Underwood,* 2 F.Supp.2d 306, 312 (W.D.N.Y.1998) (finding that fourteen-day delay in service is not itself sufficient to establish actual injury); *Jermosen v. Coughlin,* 877 F.Supp. 864, 871 (S.D .N.Y.1995) (citing cases). Rather, a plaintiff must show that prison officials had frustrated or were impeding a "nonfrivolous legal claim." *Lewis,* 518 U.S. at 353 (footnotes omitted).

In this case, construing Plaintiff's complaint with the utmost liberality and mindful of his status as a *pro se* litigant, the Court finds that Plaintiff has failed to allege facts to explain how the claimed lack of access to the law library at the Onondaga County Jail "prejudiced his ability to seek redress from the judicial system." *Smith v. O'Connor,* 901 F.Supp. 644, 649 (S.D.N.Y.1995) (footnote omitted); *see also Bourdon,* 386 F.3d at 93 (holding that "[t]o establish a [*Bounds* ] violation, 'the

inmate ... must ... demonstrate that the alleged shortcomings in the library or legal assistance program hindered his efforts to pursue a legal claim' " (quoting *Lewis,* 518 U.S. at 351, 116 S.Ct. 2174)). Although Plaintiff states that he has two "open cases," he does not allege any facts that even suggest that he has suffered "actual injury" in either action as a result of the deficient access to the law library.[FN5] Thus, with respect to the critical inquiry of whether Plaintiff has suffered "actual injury," the complaint contains only the conclusory assertion that "plaintiff has in fact been denied his constitutional right to access to the court." *See* Dkt. No. 1 at 2.

FN5. The only information that Plaintiff provides regarding these actions is their case numbers. *See* Dkt. No. 1 at 2. Case "8:09-CR-0385" appears to identify a criminal action pending against Plaintiff in the Northern District of New York. *See United States v. Cisneros-Garcia,* 8:09-CR-385(GTS). Appointed counsel represents Plaintiff in that proceeding. *See id.,* Dkt. No. 19. The court has adjourned the trial pending decision on defendant's recently filed motion to dismiss. *See id.,* Text Order filed August 3, 2010. As to the second action to which Plaintiff refers-09-2406-that case number does not identify an action pending in the Northern District of New York, nor did a search of the U.S. Party/Case Index locate any such case; and the Court therefore has no information regarding that action. *See* https://pacer.uspci.uscourts.gov.

In sum, Plaintiff's conclusory assertions that he was denied access to the courts in violation of his Sixth Amendment rights during his confinement in the Onondaga County Jail are patently insufficient to state a claim upon which relief may be granted against Defendants; and the complaint, as drafted, is therefore subject to dismissal pursuant to 28 U.S.C. § 1915(e).

**C. Opportunity to file an amended complaint**

Should Plaintiff claim that the Court should not dismiss this action, he may file an amended complaint **within thirty (30) days** of the filing date of this

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2010 WL 3491359 (N.D.N.Y.)

(Cite as: 2010 WL 3491359 (N.D.N.Y.))

Memorandum-Decision and Order. Any amended complaint, **which shall supersede and replace the original complaint in its entirety,** must allege claims of misconduct or wrongdoing against each Defendant which Plaintiff has a legal right to pursue, and over which this Court may properly exercise jurisdiction. Any amended complaint that Plaintiff files must also comply with the pleading requirements of Rules 8 and 10 of the Federal Rules of Civil Procedure.

**\*4** In this regard, the Court notes that Plaintiff is currently confined in the Cayuga County Jail and that he has advised the Court that he considers the law library at that facility, and also his access thereto, to be constitutionally deficient. *See* Dkt. No. 8 at 1-3. According to Plaintiff, he intends to amend his complaint to name as yet unidentified officials at Cayuga County Jail as Defendants in this action and to assert claims against them for the violation of his Sixth Amendment rights. *See id.* at 2-3. The Court advises Plaintiff that any additional claims that he asserts in his amended complaint will be subject to this Court's review pursuant to 28 U.S.C. § 1915(e).[FN6] The Court also advises Plaintiff that, if he fails to timely submit an amended complaint, the Court will dismiss this action without further order.

> FN6. In the event that the amended complaint names one or more "John Doe" Defendants, Plaintiff must take reasonable steps through discovery to ascertain the names of those Defendants. If Plaintiff fails to ascertain their identities so as to permit the timely amendment of the complaint and service of process on those individuals, the Court will dismiss this action as against them.

**D. Motion for appointment of counsel**

Courts cannot use a bright-line test in determining whether to appoint counsel on behalf of an indigent party. *See Hendricks v. Coughlin,* 114 F.3d 390, 392-93 (2d Cir.1997). Instead, the court must carefully consider a number of factors in ruling upon such a motion. As the Second Circuit stated in *Hodge v. Police Officers,* 802 F.2d 58 (2d Cir.1986), "the district judge should first determine whether the indigent's position seems likely to be of substance." *Id.* at 61. If the claim satisfies that

threshold requirement, the court must then consider the indigent's ability to investigate the crucial facts, whether conflicting evidence implicating the need for cross-examination will be the major proof presented to the fact finder, the indigent's ability to present the case, the complexity of the legal issues and any special reason in that case why appointment of counsel would be more likely to lead to a just determination.

*Id.* at 61-62.

None of these factors are controlling in any particular case. Rather, the court must decide each case on its own facts. *See id .* at 61.

In this case, the Court has found that the complaint that Plaintiff has submitted does not state a claim upon which relief may be granted. Accordingly, until such time as the Court accepts an amended complaint for filing and service on Defendants, the Court is not able to conclude that Plaintiff's claims appear "likely to be of substance." It further appears to the Court that the case does not present issues that are novel or more complex than those raised in most prisoner civil rights actions, and the Court is not aware of any special reasons why appointment of counsel **at this time** would be more likely to lead to a just determination of this litigation. Therefore, the Court denies Plaintiff's motion for appointment of counsel without prejudice.

**E. Motion for appointment of an investigator**

Plaintiff asks that this Court "appoint an investigator to proof his allegations to this Court." *See* Dkt. No. 8 at 3. Generally speaking, the discovery of relevant facts and the marshaling of evidence in support of a civil claim is the responsibility of the parties. Discovery in federal cases is conducted in accordance with the Federal Rules of Civil Procedure and, if necessary, subject to judicial oversight. There is no specific statute that authorizes the appointment of a *pro bono* investigator to assist in this process. Moreover, mindful of the fact that counsel generally engages in the discovery process, to the extent Plaintiff is understood to be making a further request for the appointment of *pro bono* counsel, the Court denies the motion for the reasons set forth in section II(D).

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2010 WL 3491359 (N.D.N.Y.)

(Cite as: 2010 WL 3491359 (N.D.N.Y.))

**F. Motion for appointment of a translator**

**\*5** Plaintiff also requests the appointment of a translator to assist him with "the court proceedings," stating that Spanish is his "primary language." *See* Dkt. No. 12 at 1. Although the Court has granted Plaintiff *in forma pauperis* status, "[t]here is no specific statute which authorizes the court to appoint an interpreter in civil *in forma pauperis* actions." *Mendoza v. Blodgett,* No. C-89-770-JMH, 1990 WL 263527, \*15 (E.D.Wash. Dec. 21, 1990). Thus, "[g]enerally, *pro se* civil litigants have no entitlement to an interpreter or translator." *Fessehazion v. Hudson Group,* No. 08 Civ. 10665, 2009 WL 2596619, \*2 (S.D.N.Y. Aug. 21, 2009) (citations omitted), *reconsideration granted on other grounds,* 2009 WL 2777043 (S.D.N.Y. Aug. 31, 2009).

At this early stage of the proceeding, and based upon a review of the entire record, the Court finds that Plaintiff has sufficient proficiency with the English language to prepare an amended complaint and to pursue his claims in this action in the event that the Court accepts his pleading for filing. *See Velez v. Burge,* No. 08-CV-00806, 2009 WL 3459744, \*2 (W.D.N.Y. Oct. 20, 2009) (denying *pro se* plaintiff's request for appointment of an interpreter because the record showed that the plaintiff had sufficient proficiency with the English language to prosecute the claims asserted in the complaint). In this case, although English may not be Plaintiff's primary language, there is no indication that Plaintiff is unable to prepare court papers and to communicate with the Court.[FN7] Accordingly, the Court denies Plaintiff's motion for an interpreter without prejudice.

FN7. The Court notes that Plaintiff participated in several proceedings in his criminal case without the assistance of an interpreter. *See United States v. Cisneros-Garcia,* 8:09-CV-0385; Text Minute Entry of Proceedings held January 14, 2010; Text Minute Entry of Proceedings held December 11, 2009.

**G. Motion for an order staying deportation**

Plaintiff has filed a motion styled as an "Emergency Motion to Stay of Deportation." *See* Dkt. No. 11. According to Plaintiff, he "was prejudiced and may be deported by action from the Onondga and Cajuga [sic]

County Jail on denying [him] access to the Courts." *See id.* Plaintiff cites 8 U.S.C. § 1231(a)(1) (B)(ii), a provision governing the detention and removal of aliens ordered removed from the United States. However, Plaintiff has not set forth any facts that even suggest that he is subject to a removal order, nor has he demonstrated any basis for the consideration of such a request in this civil rights action against employees of Onondaga County. Accordingly, the Court denies Plaintiff's motion to stay deportation.

**H. Motions for oral argument and for a trial date**

Plaintiff requests that the Court conduct "a hearing on the merits of the complaint" and "grant the plaintiff a trial date." *See* Dkt. Nos. 9, 13. Inasmuch as the Court has found that the complaint that Plaintiff submitted does not state a claim upon which relief may be granted and that this action may proceed only if Plaintiff files an amended complaint that this Court accepts for filing after review in accordance with 28 U.S.C. § 1915(e), the Court denies these motions without prejudice as premature.

**III. CONCLUSION**

**\*6** Accordingly, for the above-stated reasons, the Court hereby

**ORDERS** that Plaintiff's application to proceed *in forma pauperis* is **GRANTED.** The Clerk of the Court shall provide the Sheriff of the facility that Plaintiff has designated as his current location with a copy of Plaintiff's authorization form and notify that official that Plaintiff has filed this action and is required to pay the entire statutory filing fee of $350.00 pursuant to 28 U.S .C. § 1915; and the Court further

**ORDERS** that the Clerk of the Court shall provide a copy of Plaintiff's authorization form to the Financial Deputy of the Clerk's office; and the Court further

**ORDERS** that Plaintiff shall file an amended complaint **within thirty (30) days** of the filing date of this Memorandum-Decision and Order as set forth above if he wishes to avoid the dismissal of this action; and the Court further

**ORDERS** that Plaintiff's motion for appointment of counsel is **DENIED WITHOUT PREJUDICE;** and the

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2010 WL 3491359 (N.D.N.Y.)

(Cite as: 2010 WL 3491359 (N.D.N.Y.))

Court further

**ORDERS** that Plaintiff's motion for appointment of an investigator is **DENIED WITHOUT PREJUDICE;** and the Court further

**ORDERS** that Plaintiff's motion for appointment of a translator is **DENIED WITHOUT PREJUDICE;** and the Court further

**ORDERS** that Plaintiff's motion for a stay of deportation is **DENIED WITHOUT PREJUDICE;** and the Court further

**ORDERS** that Plaintiff's motions for a trial date and for oral argument are **DENIED WITHOUT PREJUDICE;** and the Court further

**ORDERS** that, upon the filing of an amended complaint, the Clerk of the Court shall return the file to the Court for its review; and the Court further

**ORDERS** that, if Plaintiff does not timely submit an amended complaint to the Court for review, the Clerk of the Court shall enter judgment dismissing this action without prejudice without further order of this Court; and the Court further

**ORDERS** that the Clerk of the Court shall serve a copy of this Memorandum-Decision and Order on Plaintiff in accordance with the Local Rules.

**IT IS SO ORDERED.**

N.D.N.Y.,2010.

Cisnevas-Garcia v. Shipman
Slip Copy, 2010 WL 3491359 (N.D.N.Y.)
END OF DOCUMENT

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2006 WL 88659 (N.D.N.Y.)

(Cite as: 2006 WL 88659 (N.D.N.Y.))

Only the Westlaw citation is currently available.
United States District Court,

N.D. New York.
Tonya R. DAKARI, Plaintiff,
v.
Cutler DAWSON, Navy Federal Credit Union,
Defendants.
No. 5:05-CV-1494(NAM).

Jan. 11, 2006.
Tonya R. Dakari, Plaintiff, pro se.

DECISION and ORDER

MORDUE, J.
**\*1** Presently before the Court is a complaint filed by *pro se* plaintiff Tonya R. Dakari.[FN1] This action, which was originally filed in the United State District Court for the Eastern District of Virginia, was transferred to this District by Order of District Judge Claude M. Hilton. Dkt. No. 3. Plaintiff has not paid any fee relating to this action, and seeks leave to proceed *in forma pauperis*. Dkt. No. 2.

FN1. The four page pleading is not signed.

In her complaint, plaintiff asserts claims arising out the ownership of an automobile which plaintiff appears to have financed through defendant Navy Federal Credit Union (the "Credit Union").[FN2] Plaintiff claims that the Credit Union has improperly refused to release the certificate of title for the vehicle. Dkt. No. 1 at 1-3.

FN2. According to the complaint, the business of the Credit Union is conducted in Virginia. Dkt. No. 1 at 1. Defendant Dawson is identified as the president of the Credit Union. *Id.*

By way of background, plaintiff was the debtor in a Chapter 13 bankruptcy proceeding in the Northern District. *See Dakari v. Navy Federal Credit Union,* 5:04-CV-0452 (NAM) (Appeal from Bankruptcy Court). On September 29, 2003, plaintiff commenced an adversary proceeding against the Credit Union claiming that the certificate of title to the vehicle is in her son's name, and the Credit Union therefore did not have a

perfected security interest in the vehicle. *See id.* at Dkt. No. 16 at 1-2 (Memorandum Decision and Order of District Judge Norman A. Mordue filed May 9, 2005). Plaintiff's Chapter 13 proceeding was dismissed by Bankruptcy Court on March 11, 2004 due to plaintiff's failure to comply with prior orders in that proceeding and, shortly thereafter, Bankruptcy Court dismissed the adversary proceeding. *See id.,* Dkt. No. 16 at 2-3.

Plaintiff appealed the dismissal of the adversary proceeding to this Court. By Memorandum-Decision and Order filed May 9, 2005, Bankruptcy Court's dismissal of the adversary proceeding was affirmed. *See id.,* Dkt. No. 16 at 4. Plaintiff's appeal of that decision was dismissed by the United States Court of Appeals for the Second Circuit. *See id.,* Dkt. No. 21.

While the Bankruptcy Appeal was pending, plaintiff commenced another action in this Court by which she claimed that the Credit Union had engaged in debt collection practices in violation of the Fair Debt Collection Practices Act, 15 U.S.C. §§ 1692 *et seq. Dakari v. Navy Federal Credit Union,* 3:04-CV-0984 (TJM/DEP). By Order of Senior District Judge Thomas J. McAvoy filed October 14, 2004, the action was dismissed for failure to state a claim because the Credit Union was not a "debt collector" as defined in the statute. *Id.,* Dkt. No. 3.

This action followed. As noted, plaintiff filed the complaint in the Eastern District of Virginia, where the Credit Union is located, and where the security agreement appears to have been made. Dkt. No. 1. Plaintiff alleges that while she signed the security agreement, the Credit Union did not obtain a perfected security interest in the vehicle because the certificate of title was issued in her son's name. Dkt. No. 1 at 2.[FN3]

FN3. Although plaintiff denies any relationship between this case and her bankruptcy appeal (Dkt. No. 1 at 2), Judge Hilton concluded otherwise. Dkt. No. 3 at 1 and n. 1.

In this case, where plaintiff seeks to proceed *in forma pauperis,* the Court must determine whether plaintiff has demonstrated sufficient economic need and must also

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2006 WL 88659 (N.D.N.Y.)

(Cite as: 2006 WL 88659 (N.D.N.Y.))

consider the sufficiency of the complaint in light of 28 U.S.C. § 1915(e).[FN4] Section 1915(e) directs that when a plaintiff seeks to proceed *in forma pauperis,* the Court:

> FN4. Plaintiff's unsigned *in forma pauperis* application states that she earns $3,500 a month. Dkt. No. 3. Plaintiff does not identify any indebtedness, but states that she is responsible for the support of her grandsons. *Id.*

**\*2** (2) [S]hall dismiss the case at any time if the Court determines that -

\* \* \*

(B) the action ... (i) is frivolous or malicious; (ii) fails to state a claim on which relief may be granted; or (iii) seeks monetary relief against a defendant who is immune from such relief.

28 U.S.C. § 1915(e)(2)(B). Thus, even if a plaintiff meets the financial criteria to commence an action *in forma pauperis,* it is the Court's responsibility to determine that a complaint may properly be maintained in the District before it may permit the plaintiff to proceed with his or her action *in forma pauperis. Id.*

The subject matter jurisdiction of the federal district courts is limited and is set forth generally in 28 U.S.C. §§ 1331 and 1332. Under these statutes, federal jurisdiction is available only when a federal question is presented or when the parties are of diverse citizenship and the amount in question exceeds $75,000. It is well established that the Court may raise the question of jurisdiction *sua sponte,* and that where jurisdiction is lacking, "dismissal is mandatory." *United Food & Commercial Workers Union, Local 919, AFL-CIO v. Centermark Properties Meriden Square, Inc.,* 30 F.3d 298, 301 (2d Cir.1994); *see also* Fed.R.Civ.P. 12(h)(3).

Plaintiff's complaint seeks to invoke the Court's diversity jurisdiction. Dkt. No. 1 at 1. Diversity jurisdiction exists only if there is diversity of citizenship between the parties *and* the matter in controversy exceeds the sum or value of $75,000. *See* 28 U.S.C. § 1332(a). "The Supreme Court has held that the party asserting

diversity jurisdiction in federal court has the burden of establishing the existence of the jurisdictional amount in controversy." *Lupo v. Human Affairs International, Inc.,* 28 F.3d 269, 273 (2d Cir.1994).

As noted, plaintiff identifies the Credit Union as an entity having its principal place of business in Virginia and it therefore appears that the parties are citizens of different states. However, the unsigned complaint is devoid of any facts which would establish that the amount in controversy exceeds the sum or value of $75,000. Accordingly, the court finds that it does not have diversity jurisdiction over this action.

In light of plaintiff's *pro se* status, the Court has also considered whether the complaint states a claim for relief pursuant to the Court's federal question jurisdiction which may be brought in this court, and concludes that it does not.

As noted, plaintiff's bankruptcy proceeding has been closed since November 10, 2005, when the Second Circuit issued its mandate dismissing plaintiff's appeal. Dkt. No. 21. The fact that the bankruptcy action was pending in this district does not confer jurisdiction over the claims asserted in this complaint. The Court further notes that while the complaint contains conclusory allegations that the defendants' alleged refusal to release the certificate of title violates her constitutional rights (see Dkt. No. 1 at 1, 3-4), those assertions are not sufficient to state a claim upon which relief may be granted by this Court. The validity of the Credit Union's security interest is, as plaintiff herself recognizes, a matter of state not federal law.

**\*3** In light of the foregoing, this Court finds that it lacks subject matter jurisdiction of plaintiff's claims. This action is hereby dismissed pursuant to 28 U.S.C. § 1915(e)(2)(B).

WHEREFORE, it is hereby

ORDERED, that the complaint is dismissed pursuant to 28 U.S.C. § 1915(e), and it is further

ORDERED, that in light of the dismissal of this

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2006 WL 88659 (N.D.N.Y.)

(Cite as: 2006 WL 88659 (N.D.N.Y.))

action, plaintiff's *in forma pauperis* application (Dkt. No. 2) is denied as moot, and it is further

ORDERED, that the Clerk of the Court serve a copy of this Order on plaintiff by regular mail.

IT IS SO ORDERED.

N.D.N.Y.,2006.

Dakari v. Dawson
Not Reported in F.Supp.2d, 2006 WL 88659 (N.D.N.Y.)
END OF DOCUMENT

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.



Not Reported in F.Supp., 1997 WL 599355 (N.D.N.Y.)

(Cite as: 1997 WL 599355 (N.D.N.Y.))

**H**

Only the Westlaw citation is currently available.
United States District Court, N.D. New York.

Kenneth BROWN, Plaintiff,
v.
Andrew PETERS, Warden, Watertown Correctional
Facility; Joseph Williams, Warden, Lincoln
Work-Release Center; Francis J. Herman, Senior Parole
Officer Interstate Bureau; T. Stanford, Senior Parole
Officer; Deborah Stewart, Parole Officer; John Doe # 1,
Parole Agent, Watertown Correctional Facility; John
Doe # 2, Parole Agent, Lincoln Work Release Center;
Susan Bishop, Director of Interstate Compact, South
Carolina; Cecil Magee, Parole Officer, South Carolina;
Frank Barton, Parole Officer, South Carolina; John
McMahan, Parole Officer, South Carolina, Defendants.
No. Civ.A. 95CV1641RSPDS.

Sept. 22, 1997.
Kenneth Brown, State Court Institute-Greene,
Waynesburg, PA, plaintiff, pro se.

Dennis C. Vacco, New York State Attorney General, The
Capitol Albany, NY, for defendants Peters, Herman
Stewart, Doe # 1, Doe # 2, and Williams, Jeffrey M.
Dvorin, Assistant Attorney General, Carl N. Lundberg,
Chief Legal Counsel, South Carolina Department of
Probation, Columbia, SC, for defendants Bishop, Magee,
Barton, McMahan, and Stanford, Carl N. Lundberg, of
Counsel.

DECISION AND ORDER

POOLER, J.

**\*1** The above matter comes to me following a
Report-Recommendation by Magistrate Judge Daniel
Scanlon, Jr., duly filed on April 17, 1997. Following ten
days from the service thereof, the Clerk has sent me the
entire file, including any and all objections filed by the
parties herein.

Plaintiff Kenneth Brown commenced this Section

1983 civil rights action on November 17, 1995. On
February 12, 1996, Magistrate Judge Scanlon ordered
Brown to submit an amended complaint alleging the
specific acts committed by the individuals named as
defendants which Brown claimed violated his
constitutional rights. Brown filed an amended complaint
on March 21, 1996. In his amended complaint, Brown
alleged that defendants violated his rights under the Eighth
and Fourteenth Amendments by failing to process properly
his interstate compact paperwork, resulting in Brown
being imprisoned pursuant to a parole hold when in fact he
had never violated the conditions of his parole. For a more
complete statement of Brown's claims, see his amended
complaint. Dkt. No. 5.

On August 5, 1996, defendants Peters and Williams
made a motion to dismiss for failure to state a claim
pursuant to Fed.R.Civ.P. 12(b)(6). Dkt. No. 13; Dkt. No.
14, at 2. On August 19, 1996, defendants Bishop, Magee,
Barton, and McMahan made a motion to dismiss the
complaint against them or, in the alternative, for summary
judgment. Dkt. No. 20. On October 17, 1996, defendants
Herman, Stewart, and Stanford made a motion to dismiss
for failure to state a claim. Dkt. No 34. On April 17, 1996,
Magistrate Judge Scanlon recommended that all
defendants' motions to dismiss be granted and that the
complaint be dismissed. Dkt. No. 50.

On June 9, 1997, Brown filed objections to the
magistrate judge's report-recommendation, having been
granted additional time in which to do so. Dkt. No. 52. In
addition, Brown filed on June 9, 1997, a motion for leave
to file a second amended complaint and a copy of his
proposed amended complaint. Dkt. No. 53. I turn first to
the last motion filed, Brown's motion for leave to amend
his complaint a second time.

Brown seeks to file a second amended complaint
"setting forth in detail the personal involvement of each
defendant and how their acts of commission and omission
served to deprive plaintiff of Constitutionally secured
rights." Dkt. No. 53. The district court has discretion
whether to grant leave to amend. Ruffolo v. Oppenheimer

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp., 1997 WL 599355 (N.D.N.Y.)

(Cite as: 1997 WL 599355 (N.D.N.Y.))

& Co., 987 F.2d 129, 131 (2d Cir.1993). In exercising that discretion, the court should freely grant leave to amend when justice so requires. Fed.R.Civ.P. 15(a). However, the court need not grant leave to amend where it appears that amendment would prove to be unproductive or futile. Ruffolo, 987 F.2d at 131.

Here, Brown moved to amend his complaint to add additional allegations against the named defendants. However, the additional allegations fail to cure the deficiency which forms the basis of defendants' motion to dismiss-the absence of defendants' personal involvement in a constitutional deprivation. Section 1983 imposes liability upon an individual only when personal involvement of that individual subjects a person to deprivation of a federal right. See Monell v. Dep't of Soc. Servs., 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978). A complaint is fatally defective if it fails to allege personal involvement sufficient to establish that a supervisor was "directly and personally responsible for the purported unlawful conduct." Alfaro Motors, Inc. v. Ward, 814 F.2d 883, 886 (2d Cir.1987).

*2 Brown's proposed amended complaint alleges in conclusory fashion that defendants acted "in a grossly negligent and concerted manner which breached their duties owed to Plaintiff and is the proximate cause of [the violation of plaintiff's constitutional rights]." Proposed Am. Compl., at 3. Brown continues in the same vein, stating that defendants owed duties to plaintiff to carry out their jobs in a professional manner and they failed to carry out those duties appropriately. The complaint states that defendants held specific responsibilities, such as checking for outstanding warrants, which if performed properly should have alerted them to a problem. However, nowhere does the complaint set forth allegations that these defendants either participated directly in any constitutional infraction or that they were even aware of such an infraction. The proposed amended complaint merely alleges that these defendants failed in performing their supervisory and ministerial functions. "These bare assertions do not state a claim under 42 U.S.C. § 1983." Smiley v. Davis, 1988 WL 78306, *2 (S.D.N.Y.).

This plaintiff previously has had the opportunity to amend his complaint for the same reason asserted here, to

allege personal involvement on the part of defendants. Brown's first amended complaint failed to accomplish that task, and it appears that even if allowed to amend again Brown would be unable to make the requisite allegations with sufficient specificity to sustain his complaint. Consequently, I find that amendment would be futile, and I deny Brown's motion for leave to amend his complaint.

I turn now to the magistrate judge's report-recommendation and defendants' motions. The magistrate judge recommends that I grant defendants' motions and dismiss the complaint as to all defendants. The report-recommendation clearly describes the grounds on which the magistrate judge recommends dismissal as to each defendant. Fed.R.Civ.P. 72(b) requires the district judge to make a de novo determination on "any portion of the magistrate's disposition to which specific, written objection has been made." Brown's objections fail to address directly any of the analysis. Brown's objections state (1) that he has been deprived of his constitutional rights; (2) that he has stated a cause of action; (3) that the court wrongly refused to appoint an attorney for him and wrongly stayed discovery pending the outcome of these motions; (4) that he seeks to file an amended complaint; (5) the standard of review for a Fed.R.Civ.P. 12(b)(6) motion; (6) that he disagrees with the magistrate judge's recommendation to grant defendants' motions because the allegations in his complaint, which he repeats, show that his rights were violated; and (7) the text of the Fourteenth and Eighth Amendments.

Even affording the objections the liberal reading required for pro se pleadings, I find that these objections fail to state any basis whatsoever, much less a specific one, for the court not to adopt the magistrate judge's rulings. They simply re-state the relief sought and the facts on which Brown grounds his complaint and conclude that the magistrate judge's conclusions are wrong. When the parties make only frivolous, conclusive, or general objections, the court reviews the report-recommendation for clear error. See Camardo v. General Motors Hourly-Rate Employees Pension Plan, 806 F.Supp. 380, 382 (W.D.N.Y.1992) (court need not consider objections which are frivolous, conclusive, or general and constitute a rehashing of the same arguments and positions taken in original pleadings); Chambrier v. Leonardo, 1991 WL

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp., 1997 WL 599355 (N.D.N.Y.)

(Cite as: 1997 WL 599355 (N.D.N.Y.))

44838, *1 (S.D.N.Y.) (restatement of allegations already before the court and assertion that valid constitutional claim exists insufficient to form specific objections); *Schoolfield v. Dep't of Correction,* 1994 WL 119740, *2 (S.D.N.Y.) (objections stating that magistrate judge's decisions are wrong and unjust, and restating relief sought and facts upon which complaint grounded, are conclusory and do not form specific basis for not adopting report-recommendation); *Vargas v. Keane,* 1994 WL 693885, *1 (S.D.N.Y.) (general objection that report does not address violation of petitioner's constitutional rights is a general plea that report not be adopted and cannot be treated as objection within the meaning of 28 U.S.C. § 636), aff'd, 86 F.3d 1273 (2d Cir.), cert. denied, 519 U.S. 895, 117 S.Ct. 240, 136 L.Ed.2d 169 (U.S.1996). See also *Scipio v. Keane,* 1997 WL 375601, *1 (1997) (when objections fail to address analysis directly, court reviews report-recommendation for clear error); Fed.R.Civ.P. 72(b), Advisory Comm. Note (when no specific, written objections filed, "court need only satisfy itself that there is no clear error on the face of the record in order to accept the recommendation").

**\*3** Because Brown fails to make specific objections or provide any basis for his general objections, I review the report-recommendation for clear error. After careful review, I conclude that the magistrate judge's report-recommendation is well-reasoned and is not clearly erroneous.[FN1] The magistrate judge employed the proper standard, accurately recited the facts, and reasonably applied the law to those facts. Consequently, I adopt the report-recommendation.

> FN1. I note, however, that the report-recommendation would survive even *de novo* review.

### CONCLUSION

Because plaintiff's proposed amendment demonstrates that amendment would be futile, I deny plaintiff's motion for leave to amend his complaint. I approve the magistrate judge's recommendation and grant defendants' motions to dismiss. Plaintiff's complaint is dismissed in its entirety.

IT IS SO ORDERED.

### ORDER and REPORT-RECOMMENDATION

This matter was referred to the undersigned for report and recommendation by the Hon. Rosemary S. Pooler, United States District Judge, by Standing Order dated November 12, 1986. Currently before this Court are a number of motions. Defendants Peters and Williams have filed a motion to dismiss (dkt.13); defendants Bishop, Magee, Barton and McMahan have filed a motion for summary judgment, or in the alternative to dismiss (dkt.20); and defendants Herman, Stewart and Stanford also have filed a motion to dismiss (dkt.34). Plaintiff opposes these three motions (dkts.27, 29, 33, 38). Defendants Bishop, Magee and McMahan have filed a motion to stay discovery (dkt.41) and plaintiff has filed a motion to extend time (dkt.44) in which to file opposition to the latter motion for a stay of discovery.

The Court addresses these issues *seriatim*.

### BACKGROUND

Plaintiff's amended complaint, which he has brought pursuant to 42 U.S.C. § 1983, alleges the following facts. In October, 1991, plaintiff was incarcerated in the Watertown Correctional Facility in Watertown, New York. He applied for an interstate compact because he wanted to return to South Carolina to live with his common law wife, Pamela Reid. During the application process, he was interviewed by the facility's parole officer, identified only as defendant John Doe # 1. After signing the necessary papers, his application was forwarded to defendant Andrew Peters, the facility's superintendent, who reviewed, signed and forwarded the papers to the Interstate Bureau. Amend. Compl. at ¶¶ 1-2; Exs. A, B.

On or about January 15, 1992, while his compact was waiting for review at the Interstate Bureau, plaintiff was approved for work release and sent to the Lincoln Work Release Center in New York City. While at the center, plaintiff spoke to a parole officer, defendant John Doe # 2, and told him that he was seeking a compact that would return him to South Carolina upon his conditional release. Plaintiff claims the parole officer told him that he would handle the necessary paperwork, although the officer had had no experience with an interstate compact. Amend. Compl. at ¶¶ 3, 4.

**\*4** Plaintiff, meanwhile, asked Reid whether any

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp., 1997 WL 599355 (N.D.N.Y.)

(Cite as: 1997 WL 599355 (N.D.N.Y.))

officials had contacted her in South Carolina regarding his prospective residence in that state. Upon discovering no one had contacted her, plaintiff asked a lawyer he knew, Navron Ponds, to inquire as to his compact status. In March, 1992, the lawyer spoke with defendant Susan Bishop, who is the director of the interstate compact program in South Carolina. Bishop allegedly told Ponds that plaintiff "was disapproved because there was a discrepancy about approving plaintiff['s] compact." The "discrepancy" was the fact that plaintiff owed the state of South Carolina eighty-six days of confinement from a previous sentence. Plaintiff claims Bishop told Ponds to contact defendants Cecil Magee and Frank Barton, who worked for the South Carolina Parole Department. Sometime in March, 1992, Ponds made some calls to Barton and Magee. A verbal agreement was reached, and plaintiff, upon speaking with Barton and Magee was told that his compact had been approved. He also was told that he should report to the South Carolina Department of Parole upon being released. Amend. Compl. at ¶¶ 5-7.

Prior to leaving the Lincoln Work Release Center, plaintiff processed paperwork related to his interstate compact. His paperwork was sent by Doe # 2 to defendant Joseph Williams, the superintendent of the center. Williams reviewed, signed and returned the paperwork to plaintiff. On May 1, 1992, upon his release from the center, plaintiff traveled to South Carolina. Three days later, he entered a South Carolina parole office and promptly was arrested because of the eighty-six days of confinement that he owed the state. Plaintiff's paperwork was given to defendant John McMahan, a parole officer. Plaintiff claims that McMahan never returned this paperwork to him. On May 20, 1992, the state of South Carolina revoked plaintiff's parole and plaintiff was returned to prison to serve the eighty-six days that he owed. When he asked McMahan what would happen to his one year of parole from New York, the officer allegedly told him that his New York parole would run concurrently with his South Carolina parole, and that when he finished his South Carolina parole, he would not owe any parole whatsoever. Plaintiff served the eighty-six days he owed and was released on July 31, 1992. Amend. Compl. at ¶¶ 8-10.

In February, 1993, plaintiff was arrested on robbery

charges in South Carolina. The charges ultimately were dropped, but he apparently encountered some difficulties regarding this arrest as a result of a parole hold that New York state had placed upon him. Bishop's office told him that it had nothing to do with his parole hold and that any problem that he had was between him and the state of New York. He talked to authorities in Albany, New York regarding the parole hold, but was not successful in his efforts to have the hold removed. On September 30, 1993, after had been extradited to New York as a fugitive from justice, plaintiff was given a preliminary hearing at Riker's Island, New York. The hearing officer found no probable cause that plaintiff had violated any condition of parole. He was released. Amend. Compl. at ¶¶ 11-14; Exs. C-J.

*5 Plaintiff claims that he would not have suffered hardships if his interstate compact had been handled correctly. He alleges that defendant Deborah Stewart failed to follow up and see whether plaintiff had arrived in South Carolina. If she had, he argues, she would have discovered that he had been arrested upon his arrival. He alleges that defendant Francis Herman, a parole officer at the Interstate Bureau failed to do his job by not investigating plaintiff's violation reports. Amend. Compl. at ¶¶ 15-17; Exs. F-I.

Plaintiff asserts that the foregoing amounts violations of his Eighth and Fourteenth Amendment rights, wherefore he both compensatory and declaratory relief.

### DISCUSSION

A. Motion to Dismiss by Williams and Peters.

Williams and Peters have filed a motion to dismiss plaintiff's complaint pursuant to FED.R.CIV.P. 12(b)(6) on the grounds that it fails to state a claim upon which relief may be granted. In a Rule 12(b)(6) motion, all factual allegations in the complaint must be taken and construed in plaintiff's favor. See LaBounty v. Adler, 933 F.2d 121, 122 (2d Cir.1991) (citing Ortiz v. Cornette, 867 F.2d 146, 149 (1989)). The Court's role is not to assess whether plaintiffs have raised questions of fact or demonstrated an entitlement to a judgment as a matter of law, as in a motion made pursuant to FED.R.CIV.P. 56 for summary judgment, but rather to determine whether plaintiff's complaint sufficiently alleges all of the

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp., 1997 WL 599355 (N.D.N.Y.)

(Cite as: 1997 WL 599355 (N.D.N.Y.))

necessary legal elements to state a claim under the law. *See Christopher v. Laidlaw Transit, Inc.* 899 F.Supp. 1224, 1226 (S.D.N.Y.1995), (citing *Ricciuti v. New York City Transit Authority,* 941 F.2d 119, 124 (2d Cir.1991)). Factual allegations in brief or memoranda may not be considered. *Fonte v. Board of Managers of Continental Towers Condominium,* 848 F.2d 24, 25 (2d Cir.1988). The Court now turns to the issues presented.

Personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983. *Wright v. Smith,* 21 F.3d 496, 501 (2d Cir.1994). As superintendents at New York State Correctional facilities, Williams and Peter may be found personally involved in the alleged deprivation of plaintiff's constitutionally protected rights by a showing that they: (1) directly participated in the infraction; (2) knew of the infraction, but failed to remedy the wrong; (3) created or continued a policy or custom under which unconstitutional practices occurred; or (4) were grossly negligent in managing subordinates who caused unlawful conditions or events. *Id.,* (quoting *Williams v. Smith,* 781 F.2d 319, 323-24 (2d Cir.1986)). Supervisory liability also may be imposed against Williams or Peters with a showing of gross negligence or deliberate indifference to plaintiff's constitutional rights. *Id.* Absent some personal involvement by Williams or Peters in the allegedly constitutionally infirm conduct of their subordinates, neither can be held liable under § 1983. *Gill v. Mooney,* 824 F.2d 192, 196 (2d Cir.1987).

**\*6** Plaintiff has not provided any evidence linking either Williams or Peters to his alleged constitutional deprivations. All that plaintiff has alleged is that Williams and Peters, as superintendents, have reviewed and signed paperwork relating to plaintiff's compact. Though it has long been held that *pro se* complaints are held to "less stringent standards than formal pleadings drafted by lawyers" for the purpose of a motion to dismiss under Rule 12(b)(6), *Haines v. Kerner,* 404 U.S. 519, 520, 92 S.Ct. 594, 595-96, 30 L.Ed.2d 652 (1972), plaintiff has not explained how the ministerial conduct of these two defendants was violative of the Constitution. Their motion to dismiss should be granted.

B. Motion for Summary Judgment or to Dismiss by Bishop, Magee, Barton and McMahan.

Bishop, Magee, Barton and McMahan have filed a motion for summary judgment, or in the alternative a motion to dismiss. The Court will treat their motion as a motion to dismiss. "[C]omplaints relying on the civil rights statutes are insufficient unless they contain some specific allegations of fact indicating a deprivation of rights, instead of a litany of general conclusions that shock but have no meaning." *Barr v. Adams,* 810 F.2d 358, 363 (2d Cir.1987). Plaintiff has not alleged specifically how the conduct of these four defendants infringed upon his constitutional rights. In his amended complaint, he contends that defendants violated the Constitution by "continuously breaching [[[their]] duty" to him. This language underscores the defect with the complaint: if it alleges anything at all, it alleges that defendants were negligent in handling plaintiff's interstate compact and parole. To state a cognizable § 1983 claim, the prisoner must allege actions or omissions sufficient to demonstrate deliberate indifference; mere negligence will not suffice. *Hayes v. New York City Dept. of Corrections,* 84 F.3d 614, 620 (2d Cir.1996); *Morales v. New York State Dep't of Corrections,* 842 F.2d 27, 30 (2d Cir.1988) (section 1983 does not encompass a cause of action sounding in negligence).

The Court finds that the claims against Bishop, Magee, Barton and McMahan should be dismissed.

C. Motion to Dismiss by Herman, Stewart and Stanford.

Plaintiff's claim against Stewart is that she failed to follow up and see whether plaintiff had arrived in South Carolina. Herman, he likewise asserts, failed to do his job because he did not investigate plaintiff's violation reports. Plaintiff has not alleged how these actions run afoul of the Constitution; and again, these claims seem to be grounded in negligence, which is not actionable under § 1983. *Hayes,* 84 F.3d at 620.

Plaintiff's claim against Stanford must fail because his complaint literally fails to state a claim against that defendant. Aside from naming Stanford as a defendant, and alleging that he was the appointed Senior Parole Officer at plaintiff's September 30, 1993 revocation hearing at Riker's Island, plaintiff does not detail how Stanford violated his constitutional rights. Absent some personal involvement by Stanford in the allegedly

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp., 1997 WL 599355 (N.D.N.Y.)

(Cite as: 1997 WL 599355 (N.D.N.Y.))

constitutionally infirm conduct of his subordinates, he cannot be held liable under § 1983. *Gill,* 824 F.2d at 196.

**\*7** Accordingly, the Court finds that Stanford, Stewart and Herman's motion to dismiss should be granted.

D. Plaintiff's "John Doe" Claims.

In so far as neither John Doe # 1 nor John Doe # 2 have been identified and served in this matter, the Court does not have jurisdiction over these parties and does not reach the merits of plaintiff's claims against them.
E. Discovery Motions.

Defendants Bishop, Magee and McMahan have filed a motion to stay discovery until the Court has made a ruling on their motion to dismiss. Plaintiff has filed a motion to extend the time in which he may file opposition to defendants' motion. Plaintiff, however, has filed his opposing response (dkt.47), therefore his instant discovery motion is denied as moot. In that the Court recommends granting defendants' motion to dismiss, discovery in this matter would be fruitless. Accordingly, defendants' motion for a stay of discovery pending the resolution of their motion to dismiss is granted.

## CONCLUSION

WHEREFORE, based upon the foregoing analysis, it is hereby
ORDERED, that plaintiff's motion to extend the time to file an opposing reply (dkt.44) is denied as moot; and it is further

ORDERED, that defendants Bishop, Magee and McMahan's motion to stay discovery until their motion to dismiss is decided (dkt.41) is granted; and it is further

RECOMMENDED, that defendants Peters and Williams' motion to dismiss (dkt.13) be granted; and it is further

RECOMMENDED, that defendants Bishop, Magee, Barton and McMahan's motion to dismiss (dkt.20) be granted; and it is further

RECOMMENDED, that defendants Herman, Stewart

and Stanford's motion to dismiss (dkt.34) be granted.

Pursuant to 28 U.S.C. § 636(b)(1) and Local Rule 72.1(c), the parties have ten (10) days within which to file written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. ***FAILURE TO OBJECT TO THIS REPORT WITHIN TEN (10) DAYS WILL PRECLUDE APPELLATE REVIEW.*** *Roldan v. Racette,* 984 F.2d 85, 89 (2d Cir.1993) (citing *Small v. Secretary of Health and Human Services,* 892 F.2d 15 (2d Cir.1989)); 28 U.S.C. § 636(b)(1); FED.R.CIV.P. 6(a), 6(e) and 72.

N.D.N.Y.,1997.

Brown v. Peters
Not Reported in F.Supp., 1997 WL 599355 (N.D.N.Y.)
END OF DOCUMENT

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.



Not Reported in F.Supp.2d, 2008 WL 1767067 (N.D.N.Y.)

(Cite as: 2008 WL 1767067 (N.D.N.Y.))

**H**

Only the Westlaw citation is currently available.
United States District Court,

N.D. New York.
Chukwuma E. AZUBUKO, Plaintiff,
v.
UNKNOWN BOSTON POLICE OFFICERS, et al.,
Defendants.
Chukwuma E. Azubuko, Plaintiff,
v.
Judge Sue Robinson, et al., Defendants.
Chukwuma E. Azubuko, Plaintiff,
v.
Judges of the United States District Court, District of
Massachusetts, Defendants.
Chukwuma E. Azubuko, Plaintiff,
v.
Richard W. Story, Defendant.
Nos. 5:08-CV-69 (NPM)(GJD), 5:08-CV-75
(NPM)(GJD), 5:08-CV-330 (NPM)(GJD), 5:08-CV-331
(NPM)(GJD).

April 16, 2008.
Chukwuma E. Azubuko, pro se.

### BAR ORDER

[NEAL P. McCURN](), Senior District Judge.
*\*1* On February 14, 2008, this court gave plaintiff
until March 15, 2008 to show cause **in writing** why he
should not be enjoined from any further filings in the
Northern District of New York without leave of court. *See
Azubuko v. Unknown Boston Police Officers,* 5:08-CV-69
and *Azubuko v. Robinson,* 5:08-CV-75 (Dkt. No. 4) (both
cases). Plaintiff filed a notice of appeal in *Azubuko v.
Unknown Boston Police Officers.* (08-CV-69) (Dkt. No.
6). Plaintiff then filed the above-captioned actions, which
this court in a separate order has dismissed after a finding
that they are **both frivolous and malicious.**

Notwithstanding this court's February 14, 2008 order
to show cause, plaintiff has failed to submit any

justification for why he should not be enjoined from
further filing in the Northern District of New York. The
court would point out that plaintiff's appeal in 08-CV-69
would not excuse him from complying with this court's
order. *See [Maness v. Meyers,]() 419 U.S. 449, 458 (1975)* (If
a person to whom a court directs an order believes that the
order is erroneous, the remedy is to appeal, but absent a
stay, he must comply promptly with the order pending
appeal.); *[McDonald v. Head Criminal Court Supervisor
Officer,]() 850 F.2d 121, 124 (2d Cir.1988).*

Since plaintiff has not appealed 08-CV-75, he
certainly would not have been excused from submitting
the appropriate document. Plaintiff did not ask for any stay
of this court's order to show cause why he should not be
enjoined from filing in this district, thus, he has failed to
respond. Instead, plaintiff filed the above-captioned
frivolous and malicious cases. Plaintiff, having failed to
respond to the court's February 14, 2008 Order, and
having instead continued his abusive litigation practices,
it is

**ORDERED,** that pursuant to [28 U.S.C. § 1651(a),]()
plaintiff is enjoined from filing any document or pleading
of any kind with this court as a *pro se* plaintiff, except in
pending litigation, unless plaintiff (1) seeks leave of the
court granting plaintiff written permission to file the
document or pleading, and (2) a Judge of this court grants
plaintiff leave to file, and it is

**ORDERED,** that the plaintiff shall include with any
proposed filing that he undertakes as a *pro se* plaintiff,
except in pending litigation, a certification taken under
oath stating (1) the complaint is not frivolous or vexatious,
(2) all claims presented have never been raised and
disposed of on the merits in this or any other court, (3) all
facts alleged in the complaint are believed by plaintiff to
be true, and (4) plaintiff has no knowledge or belief that
any of his claims are foreclosed by controlling law, and it
is

**ORDERED,** that the Clerk of the Court **shall not
accept for filing** any document or pleading of any kind

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 1767067 (N.D.N.Y.)

(Cite as: 2008 WL 1767067 (N.D.N.Y.))

submitted by, or on behalf of, plaintiff in his capacity as a *pro se* plaintiff, except (1) in pending litigation, (2) where a Judge of this court has first directed that the document or pleading be filed, or (3) papers to appeal this order or to notify the court of appellate action, and it is further

**\*2 ORDERED,** that the Clerk serve a copy of this Order on plaintiff by regular mail, and it is further

**ORDERED,** that the Clerk file a copy of this Order in 5:07-CV-1327, 5:08-CV-69, 5:08-CV-75, 5:08-CV-330 and 5:08-CV-331.

N.D.N.Y.,2008.

Azubuko v. Unknown Boston Police Officers
Not Reported in F.Supp.2d, 2008 WL 1767067 (N.D.N.Y.)
END OF DOCUMENT

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.